**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| TRINITY INDUSTRIES LEASING COMPANY | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 3:23-CV-2625-X |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | § § § | |
| *Defendant*. | § § § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Trinity Industries Leasing Company ("Trinity" or "Plaintiff") hereby files this First Amended Complaint against Defendant National Union Fire Insurance Company of Pittsburgh, Pa ("National Union" or "Defendant") and would respectfully show the Court as follows:

**I.     PARTIES**

1.     Plaintiff Trinity Industries Leasing Company is a Delaware Corporation with its principal place of business in Dallas, Texas.

2.     Defendant National Union Fire Insurance Company of Pittsburgh, Pa is a Pennsylvania insurance company with its principal place of business in New York City, New York. National Union has appeared in this case.

## II.      JURISDICTION & VENUE

3.       The foregoing allegations are incorporated herein by reference.

4.       This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because (1) Defendant is not a citizen of any state of which Plaintiff is also a citizen; and (2) the amount in controversy exceeds $75,000, excluding interest and costs.

5.       National Union is an insurer doing business in the Northern District of Texas, where National Union maintains offices and employees and regularly issues policies of insurance to Texas insureds, like Trinity.

6.       Venue is proper in this Court pursuant to (1) 28 U.S.C. § 1391(b)(1) because National Union resides in and is subject to personal jurisdiction in this district; and (2) 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims recited herein occurred in Dallas, Texas.

## III.      FACTUAL BACKGROUND

### A.      <u>National Union Issued A General Liability Policy Insuring Trinity.</u>

7.       The foregoing allegations are incorporated herein by reference.

8.       Trinity is a leading provider of railcar services and products.

9.       National Union is an insurer doing business in the State of Texas.

10.      National Union issued Commercial General Liability Policy No. 703-24-31 ("the Policy"), with limits of $10 million per occurrence, to Occidental Petroleum Corporation ("Occidental") for the period from November 1, 2022 to November 1, 2023 (the "Policy Period").

11.      Trinity is an additional insured under the Policy.

12.      National Union has acknowledged that Trinity is an additional insured under the Policy.

13.     Under the Policy, National Union promises to pay those sums that the insured becomes legally obligated to pay because of "bodily injury" and "property damage" caused by an "occurrence" during the Policy Period.

14.     The Policy provides that National Union has a duty to defend insureds against suits seeking damages because of "bodily injury" and "property damage" caused by an "occurrence" during the Policy Period.

**B.      Trinity Has Been Named As A Defendant In Underlying Lawsuits Seeking Damages Because Of Bodily Injury & Property Damage.**

15.     On February 3, 2023, a Norfolk Southern train derailed in East Palestine, Ohio (the "Derailment"). Since then, multiple lawsuits have been filed against Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively "Norfolk Southern"), including (1) a suit brought by the State of Ohio and the United States of America (the "CERCLA Suit"); (2) a putative class action brought by residents of East Palestine, Ohio (the "Class Action"); (3) a putative class action brought by Pennsylvania area school districts, among other plaintiffs (the "Ambridge Lawsuit"); and (4) a putative class action lawsuit brought by individuals residing or employed in the vicinity of East Palestine, Ohio (the "Almasy Lawsuit") (collectively the "Underlying Lawsuits").

16.     On June 30, 2023, Norfolk Southern filed a Third-Party Complaint against Trinity, among other defendants, including Oxy Vinyls, LP ("Oxy"), in the CERCLA Suit (the "CERCLA TPC").

17.     The CERCLA TPC seeks damages from Trinity because of "bodily injury" and "property damage," including costs, expenses, and damages incurred in responding to the Derailment.

18.     Specifically, Norfolk Southern alleges that in responding to the February 3, 2023 derailment, Norfolk Southern has not only "work[ed] to clean up the released materials" and "restore local waterways," but Norfolk Southern has also paid "millions of dollars in assistance to residents and communities."[1]   In connection with this allegation, Norfolk Southern has alleged that Trinity was "negligent," for which Norfolk Southern seeks to recover its "costs, expenses, and damages,"[2]   Norfolk Southern has also alleged a claim for equitable contribution, seeking to recover "any costs" for which it has paid more than its proportionate share.[3]

19.     On July 25, 2023, Norfolk Southern filed a Third-Party Complaint against Trinity and other defendants, including Oxy, in the Class Action. (the "Class Action TPC").

20.     The Class Action TPC also seeks damages from Trinity because of "bodily injury" and "property damage," including costs, expenses, and damages incurred by Norfolk Southern in responding to the Derailment,[4] which allegedly caused "loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, and economic damages."[5]

21.     On August 14, 2023, Plaintiffs in the Class Action filed their First Amended Master Consolidated Class Action Complaint and Jury Demand (the "Amended Complaint"), which asserts claims directly against Trinity.

22.     In the Amended Complaint, plaintiffs allege and seek damages, among other things, for "real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business

---

[1] *See* Ex. A at 4 (¶ 1) ("Norfolk Southern has taken significant steps to assist the people of East Palestine and the surrounding area, including by providing millions of dollars in financial assistance to residents and communities.").
[2] *Id.* at 41 (¶ 195).
[3] *Id.* at 5, 47 (¶¶ 4, 234).
[4] *See, e.g.*, Ex. B at 37 (¶ 190) ("If Plaintiffs establish that Norfolk Southern is responsible for damages, then such damages were contributed to by Third-Party Defendant Trinity Industries Leasing Company because of Trinity Industries Leasing Company's failure to property [sic] certify the design, building, conversion, testing, modification, and requalification of hazardous material tank cars and their components.").
[5] Ex. C at 2 (¶ 1).

goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness"[6] resulting from the Derailment.

23.    On December 8, 2023, plaintiffs in the Ambridge Lawsuit filed their First Amended Complaint, which asserts claims directly against Trinity.

24.    In the Ambridge Lawsuit, plaintiffs allege and seek damages, among other things, for injury and harm sustained as a result of the Derailment, "including but not limited to medical and health issues for their students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, and expenses of future medical monitoring."[7]

25.    On March 8, 2024, plaintiffs in the Almasy Lawsuit filed their Complaint and Jury Demand, which asserts claims directly against Trinity.

26.    In the Almasy Lawsuit, plaintiffs also seek damages because of "bodily injury" and "property damage," through allegations that "Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an

---

[6] *See id.* at 69-70 (¶ 305).
[7] Ex. D at 41-42 (¶ 156).

increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness."[8]

**C.**    **National Union Has Denied And/Or Refused And Failed To Pay Trinity's Defense Costs In the Underlying Lawsuits.**

27.    On August 16, 2023, Trinity gave notice to National Union and demanded a defense against the CERCLA TPC and the Class Action TPC under the Policy.

28.    On September 12, 2032, Trinity gave notice to National Union and demanded a defense against the Amended Complaint in the Class Action.

29.    On January 15, 2024, Trinity gave notice to National Union and demanded a defense against the Ambridge Lawsuit under the Policy.

30.    On March 12, 2024, Trinity gave notice to National Union and demanded a defense against the Almasy Lawsuit under the Policy.

31.    National Union failed to acknowledge receipt of Trinity's claims relating to the Underlying Lawsuits within fifteen (15) days after receiving notice.

32.    National Union failed to commence any investigation of Trinity's claims relating to the Underlying Lawsuits within fifteen (15) days after receiving notice.

33.    National Union failed to request from Trinity all items, statements, and forms that National Union reasonably believed will be required from Trinity relating to the Underlying Lawsuits within fifteen (15) days after receiving notice.

34.    A representative of AIG Claims, Inc. ("AIG Claims") contacted Trinity on January 10, 2024 and represented that National Union has agreed to defend Trinity in the Class Action.

---

[8] Ex. E at 65 (¶ 305).

35.     Notwithstanding National Union's knowledge of its statutory obligations under Chapter 542 of the Texas Insurance Code, National Union knowingly and intentionally delayed any substantive response to Trinity's claim relating to the Class Action.

36.     Due to National Union's delay, Trinity retained its own defense counsel and has litigated the Class Action for months at Trinity's expense.  National Union has forfeited any right it may otherwise have had to select counsel or otherwise control Trinity's defense against the Class Action.

37.     To date, National Union has not paid any of Trinity's defense costs incurred in defense of the Class Action.

38.     AIG Claims contacted Trinity on January 10, 2024 and represented that National Union has denied Trinity's claim for a defense against the CERCLA Suit.

39.     Notwithstanding National Union's knowledge of its statutory obligations under Chapter 542 of the Texas Insurance Code, National Union knowingly and intentionally delayed any substantive response to Trinity's claim relating to the CERCLA Suit, and National Union has also deliberately continued its failure to defend Trinity in connection with the CERCLA Suit.

40.     As a result, Trinity has retained its own defense counsel and has litigated the CERCLA Suit for months at Trinity's expense, and National Union has forfeited any right it may otherwise have had to select counsel or otherwise control Trinity's defense of the CERCLA Suit.

41.     On March 6, 2024, the Court in the CERCLA Suit entered an order dismissing Norfolk Southern's third-party complaint against Trinity.  However, National Union's refusal and failure to defend Trinity during the pendency of Norfolk Southern's claims in the CERCLA Suit has caused Trinity substantial damages.

42.     National Union has refused and failed to provide any substantive response to Trinity's tender of the Ambridge Lawsuit and the Almasy Lawsuit.

43.     National Union has refused and failed to notify Trinity in writing of the acceptance or rejection of Trinity's claim relating to the Ambridge Lawsuit and the Almasy Lawsuit as required under Section 542.056 of the Texas Insurance Code.

44.     Notwithstanding National Union's knowledge of its statutory obligations under Chapter 542 of the Texas Insurance Code, National Union has knowingly and intentionally continued to delay any substantive response to Trinity's claims relating to the Ambridge Lawsuit and the Almasy Lawsuit, and National Union has also deliberately continued its failure to defend Trinity in connection with the Ambridge Lawsuit and the Almasy Lawsuit.

45.     As a result, Trinity has been compelled to incur substantial defense costs in the Underlying Lawsuits, without the benefit of the insurance coverage owed by National Union under the Policy.  National Union has forfeited any right it may otherwise have had to select counsel or otherwise control Trinity's defense of the Underlying Lawsuits.

## IV.    CAUSES OF ACTION

### A.    Breach of Contract

46.     The foregoing allegations are incorporated herein by reference.

47.     The Policy is a valid, enforceable contract.

48.     Trinity is an additional insured under the Policy.

49.     Trinity has satisfied all conditions under the Policy. Alternatively, National Union has waived conditions precedent to coverage under the Policy.

50.     The terms of the Policy and the allegations in the Underlying Lawsuits unambiguously require National Union to defend Trinity under the Policy as an additional insured and/or to pay Trinity's defense costs, including attorneys' fees, in the Underlying Lawsuits.

51.     Alternatively, the terms of the Policy and/or the allegations in the Underlying Lawsuits are ambiguous and must be construed in favor of coverage.

52.     National Union has breached the Policy by failing to defend Trinity in connection with the Underlying Lawsuits and/or to pay Trinity's defense costs, including attorneys' fees, in the Underlying Lawsuits.

53.     National Union's breach of the Policy has caused Trinity to incur substantial damages.

**B.      Declaratory Judgment**

54.     The foregoing allegations are incorporated herein by reference.

55.     An actual, justiciable controversy exists between Trinity and National Union regarding National Union's ongoing obligation to pay the attorneys' fees and expenses incurred by Trinity's defense counsel in the Underlying Lawsuits.

56.     Pursuant to 28 U.S.C. § 2201, Trinity seeks a declaration that National Union has a continuing obligation to pay Trinity's defense costs in connection with the Underlying Lawsuits.

**C.      Chapter 542 of the Texas Insurance Code**

57.     The foregoing allegations are incorporated herein by reference.

58.     Trinity has made claims under the Policy for a defense against the Underlying Lawsuits and has satisfied all conditions under the Policy.

59.     National Union has engaged in conduct, including repeated delays, constituting violations of Chapter 542 of the Texas Insurance Code by failing to fulfill its duty to defend Trinity

in the Underlying Lawsuits under the Policy and/or to pay Trinity's defense costs, including attorney's fees, in the Underlying Lawsuits.

60.     Trinity is entitled to the damages set forth in Section 542.060 of the Texas Insurance Code, including, in addition to the amount of the unpaid defense costs, interest at the rate of eighteen percent (18%) per annum as well as any and all other relief provided therein.

**D.     Chapter 541 of the Texas Insurance Code**

61.     The foregoing allegations are incorporated herein by reference.

62.     Trinity's Original Complaint (Dkt. 1) provided notice under Texas Insurance Code § 541.151 of its intent to pursue claims against National Union for violations of Sections 541.060 and 541.154 of the Texas Insurance Code.

63.     National Union and Trinity are "persons" as that term is defined by Section 541.002(2) of the Texas Insurance Code.

64.     National Union's conduct as set forth above constitutes violations of Section 541.060(a)(3) of the Texas Insurance Code because National Union failed to promptly provide Trinity with a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law, for National Union's failure and refusal to defend Trinity in connection with the Underlying Lawsuits.

65.     National Union's conduct as set forth above constitutes violations of Section 541.060(a)(4) of the Texas Insurance Code because National Union failed within a reasonable time to (a) affirm or deny coverage of a claim to a policyholder; or (b) submit a reservation of rights to a policyholder, with respect to each of the Underlying Lawsuits.

66.     National Union's conduct as set forth above constitutes violations of Section 541.060(a)(7) of the Texas Insurance Code because National Union failed to pay a claim without

conducting a reasonable investigation with respect to Trinity's claims under the Policy for a defense against the Underlying Lawsuits.

67.     For purposes of Section 541.152 of the Texas Insurance Code, the violations of Section 541.060 set forth above were committed knowingly such that Trinity is entitled to the damages set forth in Section 541.152 of the Texas Insurance Code, including, in addition to the amount of the unpaid defense costs as well as any interest thereon, three times the amount of Trinity's actual damages.

**E.     Attorneys' Fees**

68.     The foregoing allegations are incorporated herein by reference.

69.     Due to the actions of National Union, Trinity has been required to retain the services of the law firm of Haynes and Boone, L.L.P. Trinity has agreed to pay Haynes and Boone a reasonable fee for its services necessarily rendered and to be rendered in this action. Pursuant to Section 38.001 of the Texas Civil Practices & Remedies Code and/or Sections 541.152 and 542.060 of the Texas Insurance Code, Trinity is entitled to an award of its reasonable attorneys' fees against National Union in an amount to be established at trial.

## V.     CONDITIONS PRECEDENT

70.     All conditions precedent to Trinity's claims and right to relief have been satisfied, performed, or waived.

## VI.     JURY DEMAND

71.     Trinity incorporates by reference its request for a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure. Complaint, Dkt. 1 ¶ 57.

## VII.   PRAYER

WHEREFORE, Trinity respectfully requests that this Court grant it the following relief:

(1)     Judgment awarding Trinity all damages caused by National Union's breach of the Policy;

(2)     Judgment declaring National Union's ongoing duty to pay Trinity's defense costs, including attorneys' fees, under the Policy in connection with the Underlying Lawsuits;

(3)     Judgment awarding Trinity all damages sustained as a result of National Union's violations of Chapter 541 of the Texas Insurance Code;

(4)     Judgment awarding Trinity all damages sustained as a result of National Union's violations of Chapter 542 of the Texas Insurance Code;

(5)     Judgment awarding Trinity all reasonable and necessary attorneys' fees incurred in this matter under Chapter 38 of the Texas Civil Practice & Remedies Code and Chapters 541 and 542 of the Texas Insurance Code;

(6)     Judgment awarding Trinity pre-judgment and post-judgment interest in the highest amount allowed by law;

(7)     Judgment awarding Trinity all costs of court; and

(8)     Such other and further relief to which Trinity may be justly entitled.

Respectfully submitted,

/s/ *Micah E. Skidmore* _____
Micah E. Skidmore
State Bar No. 24046856
HAYNES AND BOONE, L.L.P.
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone:      (214) 651-5000
Telecopier:      (214) 651-5940
micah.skidmore@haynesboone.com

ATTORNEY   FOR   PLAINTIFF   TRINITY
INDUSTRIES LEASING COMPANY

## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff hereby certifies that on March 20, 2024, a true and correct copy of the above and foregoing document was served upon all counsel of record in accordance with the Federal Rules of Civil Procedure.

/s/ *Micah E. Skidmore* _____
Micah E. Skidmore

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

THE STATE OF OHIO, ex rel. DAVE YOST, OHIO ATTORNEY GENERAL,

and

THE UNITED STATES OF AMERICA,

         Plaintiffs,

    v.

NORFOLK SOUTHERN RAILWAY COMPANY and NORFOLK SOUTHERN CORPORATION,

         Defendants/Third-Party Plaintiffs,

    v.

OXY VINYLS LP, GATX CORPORATION, GENERAL AMERICAN MARKS COMPANY, TRINITY INDUSTRIES LEASING COMPANY, SMBC RAIL SERVICES LLC, DOW CHEMICAL INCORPORATED, and UNION TANK CAR COMPANY,

         Third-Party Defendants.

Civil Action No. 4:23CV517

         4:23CV675

Hon. John R. Adams

**THIRD-PARTY COMPLAINT WITH JURY DEMAND**

---

### NORFOLK SOUTHERN RAILWAY COMPANY AND NORFOLK SOUTHERN CORPORATION'S THIRD-PARTY COMPLAINT

Pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Norfolk Southern"), by their undersigned counsel, for their Third-Party Complaint against Third-Party Defendants Oxy Vinyls LP, GATX Corporation, General American Marks Company, Trinity Industries Leasing Company, SMBC Rail Services LLC, Dow Chemical Incorporated, and Union Tank Car Company, allege as follows:

## INTRODUCTION

On the night of February 3, 2023, a Norfolk Southern train, Train 32N, derailed in East Palestine, Ohio. Norfolk Southern is a common carrier, which means it is required by federal law to accept and transport innumerable materials, including chemicals that are used to make everyday products. Train 32N was transporting several railcars containing chemicals, including five railcars containing vinyl chloride. Vinyl chloride is used to make polyvinyl chloride, or PVC, one of the most widely produced synthetic plastics, typically found in clothing, pipes, doors, windows, and residential construction. Norfolk Southern did not manufacture, load, or own the vinyl chloride and other chemicals that Train 32N was carrying on February 3, 2023, nor did it manufacture, lease, or own the railcars that contained the vinyl chloride and other chemicals.

In the United States, railroads are obligated as common carriers under 49 U.S.C. § 11101 to transport hazardous materials, including chemicals. This common-carrier obligation recognizes the public good of open access to rail transportation, which is the safest and most fuel-efficient means for the transport of hazardous materials. The responsibility for safe transport is shared among several interested parties, including the manufacturers of the railcars and safety devices, the owners and lessees of the railcars, the manufacturers and shippers of the material being transported, and the railroad. Each interested party along the way is regulated by a multitude of federal laws, regulations, and industry practices: railcars, railcar components, and hazardous materials tank cars are federally certified to meet physical and safety requirements; specialized shipping procedures are required for chemicals; and inspections are conducted of the railcars and their safety features, the shipped materials, the tracks, and devices along the tracks.

Despite this regulatory scheme and the rail industry's focus on safety, incidents can occur. On February 3, 2023, Train 32N included a railcar owned by General American Marks

Company. A bearing on that railcar failed and the car derailed. In turn, several railcars on Train 32N derailed. Norfolk Southern did not manufacture or own the bearing; did not manufacture, own, or lease the derailed railcar; and did not manufacture, own, or load the contents of that railcar. Nonetheless, Norfolk Southern responded to the derailment quickly and comprehensively, including by working to clean up the released materials, restore local waterways, and provide millions of dollars in assistance to residents and communities. Norfolk Southern is committed to being there for East Palestine and the surrounding communities for the long haul.

At the same time, federal environmental laws require that all responsible parties contribute to the cleanup costs. The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 was passed to ensure the cleanup of contaminated sites, including when accidents occur. Congress established a broad strict-liability regime that holds a range of past and current owners and operators of facilities liable to secure the financial resources necessary to address the release of hazardous substances. This regime ensures that all industry participants bear the environmental cost of potentially hazardous goods, which balances the benefits of industrial manufacturing with the protection of public resources. In this instance, the responsible parties include, among others, the owners of the railcars that were carrying chemicals and the shippers of the chemicals released in the derailment.

In the rail industry, a host of regulations and standards govern the design, materials, construction, conversion, and modification of railcars and their components. Shippers of chemicals are required to comply with handling procedures and, under federal hazard communications standards, must provide each transporter of a chemical with safety information. Compliance with these regulations and standards governing railcar equipment, compatibility with the lading, and safe handling are a centerpiece of safe railroad

transportation. To that end, railcar owners and shippers governed by these regulatory

standards are responsible for chemicals released in a derailment.

In bringing this action, Norfolk Southern seeks only what is appropriate under these

laws.

## OVERVIEW OF CLAIMS

1.     Throughout the legal process following the East Palestine train derailment,

Norfolk Southern has committed to making things right in the greater East Palestine area.

This Third-Party Complaint does not change that commitment, but rather seeks to ensure that

others responsible for the safe transport of their railcars and their chemicals contribute

resources to the effort. Norfolk Southern has taken significant steps to assist the people of

East Palestine and the surrounding area, including by providing millions of dollars in

financial assistance to residents and communities. Norfolk Southern is committed to

establishing long-term funds to address concerns about health, water quality, and residential

property values as part of a final resolution of claims. Norfolk Southern also continues to

remediate the derailment site with oversight by the U.S. Environmental Protection Agency,

the Ohio Environmental Protection Agency, and other federal, state, and local regulatory

agencies. Norfolk Southern has undertaken these steps without any financial assistance from

other entities.

2.     Norfolk Southern brings this Third-Party Complaint pursuant to Sections

107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(f), to recover from Third-Party

Defendants their share of response costs that Norfolk Southern has incurred and will incur for

investigation, design, construction, remediation, and other activities in East Palestine, Ohio,

arising from the February 3, 2023, train derailment on the Fort Wayne Line of the Keystone

Division. The response costs resulted from the release of one or more hazardous substances,

as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), from railcars owned
and/or operated by the Third-Party Defendants.

3.    Norfolk Southern seeks a declaratory judgment that it is entitled to
contribution from the Third-Party Defendants for their fair share of the liability attributed to
Norfolk Southern for the release of hazardous substances arising out of the February 3, 2023,
train derailment.

4.    Norfolk Southern also seeks contribution under Ohio law for any costs that
Norfolk Southern has paid in excess of its proportionate share of costs.

5.    Lastly, Norfolk Southern seeks damages under Ohio law for the negligence of
certain Third-Party Defendants that failed to follow federal regulations and industry rules
governing the compliance and certification of hazardous materials tank cars, failed to ensure
that shipping equipment was compatible with the lading, failed to provide accurate hazardous
communication information, and/or failed to properly maintain railcars and equipment. Under
Ohio state law and equitable principles, these Third-Party Defendants are liable to Norfolk
Southern for contribution toward any costs Norfolk Southern has paid in excess of its
proportionate share of costs. *See* O.R.C. §§ 2307.22, 2307.25.

## THE PARTIES

6.    Third-Party Plaintiff Norfolk Southern Railway Company, a Virginia
company, is a subsidiary and principal operating company of Norfolk Southern Corporation.
Norfolk Southern Railway Company conducted railroad operations in East Palestine, Ohio,
on February 3, 2023.

7.    Third-Party Plaintiff Norfolk Southern Corporation, a Virginia corporation, is
the parent of Norfolk Southern Railway Company.

8.      Oxy Vinyls LP ("Oxy Vinyls"), a Delaware limited partnership, was at all relevant times the owner of railcars OCPX80235 ("Car 27"[1]), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53"), that derailed on February 3, 2023. Oxy Vinyls, shipping from its La Porte, Texas, facility, was additionally at all relevant times the shipper of TILX402025 ("Car 26"), Car 27, Car 28, GATX95098 ("Car 29"), and Car 53, all of which derailed on February 3, 2023.

9.      GATX Corporation, a New York corporation, was at all relevant times the owner of Car 29.

10.     Trinity Industries Leasing Company, a Delaware company and subsidiary of Trinity Industries Corporation, was at all relevant times the owner of Car 26.

11.     General American Marks Company, a subsidiary of GATX Corporation, a Delaware Corporation, was at all relevant times the owner of railcar GPLX75465 ("Car 23") that derailed on February 3, 2023.

12.     SMBC Rail Services LLC, a Delaware limited liability company, was at all relevant times the owner of railcar SHPX211226 ("Car 34") that derailed on February 3, 2023.

13.     Dow Chemical Incorporated, a Delaware company, was at all relevant times the owner of railcar DOWX73168 ("Car 36") that derailed on February 3, 2023.

14.     Union Tank Car Company, a Delaware company, was at all relevant times the owner of railcar UTLX205907 ("Car 48") that derailed on February 3, 2023.

---

[1] The car numbers used in this Third-Party Complaint refer to each railcar's position among the train's 149 railcars, which followed the two head-end locomotives. For example, Car 1 would refer to the train's first railcar, which would have been in the third position in the train overall.

## JURISDICTION

15.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331;

Section 113(b) of CERCLA, 42 U.S.C. § 9613(b); and 28 U.S.C. § 2201.

16.     The Court has jurisdiction over pendant state-law claims pursuant to 28 U.S.C.

§ 1367.

## VENUE

17.     Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C.

§ 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the release and

circumstances giving rise to the claim for response costs occurred in East Palestine, Ohio,

which lies within this judicial district. Additionally, this Third-Party Complaint is brought in

an action already pending before this Court.

## FACTUAL ALLEGATIONS

### A.     Railroad Transportation and Common Carrier Obligations

18.     Railroads are one of multiple links in the chain of production, transportation,

distribution, and consumption that connects American businesses and industries to the global

economy.

19.     As common carriers, railroads have a statutory duty to provide "transportation

or service on reasonable request" to all shippers. 49 U.S.C. § 11101(a). Railroads may not

refuse to provide service because doing so would be inconvenient, unprofitable, or potentially

risky.

20.     This common-carrier obligation also imposes a duty on railroads to transport

hazardous materials, even when a railroad might prefer not to do so. Under this obligation,

railroads have been charged with the safe transportation of materials such as crude oil, spent

nuclear fuel, and a range of chemicals, among other hazardous materials.

21.     Railroads take the common-carrier obligation seriously and are the nation's most trusted transporter of hazardous materials. Incident rates stemming from the transport of hazardous materials by rail are at an all-time low, and more than 99.9% of hazardous materials reach their destination without incident. The railroad industry's accident rate is far lower than the accident rate for trucking—according to studies, trucks carrying hazardous materials are involved in nearly ten times the rate of fatal accidents. In addition, transport by rail has a lower environmental impact than trucking. Trains are four times more efficient than trucks and are able to move one ton of freight more than 470 miles on one gallon of diesel fuel.

22.     While railroads are the primary face of hazardous materials transportation, they are only one of many regulated steps in the transportation process. Generally, railroads are responsible for train movement and track maintenance, but rely considerably on other entities for the safe transportation and delivery of hazardous goods.

23.     For example, railroads—like Norfolk Southern here—typically do not own tank cars that carry hazardous materials. Rather, they rely on tank car manufacturers and owners to ensure tank cars are compliant with federal laws and regulations and capable of safely moving hazardous materials. *See generally* 49 C.F.R. part 180.

24.     Additionally, railroads rely on shippers for the safe loading, packaging, and inspection of hazardous goods. Shippers ensure, and certify to railroads pursuant to federal regulations, that hazardous materials are properly classified as hazardous, loaded into tank cars following specific steps, securely closed, labeled with a placard for outward hazardous identification, and shipped with proper identification and safety materials for the railroad and potential first responders to rely on. *See generally* 49 C.F.R. part 173.

25.     When a tank car carrying hazardous materials is presented to a railroad for shipment, the railroad is responsible for collecting shippers' certifications and other shipping

papers, conducting a limited visual inspection of the tank car from the ground, and transporting the hazardous materials in a safe and expeditious manner. *See generally* 49 C.F.R. part 174.

26.     However, railroads are limited in their ability to conduct a detailed inspection or take other action. They cannot, for example, test or certify a tank car's safety-related mechanical functions—as car owners must do under 49 C.F.R. § 180.509 and other provisions—or load the hazardous materials to ensure proper stability and pressure for shipment—as chemical shippers must do under 49 C.F.R. § 173.22. It is the shipper that has the primary obligation to ensure that the railcar and equipment used are compatible with the lading.

27.     Ultimately, the safe transportation of hazardous materials depends on the care of each and every company involved in shipment. When accidents occur, as they did on February 3, 2023, each interested party is responsible for doing its part to address the impact.

    **B.      The Fort Wayne Rail Line**

28.     Norfolk Southern operates a Class I freight railroad that connects twenty-two states and the District of Columbia across the eastern United States.

29.     From its headquarters in Atlanta, Georgia, Norfolk Southern manages operations for more than 19,000 route miles. It is the largest intermodal network in the eastern United States.

30.     The Fort Wayne rail line traces back to the 1850s, when it was built to connect Chicago, Illinois to Pittsburgh, Pennsylvania. The line runs from southwest to northeast across Indiana, then east and southeast across Ohio to Pittsburgh.

31.     Before crossing the border into Pennsylvania, the line runs through East Palestine, Ohio, at approximately milepost fifty.

32.     East Palestine is a village in Columbiana County near the Pennsylvania border, approximately twenty miles north of the Ohio River border separating Ohio from West Virginia. East Palestine was founded in 1828. Today, it is home to roughly 4,700 residents.

### C.     The February 3, 2023, Derailment

33.     On February 3, 2023, Train 32N, a Norfolk Southern Railway general merchandise freight train, was traveling eastbound on the Fort Wayne Line of the Keystone Division through northeast Ohio.

34.     Train 32N was comprised of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive that was positioned between the 111th and 112th railcars.

35.     The train was assembled in Madison, Illinois, and was destined for Conway, Pennsylvania. On February 1, 2023, in Madison, a qualified mechanical inspector conducted a mechanical inspection and air brake test.

36.      One of Train 32N's cars was Car 23, a hopper car owned by General American Marks Corporation that was carrying polyethylene (plastic) pellets.

37.     Car 23 was received by Norfolk Southern at the interchange in the Terminal Railroad Association ("TRRA") of St. Louis yard in Madison and transferred by Alston & Southern Railway, a subsidiary of Union Pacific Railroad Company. At the TRRA yard, TRRA employees performed and certified a brake test on Car 23.

38.     Modern railcars, like Car 23, have roller bearings that transfer the weight of the car and its lading to the wheels. The bearings allow the axle to rotate under the load, while minimizing the rotational friction. Bearings are capable of overheating and, though uncommon, can cause derailments.

39.     Therefore, Norfolk Southern has equipped its network, including the Fort Wayne Line, with a hot bearing detector ("HBD") system. HBDs are devices that assess the

temperature conditions of bearings and provide audible, real-time warnings to train crews and

Norfolk Southern's Advance Train Control Wayside Help Desk—a twenty-four-hour alert

desk in Atlanta—when bearing temperatures indicate potential overheating.

40.     HBDs provide alerts and alarms to train crews and the Wayside Help Desk

when bearings report high temperatures above ambient temperature. Per Norfolk Southern's

protocol in effect on February 3, 2023, if a bearing temperature reading exceeded 200°F

above ambient temperature, a critical alarm would be triggered that required the train crew to

stop the train. Another type of non-critical alarm would be triggered at 170°F above ambient

temperature. And an alert created by Norfolk Southern—called a "953 alert"—would be

triggered based on a trending algorithm of train data to alert the Wayside Help Desk that a

bearing may be overheating.

41.     Although the Federal Railroad Administration does not require the use of

HBDs, at the time of the derailment, Norfolk Southern had HBDs spaced at a maximum of

every forty miles. The average spacing of HBDs across Norfolk Southern's network is 13.9

miles.

42.     On the night of February 3, 2023, Norfolk Southern's HBD system on the Fort

Wayne Line was in operation. Train 32N passed three HBDs in northeast Ohio in the thirty

miles west of East Palestine. Approximately thirty miles before the derailment, near Sebring,

Ohio, at milepost 79.8, the first of these three HBDs recorded a bearing on Car 23 at 38°F

above ambient temperature. This temperature was within normal range and did not send any

alert.

43.     When the train passed the next HBD about ten miles later outside Salem,

Ohio, at milepost 69.01, the bearing's recorded temperature was 103°F above ambient

temperature, still below the temperature threshold for a critical alarm. The Salem temperature

did cause a 953 alert (not an alarm) to be sent to the Wayside Help Desk, but the temperature

reading did not require any action by the Wayside Help Desk, as it was well below the threshold for a critical alarm.

44.     At the third HBD in East Palestine at milepost 49.81, the detector recorded a temperature of 253°F above ambient temperature, triggering a critical, audible alarm to the train crew. At this time, the Norfolk Southern train crew was traveling forty-seven miles per hour and already slowing the train because of train traffic ahead on the line. Upon receiving the critical alert, the train engineer increased the brake application to further slow the train to a stop.

45.     During deceleration of the train, at approximately 8:54 p.m., the overheated bearing on Car 23 failed, and the car derailed near milepost 49.5.

46.     Thirty-eight railcars then also derailed from the main track, including the following eight tank cars:

        a.  Car 26, TILX402025, carrying vinyl chloride.

        b.  Car 27, OCPX80235, carrying vinyl chloride.

        c.  Car 28, OCPX80179, carrying vinyl chloride.

        d.  Car 29, GATX95098, carrying vinyl chloride.

        e.  Car 34, SHPX211226, carrying ethylene glycol monobutyl ether.

        f.  Car 36, DOWX73168, carrying 2-ethyl hexyl acrylate.

        g.  Car 48, UTLX205907, carrying butyl acrylates.

        h.  Car 53, OCPX80370, carrying vinyl chloride.

47.     Cars 26, 27, 28, 29, and 53, among others, were subsequently involved in pool fires that lasted until on or about February 6, 2023.

        **D.     The Derailed Tank Cars**

48.     Three tank cars carrying chemicals—Cars 34, 36, and 48 (the non-vinyl chloride cars)—were breached in the derailment:

a. Car 34 was breached, with damage to the B-end top head of the tank, and its bottom outlet valve fully opened. Car 34 released its load of roughly 25,000 gallons of ethylene glycol monobutyl ether.

b. Car 36 had cracks to the B-end top head and B-end bottom head of the tank, and the A-end bottom head was punctured. Car 36 released part of the roughly 29,000 gallons of 2-ethyl hexyl acrylate in its load.

c. Car 48's A-end bottom head was punctured, and its manway gaskets burned away. Car 48 released its load of roughly 30,000 gallons of butyl acrylates.

49.     Cars 34, 36, and 48 were all DOT-111 tank cars.

a. Car 34 was owned by SMBC Rail Services LLC and was shipping ethylene glycol monobutyl ether from shipper Equistar Chemicals BPO.

b. Car 36 was owned by Dow Chemical Incorporated and was shipping 2-ethyl hexyl acrylate from shipper Union Carbide Corporation, a Dow Chemical Incorporated subsidiary.

c. Car 48 was owned by Union Tank Car Company and was shipping butyl acrylates from shipper Arkema, Incorporated.

50.     The DOT-111 is an unpressurized general-service tank car with a gross load weight of approximately 286,000 pounds and a capacity of 30,000 or less gallons.

51.     Though one of the most common general-service tank cars, the DOT-111 tank car is a legacy car and subject to a federal phase-out for use transporting flammable liquids. The potential replacement, the DOT-117J, features a thicker tank shell, thermal protection system, and additional features.

52.     Five derailed tank cars were DOT-105J300W specification tank cars carrying vinyl chloride (also referred to as "vinyl chloride monomer" or "VCM"), a chemical that is transported as a compressed liquified gas.

53.     These five tank cars were Cars 26, 27, 28, 29, and 53.

    a.   Car 26 was owned by Trinity Industries Leasing Company and shipped by Oxy Vinyls.

    b.   Cars 27, 28, and 53 were owned and shipped by Oxy Vinyls.

    c.   Car 29 was owned by GATX Corporation and shipped by Oxy Vinyls.

54.     The DOT-105J300W is a standardized tank car with a gross rail load of 263,000 pounds and full water capacity of between 23,570 and 25,742 gallons. By federal regulation, DOT-105 pressure tank cars must have a minimum plate thickness, plate materials that comply with minimum tensile strength, approved venting, loading, and unloading valves, and must be tested in compliance with federal testing procedures. *See* 49 C.F.R. Subpart C, § 179.100 *et seq.*

55.     The five DOT-105J300W tank cars carrying vinyl chloride were manufactured by Trinity Tank Car, Incorporated.

56.     All five tank cars were "fully loaded," carrying approximately 178,000 pounds of vinyl chloride each.

57.     Tank cars carrying pressurized gases are typically outfitted with a reclosing pressure relief device ("PRD"), which is designed to activate automatically to relieve pressure from a tank car when the tank's contents exceed a pressure threshold.

58.     Each of the five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53—were equipped with a PRD designed and manufactured by Midland Manufacturing Corporation.

59.     Tank cars also have a thermal protection system, which consists of a layer of insulated fiber between the tank and outer jacket meant to limit the amount of external heat transferred to the internal tank contents. Federal performance standards for the thermal protection systems aim to protect the internal tank contents from an external pool fire for

approximately 100 minutes. After this time, heat will reach the internal tank and the PRD will activate.

60.     Each vinyl chloride tank car was also outfitted with protective housing covers. Cars 27, 28, and 29 were fitted with protective housing covers made of aluminum, and Cars 26 and 53 were fitted with protective housing covers made of steel.

### E.     Vinyl Chloride and Polymerization

61.     Vinyl chloride is a flammable gas, transported in a pressurized liquid state, that is used to make PVC, a common synthetic plastic polymer.

62.     Vinyl chloride must be stabilized for safe transportation to prevent contact with reactive agents like oxygen. Chemical shippers typically utilize two methods of stabilization: mixing the liquified vinyl chloride with a chemical stabilizer such as phenol; and/or purging the tank car with nitrogen prior to filling the car so the oxygen concentration is below 200 parts per million.

63.      Oxy Vinyls, which shipped the vinyl chloride in Cars 26, 27, 28, 29, and 53, utilized oxygen purging to stabilize its vinyl chloride.

64.     Vinyl chloride is reactive with various external conditions and materials. Under prolonged exposure to fire or intense heat, liquefied vinyl chloride turns to vapor and expands, which can cause its container to violently rupture and explode. An uncontrolled vinyl chloride explosion can result in the release of hydrogen chloride, phosgene, and carbon monoxide gases, and the resulting rupture can launch tank shrapnel hundreds of feet or more into the surrounding area. This reaction is called a boiling liquid evaporating vapor explosion ("BLEVE").

65.     In the history of chemical shipping, BLEVE incidents have resulted in multiple deaths, mass evacuations, and significant damage to property caused by the violent rupture of the tank car.

66. Another effect of heating vinyl chloride is polymerization, a chemical reaction that turns vinyl chloride into a solid-state polymer. The industry literature on vinyl chloride for railroad transportation is nearly uniform in stating that vinyl chloride is capable of polymerizing at heightened temperatures caused by fire or radiant heat. *See, e.g.*, The Chlorine Institute & The Vinyl Institute, *Pamphlet 171, Vinyl Chloride Monomer (VCM) Tank Car & Cargo Tank Handling Manual*, 4–5 (1st ed. July 2018) ("Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM: air, sunlight, excessive heat, oxidizers, catalytic metals such as copper and aluminum and their alloys, and certain catalytic impurities."); Richard P. Pohanish, *Sittig's Handbook of Toxic and Hazardous Chemical and Carcinogens*, 2700 (6th ed. 2012) ("Polymerizes in air, sunlight, heat, and on contact with a catalyst, strong oxidizers, and metals, such as aluminum and copper, unless stabilized by inhibitors, such as phenol.").

67. Additionally, polymerization can accelerate the risks of a BLEVE by blocking pressure release devices that are intended to allow the release of gas pressure when it is higher than the tank car is designed to contain.

68. Though Oxy Vinyls is now discounting the risk that stabilized vinyl chloride can polymerize due to heating alone, the chemical data sheet that Oxy Vinyls provided to Norfolk Southern warns of the polymerization and explosion risks of vinyl chloride due to excessive heating.

69. Chemical manufacturers are required by federal regulation to provide these chemical data sheets, called a Safety Data Sheet ("SDS"), for each chemical they make. *See* 29 C.F.R. § 1920.1200(g). The SDS must "accurately reflect[] the scientific evidence used in making the hazard classification," and must be continually updated. *Id.* § 1920.1200(g)(5), (6). The SDS must include, among other things, information covering handling and storage,

accidental release measures, and the chemical's stability and reactivity, including whether the chemical will react or polymerize in various conditions. *Id.* § 1920.1200(g)(2).

70.     The vinyl chloride SDS that Oxy Vinyls provided to Norfolk Southern described the above risks, noting that vinyl chloride "MAY MASS EXPLODE IN FIRE. EXTREMELY FLAMMABLE GAS. CONTAINS GAS UNDER PRESSURE, MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR." *See* Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet*, 2 (Nov. 30, 2020).

71.     Further, Oxy Vinyls' SDS warned that vinyl chloride "[r]equires stabilizer to prevent potential dangerous polymerization." *Id.* The SDS warns about hazardous polymerization and notes: "*Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM*: Air, Sunlight, Excessive heat, Oxidizers, Catalytic metals, such as *copper*, *aluminum* and their alloys and certain catalytic impurities. Avoid *elevated temperatures*, oxidizing agents, oxides of nitrogen, oxygen, peroxides, other polymerization catalysts/initiators, air and sunlight." *Id.* at 10 (emphasis added).

72.     The SDS also warns of incompatible substances, listing "aluminum" and "aluminum alloys," and noting: "Explosive or violent polymerization can occur when exposed to air, sunlight, or excessive heat if not properly stabilized. Polymerizes exothermically in the presence of light, air, oxygen, or catalyst. Reacts with the following incompatible materials and create a strong exothermic reaction: oxygen, moisture, polymerization additives, copper, aluminum…." *Id.*

73.     In the case of a railcar fire, the SDS warns to "[l]et burn unless leak can be stopped immediately." *Id.* at 6.

74.     Oxy Vinyls has acknowledged that its SDS for vinyl chloride contained this information.

75.     The information on vinyl chloride in Oxy Vinyls' SDS also matches Norfolk Southern's own emergency safety guidance for vinyl chloride, which notes that the chemical "[p]olymerizes in air, sunlight, or heat unless stabilized by inhibitors such as phenol"; "[r]eacts with copper, aluminum…." Norfolk Southern Corp., *Emergency Safety Guide, Vinyl Chloride Division 2.1* (Flammable Gas), 1 (Sept. 2006). The guidance also warns that exposure of vinyl chloride containers "to fire or heat may result in violent polymerization" and that "[e]xcessive heat, light, or air may cause spontaneous violent polymerization resulting in container rupture." *Id.* at 2.

76.     Lastly, the U.S. Department of Transportation's Emergency Response Guidebook ("ERG 2020"), which is intended for use by first responders during hazardous materials incidents, designates vinyl chloride as a chemical capable of explosively polymerizing when heated or involved in fire.

**F.     The Derailment Response**

77.      On February 3, 2023, at 8:56 p.m. local time, minutes after the critical alarm sounded in the engineer cabin, the train crew on Train 32N contacted local dispatchers and the Norfolk Southern Wayside Help Desk regarding an emergency and possible derailment.

78.     Local first responders arrived on scene by 9:00 p.m. local time and began responding to small spreading pool fires. Within the hour, East Palestine dispatch requested hazardous material ("hazmat") support, additional responders, and emergency responders from Columbiana County, Ohio, and Beaver County, Pennsylvania.

79.     By midnight, a Unified Command team was formed comprised of local first responders and personnel from the Ohio Environmental Protection Agency, Pennsylvania Department of Environmental Protection, Norfolk Southern Hazmat Team, Pennsylvania State Police, Beaver County Hazmat Response Team, U.S. Environmental Protection Agency, Ohio Emergency Management Agency, and Ohio and Pennsylvania state officials.

80.     In the initial hours after the derailment, local firefighters responded to small spreading fires and the Unified Command team monitored the derailed tank cars. Over time, the fires grew into hot, active fires that surrounded the derailed railcars.

81.     Shortly after midnight, on February 4, 2023, the PRDs on the vinyl chloride tank cars began activating and releasing pressure in a cycle of thirty seconds on (releasing) and two minutes off.

82.     Because of the surrounding pool fires, the flammable gas venting from the PRDs ignited, which upon information and belief began to melt part or all of the tank car liquid transfer valves and fittings.

83.     Midland Manufacturing Corporation, which manufactured the PRDs, only tests PRDs with air. They are not tested to ensure their ability to withstand flame, heat, or corrosion from materials that can be expelled when the PRD activates.

84.     The PRDs continued to vent through the early morning hours of February 4, 2023, cycling between venting and pausing for approximately twelve hours.

85.     As the PRDs continued to vent, on-site responders, which included hazmat and tank derailment specialists, began assessing the damage to the tank cars to plan for next steps.

86.     Following a tank car derailment and fire, responders typically have four options: First, responders can re-rail the tank car and move it to the next destination if they determine there is no tank damage. Second, if the tank car is damaged and cannot be safely re-railed and moved, responders can transfer the product from the tank car using the transfer valves. This method requires working valves and access to the cars for a prolonged period of time. Third, responders can transfer the product via "hot tapping," a procedure that involves welding a transfer valve onto the tank, drilling a hole in the tank, and transferring the remaining liquid product through the hole. This third option carries significant risks, because

the welder might accidentally weld and drill into a gaseous space, rather than into the liquid; this can ignite the tank car and cause a BLEVE. Further, if the tank car's structural integrity is compromised, welding can cause cracking in the still-pressurized tank car, which can also cause a BLEVE. Hot tapping also requires prolonged exposure to a tank car that may be experiencing increased pressurization and BLEVE conditions. The fourth option, and the last resort, is to conduct a controlled "vent and burn." During a vent and burn, responders place a series of explosive charges on the tank cars, which detonate and puncture holes at the top and bottom of the car to burn off pressurized gas (from the top) and expel liquid (from the bottom) in a controlled manner. Although a last resort option, a vent and burn is the safest option when the other strategies are infeasible or carry too high a risk of loss of life.

87.    After venting vinyl chloride for approximately twelve hours, the PRDs stopped venting in the early afternoon of Saturday, February 4, 2023. By that same afternoon, the pool fires at the derailment site began to die down.

88.    At that point, responders sent in two "assess and entry" teams to the east and west ends of the derailment site to monitor the potential pressure conditions of the vinyl chloride tank cars. Because of the damage to the tank cars, responders concluded they were not able to re-rail the tank cars. They further determined that product transfer was not viable because the seals and gaskets within the transfer valves were damaged by heat. Therefore, responders began assessing the cars to implement a hot-tap option.

89.    As responders were monitoring that afternoon, the PRD on Car 28 activated again and began to continuously vent gas for approximately 70 minutes. The pressure relief was described by a hazmat specialist as akin to a violent and sudden roar of fury following two hours of calm. It scared responders with decades of experience handling hazmat derailment responses. Specifically, responders were concerned that pressure and heat were building inside the Car 28 tank, even though the pool fire under Car 28 and surrounding pool

fires had extinguished hours ago, indicating that the rising heat was from an internal process and not the external fires.

90.     The next day, on February 5, 2023, responders went into the derailment zone to assess the vinyl chloride tank cars, where they found that the tank shell on Car 53 was exposed due to jacket damage. They were able to get alongside the tank car, but did not hear any audible hiss from the protective housing, liquid lines, vapor lines, or PRD, and reported a negative reading on their meter testing for volatile organic compounds. This indicated to responders that the tank car was not leaking or releasing any gas.

91.     Responders also touched the tank shell inside the jacket of Car 53 and found that the tank was hot, even though surrounding pool fires had died down hours before. Using a thermal imaging camera, responders recorded a temperature of 135°F through a small opening in the jacket, followed by a temperature of 138°F one hour later. Again, responders became concerned that the tank temperature and pressure were rising without external stimulus.

92.     Responders attempted to record the temperatures on the other vinyl chloride tank cars. Where possible, assess and entry teams were able to record temperatures of around 65°F. However, because responders were only able to obtain temperature readings with the thermal imaging cameras through small holes in the jacket without verifying the readings were measuring the temperature of the tank itself—as opposed to the outer jacket— responders discounted the accuracy of these temperature readings.

93.     The elevated temperature on Car 53 and sudden extended venting from Car 28 without a pool fire underneath it caused responders to become concerned about the potential for a catastrophic explosion.

94.     According to chemical industry groups, the temperature of a tank of vinyl chloride measuring "above ambient temperature may imply that the [vinyl chloride] is

polymerizing inside the tank car." The Chlorine Institute & The Vinyl Institute, *Pamphlet 171, Vinyl Chloride Monomer (VCM) Tank Car & Cargo Tank Handling Manual*, at 36. Furthermore, vinyl chloride polymerization is a form of living polymerization and is an exothermic (heat-releasing) process. The rate of polymerization can accelerate thereby generating more heat in a closed-loop system that cycles and can become uncontrollable. Indeed, a key component of controlled vinyl chloride polymerization in the production of PVC is the *removal* of heat through effective thermal management of the process.

95.     The pause in the PRD venting and the inspection of Car 53 indicated to Unified Command that polymerization may have blocked the PRDs on Car 28 and the other vinyl chloride tank cars. Based on guidance from Oxy Vinyls, responders understood that a tank car temperature of 185°F could lead to runaway polymerization and explosion.

96.     Due to the re-activation of the PRD on Car 28 and the unknown liquid levels in the remaining tank cars, hot tapping the cars was considered too high a risk to the welders, who could inadvertently ignite the tank car if they struck gas, would be unable to transfer the product if the tank contained polymer, and could risk reigniting the pool fires throughout the derailment site.

97.     Responders spoke to the on-site representative of Oxy Vinyls—the vinyl chloride manufacturer—who commented that the rising temperature could indicate that polymerization was occurring. Responders also spoke with a support team operating out of the Oxy Vinyls corporate office in Dallas, Texas, which explained its belief that there was a low probability of polymerization and that the PRD was likely responding to other conditions or had a mechanical malfunction.

98.      On a subsequent call, an Oxy Vinyls senior vice president of manufacturing who was not on the scene stated that polymerization was not occurring. The Dallas team also concluded that at least three of the vinyl chloride tank cars were nearly empty. This

determination was made based in part on temperature readings that responders considered inaccurate.

99.     Responders attempted to collect further tank car measurements. While they continued collecting potential readings through the small holes in the jackets, responders were unable to collect internal tank pressure measurements due to the compromised valve assemblies and risk of placing personnel alongside dangerously unstable tank cars.

100.     On the evening of February 5, 2023, responders reported to Unified Command that the temperature trends and dangerous conditions for hot tapping led hazmat specialists to believe that a vent and burn would be the safest option. Responders were also concerned about polymerization, although polymerization was not the only reason that a vent and burn was considered the safest option.

101.     On the morning of February 6, 2023, Unified Command met to discuss strategies to relieve the pressure in the five vinyl chloride tanks and avoid a catastrophic uncontrolled explosion. By approximately noon, Unified Command agreed that a vent and burn of all five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53—should occur. As noted, Unified Command included the U.S. Environmental Protection Agency, National Guard, Ohio state agencies, Pennsylvania state agencies, and local first responders.

102.     At approximately 4:37 p.m. local time on February 6, 2023, Unified Command provided by radio the official green light to execute the vent and burn, and the response team detonated controlled explosives on the five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53.

103.     The released vinyl chloride burned through the night of February 6, 2023.

104.     During the vent and burn, video footage reportedly identified pure polymer, indicating a polymerization reaction, releasing from two of the vinyl chloride tank cars.

105.    Additionally, the PRDs on Car 28—on which the PRD re-activated—and Car 53—which had a recorded temperature of 138°F—were found to be corroded. According to the PRD manufacturer, Midland Manufacturing Corporation, these PRDs are not tested for fire conditions.

106.    The vent and burn was executed effectively and resulted in no casualties.

**G.    Railroad Regulation and Industry Standards**

107.    The railroad industry is regulated through a combination of federal laws, regulations, and industry standards set by the Association of American Railroads ("AAR"). Norfolk Southern, as a Class I freight railroad, is a member of the AAR.

108.    Rail transportation of hazardous materials is regulated under Title 49, subtitle B, chapter 1, subpart C. These regulations divide obligations for hazardous materials transportation among shippers, railroads, and car owners. *See, e.g.*, 49 C.F.R. §§ 173 (detailing shipper responsibilities), 174 (detailing railroad responsibilities), 180 (detailing car owner responsibilities).

109.    Alongside federal regulations, the AAR publishes rules and standards for the design, operation, maintenance, inspection, and repair of railcars and their components. Among these are the Manual of Standards and Recommended Practices ("MSRP") and the Interchange Rules. These rules set the standards for the movement of railcars and the safety and interoperability of railcar equipment. All freight railroads, interchange freight car owners, and repair agents must subscribe to the Interchange Rules.

110.    The Interchange Rules also divide and assign responsibilities for maintenance and inspection in rail transportation between car owners, railroads, and other entities. For example, the Interchange Rules establish that car owners are responsible for and chargeable for repairs to their railcars necessitated by wear and tear.

### H. Car 23 Was Improperly Maintained

111.    Car 23, which derailed first, was a hopper car owned by General American Marks Company.

112.    The bearing on Car 23 was manufactured by the Timken Company. Timken's Bearing Install Manual states that "[c]ars, coaches, and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces." Timken, *Installing and Maintaining Timken AP and AP-2 Bearings, Diesel Locomotive, Passenger and Freight Car Applications*, 25 (2015).

113.    Industry practice is to prevent railcars from sitting stationary for long periods because grease separation may occur, which reduces the amount of lubrication around the bearings and may impact functionality.

114.    Car 23 operated out of the Gulf States, with shipments from New Orleans and other locations along the Gulf Coast.

115.    According to car movement data, Car 23 had few shipments and low mileage over the prior decade.

116.    Upon information and belief, Car 23 was twice stationary for longer than six months: first for 565 days ending in August 2018 and again for 206 days ending in May 2019.

117.    When a bearing sits for extended periods of time, especially in heat, rain, or extreme weather, the grease in the bearing can separate and degrade the bearing. Water damage—such as that caused by sitting in heavy rain, hurricanes, or flooding—can cause friction and quickly degrade the bearing.

118.    Under the AAR Interchange Rules, car owners must inspect and, if necessary, repair or replace railcars or components at any time after the car is partially or fully submerged in water.

119.    Due to the construction of the bearings and where they are installed inside the wheelset, the full condition of the bearings cannot be inspected by the railroad without disassembling the bearings from the wheelset.

**I.      Third-Party Defendant Railcar Owners Are Responsible for the Compliance and Maintenance of Railcars Carrying Chemicals**

120.    CERCLA's broad scope imposes strict liability on potentially responsible parties for response costs related to the release of a hazardous substance at a facility. 42 U.S.C. § 9607(a).

121.    "Response" includes "the cleanup or removal of released hazardous substances from the environment." 42 U.S.C. § 9601(23), (25).

122.    "Release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22).

123.    "Hazardous substance" means any substance designated as hazardous under any of several federal environmental statutes. 42 U.S.C. § 9601(14).

124.    "Facility" means "any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).

125.    Potentially responsible parties under CERCLA include "any person who at the time of disposal of any hazardous substance owned or operated" the facility. 42 U.S.C. § 9607(a)(2).

126.    The "operator" of a facility includes "someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998).

127.     Railcar owners are operators under CERCLA because they direct the workings of, manage, and conduct the affairs of rolling stock, including tank cars carrying hazardous materials. *United States v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998).

128.     Railcar owners are responsible for a variety of compliance and maintenance measures for tank cars that carry hazardous materials. For example, railcar owners are responsible for the certification, qualification, compliance, and maintenance of railcars and components, such as the thermal protection system, PRDs, and valves. *See, e.g.*, 49 C.F.R. §§ 180.501 (general applicability), 180.507 (qualification requirements), 180.509 (inspection requirements), 180.517 (reporting requirements).

129.     Under the AAR Interchange Rules, railcar manufacturers must have the construction and design of railcars used for hazardous materials transportation approved. The valves, fittings, PRDs, and other car components must also receive standalone approval.

130.     This industry rule is incorporated by 49 C.F.R. § 179.3, pursuant to which the United States Department of Transportation assigns to AAR the authority to approve design, materials, construction, conversion, and modification of tank cars in accordance with the AAR MSRP Specification for Tank Cars and the federal regulatory specifications.

131.     Any changes to the tank car design or components must also be approved. *See* 49 C.F.R. § 179.6. This additional certification is required to ensure that changes to tank cars do not render them unsafe for transportation of hazardous materials.

132.     Here, there were multiple discrepancies, identified by the Federal Railroad Administration, between the approved documents and the actual physical characteristics of the vinyl chloride tank cars on Train 32N.

   a.   Trinity Industries Leasing Company's Car 26 has discrepancies between its AAR 4-2 certificate of construction and the tank car's actual characteristics.

b.  For GATX Corporation's Car 29, the tank car valve was replaced with a
Midland 720 valve without approval. Additionally, this Car's PRD, which had
a 225 psi start, was replaced without approval with a PRD with a 247.5 psi
start. Finally, according to the Federal Railroad Administration, Car 29 was
never approved for vinyl chloride service, which has a special regulatory
provision.

c.  All three vinyl chloride tank cars owned by Oxy Vinyls—Cars 27, 28, and
53—have missing or incorrect information on their AAR Form 4-2. For
example, Car 27 has modifications that were not properly documented or
approved, including changes to two component parts that modified the
material from carbon steel to stainless steel.

133.  Following the approved construction of a tank car, the builder must furnish a
Certificate of Construction to the tank car owner certifying that the tank, equipment, and car
fully conform to the regulations. *See* 49 C.F.R. § 179.5(a).

134.  The owners of tank cars carrying hazardous materials are required to continue
this certification process. Tank cars marketed as a "DOT" specification—like the DOT-111
or DOT-105—must meet all regulatory requirements for tank car specifications, and each
owner "must retain the certificate of construction (AAR Form 4-2) and related papers
certifying that the manufacture of the specification tank car identified in the documents is in
accordance with the applicable specification." 49 C.F.R. §§ 180.507, 180.517.

135.  Additionally, DOT specification tank car owners are responsible for the
inspection, testing, and requalification of the tank car's structural integrity, thickness, internal
coating or lining, leakage under pressure, and service equipment like PRDs, at set temporal
intervals. *See* 49 C.F.R. § 180.509 *et seq.*

136.    These areas of responsibility—the certification, qualification, compliance, and maintenance—all dictate tank car operations related to the transport of hazardous materials and are the sole domain of car owners.

137.    Railroads have discrete inspection duties and rely on the work of tank car owners to ensure that compliant tank cars are used for safe transport. For example, the railroads are required by federal regulation to inspect each railcar "visually" and "at ground level," but do not climb up on tank cars to inspect PRDs. 49 C.F.R. §§ 174.9(a), 174.9(b). While railroads are required to receive shippers' certifications and shipping papers for hazardous materials shipment, railroads are not responsible for the certified design, building, conversion, testing, modification, and requalification of tank cars.

138.    It is this certified design, building, conversion, testing, modification, and requalification of hazardous materials tank cars that ensures that tank cars containing flammable chemicals can be safely transported.

**J.    The Third-Party Defendant Shipper is Responsible for the Compliance and Maintenance of Railcars**

139.    Chemical shippers are also "operators" under CERCLA because they direct the workings of, manage, and conduct the affairs of rolling stock, including tank cars carrying chemicals. *Bestfoods*, 524 U.S. at 66.

140.    Shippers control tank cars carrying chemicals by exercising control over the cars' environmental compliance in a manner that directly prevents—or permits—a release of hazardous substances.

141.    Shippers are responsible for a variety of compliance and maintenance measures for hazardous tank cars. *See generally* 49 C.F.R. § 173.1 *et seq.*

142.    For example, shippers are responsible for the proper loading and labeling of the tank car, which includes federal certification of the proper packaging of the commodity and placement of tank car placards. *See* 49 C.F.R. §§ 173.31, 172.508.

143.     For vinyl chloride, shippers must ensure it is properly mixed with inhibitors or otherwise stabilized to prevent negative effects like violent polymerization. Shippers use a chemical inhibitor to prevent polymerization and/or purge the tank of oxygen with nitrogen prior to filling the tank so oxygen levels are below 200 parts per million.

144.     Oxy Vinyls has stated that it used oxygen purging to stabilize the vinyl chloride for shipment.

145.     As discussed, by federal regulation, chemical manufacturers and importers must also develop an SDS for each hazardous chemical they produce or import that identifies, among other items, accidental release measures, stability and reactivity, and fire-fighting measures. *See* 29 C.F.R. § 1910.1200(g).

146.     The vinyl chloride SDS prepared by Oxy Vinyls and provided to Norfolk Southern warned of the risks of polymerization, noting in twelve instances some variation of the warning that vinyl chloride "MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR" if the vinyl chloride is exposed to "air, sunlight, excessive heat" and/or "Catalytic metals, such as copper, aluminum, and their alloys." Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet* at 2, 10.

147.     Upon information and belief, in the aftermath of the derailment and vent and burn, aluminum and copper were found in the vinyl chloride tank cars:

   a.   Car 26 had aluminum found in samples of the interior surface of the manway nozzle and aluminum coating on the PRD springs.

   b.   Car 27, which had been fitted with a protective housing cover made of aluminum that was missing or destroyed, had aluminum in the exterior surface of the PRD spring in the top guide discharge port of the PRD. Additionally, Car 27 had an aluminum angle valve handwheel, and melted aluminum was found around the base of one of the liquid discharge valves.

    c.   Car 28 had aluminum angle valve handwheels and had been fitted with a protective housing cover made of aluminum that was missing or destroyed. Further, aluminum was found in a sample taken from the interior surface of the manway nozzle, top fitting of the protective housing, and around the base of both liquid valves.

    d.   Car 29, which had been fitted with a protective housing cover made of aluminum that was missing or destroyed, had aluminum found in exterior debris of the protective housing and housing cover on the tank car, as well as a residue sample containing copper inside the tank next to a vent and burn breaching hole. Further, Car 29's angle valves were covered in solidified melted aluminum after the derailment, and its angle valve handwheels were missing.

    e.   Car 53 had angle valve handwheels constructed from aluminum.

148.    By federal regulation, chemical shippers like Oxy Vinyls are also responsible for their chemicals' shipping certification. Shippers may not offer a hazardous material for transportation without a determination "that the tank car is in proper condition and safe for transportation," which requires at minimum a visual inspection of the tank, thermal protection system, valves, and PRDs. 49 C.F.R. § 173.31(d).

149.    Shippers cannot offer a hazardous material for transportation in a tank car unless that tank car meets the applicable specification and packaging requirements, including the approved certificate of construction. 49 C.F.R. § 173.31(a). Shippers must ensure that hazardous materials are in containers that have been manufactured, assembled, and marked in accordance with various regulations, including AAR tank construction requirements under 49 C.F.R. part 179, 49 C.F.R. § 173.22.

150.  As described above, Oxy Vinyls offered the five vinyl chloride tank cars for shipment without complete approvals and certifications.

151.  Ultimately, it is the shipper that is responsible for ensuring that the equipment used is compatible with the lading and can safely contain the commodity.

152.  While railroads like Norfolk Southern must also inspect the tank cars from the ground, ensure proper shipping papers, and perform other duties related to rail movement, railroads rely on the accurate federal approvals and certifications of shippers that the equipment and lading are compatible.

153.  When an incident occurs, as it did on February 3, 2023, railroads like Norfolk Southern rely on the accurate representations of shippers during the response.

### K.  Norfolk Southern Has Incurred Response Costs Before and Pursuant to an EPA Unilateral Administrative Order

154.  Following the derailment, the U.S. Environmental Protection Agency ("EPA") mobilized to the derailment site in East Palestine, Ohio, along with various federal, state, and local agencies.

155.  On February 21, 2023, EPA determined that the derailment site posed an imminent and substantial threat to human health and the environment and issued a Unilateral Administrative Order to Norfolk Southern under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

156.  EPA's Unilateral Administrative Order required Norfolk Southern to implement specific response activities, and incur all associated costs, related to air monitoring and sampling, the identification and delineation of contamination, the containment and remediation of contaminated areas, the removal and disposal of hazardous substances, and additional actions needed to prevent imminent and substantial endangerment to public health or the environment.

157.     Norfolk Southern has incurred and will incur substantial response costs related to the release of substances resulting from the derailment, pool fires, vent and burn, and firefighting efforts.

158.     In addition, the United States and State of Ohio have brought claims under CERCLA seeking reimbursement of their response costs.

159.     Norfolk Southern has paid millions of dollars and will continue to pay for the comprehensive environmental response in East Palestine. Norfolk Southern is committed to making it right in East Palestine and the surrounding communities. It brings this action to ensure that every responsible party contributes its proper share under federal and state law.

## CLAIMS FOR RELIEF

### COUNT ONE

**CERCLA Recovery of Response Costs Against Railcar Owner Defendants
(Oxy Vinyls, GATX Corporation, Trinity Industries Leasing Company, SMBC Rail
Services LLC, Dow Chemical Incorporated, and Union Tank Car Company)**

160.     The allegations in paragraphs 1 through 159 above are incorporated by reference.

161.     Under CERCLA, potentially responsible parties are liable for a "release" or "threatened release" of a "hazardous substance" from a "facility" that causes necessary response costs consistent with the National Contingency Plan. *See* 42 U.S.C. § 9607(a).

162.     Potentially responsible parties include the present "owner and operator" of the facility, along with "any person who at the time of disposal of any hazardous substance owned or operated" the facility. 42 U.S.C. § 9607(a).

163.     Railcar Owner Defendants are "persons" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

164.     Railcar Owner Defendants are persons liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2):

a. Trinity Industries Leasing Company owned and was responsible for the maintenance and condition of Car 26, which released vinyl chloride.

b. Oxy Vinyls owned and was responsible for the maintenance and condition of Car 27, Car 28, and Car 53, which released vinyl chloride.

c. GATX Corporation owned and was responsible for the maintenance and condition of Car 29, which released vinyl chloride.

d. SMBC Rail Services LLC owned and was responsible for the maintenance and condition of Car 34, which released ethylene glycol monobutyl ether.

e. Dow Chemical Incorporated owned and was responsible for the maintenance and condition of Car 36, which released 2-ethyl hexyl acrylate.

f. Union Tank Car Company owned and was responsible for the maintenance and condition of Car 48, which released butyl acrylates.

g. Railcar owners are "owner[s] or operator[s]" under Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), as the owners of an "onshore facility." The term "onshore facility," as defined in Section 101(18) of CERCLA, 42 U.S.C. § 9601(18), includes "rolling stock … of any kind located in, on, or under, any land … within the United States."

h. Railcar owners directly control the inspection, maintenance, and repair of rolling stock like railcars and their safety features. These features must comply with environmental and safety regulations covering the safe storage and transport of chemicals in tank cars.

i. Vinyl chloride is a "hazardous substance" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and as defined in regulation under 40 C.F.R. § 302.4.

j.   Ethylene glycol monobutyl ether (also known as 2-Butoxy Ethanol) is a "hazardous substance" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and as defined by regulation under 40 C.F.R. § 302.4.

k.   2-ethyl hexyl acrylate is a "hazardous substance" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and as defined by regulation under 40 C.F.R. § 302.4.

l.   Butyl acrylates is a "hazardous substance" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and as defined by regulation under 40 C.F.R. § 302.4.

m.   A "release" occurred as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), when the derailment, fires, and/or the controlled vent and burn caused the "spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment" of hazardous substances, including vinyl chloride, ethylene glycol monobutyl ether, 2-ethyl hexyl acrylate, and butyl acrylates.

165.   Norfolk Southern has incurred response costs well in excess of $1 million or an amount according to proof at trial for work performed responding to the release of hazardous substances and will incur additional response costs in the future.

166.   The costs incurred by Norfolk Southern related to the February 3, 2023, derailment site in East Palestine, Ohio, that it seeks to recover here constitute necessary costs of response, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), and are consistent with the National Contingency Plan, 40 C.F.R. Part 300, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

167.     Norfolk Southern's costs incurred prior to the issuance of the Unilateral Administrative Order that it seeks to recover here were necessary and consistent with the National Contingency Plan under 40 C.F.R. Part 300.

168.     Norfolk Southern's costs incurred in compliance with the Unilateral Administrative Order that it seeks to recover here were necessary and consistent with both the Order and with the National Contingency Plan under 40 C.F.R. Part 300.

169.     The Third-Party Defendants have not contributed to any of the response costs to address the February 3, 2023, derailment site in East Palestine, Ohio, and resulting release of hazardous substances.

### COUNT TWO

**CERCLA Recovery of Response Costs Against Vinyl Chloride Shipper Defendant
(Oxy Vinyls)**

170.     The allegations in paragraphs 1 through 169 above are incorporated by reference.

171.     Oxy Vinyls is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

172.     Oxy Vinyls is a person liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2):

   a.   Oxy Vinyls shipped the vinyl chloride in Cars 26, 27, 28, 29, and 53.

   b.   A railcar shipper is an "owner or operator" under Section 101(20) of CERCLA, 42 U.S.C. § 9601(20) when it directs the workings of and manages or conducts the affairs of an "onshore facility."

   c.   The term "onshore facility," as defined in Section 101(18) of CERCLA, 42 U.S.C. § 9601(18), includes "rolling stock . . . of any kind located in, on, or under, any land . . . within the United States."

    d.   As shipper, Oxy Vinyls was responsible for the maintenance and environmental compliance of the loading and packaging of rolling stock tank cars carrying hazardous substances.

    e.   Oxy Vinyls prepared a federally required certification attesting to the tank cars' proper packaging and tank build compliance, and filed with Norfolk Southern an SDS describing the safety risks and proper handling of vinyl chloride.

    f.   This SDS stated that vinyl chloride can violently polymerize and "MAY MASS EXPLODE IN FIRE. EXTREMELY FLAMMABLE GAS. CONTAINS GAS UNDER PRESSURE, MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR." Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet*, at 2.

    g.   Due to the risks of a catastrophic BLEVE indicated by Oxy Vinyls' SDS, the Unified Command response team executed a controlled vent and burn that released vinyl chloride from Cars 26, 27, 28, 29, and 53.

    h.   Vinyl chloride is a "hazardous substance" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and as defined in regulation under 40 C.F.R. § 302.4.

    i.   A "release" occurred as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), when the derailment, pool fires, and venting and burning of vinyl chloride in Cars 26, 27, 28, 29 and 53 caused "spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment" of the hazardous substance vinyl chloride.

173.     Norfolk Southern has incurred response costs well in excess of $1 million or an amount according to proof at trial for work performed responding to the release of hazardous substances and will incur additional response costs in the future.

174.     The costs incurred by Norfolk Southern related to the February 3, 2023, derailment site in East Palestine, Ohio, that it seeks to recover here constitute necessary costs of response, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), and are consistent with the National Contingency Plan, 40 C.F.R. Part 300, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

175.     Norfolk Southern's costs prior to the issuance of the Unilateral Administrative Order that it seeks to recover here were necessary and consistent with the National Contingency Plan under 40 C.F.R. Part 300.

176.     Norfolk Southern's costs incurred pursuant to the Unilateral Administrative Order that it seeks to recover here were necessary and consistent with both the Order and with the National Contingency Plan under 40 C.F.R. Part 300.

177.     Oxy Vinyls has not contributed to any of the response costs to address the February 3, 2023, derailment site in East Palestine, Ohio, and resulting release of hazardous substances.

## COUNT THREE

**CERCLA Contribution Against Railcar Owner Defendants**
**(Oxy Vinyls, GATX Corporation, Trinity Industries Leasing Company, SMBC Rail Services LLC, Dow Chemical Incorporated, and Union Tank Car Company)**

178.     The allegations in paragraphs 1 through 177 above are incorporated by reference.

179.     Norfolk Southern has paid and will pay more than its equitable share of costs consistent with the National Contingency Plan, 40 C.F.R. Part 300, resulting from the release at the February 3, 2023, derailment site.

180.     Under Sections 113(f)(1) and 113(f)(3)(B) of CERCLA, 42 U.S.C.

§ 9613(f)(1), (f)(3)(B), Norfolk Southern is entitled to contribution from Railcar Owner

Defendants for their equitable share of these costs.

181.     Accordingly, Norfolk Southern seeks contribution for an equitable share of

these costs from Railcar Owner Defendants.

**COUNT FOUR**

**CERCLA Contribution Against Vinyl Chloride Shipper Defendant
(Oxy Vinyls)**

182.     The allegations in paragraphs 1 through 181 above are incorporated by

reference.

183.     Norfolk Southern has paid and will pay more than its equitable share of costs

consistent with the National Contingency Plan, 40 C.F.R. Part 300, resulting from the release

at the February 3, 2023, derailment site.

184.     Under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), Norfolk

Southern is entitled to contribution from Oxy Vinyls for its equitable share of these costs as a

chemical shipper and railcar operator.

185.     Accordingly, Norfolk Southern seeks contribution for an equitable share of

these costs from Oxy Vinyls.

**COUNT FIVE**

**CERCLA Declaratory Relief
(Oxy Vinyls, GATX Corporation, Trinity Industries Leasing Company, SMBC Rail
Services LLC, Dow Chemical Incorporated, and Union Tank Car Company)**

186.     The allegations in paragraphs 1 through 185 above are incorporated by

reference.

187.     Under Section 113(g) of CERCLA, 42 U.S.C. § 9613(g)(2)(B), a court "shall

enter a declaratory judgment on liability for response costs or damages that will be binding

on any subsequent action or actions to recover further response costs or damages."

39

188.     Norfolk Southern is entitled to a declaratory judgment that Third-Party

Defendants are liable for any further response costs Norfolk Southern incurs.

## COUNT SIX

### Negligence Against Certain Railcar Owner Defendants
### (Oxy Vinyls, GATX Corporation, and Trinity Industries Leasing Company)

189.     The allegations in paragraphs 1 through 188 above are incorporated by

reference.

190.     In owning and maintaining rolling stock transported by Norfolk Southern, the

Third-Party Defendants were obligated to exercise care for the safety of individuals and

entities whose persons or property were within reasonable proximity to the rail line, Norfolk

Southern's employees and its property, and the environment.

191.     In ensuring the certified design, building, conversion, testing, modification,

and requalification of hazardous materials tank cars that ensures that tank cars containing

chemicals can be safely transported, Third-Party Defendants Oxy Vinyls, GATX

Corporation, and Trinity Industries Leasing Company were obligated to exercise reasonable

and ordinary care, and/or that degree of care that a similarly situated railcar owner would use

under the same or similar circumstances.

192.     Third-Party Defendants failed to exercise ordinary care by failing to properly

certify the design, building, conversion, testing, modification, and requalification of

hazardous materials tank cars and their components. By federal regulation, car owners must

receive approval for the car construction and any design or component change. 49 C.F.R. §§

179.3, 179.6. Car owners must continually certify this approval. 49 C.F.R. §§ 180.507,

180.517.

193.     Each car carrying vinyl chloride had discrepancies between its federal certified

and approved certificate of construction and the tank car's actual characteristics:

    a.   Trinity Industries Leasing Company's Car 26 has discrepancies between its AAR 4-2 certificate of construction and the tank car's actual characteristics.

    b.   For GATX Corporation's Car 29, the tank car valve was replaced with a Midland 720 valve without approval. Additionally, this Car's PRD was replaced from a PRD with a 125 psi start to a PRD with a 247.5 psi start without approval. Finally, Car 29 was never approved for vinyl chloride service, which has a special regulatory provision.

    c.   All three vinyl chloride tank cars owned by Oxy Vinyls—Cars 27, 28, and 53—have missing or incorrect information on their AAR form 4-2. For example, Car 27 has modifications that were not properly documented or approved, including changes to two component parts that modified the material from stainless steel to carbon steel.

194.    The damage and release of hazardous materials from Cars 26 27, 28, 29, and 53 were, in part, the result of Third-Party Defendants' failure to follow federal regulations and industry rules on the design, build, testing, modification, and qualification of hazardous materials tank cars and their components.

195.    As a direct and proximate result of Third-Party Defendants' negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

### COUNT SEVEN

### Negligence
### (Oxy Vinyls)

196.    The allegations in paragraphs 1 through 195 above are incorporated by reference.

197.    In undertaking to ship vinyl chloride by rail, Oxy Vinyls was obligated to exercise care for the safety of Norfolk Southern's employees, its property, those individuals

and entities whose persons or property were within reasonable proximity to the rail lines, and the environment.

198.   By shipping vinyl chloride, Oxy Vinyls was obligated to exercise reasonable and ordinary care, and/or that degree of care that a similarly chemical shipper would use under the same or similar circumstances.

199.   As a shipper, Oxy Vinyls was required to ensure that the equipment used in shipping was compatible with the lading and could contain vinyl chloride.

200.   By regulation, Oxy Vinyls was required to certify that the tank cars met the applicable specification and packaging requirements, including the approved certificate of construction, and certify that the tank cars were manufactured, assembled, and marked in accordance with AAR tank construction requirements. 49 C.F.R. §§ 173.22, 173.31(a).

201.   Consistent with these requirements, Oxy Vinyls certified that its tank cars and components were suitable for vinyl chloride transportation.

202.   However, the Federal Railroad Administration found that all five tank cars used to ship vinyl chloride had discrepancies between the AAR 4-2 certificate of construction and the cars' actual characteristics, including non-approved changes to the PRDs, valves, and component parts, and raised questions over whether a tank car was even approved for vinyl chloride transportation.

203.   As described above, Oxy Vinyls failed to exercise ordinary care by failing to properly certify the design, build, testing, modification, and qualification of hazardous materials tank cars and their components used for vinyl chloride transportation.

204.   Oxy Vinyls was also required to prepare and submit an SDS for vinyl chloride. 29 C.F.R. § 1920.1200(g).

205.    The SDS was required to "accurately reflect[] the scientific evidence used in making the hazard classification," with continual, ongoing updates. *Id.* §§ 1920.1200(g)(5), 1920.1200(g)(6).

206.    Oxy Vinyls submitted an SDS to Norfolk Southern explicitly stating that "Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM: Air, Sunlight, Excessive heat, Oxidizers, Catalytic metals, such as *copper*, *aluminum* and their alloys and certain catalytic impurities." Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet*, at 10 (emphasis added).

207.    The SDS Oxy Vinyls submitted to Norfolk Southern also warned repeatedly— twelve times in various combinations—that vinyl chloride "MAY EXPLODE IF HEATED" and that POLYMERIZATION CAN OCCUR." *Id.* at 2.

208.    Oxy Vinyls shipped vinyl chloride in tank cars with aluminum components in the pressure release devices and in other components on each of the vinyl chloride tank cars. For example, Cars 26, 27, 28, and 29 contained aluminum in the PRD springs, PRD surface, or had aluminum used in various valves on the tank car. When the PRDs activated—releasing flammable vinyl chloride that ignited—the vinyl chloride mixed with "air, sunlight" and "aluminum."

209.    At the scene of the derailment, Oxy Vinyls representatives made conflicting statements regarding the ability of vinyl chloride to polymerize, asking first responders to ignore the all-caps text in its own SDS. At various times during the derailment response, Oxy Vinyls representatives provided inconsistent warnings that polymerization was possible, was not occurring, and could not occur, each with varying degrees of certainty.

210.    Finally, Oxy Vinyls representatives have stated that polymerization was not possible under the derailment conditions and that "stabilized" vinyl chloride—the same vinyl

43

chloride that had been exposed to extreme conditions for nearly two full days—is incapable of polymerizing under "normal" conditions.

211.    Oxy Vinyls ignored its own federally required SDS on the safe handling of vinyl chloride and improperly certified the shipping of its vinyl chloride in conditions contrasting with its own guidance.

212.    Further, Oxy Vinyls then ignored its own federally required warnings on the safe handling of vinyl chloride and provided ineffectual and negligent warnings to Norfolk Southern and first responders.

213.    The vent and burn and release of hazardous vinyl chloride was the direct result of the improper shipping containers and Oxy Vinyls' failure to follow federal regulations and its own SDS.

214.    In the alternative, if aluminum components can be safely used with vinyl chloride, then Oxy Vinyls' SDS did not "accurately reflect the scientific evidence," and Oxy Vinyls failed to furnish a correct document for hazard communications.

215.    Similarly, if vinyl chloride is not capable of polymerization in circumstances like those present in East Palestine, then Oxy Vinyls' SDS did not "accurately reflect the scientific evidence," and Oxy Vinyls furnished a negligently prepared SDS.

216.    Oxy Vinyls violated federal regulations and its duties by failing to ensure that its shipping equipment was compatible with its lading.

217.    In addition, and/or in the alternative, as Oxy Vinyls now claims, it violated federal regulations by providing a negligently prepared SDS.

218.    As a direct and proximate result of Oxy Vinyls' negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

## COUNT EIGHT

### Negligence
### (General American Marks Company and GATX Corporation)

219.    The allegations in paragraphs 1 through 218 above are incorporated by

reference.

220.    As the railcar owner responsible for the maintenance of Car 23, General

American Marks Company, a subsidiary of GATX Corporation, was responsible for ensuring

that Car 23 moved at least one car length every six months, yet, upon information and belief,

Car 23 was twice stationary for longer than six months.

221.    In owning and maintaining rolling stock ultimately transported by Norfolk

Southern, General American Marks Company was obligated to exercise care for the safety of

Norfolk Southern's employees, its property, those individuals and entities whose persons or

property were within reasonable proximity to the rail lines, and the environment.

222.    In ensuring the certification, qualification, compliance, and maintenance of

railcars and their components, General American Marks Company was obligated to exercise

reasonable and ordinary care, and/or that degree of care that a similarly situated railcar owner

would use under the same or similar circumstances.

223.    Upon information and belief, General American Marks Company failed to

exercise ordinary care by, among other things, failing to properly maintain Car 23's bearings

by leaving the car stationary for periods in excess of six months; failing to inspect the car's

bearings after the car remained stationary for periods in excess of six months; failing to

advise carriers including Norfolk Southern that the car was not inspected after remaining

stationary for periods in excess of six months; and allowing and placing Car 23 into rail

service without inspecting its bearings after remaining stationary for periods in excess of six

months.

224.     Upon information and belief, leaving Car 23 stationary in excess of six months damaged the lubrication of the bearing, leading to the degradation of the bearing and the ultimate failure of the bearing. Car 23 and several other railcars in Train 32N subsequently derailed.

225.     Upon information and belief, the bearing failure on Car 23 was caused by the negative impacts on the bearing and/or its functionality stemming from General American Marks Company's failure to properly maintain its railcar.

226.     Upon information and belief, GATX Corporation exercises substantial direct control over the operations of its subsidiary General American Marks Company, including with respect to railcar maintenance.

227.     As a direct and proximate result of General American Marks Company and GATX Corporation's negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

## COUNT NINE

### Ohio Joint & Several Liability and Contribution
### (Oxy Vinyls, General American Marks Company, and GATX Corporation)

228.     The allegations in paragraphs 1 through 227 above are incorporated by reference.

229.     If the State of Ohio establishes that Norfolk Southern is responsible for damages, then such damages were contributed to by Third-Party Defendant Oxy Vinyls because of Oxy Vinyls' failure to exercise ordinary care by failing to properly certify the design, building, conversion, testing, modification, and requalification of hazardous materials tank cars and their components; failing to properly certify that the railcar used was compatible with the lading; failing to submit a scientifically accurate SDS; and/or failing to properly warn Norfolk Southern of the dangers of an uncontrolled vinyl chloride fire.

46

230.     If the State of Ohio establishes that Norfolk Southern is responsible for damages, then such damages were contributed to by Third-Party Defendant General American Marks Company and GATX Corporation because of General American Marks Company's failure to properly maintain Car 23's bearings by leaving the car stationary for periods in excess of six months.

231.     Under Ohio statute O.R.C. § 2307.22, Third-Party Defendants Oxy Vinyls, General American Marks Company, and GATX Corporation are liable for their share of all compensatory damages that represent economic loss.

232.     Under Ohio statute O.R.C. § 2307.25, Third-Party Defendants Oxy Vinyls, General American Marks Company, and GATX Corporation are liable to Norfolk Southern for contribution as to any costs that Norfolk Southern has paid and will pay in excess of its proportionate share of costs.

## COUNT TEN

**Equitable Contribution**
**(Oxy Vinyls, GATX Corporation, Trinity Industries Leasing Company, SMBC Rail Services LLC, Dow Chemical Incorporated, and Union Tank Car Company)**

233.     The allegations in paragraphs 1 through 232 above are incorporated by reference.

234.     If the State of Ohio establishes that Norfolk Southern is responsible for damages, then Norfolk Southern is entitled under general principles of equity to contribution from Third-Party Defendants for their full and fair share of costs incurred.

## PRAYER FOR RELIEF

WHEREFORE, Defendants and Third-Party Plaintiffs Norfolk Southern Railway Company and Norfolk Southern Corporation respectfully seek the following relief:

A.     Order the Third-Party Defendants to pay their fair and equitable share of

CERCLA response costs and other costs Norfolk Southern incurred and will

incur as a result of Third-Party Defendants' conduct through the date of judgment, including pre-judgment interest;

B.      Enter a judgment declaring the Third-Party Defendants' appropriate share of future response costs under CERCLA;

C.      Grant Norfolk Southern costs and interest as allowed by law; and

D.      Provide such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Norfolk Southern demands a trial by jury of all issues so triable.

Date: June 30, 2023                      Respectfully submitted,

By: /s/ *Davina Pujari*
Davina Pujari (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: (628) 235-1136
Fax: (628) 235-1001
Davina.Pujari@wilmerhale.com

Edward O'Callaghan (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel.: (202) 663-6956
Fax: (202) 663-6363
Edward.O'Callaghan@wilmerhale.com

Claire Guehenno (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 295-6524
Fax: (212) 230-8888
Claire.Guehenno@wilmerhale.com

Christopher A. Rheinheimer (admitted
*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: (628) 235-1000
Fax: (628) 235-1001
Chris.Rheinheimer@wilmerhale.com

Louis L. McMahon (0067378)
MCMAHON DEGULIS LLP
812 Huron Road, Suite 650
Cleveland, OH 44115
Tel.: (216) 367-1407
lmcmahon@mdllp.net

*Counsel for Defendants and Third-Party
Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, I caused a copy of the foregoing to be filed with the Clerk of the Court using the Court's CM/ECF electronic filing system, which will provide electronic notice to all counsel of record.

*/s/ Davina Pujari*
Davina Pujari (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: (628) 235-1136
Fax: (628) 235-1001
Davina.Pujari@wilmerhale.com

*Counsel for Defendants and Third-Party Plaintiffs*

# Exhibit
# B

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

---

**IN RE: EAST PALESTINE TRAIN DERAILMENT**

STEVEN MCKAY, SUSAN SCHEUFELE, KAYLA
BAKER, NEELY JACK, DAWN BAUGHMAN,
DAVID ANDERSON, JAMES ROSS, JON LUKE
AFFELTRANGER, ROSEMARY MOZUCH,
CHARLES MOZUCH, GREGORY SWAN, LANCE
BECK, CLARISSA COHAN, ROLLERENA AUTO
SALES LLC, HAROLD FEEZLE, DALQAN
HOLDINGS, LLC, VALLEY VIEW MPH LLC,
COMPETITION & LUXURY VEHICLE CLUB OF
HARLINGTON, LLC, individually and on behalf of all
others similarly situated,

       *Plaintiffs*,

    v.

NORFOLK SOUTHERN CORPORATION and
NORFOLK SOUTHERN RAILWAY COMPANY,

       *Defendants/Third-Party Plaintiffs*,

    v.

OXY VINYLS LP, GATX CORPORATION,
GENERAL AMERICAN MARKS COMPANY,
TRINITY INDUSTRIES LEASING COMPANY,

       *Third-Party Defendants*.

Case No. 4:23-CV-00242-BYP

JUDGE BENITA Y. PEARSON

**THIRD-PARTY COMPLAINT
JURY TRIAL DEMANDED**

---

**<u>NORFOLK SOUTHERN RAILWAY COMPANY AND
NORFOLK SOUTHERN CORPORATION'S THIRD-PARTY COMPLAINT</u>**

Pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Norfolk Southern"), by their undersigned counsel, for their Third-Party Complaint against Third-Party Defendants Oxy Vinyls LP, GATX Corporation, General American Marks Company, and Trinity Industries Leasing Company, allege as follows:

## INTRODUCTION

On the night of February 3, 2023, a Norfolk Southern train, Train 32N, derailed in East Palestine, Ohio. Norfolk Southern is a common carrier, which means it is required by federal law to accept and transport innumerable materials, including chemicals that are used to make everyday products. Train 32N was transporting several railcars containing chemicals, including five railcars containing vinyl chloride. Vinyl chloride is used to make polyvinyl chloride, or PVC, one of the most widely produced synthetic plastics, typically found in clothing, pipes, doors, windows, and residential construction. Norfolk Southern did not manufacture, load, or own the vinyl chloride and other chemicals that Train 32N was carrying on February 3, 2023, nor did it manufacture, lease, or own the railcars that contained the vinyl chloride and other chemicals.

In the United States, railroads are obligated as common carriers under 49 U.S.C. § 11101 to transport hazardous materials, including chemicals. This common-carrier obligation recognizes the public good of open access to rail transportation, which is the safest and most fuel-efficient means for the transport of hazardous materials. The responsibility for safe transport is shared among several interested parties, including the manufacturers of the railcars and safety devices, the owners and lessees of the railcars, the manufacturers and shippers of the material being transported, and the railroad. Each interested party along the way is regulated by a multitude of federal laws, regulations, and industry practices: railcars, railcar components, and hazardous materials tank cars are federally certified to meet physical

and safety requirements; specialized shipping procedures are required for chemicals; and inspections are conducted of the railcars and their safety features, the shipped materials, the tracks, and devices along the tracks.

Despite this regulatory scheme and the rail industry's focus on safety, incidents can occur. On February 3, 2023, Train 32N included a railcar owned by General American Marks Company. A bearing on that railcar failed and the car derailed. In turn, several railcars on Train 32N derailed. Norfolk Southern did not manufacture or own the bearing; did not manufacture, own, or lease the derailed railcar; and did not manufacture, own, or load the contents of that railcar. Nonetheless, Norfolk Southern responded to the derailment quickly and comprehensively, including by working to clean up the released materials, restore local waterways, and provide millions of dollars in assistance to residents and communities. Norfolk Southern is committed to being there for East Palestine and the surrounding communities for the long haul, and nothing in this Third-Party Complaint changes that.

At the same time, through this Third-Party Complaint, Norfolk Southern seeks to ensure that all necessary parties are involved. In the rail industry, a host of regulations and standards govern the design, materials, construction, conversion, and modification of railcars and their components. Shippers of chemicals are required to comply with handling procedures and, under federal hazard communications standards, must provide each transporter of a chemical with safety information. Compliance with these regulations and standards governing railcar equipment, compatibility with the lading, and safe handling are a centerpiece of safe railroad transportation. As set forth below, Third-Party Defendants failed to comply with their obligations, and in bringing this Third-Party Complaint, Norfolk Southern seeks only what is appropriate under the law.

## OVERVIEW OF CLAIMS

1.      Throughout the legal process following the East Palestine train derailment, Norfolk Southern has committed to making things right in the greater East Palestine area. Norfolk Southern has taken significant steps to assist the people of East Palestine and the surrounding area, including by providing millions of dollars in financial assistance to residents and communities. Norfolk Southern is committed to establishing long-term funds to address concerns about health, water quality, and residential property values as part of a final resolution of claims. Norfolk Southern also continues to remediate the derailment site with oversight by the U.S. Environmental Protection Agency, the Ohio Environmental Protection Agency, and other federal, state, and local regulatory agencies. Norfolk Southern has undertaken these steps without any financial assistance from other entities.

2.      This Third-Party Complaint does not change any of those commitments, but rather seeks to ensure that those responsible pay what is appropriate under the law.

3.      Thus, Norfolk Southern brings this Third-Party Complaint for damages under Ohio law for the negligence of Third-Party Defendants that failed to follow federal regulations, rules, and standards governing the compliance and certification of hazardous materials tank cars, failed to ensure that shipping equipment was compatible with the lading, failed to provide accurate hazardous communication information, and/or failed to properly maintain railcars and equipment.

## THE PARTIES

4.      Third-Party Plaintiff Norfolk Southern Railway Company, a Virginia company, is a subsidiary and principal operating company of Norfolk Southern Corporation. Norfolk Southern Railway Company conducted railroad operations in East Palestine, Ohio, on February 3, 2023.

5.      Third-Party Plaintiff Norfolk Southern Corporation, a Virginia corporation, is the parent of Norfolk Southern Railway Company.

6.      Third-Party Defendant Oxy Vinyls LP ("Oxy Vinyls"), a Delaware limited partnership, was at all relevant times the owner of railcars OCPX80235 ("Car 27"[1]), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53"), that derailed on February 3, 2023. Oxy Vinyls, shipping from its La Porte, Texas, facility, was additionally at all relevant times the shipper of TILX402025 ("Car 26"), Car 27, Car 28, GATX95098 ("Car 29"), and Car 53, all of which derailed on February 3, 2023.

7.      Third-Party Defendant GATX Corporation, a New York corporation, was at all relevant times the owner of Car 29.

8.      Third-Party Defendant Trinity Industries Leasing Company, a Delaware company and subsidiary of Trinity Industries Corporation, was at all relevant times the owner of Car 26.

9.      Third-Party Defendant General American Marks Company, a subsidiary of GATX Corporation, a Delaware Corporation, was at all relevant times the owner of railcar GPLX75465 ("Car 23") that derailed on February 3, 2023.

## JURISDICTION

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367.

## VENUE

11.      Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Norfolk Southern's claims occurred in the Northern District of Ohio. Additionally, this Third-Party Complaint is brought in an action already pending before this Court.

---

[1]      The car numbers used in this Third-Party Complaint refer to each railcar's position among the train's 149 railcars, which followed the two head-end locomotives. For example, Car 1 would refer to the train's first railcar, which would have been in the third position in the train overall.

## FACTUAL ALLEGATIONS

**A.     Railroad Transportation and Common Carrier Obligations**

12.     Railroads are one of multiple links in the chain of production, transportation, distribution, and consumption that connects American businesses and industries to the global economy.

13.     As common carriers, railroads have a statutory duty to provide "transportation or service on reasonable request" to all shippers. 49 U.S.C. § 11101(a). Railroads may not refuse to provide service because doing so would be inconvenient, unprofitable, or potentially risky.

14.     This common-carrier obligation also imposes a duty on railroads to transport hazardous materials, even when a railroad might prefer not to do so. Under this obligation, railroads have been charged with the safe transportation of materials such as crude oil, spent nuclear fuel, and a range of chemicals, among other hazardous materials.

15.     Railroads take the common-carrier obligation seriously and are the nation's most trusted transporter of hazardous materials. Incident rates stemming from the transport of hazardous materials by rail are at an all-time low, and more than 99.9% of hazardous materials reach their destination without incident. The railroad industry's accident rate is far lower than the accident rate for trucking—according to studies, trucks carrying hazardous materials are involved in nearly ten times the rate of fatal accidents. In addition, transport by rail has a lower environmental impact than trucking. Trains are four times more efficient than trucks and are able to move one ton of freight more than 470 miles on one gallon of diesel fuel.

16.     While railroads are the primary face of hazardous materials transportation, they are only one of many regulated steps in the transportation process. Generally, railroads

are responsible for train movement and track maintenance, but rely considerably on other entities for the safe transportation and delivery of hazardous goods.

17.    For example, railroads—like Norfolk Southern here—typically do not own tank cars that carry hazardous materials. Rather, they rely on tank car manufacturers and owners to ensure tank cars are compliant with federal laws and regulations, national and industry standards, and are capable of safely moving hazardous materials. *See generally* 49 C.F.R. part 180.

18.    Additionally, railroads rely on shippers for the safe loading, packaging, and inspection of hazardous goods. Shippers ensure, and certify to railroads pursuant to federal regulations, that hazardous materials are properly classified as hazardous, loaded into tank cars following specific steps, securely closed, labeled with a placard for outward hazardous identification, and shipped with proper identification and safety materials for the railroad and potential first responders to rely on. *See generally* 49 C.F.R. part 173.

19.    When a tank car carrying hazardous materials is presented to a railroad for shipment, the railroad is responsible for collecting shippers' certifications and other shipping papers, conducting a limited visual inspection of the tank car from the ground, and transporting the hazardous materials in a safe and expeditious manner. *See generally* 49 C.F.R. part 174.

20.    However, railroads are limited in their ability to conduct a detailed inspection or take other action. They cannot, for example, test or certify a tank car's safety-related mechanical functions—as car owners must do under 49 C.F.R. § 180.509 and other provisions—or load the hazardous materials to ensure proper stability and pressure for shipment—as chemical shippers must do under 49 C.F.R. § 173.22. It is the shipper that has the primary obligation to ensure that the railcar and equipment used are compatible with the lading.

21.     Ultimately, the safe transportation of hazardous materials depends on the care of each and every company involved in shipment. When accidents occur, as they did on February 3, 2023, each interested party is responsible for doing its part to address the impact.

**B.      The Fort Wayne Rail Line**

22.     Norfolk Southern operates a Class I freight railroad that connects twenty-two states and the District of Columbia across the eastern United States.

23.     From its headquarters in Atlanta, Georgia, Norfolk Southern manages operations for more than 19,000 route miles. It is the largest intermodal network in the eastern United States.

24.     The Fort Wayne rail line traces back to the 1850s, when it was built to connect Chicago, Illinois to Pittsburgh, Pennsylvania. The line runs from southwest to northeast across Indiana, then east and southeast across Ohio to Pittsburgh.

25.     Before crossing the border into Pennsylvania, the line runs through East Palestine, Ohio, at approximately milepost fifty.

26.     East Palestine is a village in Columbiana County near the Pennsylvania border, approximately twenty miles north of the Ohio River border separating Ohio from West Virginia. East Palestine was founded in 1828. Today, it is home to roughly 4,700 residents.

**C.      The February 3, 2023, Derailment**

27.     On February 3, 2023, Train 32N, a Norfolk Southern Railway general merchandise freight train, was traveling eastbound on the Fort Wayne Line of the Keystone Division through northeast Ohio.

28.     Train 32N was comprised of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive that was positioned between the 111th and 112th railcars.

29.     The train was assembled in Madison, Illinois, and was destined for Conway, Pennsylvania. On February 1, 2023, in Madison, a qualified mechanical inspector conducted a mechanical inspection and air brake test.

30.     One of Train 32N's cars was Car 23, a hopper car owned by General American Marks Corporation that was carrying polyethylene (plastic) pellets.

31.     Car 23 was received by Norfolk Southern at the interchange in the Terminal Railroad Association ("TRRA") of St. Louis yard in Madison and transferred by Alston & Southern Railway, a subsidiary of Union Pacific Railroad Company. At the TRRA yard, TRRA employees performed and certified a brake test on Car 23.

32.     Modern railcars, like Car 23, have roller bearings that transfer the weight of the car and its lading to the wheels. The bearings allow the axle to rotate under the load, while minimizing the rotational friction. Bearings are capable of overheating and, though uncommon, can cause derailments.

33.     Therefore, Norfolk Southern has equipped its network, including the Fort Wayne Line, with a hot bearing detector ("HBD") system. HBDs are devices that assess the temperature conditions of bearings and provide audible, real-time warnings to train crews and Norfolk Southern's Advance Train Control Wayside Help Desk—a twenty-four-hour alert desk in Atlanta—when bearing temperatures indicate potential overheating.

34.     HBDs provide alerts and alarms to train crews and the Wayside Help Desk when bearings report high temperatures above ambient temperature. Per Norfolk Southern's protocol in effect on February 3, 2023, if a bearing temperature reading exceeded 200°F above ambient temperature, a critical alarm would be triggered that required the train crew to stop the train. Another type of non-critical alarm would be triggered at 170°F above ambient temperature. And an alert created by Norfolk Southern—called a "953 alert"—would be

triggered based on a trending algorithm of train data to alert the Wayside Help Desk that a bearing may be overheating.

35.  Although the Federal Railroad Administration does not require the use of HBDs, at the time of the derailment, Norfolk Southern had HBDs spaced at a maximum of every forty miles. The average spacing of HBDs across Norfolk Southern's network is 13.9 miles.

36.  On the night of February 3, 2023, Norfolk Southern's HBD system on the Fort Wayne Line was in operation. Train 32N passed three HBDs in northeast Ohio in the thirty miles west of East Palestine. Approximately thirty miles before the derailment, near Sebring, Ohio, at milepost 79.8, the first of these three HBDs recorded a bearing on Car 23 at 38°F above ambient temperature. This temperature was within normal range and did not send any alert.

37.  When the train passed the next HBD about ten miles later outside Salem, Ohio, at milepost 69.01, the bearing's recorded temperature was 103°F above ambient temperature, still below the temperature threshold for any alarm. The Salem temperature did cause a 953 alert (not an alarm) to be sent to the Wayside Help Desk, but the temperature reading did not require any action by the Wayside Help Desk, as it was well below the threshold for any alarm.

38.  At the third HBD in East Palestine at milepost 49.81, the detector recorded a temperature of 253°F above ambient temperature, triggering a critical, audible alarm to the train crew. At this time, the Norfolk Southern train crew was traveling forty-seven miles per hour and already slowing the train because of train traffic ahead on the line. Upon receiving the critical alarm, the train engineer increased the brake application to further slow the train to a stop.

39.    During deceleration of the train, at approximately 8:54 p.m., the overheated bearing on Car 23 failed, and the car derailed near milepost 49.5.

40.    Thirty-eight railcars then also derailed from the main track, including the following eight tank cars:

  a.    Car 26, TILX402025, carrying vinyl chloride.

  b.    Car 27, OCPX80235, carrying vinyl chloride.

  c.    Car 28, OCPX80179, carrying vinyl chloride.

  d.    Car 29, GATX95098, carrying vinyl chloride.

  e.    Car 34, SHPX211226, carrying ethylene glycol monobutyl ether.

  f.    Car 36, DOWX73168, carrying 2-ethyl hexyl acrylate.

  g.    Car 48, UTLX205907, carrying butyl acrylates.

  h.    Car 53, OCPX80370, carrying vinyl chloride.

41.    Cars 26, 27, 28, 29, and 53, among others, were subsequently involved in pool fires that lasted until on or about February 6, 2023.

**D.    The Derailed Tank Cars**

42.    Three tank cars carrying chemicals—Cars 34, 36, and 48 (the non-vinyl chloride cars)—were breached in the derailment:

  a.    Car 34 was breached, with damage to the B-end top head of the tank, and its bottom outlet valve fully opened. Car 34 released its load of roughly 25,000 gallons of ethylene glycol monobutyl ether.

  b.    Car 36 had cracks to the B-end top head and B-end bottom head of the tank, and the A-end bottom head was punctured. Car 36 released part of the roughly 29,000 gallons of 2-ethyl hexyl acrylate in its load.

     c.     Car 48's A-end bottom head was punctured, and its manway gaskets

          burned away. Car 48 released its load of roughly 30,000 gallons of

          butyl acrylates.

43.     Cars 34, 36, and 48 were all DOT-111 tank cars.

44.     The DOT-111 is an unpressurized general-service tank car with a gross load weight of approximately 286,000 pounds and a capacity of 30,000 or less gallons.

45.     Though one of the most common general-service tank cars, the DOT-111 tank car is a legacy car and subject to a federal phase-out for use transporting flammable liquids. The potential replacement, the DOT-117J, features a thicker tank shell, thermal protection system, and additional features.

46.     Five derailed tank cars were DOT-105J300W specification tank cars carrying vinyl chloride (also referred to as "vinyl chloride monomer" or "VCM"), a chemical that is transported as a compressed liquified gas.

47.     These five tank cars were Cars 26, 27, 28, 29, and 53.

     a.     Car 26 was owned by Trinity Industries Leasing Company and shipped

          by Oxy Vinyls.

     b.     Cars 27, 28, and 53 were owned and shipped by Oxy Vinyls.

     c.     Car 29 was owned by GATX Corporation and shipped by Oxy Vinyls.

48.     The DOT-105J300W is a standardized tank car with a gross rail load of 263,000 pounds and full water capacity of between 23,570 and 25,742 gallons. By federal regulation, DOT-105 pressure tank cars must have a minimum plate thickness, plate materials that comply with minimum tensile strength, approved venting, loading, and unloading valves, and must be tested in compliance with federal testing procedures. *See* 49 C.F.R. Subpart C, § 179.100 *et seq.*

49.     The five DOT-105J300W tank cars carrying vinyl chloride were manufactured by Trinity Tank Car, Incorporated.

50.     All five tank cars were "fully loaded," carrying approximately 178,000 pounds of vinyl chloride each.

51.     Tank cars carrying pressurized gases are typically outfitted with a reclosing pressure relief device ("PRD"), which is designed to activate automatically to relieve pressure from a tank car when the tank's contents exceed a pressure threshold.

52.     Each of the five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53—were equipped with a PRD designed and manufactured by Midland Manufacturing Corporation.

53.     Tank cars also have a thermal protection system, which consists of a layer of insulated fiber between the tank and outer jacket meant to limit the amount of external heat transferred to the internal tank contents. Federal performance standards for the thermal protection systems aim to protect the internal tank contents from an external pool fire for approximately 100 minutes. After this time, heat will reach the internal tank and the PRD will activate.

54.     Each vinyl chloride tank car was also outfitted with protective housing covers. Cars 27, 28, and 29 were fitted with protective housing covers made of aluminum, and Cars 26 and 53 were fitted with protective housing covers made of steel.

**E.     Vinyl Chloride and Polymerization**

55.     Vinyl chloride is a flammable gas, transported in a pressurized liquid state, that is used to make PVC, a common synthetic plastic polymer.

56.     Vinyl chloride must be stabilized for safe transportation to prevent contact with reactive agents like oxygen. Chemical shippers typically utilize two methods of stabilization: mixing the liquified vinyl chloride with a chemical stabilizer such as phenol;

and/or purging the tank car with nitrogen prior to filling the car so the oxygen concentration is below 200 parts per million.

57.     Oxy Vinyls, which shipped the vinyl chloride in Cars 26, 27, 28, 29, and 53, utilized oxygen purging to stabilize its vinyl chloride.

58.     Vinyl chloride is reactive with various external conditions and materials. Under prolonged exposure to fire or intense heat, liquefied vinyl chloride turns to vapor and expands, which can cause its container to violently rupture and explode. An uncontrolled vinyl chloride explosion can result in the release of hydrogen chloride, phosgene, and carbon monoxide gases, and the resulting rupture can launch tank shrapnel hundreds of feet or more into the surrounding area. This reaction is called a boiling liquid evaporating vapor explosion ("BLEVE").

59.     In the history of chemical shipping, BLEVE incidents have resulted in multiple deaths, mass evacuations, and significant damage to property caused by the violent rupture of the tank car.

60.     Another effect of heating vinyl chloride is polymerization, a chemical reaction that turns vinyl chloride into a solid-state polymer. The industry literature on vinyl chloride for railroad transportation is nearly uniform in stating that vinyl chloride is capable of polymerizing at heightened temperatures caused by fire or radiant heat. *See, e.g.*, The Chlorine Institute & The Vinyl Institute, *Pamphlet 171, Vinyl Chloride Monomer (VCM) Tank Car & Cargo Tank Handling Manual*, 4-5 (1st ed. July 2018) ("Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM: air, sunlight, excessive heat, oxidizers, catalytic metals such as copper and aluminum and their alloys, and certain catalytic impurities."); Richard P. Pohanish, *Sittig's Handbook of Toxic and Hazardous Chemical and Carcinogens*, 2700 (6th ed. 2012) ("Polymerizes in air, sunlight, heat, and on contact with a catalyst, strong

oxidizers, and metals, such as aluminum and copper, unless stabilized by inhibitors, such as phenol.").

61.     Additionally, polymerization can accelerate the risks of a BLEVE by blocking pressure release devices that are intended to allow the release of gas pressure when it is higher than the tank car is designed to contain.

62.     Though Oxy Vinyls is now discounting the risk that stabilized vinyl chloride can polymerize due to heating alone, the chemical data sheet that Oxy Vinyls provided to Norfolk Southern warns of the polymerization and explosion risks of vinyl chloride due to excessive heating.

63.     Chemical manufacturers are required by federal regulation to provide these chemical data sheets, called a Safety Data Sheet ("SDS"), for each chemical they make. *See* 29 C.F.R. § 1920.1200(g). The SDS must "accurately reflect[] the scientific evidence used in making the hazard classification," and must be continually updated. *Id.* § 1920.1200(g)(5), (6). The SDS must include, among other things, information covering handling and storage, accidental release measures, and the chemical's stability and reactivity, including whether the chemical will react or polymerize in various conditions. *Id.* § 1920.1200(g)(2).

64.     The vinyl chloride SDS that Oxy Vinyls provided to Norfolk Southern described the above risks, noting that vinyl chloride "MAY MASS EXPLODE IN FIRE. EXTREMELY FLAMMABLE GAS. CONTAINS GAS UNDER PRESSURE, MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR." *See* Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet*, 2 (Nov. 30, 2020).

65.     Further, Oxy Vinyls' SDS warned that vinyl chloride "[r]equires stabilizer to prevent potential dangerous polymerization." *Id.* The SDS warns about hazardous polymerization and notes: "*Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM*: Air,

Sunlight, Excessive heat, Oxidizers, Catalytic metals, such as *copper*, *aluminum* and their alloys and certain catalytic impurities. Avoid *elevated temperatures*, oxidizing agents, oxides of nitrogen, oxygen, peroxides, other polymerization catalysts/initiators, air and sunlight." *Id.* at 10 (emphasis added).

66.     The SDS also warns of incompatible substances, listing "aluminum" and "aluminum alloys," and noting: "Explosive or violent polymerization can occur when exposed to air, sunlight, or excessive heat if not properly stabilized. Polymerizes exothermically in the presence of light, air, oxygen, or catalyst. Reacts with the following incompatible materials and create a strong exothermic reaction: oxygen, moisture, polymerization additives, copper, aluminum…." *Id.*

67.     In the case of a railcar fire, the SDS warns to "[l]et burn unless leak can be stopped immediately." *Id.* at 6.

68.     Oxy Vinyls has acknowledged that its SDS for vinyl chloride contained this information.

69.     The information on vinyl chloride in Oxy Vinyls' SDS also matches Norfolk Southern's own emergency safety guidance for vinyl chloride, which notes that the chemical "[p]olymerizes in air, sunlight, or heat unless stabilized by inhibitors such as phenol"; "[r]eacts with copper, aluminum…." Norfolk Southern Corp., *Emergency Safety Guide, Vinyl Chloride Division 2.1* (Flammable Gas), 1 (Sept. 2006). The guidance also warns that exposure of vinyl chloride containers "to fire or heat may result in violent polymerization" and that "[e]xcessive heat, light, or air may cause spontaneous violent polymerization resulting in container rupture." *Id.* at 2.

70.     Additionally, the U.S. Department of Transportation's Emergency Response Guidebook ("ERG 2020 Guidebook"), which is intended for use by first responders during hazardous materials incidents, designates vinyl chloride as a chemical capable of explosively

polymerizing when heated or involved in fire. This guidance defines substances as capable

for polymerization when it "may polymerize violently under high temperature conditions or

contamination with other products during a transportation incident," as well as where there is

a "strong potential for polymerization in the absence of an inhibitor due to depletion of this

inhibitor caused by accident conditions." *See* U.S. Dep't of Transp., Pipeline and Hazardous

Materials Safety Admin., *2020 Emergency Response Guidebook*, 381 (2020).

71.    In line with this definition, the bills of lading provided by Oxy Vinyls for each

of the vinyl chloride shipments state that "substances designated with a (P) may polymerize

explosively when heated or involved in a fire." This language is taken directly from and

references the ERG 2020 Guidebook, which designates "vinyl chloride, stabilized" with a

"P." *Id.* at 31, 168.

## F.    The Derailment Response

72.    On February 3, 2023, at 8:56 p.m. local time, minutes after the critical alarm

sounded in the engineer cabin, the train crew on Train 32N contacted local dispatchers and

the Norfolk Southern Wayside Help Desk regarding an emergency and possible derailment.

73.    Local first responders arrived on scene by 9:00 p.m. local time and began

responding to small spreading pool fires. Within the hour, East Palestine dispatch requested

hazardous material ("hazmat") support, additional responders, and emergency responders

from Columbiana County, Ohio, and Beaver County, Pennsylvania.

74.    By midnight, a Unified Command team was formed comprised of local first

responders and personnel from the Ohio Environmental Protection Agency, Pennsylvania

Department of Environmental Protection, Norfolk Southern Hazmat Team, Pennsylvania

State Police, Beaver County Hazmat Response Team, U.S. Environmental Protection

Agency, Ohio Emergency Management Agency, and Ohio and Pennsylvania state officials.

75.     In the initial hours after the derailment, local firefighters responded to small spreading fires and the Unified Command team monitored the derailed tank cars. Over time, the fires grew into hot, active fires that surrounded the derailed railcars.

76.     Shortly after midnight, on February 4, 2023, the PRDs on the vinyl chloride tank cars began activating and releasing pressure in a cycle of thirty seconds on (releasing) and two minutes off.

77.     Because of the surrounding pool fires, the flammable gas venting from the PRDs ignited, which upon information and belief began to melt part or all of the tank car liquid transfer valves and fittings.

78.     Midland Manufacturing Corporation, which manufactured the PRDs, only tests PRDs with air. They are not tested to ensure their ability to withstand flame, heat, or corrosion from materials that can be expelled when the PRD activates.

79.     The PRDs continued to vent through the early morning hours of February 4, 2023, cycling between venting and pausing for approximately twelve hours.

80.     As the PRDs continued to vent, on-site responders, which included hazmat and tank derailment specialists, began assessing the damage to the tank cars to plan for next steps.

81.     Following a tank car derailment and fire, responders typically have four options: First, responders can re-rail the tank car and move it to the next destination if they determine there is no tank damage. Second, if the tank car is damaged and cannot be safely re-railed and moved, responders can transfer the product from the tank car using the transfer valves. This method requires working valves and access to the cars for a prolonged period of time. Third, responders can transfer the product via "hot tapping," a procedure that involves welding a transfer valve onto the tank, drilling a hole in the tank, and transferring the remaining liquid product through the hole. This third option carries significant risks, because

the welder might accidentally weld and drill into a gaseous space, rather than into the liquid; this can ignite the tank car and cause a BLEVE. Further, if the tank car's structural integrity is compromised, welding can cause cracking in the still-pressurized tank car, which can also cause a BLEVE. Hot tapping also requires prolonged exposure to a tank car that may be experiencing increased pressurization and BLEVE conditions. The fourth option, and the last resort, is to conduct a controlled "vent and burn." During a vent and burn, responders place a series of explosive charges on the tank cars, which detonate and puncture holes at the top and bottom of the car to burn off pressurized gas (from the top) and expel liquid (from the bottom) in a controlled manner. Although a last resort option, a vent and burn is the safest option when the other strategies are infeasible or carry too high a risk of loss of life.

82.     After venting vinyl chloride for approximately twelve hours, the PRDs stopped venting in the early afternoon of Saturday, February 4, 2023. By that same afternoon, the pool fires at the derailment site began to die down.

83.     At that point, responders sent in two "assess and entry" teams to the east and west ends of the derailment site to monitor the potential pressure conditions of the vinyl chloride tank cars. Because of the damage to the tank cars, responders concluded they were not able to re-rail the tank cars. They further determined that product transfer was not viable because the seals and gaskets within the transfer valves were damaged by heat. Therefore, responders began assessing the cars to implement a hot-tap option.

84.     As responders were monitoring that afternoon, the PRD on Car 28 activated again and began to continuously vent gas for approximately 70 minutes. The pressure relief was described by a hazmat specialist as akin to a violent and sudden roar of fury following two hours of calm. It scared responders with decades of experience handling hazmat derailment responses. Specifically, responders were concerned that pressure and heat were building inside the Car 28 tank, even though the pool fire under Car 28 and surrounding pool

fires had extinguished hours ago, indicating that the rising heat was from an internal process and not the external fires.

85.     The next day, on February 5, 2023, responders went into the derailment zone to assess the vinyl chloride tank cars, where they found that the tank shell on Car 53 was exposed due to jacket damage. They were able to get alongside the tank car, but did not hear any audible hiss from the protective housing, liquid lines, vapor lines, or PRD, and reported a negative reading on their meter testing for volatile organic compounds. This indicated to responders that the tank car was not leaking or releasing any gas.

86.     Responders also touched the tank shell inside the jacket of Car 53 and found that the tank was hot, even though surrounding pool fires had died down hours before. Using a thermal imaging camera, responders recorded a temperature of 135°F through a small opening in the jacket, followed by a temperature of 138°F one hour later. Again, responders became concerned that the tank temperature and pressure were rising without external stimulus.

87.     Responders attempted to record the temperatures on the other vinyl chloride tank cars. Where possible, assess and entry teams were able to record temperatures of around 65°F. However, because responders were only able to obtain temperature readings with the thermal imaging cameras through small holes in the jacket without verifying the readings were measuring the temperature of the tank itself—as opposed to the outer jacket— responders discounted the accuracy of these temperature readings.

88.     The elevated temperature on Car 53 and sudden extended venting from Car 28 without a pool fire underneath it caused responders to become concerned about the potential for a catastrophic explosion.

89.     According to chemical industry groups, the temperature of a tank of vinyl chloride measuring "above ambient temperature may imply that the [vinyl chloride] is

polymerizing inside the tank car." The Chlorine Institute & The Vinyl Institute, *Pamphlet 171, Vinyl Chloride Monomer (VCM) Tank Car & Cargo Tank Handling Manual*, at 36. Furthermore, vinyl chloride polymerization is a form of living polymerization and is an exothermic (heat-releasing) process. The rate of polymerization can accelerate thereby generating more heat in a closed-loop system that cycles and can become uncontrollable. Indeed, a key component of controlled vinyl chloride polymerization in the production of PVC is the *removal* of heat through effective thermal management of the process.

90.     The pause in the PRD venting and the inspection of Car 53 indicated to Unified Command that polymerization may have blocked the PRDs on Car 28 and the other vinyl chloride tank cars. Based on guidance from Oxy Vinyls, responders understood that a tank car temperature of 185°F could lead to runaway polymerization and explosion.

91.     Due to the re-activation of the PRD on Car 28 and the unknown liquid levels in the remaining tank cars, hot tapping the cars was considered too high a risk to the welders, who could inadvertently ignite the tank car if they struck gas, would be unable to transfer the product if the tank contained polymer, and could risk reigniting the pool fires throughout the derailment site.

92.     Responders spoke to the on-site representative of Oxy Vinyls—the vinyl chloride manufacturer—who commented that the rising temperature could indicate that polymerization was occurring. Responders also spoke with a support team operating out of the Oxy Vinyls corporate office in Dallas, Texas, which explained its belief that there was a low probability of polymerization and that the PRD was likely responding to other conditions or had a mechanical malfunction.

93.     On a subsequent call, an Oxy Vinyls senior vice president of manufacturing who was not on the scene stated that polymerization was not occurring. The Dallas team also concluded that at least three of the vinyl chloride tank cars were nearly empty. This

determination was made based in part on temperature readings that responders considered inaccurate.

94.     Responders attempted to collect further tank car measurements. While they continued collecting potential readings through the small holes in the jackets, responders were unable to collect internal tank pressure measurements due to the compromised valve assemblies and risk of placing personnel alongside dangerously unstable tank cars.

95.     On the evening of February 5, 2023, responders reported to Unified Command that the temperature trends and dangerous conditions for hot tapping led hazmat specialists to believe that a vent and burn would be the safest option. Responders were also concerned about polymerization, although polymerization was not the only reason that a vent and burn was considered the safest option.

96.     On the morning of February 6, 2023, Unified Command met to discuss strategies to relieve the pressure in the five vinyl chloride tanks and avoid a catastrophic uncontrolled explosion. By approximately noon, Unified Command agreed that a vent and burn of all five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53—should occur. As noted, Unified Command included the U.S. Environmental Protection Agency, National Guard, Ohio state agencies, Pennsylvania state agencies, and local first responders.

97.     At approximately 4:37 p.m. local time on February 6, 2023, Unified Command provided by radio the official green light to execute the vent and burn, and the response team detonated controlled explosives on the five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53.

98.     The released vinyl chloride burned through the night of February 6, 2023.

99.     During the vent and burn, video footage reportedly identified pure polymer, indicating a polymerization reaction, releasing from two of the vinyl chloride tank cars.

100.     Additionally, the PRDs on Car 28—on which the PRD re-activated—and Car 53—which had a recorded temperature of 138°F—were found to be corroded. According to the PRD manufacturer, Midland Manufacturing Corporation, these PRDs are not tested for fire conditions.

101.     The vent and burn was executed effectively and resulted in no casualties.

**G.     Railroad Regulation and Industry Standards**

102.     The railroad industry is regulated through a combination of federal laws, regulations, and industry standards set by the Association of American Railroads ("AAR"). Norfolk Southern, as a Class I freight railroad, is a member of the AAR.

103.     Rail transportation of hazardous materials is regulated under Title 49, subtitle B, chapter 1, subpart C. These regulations divide obligations for hazardous materials transportation among shippers, railroads, and car owners. *See, e.g.*, 49 C.F.R. §§ 173 (detailing shipper responsibilities), 174 (detailing railroad responsibilities), 180 (detailing car owner responsibilities).

104.     Alongside federal regulations, the AAR publishes rules and standards for the design, operation, maintenance, inspection, and repair of railcars and their components. Among these are the Manual of Standards and Recommended Practices ("MSRP") and the Interchange Rules. These rules set the standards for the movement of railcars and the safety and interoperability of railcar equipment. All freight railroads, interchange freight car owners, and repair agents must subscribe to the Interchange Rules.

105.     The Interchange Rules also divide and assign responsibilities for maintenance and inspection in rail transportation between car owners, railroads, and other entities. For example, the Interchange Rules establish that car owners are responsible for and chargeable for repairs to their railcars necessitated by wear and tear.

### H.    Car 23 Was Improperly Maintained

106.    Car 23, which derailed first, was a hopper car owned by General American Marks Company.

107.    The bearing on Car 23 was manufactured by the Timken Company. Timken's Bearing Install Manual states that "[c]ars, coaches, and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces." Timken, *Installing and Maintaining Timken AP and AP-2 Bearings, Diesel Locomotive, Passenger and Freight Car Applications*, 25 (2015).

108.    Industry practice is to prevent railcars from sitting stationary for long periods because grease separation may occur, which reduces the amount of lubrication around the bearings and may impact functionality.

109.    Car 23 operated out of the Gulf States, with shipments from New Orleans and other locations along the Gulf Coast.

110.    According to car movement data, Car 23 had few shipments and low mileage over the prior decade.

111.    Upon information and belief, Car 23 was twice stationary for longer than six months: first for 565 days ending in August 2018 and again for 206 days ending in May 2019.

112.    When a bearing sits for extended periods of time, especially in heat, rain, or extreme weather, the grease in the bearing can separate and degrade the bearing. Water damage—such as that caused by sitting in heavy rain, hurricanes, or flooding—can cause friction and quickly degrade the bearing.

113.    Under the AAR Interchange Rules, car owners must inspect and, if necessary, repair or replace railcars or components at any time after the car is partially or fully submerged in water.

114.    Due to the construction of the bearings and where they are installed inside the wheelset, the full condition of the bearings cannot be inspected by the railroad without disassembling the bearings from the wheelset.

## I.    Third-Party Defendant Railcar Owners Are Responsible for the Compliance and Maintenance of Railcars Carrying Chemicals

115.    Railcar owners direct the workings of, manage, and conduct the affairs of rolling stock, including tank cars carrying hazardous materials.

116.    Railcar owners are responsible for a variety of compliance and maintenance measures for tank cars that carry hazardous materials. For example, railcar owners are responsible for the certification, qualification, compliance, and maintenance of railcars and components, such as the thermal protection system, PRDs, and valves. *See, e.g.*, 49 C.F.R. §§ 180.501 (general applicability), 180.507 (qualification requirements), 180.509 (inspection requirements), 180.517 (reporting requirements).

117.    Under the AAR Interchange Rules, railcar manufacturers must have the construction and design of railcars used for hazardous materials transportation approved. The valves, fittings, PRDs, and other car components must also receive standalone approval.

118.    This industry rule is incorporated by 49 C.F.R. § 179.3, pursuant to which the United States Department of Transportation assigns to AAR the authority to approve design, materials, construction, conversion, and modification of tank cars in accordance with the AAR MSRP Specification for Tank Cars and the federal regulatory specifications.

119.    Any changes to the tank car design or components must also be approved. *See* 49 C.F.R. § 179.6. This additional certification is required to ensure that changes to tank cars do not render them unsafe for transportation of hazardous materials.

120.    Here, there were multiple discrepancies, identified by the Federal Railroad Administration, between the approved documents and the actual physical characteristics of the vinyl chloride tank cars on Train 32N.

      a.     Trinity Industries Leasing Company's Car 26 has discrepancies between its AAR 4-2 certificate of construction and the tank car's actual characteristics.

      b.     For GATX Corporation's Car 29, the tank car valve was replaced with a Midland 720 valve without approval. Additionally, this Car's PRD, which had a 225 psi start, was replaced without approval with a PRD with a 247.5 psi start. Finally, according to the Federal Railroad Administration, Car 29 was never approved for vinyl chloride service, which has a special regulatory provision.

      c.     All three vinyl chloride tank cars owned by Oxy Vinyls—Cars 27, 28, and 53—have missing or incorrect information on their AAR Form 4-2. For example, Car 27 has modifications that were not properly documented or approved, including changes to two component parts that modified the material from carbon steel to stainless steel.

121.    Following the approved construction of a tank car, the builder must furnish a Certificate of Construction to the tank car owner certifying that the tank, equipment, and car fully conform to the regulations. *See* 49 C.F.R. § 179.5(a).

122.    The owners of tank cars carrying hazardous materials are required to continue this certification process. Tank cars marketed as a "DOT" specification—like the DOT-111 or DOT-105—must meet all regulatory requirements for tank car specifications, and each owner "must retain the certificate of construction (AAR Form 4-2) and related papers certifying that the manufacture of the specification tank car identified in the documents is in accordance with the applicable specification." 49 C.F.R. §§ 180.507, 180.517.

123.    Additionally, DOT specification tank car owners are responsible for the inspection, testing, and requalification of the tank car's structural integrity, thickness, internal

coating or lining, leakage under pressure, and service equipment like PRDs, at set temporal intervals. *See* 49 C.F.R. § 180.509 *et seq.*

124.    These areas of responsibility—the certification, qualification, compliance, and maintenance—all dictate tank car operations related to the transport of hazardous materials and are the sole domain of car owners.

125.    Railroads have discrete inspection duties and rely on the work of tank car owners to ensure that compliant tank cars are used for safe transport. For example, the railroads are required by federal regulation to inspect each railcar "visually" and "at ground level," but do not climb up on tank cars to inspect PRDs. 49 C.F.R. §§ 174.9(a), 174.9(b). While railroads are required to receive shippers' certifications and shipping papers for hazardous materials shipment, railroads are not responsible for the certified design, building, conversion, testing, modification, and requalification of tank cars.

126.    It is this certified design, building, conversion, testing, modification, and requalification of hazardous materials tank cars that ensures that tank cars containing flammable chemicals can be safely transported.

**J.      Third-Party Defendant Shipper is Responsible for the Compliance and Maintenance of Railcars**

127.    Chemical shippers also direct the workings of, manage, and conduct the affairs of rolling stock, including tank cars carrying chemicals.

128.    Chemical shippers control tank cars carrying chemicals by exercising control over the cars' environmental compliance in a manner that directly prevents—or permits—a release of hazardous substances.

129.    Shippers are responsible for a variety of compliance and maintenance measures for hazardous tank cars. *See generally* 49 C.F.R. § 173.1 *et seq.*

130.    For example, shippers are responsible for the proper loading and labeling of the tank car, which includes federal certification of the proper packaging of the commodity and placement of tank car placards. *See* 49 C.F.R. §§ 173.31, 172.508.

131.    For vinyl chloride, shippers must ensure it is properly mixed with inhibitors or otherwise stabilized to prevent negative effects like violent polymerization. Shippers use a chemical inhibitor to prevent polymerization and/or purge the tank of oxygen with nitrogen prior to filling the tank so oxygen levels are below 200 parts per million.

132.    Oxy Vinyls has stated that it used oxygen purging to stabilize the vinyl chloride for shipment.

133.    As discussed, by federal regulation, chemical manufacturers and importers must also develop an SDS for each hazardous chemical they produce or import that identifies, among other items, accidental release measures, stability and reactivity, and fire-fighting measures. *See* 29 C.F.R. § 1910.1200(g).

134.    The vinyl chloride SDS prepared by Oxy Vinyls and provided to Norfolk Southern warned of the risks of polymerization, noting in twelve instances some variation of the warning that vinyl chloride "MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR" if the vinyl chloride is exposed to "air, sunlight, excessive heat" and/or "Catalytic metals, such as copper, aluminum, and their alloys." Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet* at 2, 10.

135.    Upon information and belief, in the aftermath of the derailment and vent and burn, aluminum and copper were found in the vinyl chloride tank cars:

    a.    Car 26 had aluminum found in samples of the interior surface of the manway nozzle and aluminum coating on the PRD springs.

    b.    Car 27, which had been fitted with a protective housing cover made of aluminum that was missing or destroyed, had aluminum in the exterior

surface of the PRD spring in the top guide discharge port of the PRD. Additionally, Car 27 had an aluminum angle valve handwheel, and melted aluminum was found around the base of one of the liquid discharge valves.

c.   Car 28 had aluminum angle valve handwheels and had been fitted with a protective housing cover made of aluminum that was missing or destroyed. Further, aluminum was found in a sample taken from the interior surface of the manway nozzle, top fitting of the protective housing, and around the base of both liquid valves.

d.   Car 29, which had been fitted with a protective housing cover made of aluminum that was missing or destroyed, had aluminum found in exterior debris of the protective housing and housing cover on the tank car, as well as a residue sample containing copper inside the tank next to a vent and burn breaching hole. Further, Car 29's angle valves were covered in solidified melted aluminum after the derailment, and its angle valve handwheels were missing.

e.   Car 53 had angle valve handwheels constructed from aluminum.

136.   By federal regulation, chemical shippers like Oxy Vinyls are also responsible for their chemicals' shipping certification. Shippers may not offer a hazardous material for transportation without a determination "that the tank car is in proper condition and safe for transportation," which requires at minimum a visual inspection of the tank, thermal protection system, valves, and PRDs. 49 C.F.R. § 173.31(d).

137.   Shippers cannot offer a hazardous material for transportation in a tank car unless that tank car meets the applicable specification and packaging requirements, including the approved certificate of construction. 49 C.F.R. § 173.31(a). Shippers must ensure that

hazardous materials are in containers that have been manufactured, assembled, and marked in accordance with various regulations, including AAR tank construction requirements under 49 C.F.R. part 179, 49 C.F.R. § 173.22.

138.    As described above, Oxy Vinyls offered the five vinyl chloride tank cars for shipment without complete approvals and certifications.

139.    Ultimately, it is the shipper that is responsible for ensuring that the equipment used is compatible with the lading and can safely contain the commodity.

140.    While railroads like Norfolk Southern must also inspect the tank cars from the ground, ensure proper shipping papers, and perform other duties related to rail movement, railroads rely on the accurate federal approvals and certifications of shippers that the equipment and lading are compatible.

141.    When an incident occurs, as it did on February 3, 2023, railroads like Norfolk Southern rely on the accurate representations of shippers during the response.

**K.    Norfolk Southern Has Incurred Response Costs Before and Pursuant to an EPA Unilateral Administrative Order**

142.    Following the derailment, the U.S. Environmental Protection Agency ("EPA") mobilized to the derailment site in East Palestine, Ohio, along with various federal, state, and local agencies.

143.    On February 21, 2023, EPA determined that the derailment site posed an imminent and substantial threat to human health and the environment and issued a Unilateral Administrative Order to Norfolk Southern under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

144.    EPA's Unilateral Administrative Order required Norfolk Southern to implement specific response activities, and incur all associated costs, related to air monitoring and sampling, the identification and delineation of contamination, the containment and remediation of contaminated areas, the removal and disposal of hazardous substances, and

additional actions needed to prevent imminent and substantial endangerment to public health or the environment.

145.    Norfolk Southern has incurred and will incur substantial response costs related to the release of substances resulting from the derailment, pool fires, vent and burn, and firefighting efforts.

146.    In addition, by separate actions in the Northern District of Ohio (Nos. 23-CV-517, 23-CV-675) (Adams, J.), the United States and State of Ohio have brought claims under federal and state law seeking reimbursement of their response costs.

147.    Norfolk Southern has paid millions of dollars and will continue to pay for the comprehensive environmental response in East Palestine. Norfolk Southern is committed to making it right in East Palestine and the surrounding communities. It brings this action to ensure that all necessary parties are involved.

## CLAIMS FOR RELIEF

### COUNT ONE

**Negligence**
**(Oxy Vinyls, GATX Corporation, and Trinity Industries Leasing Company)**

148.    The allegations in paragraphs 1 through 147 above are incorporated by reference.

149.    In owning and maintaining rolling stock transported by Norfolk Southern, Oxy Vinyls, GATX Corporation, and Trinity Industries Leasing Company were obligated to exercise care for the safety of individuals and entities whose persons or property were within reasonable proximity to the rail line, Norfolk Southern's employees and its property, and the environment.

150.    In ensuring the certified design, building, conversion, testing, modification, and requalification of hazardous materials tank cars that ensures that tank cars containing chemicals can be safely transported, Oxy Vinyls, GATX Corporation, and Trinity Industries

Leasing Company were obligated to exercise reasonable and ordinary care, and/or that degree of care that a similarly situated railcar owner would use under the same or similar circumstances.

151.    Oxy Vinyls, GATX Corporation, and Trinity Industries Leasing Company failed to exercise ordinary care by failing to properly certify the design, building, conversion, testing, modification, and requalification of hazardous materials tank cars and their components. By federal regulation, car owners must receive approval for the car construction and any design or component change. 49 C.F.R. §§ 179.3, 179.6. Car owners must continually certify this approval. 49 C.F.R. §§ 180.507, 180.517.

152.    Each car carrying vinyl chloride had discrepancies between its federal certified and approved certificate of construction and the tank car's actual characteristics:

    a.    Trinity Industries Leasing Company's Car 26 has discrepancies between its AAR 4-2 certificate of construction and the tank car's actual characteristics.

    b.    For GATX Corporation's Car 29, the tank car valve was replaced with a Midland 720 valve without approval. Additionally, this Car's PRD was replaced from a PRD with a 125 psi start to a PRD with a 247.5 psi start without approval. Finally, Car 29 was never approved for vinyl chloride service, which has a special regulatory provision.

    c.    All three vinyl chloride tank cars owned by Oxy Vinyls—Cars 27, 28, and 53—have missing or incorrect information on their AAR form 4-2. For example, Car 27 has modifications that were not properly documented or approved, including changes to two component parts that modified the material from stainless steel to carbon steel.

153.     The damage and release of hazardous materials from Cars 26, 27, 28, 29, and 53 were, in part, the result of Third-Party Defendants' failure to follow federal regulations and industry rules on the design, build, testing, modification, and qualification of hazardous materials tank cars and their components.

154.     As a direct and proximate result of Third-Party Defendants' negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

## COUNT TWO

### Negligence
### (Oxy Vinyls)

155.     The allegations in paragraphs 1 through 147 above are incorporated by reference.

156.     In undertaking to ship vinyl chloride by rail, Oxy Vinyls was obligated to exercise care for the safety of Norfolk Southern's employees, its property, those individuals and entities whose persons or property were within reasonable proximity to the rail lines, and the environment.

157.     By shipping vinyl chloride, Oxy Vinyls was obligated to exercise reasonable and ordinary care, and/or that degree of care that a similarly chemical shipper would use under the same or similar circumstances.

158.     As a shipper, Oxy Vinyls was required to ensure that the equipment used in shipping was compatible with the lading and could contain vinyl chloride.

159.     By regulation, Oxy Vinyls was required to certify that the tank cars met the applicable specification and packaging requirements, including the approved certificate of construction, and certify that the tank cars were manufactured, assembled, and marked in accordance with AAR tank construction requirements. 49 C.F.R. §§ 173.22, 173.31(a).

160.    Consistent with these requirements, Oxy Vinyls certified that its tank cars and components were suitable for vinyl chloride transportation.

161.    However, the Federal Railroad Administration found that all five tank cars used to ship vinyl chloride had discrepancies between the AAR 4-2 certificate of construction and the cars' actual characteristics, including non-approved changes to the PRDs, valves, and component parts, and raised questions over whether a tank car was even approved for vinyl chloride transportation.

162.    As described above, Oxy Vinyls failed to exercise ordinary care by failing to properly certify the design, build, testing, modification, and qualification of hazardous materials tank cars and their components used for vinyl chloride transportation.

163.    Oxy Vinyls was also required to prepare and submit an SDS for vinyl chloride. 29 C.F.R. § 1920.1200(g).

164.    The SDS was required to "accurately reflect[] the scientific evidence used in making the hazard classification," with continual, ongoing updates. *Id.* §§ 1920.1200(g)(5), 1920.1200(g)(6).

165.    Oxy Vinyls submitted an SDS to Norfolk Southern explicitly stating that "Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM: Air, Sunlight, Excessive heat, Oxidizers, Catalytic metals, such as *copper*, *aluminum* and their alloys and certain catalytic impurities." Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet*, at 10 (emphasis added).

166.    The SDS Oxy Vinyls submitted to Norfolk Southern also warned repeatedly— twelve times in various combinations—that vinyl chloride "MAY EXPLODE IF HEATED" and that POLYMERIZATION CAN OCCUR." *Id.* at 2.

167.    Oxy Vinyls shipped vinyl chloride in tank cars with aluminum components in the pressure release devices and in other components on each of the vinyl chloride tank cars. For example, Cars 26, 27, 28, and 29 contained aluminum in the PRD springs, PRD surface, or had aluminum used in various valves on the tank car. When the PRDs activated—releasing flammable vinyl chloride that ignited—the vinyl chloride mixed with "air, sunlight" and "aluminum."

168.    At the scene of the derailment, Oxy Vinyls representatives made conflicting statements regarding the ability of vinyl chloride to polymerize, asking first responders to ignore the all-caps text in its own SDS. At various times during the derailment response, Oxy Vinyls representatives provided inconsistent warnings that polymerization was possible, was not occurring, and could not occur, each with varying degrees of certainty.

169.    Finally, Oxy Vinyls representatives have stated that polymerization was not possible under the derailment conditions and that "stabilized" vinyl chloride—the same vinyl chloride that had been exposed to extreme conditions for nearly two full days—is incapable of polymerizing under "normal" conditions.

170.    Oxy Vinyls ignored its own federally required SDS on the safe handling of vinyl chloride and improperly certified the shipping of its vinyl chloride in conditions contrasting with its own guidance.

171.    Further, Oxy Vinyls then ignored its own federally required warnings on the safe handling of vinyl chloride and provided ineffectual and negligent warnings to Norfolk Southern and first responders.

172.    The vent and burn and release of hazardous vinyl chloride was the direct result of the improper shipping containers and Oxy Vinyls' failure to follow federal regulations and its own SDS.

173.     In the alternative, if aluminum components can be safely used with vinyl chloride, then Oxy Vinyls' SDS did not "accurately reflect the scientific evidence," and Oxy Vinyls failed to furnish a correct document for hazard communications.

174.     Similarly, if vinyl chloride is not capable of polymerization in circumstances like those present in East Palestine, then Oxy Vinyls' SDS did not "accurately reflect the scientific evidence," and Oxy Vinyls furnished a negligently prepared SDS.

175.     Oxy Vinyls violated federal regulations and its duties by failing to ensure that its shipping equipment was compatible with its lading.

176.     In addition, and/or in the alternative, as Oxy Vinyls now claims, it violated federal regulations by providing a negligently prepared SDS.

177.     As a direct and proximate result of Oxy Vinyls' negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

### COUNT THREE

**Negligence**
**(General American Marks Company and GATX Corporation)**

178.     The allegations in paragraphs 1 through 147 above are incorporated by reference.

179.     As the railcar owner responsible for the maintenance of Car 23, General American Marks Company, a subsidiary of GATX Corporation, was responsible for ensuring that Car 23 moved at least one car length every six months, yet, upon information and belief, Car 23 was twice stationary for longer than six months.

180.     In owning and maintaining rolling stock ultimately transported by Norfolk Southern, General American Marks Company was obligated to exercise care for the safety of Norfolk Southern's employees, its property, those individuals and entities whose persons or property were within reasonable proximity to the rail lines, and the environment.

181.   In ensuring the certification, qualification, compliance, and maintenance of railcars and their components, General American Marks Company was obligated to exercise reasonable and ordinary care, and/or that degree of care that a similarly situated railcar owner would use under the same or similar circumstances.

182.   Upon information and belief, General American Marks Company failed to exercise ordinary care by, among other things, failing to properly maintain Car 23's bearings by leaving the car stationary for periods in excess of six months; failing to inspect the car's bearings after the car remained stationary for periods in excess of six months; failing to advise carriers including Norfolk Southern that the car was not inspected after remaining stationary for periods in excess of six months; and allowing and placing Car 23 into rail service without inspecting its bearings after remaining stationary for periods in excess of six months.

183.   Upon information and belief, leaving Car 23 stationary in excess of six months damaged the lubrication of the bearing, leading to the degradation of the bearing and the ultimate failure of the bearing. Car 23 and several other railcars in Train 32N subsequently derailed.

184.   Upon information and belief, the bearing failure on Car 23 was caused by the negative impacts on the bearing and/or its functionality stemming from General American Marks Company's failure to properly maintain its railcar.

185.   Upon information and belief, GATX Corporation exercises substantial direct control over the operations of its subsidiary General American Marks Company, including with respect to railcar maintenance.

186.   As a direct and proximate result of General American Marks Company and GATX Corporation's negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

## COUNT FOUR

### Ohio Joint & Several Liability and Contribution
### (All Third-Party Defendants)

187.    The allegations in paragraphs 1 through 147 above are incorporated by reference.

188.    If Plaintiffs establish that Norfolk Southern is responsible for damages, then such damages were contributed to by Third-Party Defendant Oxy Vinyls because of Oxy Vinyls' failure to exercise ordinary care by failing to properly certify the design, building, conversion, testing, modification, and requalification of hazardous materials tank cars and their components; failing to properly certify that the railcar used was compatible with the lading; failing to submit a scientifically accurate SDS; and/or failing to properly warn Norfolk Southern of the dangers of an uncontrolled vinyl chloride fire.

189.    If Plaintiffs establish that Norfolk Southern is responsible for damages, then such damages were contributed to by Third-Party Defendants General American Marks Company and GATX Corporation because of General American Marks Company's failure to properly maintain Car 23's bearings by leaving the car stationary for periods in excess of six months.

190.    If Plaintiffs establish that Norfolk Southern is responsible for damages, then such damages were contributed to by Third-Party Defendant Trinity Industries Leasing Company because of Trinity Industries Leasing Company's failure to property certify the design, building, conversion, testing, modification, and requalification of hazardous material tank cars and their components.

191.    Under Ohio statute O.R.C. § 2307.22, Third-Party Defendants Oxy Vinyls, General American Marks Company, GATX Corporation, and Trinity Industries Leasing Company are liable for their share of all compensatory damages that represent economic loss.

192.    Under Ohio statute O.R.C. § 2307.25, Third-Party Defendants Oxy Vinyls,

General American Marks Company, GATX Corporation, and Trinity Industries Leasing

Company are liable to Norfolk Southern for contribution as to any costs that Norfolk

Southern has paid and will pay in excess of its proportionate share of costs.

## PRAYER FOR RELIEF

WHEREFORE, Defendants and Third-Party Plaintiffs Norfolk Southern Railway

Company and Norfolk Southern Corporation respectfully seek the following relief:

A.    Grant Norfolk Southern damages and interest as allowed by law; and

B.    Provide such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Norfolk Southern demands a trial by jury of all issues so triable.

Dated:  July 25, 2023

Respectfully submitted.

WILMER CUTLER PICKERING
   HALE AND DORR LLP

*/s/ Alan Schoenfeld*
ALAN SCHOENFELD*
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com

DAVINA PUJARI*
CHRISTOPHER A. RHEINHEIMER*
One Front Street, Suite 3500
San Francisco, CA  94111
Tel.: (628) 235-1000
Fax: (628) 235-1011
davina.pujari@wilmerhale.com
chris.rheinheimer@wilmerhale.com

ALBINAS PRIZGINTAS*
2100 Pennsylvania Avenue NW
Washington, DC  20036
Tel.: (202) 663-6000
Fax: (202) 663-6363
albinas.prizgintas@wilmerhale.com

MICHELLE LISZT SANDALS*
60 State Street
Boston, MA  02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
michelle.sandals@wilmerhale.com

*Pro hac vice*

DICKIE, MCCAMEY &
   CHILCOTE, P.C.

J. LAWSON JOHNSTON
SCOTT D. CLEMENTS, Ohio Bar No.
0096529
AARON PONZO*
PAUL ROMAN*
Two PPG Place, Suite 400
Pittsburgh, PA  15222
Tel.: (412) 281-7272
Fax: (412) 888-811-7144
ljohnston@dmclaw.com
sclemenets@dmclaw.com
aponzo@dmclaw.com
proman@dmclaw.com

*Pro hac vice*

*Counsel for Defendants/Third-Party Plaintiffs*
*Norfolk Southern Corporation and Norfolk Southern Railway Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2023, I caused a copy of the foregoing to be filed with the Clerk of the Court using the Court's CM/ECF electronic filing system, which will provide electronic notice to all counsel of record.

/s/ Alan Schoenfeld
ALAN SCHOENFELD

- 40 -

Exhibit
C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION, YOUNGSTOWN

| | | |
|---|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | : | **CASE NO.: 4:23-cv-00242** |
| | : | |
| | : | **JUDGE BENITA Y. PEARSON** |
| **Steven McKay, Susan Scheufele, Kayla Baker, Neely Jack, Dawn Baughman, David Anderson, James Ross, Jon Luke Affeltranger, Rosemary Mozuch, Charles Mozuch, Gregory Swan, Lance Beck, Clarissa Cohan, Rollerena Auto Sales LLC, Harold Feezle, DalQan Holdings, LLC, Valley View MPH LLC, Competition & Luxury Vehicle Club of Darlington, LLC,** | : : : : : : : : : : : | **JURY TRIAL DEMANDED** |
| | : | |
| **Individually and on behalf of all others similarly situated,** | : : | |
| | : | |
| **Plaintiffs,** | : : | |
| **v.** | : : | |
| | : | |
| **Norfolk Southern Corporation, Norfolk Southern Railway Company, Oxy Vinyls, LP, GATX Corporation, General American Marks Company, Trinity Industries Leasing Company** | : : : : : : | |
| | : | |
| **Defendants** | | |

## FIRST AMENDED MASTER CONSOLIDATED
## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Steven McKay, Susan Scheufele, Kayla Baker, Neely Jack, Dawn Baughman,

David  Anderson,  James  Ross,  Jon  Luke  Affeltranger,  Rosemary  Mozuch,  Charles  Mozuch,

Gregory Swan, Lance Beck, Clarissa Cohan, Rollerena Auto Sales LLC, Harold Feezle, DalQan

1

Holdings, LLC, Valley View MHP LLC, Competition & Luxury Vehicle Club of Darlington, LLC, individually and on behalf of putative classes of all others similarly situated ("Class Members" or "Class(es)"), sue Defendants Norfolk Southern Corporation ("NSC"), Norfolk Southern Railway Company ("NSRC"), (collectively "Railroad Defendants"); Oxy Vinyls LP, GATX Corporation, General American Marks Company, and Trinity Industries Leasing Company (collectively, "Railcar Defendants"), and based on personal knowledge, investigation of counsel and review of public documents and information, allege as follows:

## <u>INTRODUCTION</u>

1.      This Consolidated Class Action seeks redress for residents, property owners, employees and businesses living, working and/or located in and around the February 3, 2023 Norfolk Southern Freight Train 32N derailment and subsequent "controlled" release in East Palestine, Ohio (the "Derailment Site"[1]), that resulted in contamination of, and exposure to, massive amounts of vinyl chloride, dioxins, and other toxic chemicals—including butyl acrylate, benzene, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, volatile and semi-volatile byproduct compounds and other combustible materials. As a result of this derailment and NSC and NSRC's actions afterwards to conduct a "controlled" release and burn, the Classes have all suffered, among other things, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, and economic damages as alleged more specifically below.[2]

---

[1] The Derailment Site is in East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W.

[2] These events are herein referred to as the train derailment and resulting toxic chemical explosion.

## THE PARTIES

### *Plaintiffs*

2.      At all relevant times, Plaintiff Steven McKay was an adult citizen of Ohio and the owner-occupier of the real property located at 710 East Martin Street, East Palestine, Ohio 44413.

3.      Further, at all relevant times, Mr. McKay's principal place of employment was located at 242 Chippewa Town Center, Beaver Falls, Pennsylvania 15010, which is located within five miles of the Derailment Site.

4.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. McKay has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

5.      Mr. McKay seeks to represent the Ohio Property Owner Subclass, the Ohio Resident Subclass, and the Pennsylvania Employee Subclass as defined below.

6.      At all relevant times, Plaintiff Susan Scheufele was an adult citizen of Ohio residing at 298 East Clark Street, East Palestine, Ohio 44413.

7.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Scheufele has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

8.      Ms. Scheufele seeks to represent the Ohio Resident Subclass as defined below.

3

9.     At all relevant times, Plaintiff Kayla Barker was an adult citizen of Ohio and the owner-occupier of the real property located at 737 Moore Lane, East Palestine, Ohio 44413.

10.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Barker has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

11.     Ms. Barker seeks to represent the Ohio Property Owner Subclass and the Ohio Resident Subclass as defined below.

12.     At all relevant times, Plaintiff Neely Jack was an adult citizen of Ohio residing at 116 ½ East North Avenue, East Palestine, Ohio 44413.

13.     Further, at all relevant times, Ms. Jack's principal place of employment was located at 60 South Market Street, East Palestine, Ohio 44413.

14.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Jack has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals and contamination of her residence and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

15.     Ms. Jack seeks to represent the Ohio Employee Subclass and Ohio Resident Subclass as defined below.

4

16.     At all relevant times, Plaintiff Dawn Baughman was an adult citizen of Ohio and the owner-occupier of the real property located at 456 East Martin Street, East Palestine, Ohio 44413, where she operates an agricultural business.

17.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Baughman has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

18.     Ms. Baughman seeks to represent the Ohio Property Owner Subclass, the Ohio Resident Subclass, and the Ohio Agricultural Business Subclass as defined below.

19.     At all relevant times, Plaintiff David Anderson was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 377 Echo Valley Road, New Galilee, Pennsylvania 16141, where he operates an agricultural business known as Echo Valley Farms.

20.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Anderson has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air, soil and water.

21.     Mr. Anderson seeks to represent the Pennsylvania Property Owner Subclass, the Pennsylvania Resident Subclass, and the Pennsylvania Agricultural Business Subclass as defined below.

5

22.     At all relevant times, Plaintiff James Ross was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 139 Taggert Road, Darlington, Pennsylvania 16115, where he operates an agricultural business.

23.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Ross has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air, soil and water.

24.     Mr. Ross seeks to represent the Pennsylvania Property Owner Subclass, the Pennsylvania Resident Subclass, and the Pennsylvania Agricultural Business Subclass as defined below.

25.     At all relevant times, Plaintiff Jon Luke Affeltranger was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 2029 Circle Drive, Aliquippa, Pennsylvania, 15001

26.     Further, at all relevant times, Mr. Affeltranger's principal place of employment was located at 3944 Constitution Blvd., Darlington, Pennsylvania, 16115.

27.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Affeltranger has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly

dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

28.     Mr. Affeltranger seeks to represent the Pennsylvania Property Owner Subclass, the Pennsylvania Resident Subclass, and the Pennsylvania Employee Subclass as defined below.

29.     At all relevant times, Plaintiff Rosemary Mozuch was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 108 Alice Street, Darlington, Pennsylvania, 16115.

30.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Mozuch has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

31.     Ms. Mozuch seeks to represent the Pennsylvania Property Owner Subclass and the Pennsylvania Resident Subclass as defined below.

32.     At all relevant times, Plaintiff Charles Mozuch was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 108 Alice Street, Darlington, Pennsylvania, 16115.

33.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Mozuch has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his

property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

34.     Mr. Mozuch seeks to represent the Pennsylvania Property Owner Subclass and the Pennsylvania Resident Subclass as defined below.

35.     At all relevant times, Plaintiff Gregory Swan was an adult citizen of West Virginia and the owner-occupier of the real property located at 558 Titus Street, Weirton, West Virginia 26062.

36.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Swan has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

37.     Mr. Swan seeks to represent the West Virginia Property Owner Subclass and the West Virginia Resident Subclass as defined below.

38.     At all relevant times, Plaintiff Lance Beck was an adult citizen of West Virginia and the owner-occupier of the real property located at 16 Kiefer Way, Weirton, West Virginia 26062, where he also operates a business. Mr. Beck grows plants, including flowers and tomatoes.

39.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Beck has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination

8

of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

40.     Mr. Beck seeks to represent the West Virginia Property Owner Subclass, West Virginia Resident Subclass, West Virginia Employee Subclass, and West Virginia Business Subclass as defined below.

41.     At all relevant times, Plaintiff Clarissa Cohan was an adult citizen of West Virginia and the owner-occupier of the real property located at 525 California Avenue, Chester, West Virginia 26034. Ms. Cohan grows plants, including flowers, tomatoes, peppers, basil, cilantro, and parsley.

42.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Cohan has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

43.     Ms. Cohan seeks to represent the West Virginia Property Owner Subclass and the West Virginia Resident Subclass as defined below.

44.     At all relevant times, Rollerena Auto Sales LLC operates an automotive sales business located 50263 State Route 14, East Palestine, Ohio 44413. The sole member of Rollerena Auto Sales LLC is Harold Feezle, a resident and citizen of East Palestine, Ohio.

45.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Rollerena Auto Sales LLC has suffered a loss of business income and goodwill, and its business

property and place of employment has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

46.     Rollerena Auto Sales LLC seeks to represent the Ohio Business Subclass as defined below.

47.     At all relevant times, Plaintiff Harold Feezle was an employee of a business known as Rollerena Auto Sales LLC located 50263 State Route 14, East Palestine, Ohio 44413.

48.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Mr. Feezle has suffered a loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

49.     Mr. Feezle seeks to represent the Ohio Employee Subclass as defined below.

50.     At all relevant times, Plaintiff DalQan Holdings, LLC was an Ohio domestic limited liability company operating a Dairy Queen located at 262 South Market Street, East Palestine, Ohio 44413. The members of DalQan Holdings, LLC are Sam Covelli, an Ohio resident and citizen, Albert M. Covelli, an Ohio resident and citizen, Candace Covelli, a New York resident and Citizen, and Danielle Covelli, a District of Columbia resident and citizen.

51.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, DalQan Holdings, LLC has suffered a loss of business income and goodwill, and its business property has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

52.     DalQan Holdings, LLC seeks to represent the Ohio Business Subclass as defined below.

53.     At all relevant times, Plaintiff Valley View MHP LLC was a Pennsylvania domestic limited liability company with a principal place of business located at 377 Echo Valley Road, New Galilee, Pennsylvania 16141.

54.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Valley View MHP LLC has suffered a loss of business income and goodwill, and its business property has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

55.     Valley View MHP LLC seeks to represent the Pennsylvania Business Subclass as defined below.

56.     At all relevant times, Plaintiff Competition & Luxury Vehicle Club of Darlington LLC was a Pennsylvania domestic limited liability company with a principal place of business located at 3944 Constitution Blvd., Darlington, Pennsylvania 16115.  Plaintiff Competition & Luxury Vehicle Club of Darlington LLC has one member, who is a resident and citizen of Pennsylvania.

57.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Competition & Luxury Vehicle Club of Darlington LLC has suffered a loss of business income and goodwill, and its business property has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

11

58.     Competition & Luxury Vehicle Club of Darlington LLC seeks to represent the Pennsylvania Business Subclass as defined below.

### *The Railroad Defendants*

59.     Defendant NSC is a publicly traded corporation that is organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

60.     Defendant NSC plays a controlling role in decisions regarding the operations of NSRC, which operates a freight railroad over 35,000 miles of track in 22 states, transporting all manner of materials and goods, including coal, intermodal containers, agricultural products, chemicals, metals, and automotive products.

61.     Defendant NSRC is a wholly owned subsidiary of NSC.  NSRC is a Class I railroad corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

62.     Defendant NSRC is a common carrier that accepts hazardous substances for transport.

63.     Defendants NSC and NSRC operated Norfolk Southern Train 32N and its railcars in their Keystone Division in Pennsylvania, at all relevant times.

64.     Defendants NSC and NSRC owned the locomotive and certain of the railcars on Norfolk Southern Train 32N at all relevant times.

65.     At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

*The Railcar Defendants*

66.     Defendant General American Marks Company is a Delaware corporation with its principal place of business in Chicago, Illinois.  General American Marks Company is a wholly owned subsidiary of Defendant GATX Corporation.

67.     Upon information and belief, Defendant General American Marks Company owns and maintains a fleet of railcars for use in transportation of goods and products.

68.     At all relevant times, Defendant General American Marks Company was the owner of one of the railcars (GPLX 75465, "Car 23") in the consist of Train 32N that derailed on February 3, 2023.

69.     Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed.

70.     At all relevant times, Defendant General American Marks Company acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

71.     Defendant Oxy Vinyls, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

72.     The only General Partner of Oxy Vinyls is Occidental PVC, LLC, and the only Limited Partner of Oxy Vinyls is Occidental Chemical Corporation.  Occidental Chemical Corporation is a New York corporation with its principal place of business in Dallas, Texas.  The sole member of Occidental PVC, LLC is Occidental Chemical Corporation.

73.     Defendant Oxy Vinyls is a leading North American manufacturer of vinyl resins, chlorine and caustic soda, key building blocks for a number of plastic products.

74.     Upon information and belief, Defendant Oxy Vinyls owns and maintains a fleet of railcars for use in transportation of its goods and products, including vinyl chloride.

13

75.     At all relevant times Defendant Oxy Vinyls was the owner and shipper of three of the five railcars (OCPX 80235 ("Car 27"), OCPX 80179 ("Car 28"), and OCPX 80370 ("Car 53")) carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

76.     At all relevant times, Defendant Oxy Vinyls was also the shipper of two of the other railcars carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023:  TILX 402025, "Car 26" owned by Defendant Trinity Industries Leasing Company; and GATX 95098, "Car 29," owned by Defendant GATX Corporation.

77.     At all relevant times, Defendant Oxy Vinyls acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

78.     Defendant GATX Corporation ("GATX") is a publicly traded corporation organized and existing under the laws of the State of New York with its principal place of business in Chicago, Illinois. Defendant GATX is a leading global railcar lessor, owning fleets in North America, Europe and India.

79.     At all relevant times, Defendant GATX was the owner of one of the five railcars (GATX 95098, "Car 29") carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

80.     At all relevant times, Defendant GATX acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

81.     Defendant Trinity Industries Leasing Company ("TILC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Dallas, Texas.

14

82.     Upon information and belief, Defendant TILC, a wholly owned subsidiary of Trinity Industries, Inc., owns a fleet of railcars, as well as originates and manages railcar leases for third party shippers.

83.     At all relevant times, Defendant TILC was the owner of one of the five railcars (TILX 402025, "Car 26") carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

84.     At all relevant times, Defendant TILC acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

85.     Upon information and belief, all Railcar Defendants were aware that transportation of the railcars from the Midwest to the East Coast would involve passing through Ohio.

### JURISDICTION AND VENUE

86.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one member of the class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

87.     This Court has personal jurisdiction over Defendants because they regularly engage in business within the state of Ohio, were engaged in business within the state of Ohio prior to and at the time of the derailment, and because the claims asserted herein arise from the business activities and tortious conduct of Defendants within the state of Ohio prior to and at the time of the derailment.

88.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of Ohio, Plaintiffs and all Class Members were injured because of tortious activity in this District.

**FACTUAL ALLEGATIONS**

*The Relationship Between NSC and NSRC*

89.    Both NSC and NSRC operate out of the same corporate headquarters, and the President, Vice President, Chief Financial Officer, and Treasurer for NSRC hold the same or very similar positions in NSC.

90.    NSC and NSRC are jointly and severally liable for conduct alleged herein because they acted in concert and under alter ego and piercing the corporate veil theories, including based on the domination and /or control by NSC and the interlocking and overlapping officers and directors.

91.    The United States Surface Transportation Board requires railroad companies operating within the United States to submit an annual report ("Annual Report").

92.    NSC's 2021 Annual Report states that all of NSC's subsidiaries were under the common control of NSC, and that rail operations are coordinated at the holding company level by NSC's Chief Operating Officer.

93.    The 2021 Annual Report identifies NSRC as the principal subsidiary of NSC.

94.    Clairborne L. Moore, the Vice President and Controller for NSC, signed the 2021 Annual Report.

95.    In affidavits filed in federal ligation[3], Jason Zampi, a Vice President and Controller for NSC, stated that the annual reports submitted to the Surface Transportation Board are prepared by personnel of NSC with knowledge of and a business duty to prepare the information contained in the annual reports.

---

[3] *See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

96.     In affidavits filed in that same federal litigation, Roger Petersen, NSC's General Counsel for Litigation, stated that NSC "directs, controls, oversees, and handles litigation involving it and its wholly-owned subsidiaries, including [NSRC]."

97.     Approximately eighty percent (80%) of the compensation for NSC's executives are based on performance metrics.

98.     These metrics focus on performance measures such as operating ratio and operating income for NSC subsidiaries, including NSRC. Operating ratio looks at operating expenses as a percentage of revenue. Operating income looks at operating revenue less operating expenses.

99.     These financial metrics were selected to motivate and reward NSC's executives for increasing revenue, improving operating efficiency, and reducing expenses of its railroad subsidiaries.

100.    NSC's executives achieve these metrics by controlling subsidiaries' operations, which includes the operations of NSRC.

101.    Over the past four years, NSC's Annual Reports show a stark contrast between the increases in operating income and the drop in railroad operating costs.

102.    The drop in operating costs includes reductions in NSC and/or NSRC spending to repair, service, and maintain locomotives and freight cars, perform train inspections, and pay engine crews and train crews.

103.    In 2019, Mike Wheeler, then the Executive Vice President and Chief Operating Officer for NSC, issued Operating Rules governing the operations of all of NSC's railroad subsidiaries, including NSRC.

104.    Upon information and belief, these same or similar Operating Rules were in place at the time of the train derailment and subsequent explosion.

17

105.    These Operating Rules cover almost every aspect of NSRC's operations, including train inspections, use of defective equipment detectors, train movement, braking, and positive train control.

106.    NSC has also issued Railroad Special Hazmat Instructions that govern the transportation and handling of hazardous materials by NSRC employees.

107.    NSC requires each NSRC employee who inspects or transports hazardous materials by rail to have a copy of and comply with the Railroad Special Hazmat Instructions.

108.    Upon information and belief, NSC's Railroad Special Hazmat Instructions were in place at the time of the train derailment and subsequent explosion.

109.    Further, NSC trains each NSRC employee who transports hazardous materials.

*NSC and NSRC's Prolific History of Train Derailments*

110.    Between 1990 and 2022, there were a total of 55,755 train derailments throughout the United States, for an average of 1,742 train derailments a year.[4]

111.    According to the Federal Railroad Administration ("FRA"), NSC and NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 69 accidents total—22 in 2019, 18 in 2020, 15 in 2021 and 14 in 2022.

112.    According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 76 total accidents from 2019 to 2022—23 in 2019, 14 in 2020, 23 in 2021, and 16 in 2022.

---

[4] *See* Federal Railroad Safety Administration. Office of Safety Analysis, Table 3.16 data, available at 3.16 - Summary of Train Accidents With Reportable Damage, Casualties, and Major Causes (dot.gov).

113.    According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in West Virginia. This includes 13 total accidents from 2019 to 2022—4 in 2019, 6 in 2020, 2 in 2021, and 1 in 2022.

114.    According to data from the FRA, there were a total of 103 derailments in January 2023, and 11 were NSC and NRSC derailments.  Although the FRA only has publicly available data through January 2023, additional NSC and NRSC derailments have occurred this year: February 16 in Van Buren Township, Michigan; February 16 in Mingo County, West Virginia; February 25 in Lexington, North Carolina; March 4 in Springfield, Ohio; March 9 in Iron City, Alabama; Aril 8 in Pittsburgh, Pennsylvania; and April 9 in Jasper, Alabama.

115.    NSC and NSRC's record of train derailments and accidents, especially in recent years, is caused, in part, by its adoption of operating procedures referred to as "Precision Scheduled Railroading" ("PSR").

116.    More specifically, in 2019, NSC and NSRC launched an "ambitious three-year strategic plan," which relied heavily on PSR to achieve "goals that include creating longer trains, continuing productivity initiatives and finding growth opportunities."[5]

117.    In plain speak, PSR was NSC's and NSRC's plan to cut jobs, cut costs, cut safety and increase risks – all so they could increase their profits.

118.    PSR eliminates necessary inspections, maintenance, repairs and safety devices so that trains stay in depots for shorter amounts of time.  The elimination of these tasks also allowed NSC and NSRC to eliminate a number of jobs for inspectors, maintenance workers and repair workers.

---

[5] *See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

119.     PSR is a widely criticized practice in the railroad industry because it eliminates jobs while increasing the overall size and weight of trains leading to increased safety risks.

120.     Increasing the overall size and weight of trains makes trains more difficult to control, renders safety devices less effective, and increases the risks of train wrecks.

121.     PSR also deprioritizes rail and railcar inspections, maintenance, repairs, and safety devices in favor of increasing the speed and efficiency with which loads are transported.

122.     For example, NSC and NSRC were aware that there are different, safer braking mechanisms available for their trains, including Electronically Controlled Pneumatic (ECP) brakes, which have the potential to reduce train stopping distances by up to sixty percent. However, under its PSR program, NSC and NSRC prioritized profits over safety by utilizing outdated airbrakes instead of ECP brakes in its trains.

123.     NSC and NSRC's decision to adopt PSR also led to the FRA determining that between January 2022 and May 2022, both companies suffered from significant safety violations including undercounting, inadequately observing rules failures, and failing to verify the performance of operational tests.[6] FRA noted that "NS did not take immediate actions to remediate defective conditions" and that "these conditions have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service". Additionally, FRA identified a number of rail component defects, and warned Norfolk Southern that "when critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential."

---

[6] U.S. Dept. of Transportation, FRA Audit Report of Norfolk Southern Railway Company, FRA Audit Number: 2022-NS Special Audit-01-1, at 7, 9-10, available at https://railroads.dot.gov/sites/fra.dot.gov/files/2022-11/Final%20Norfolk%20Southern%20Audit%20Report%202022%20%28003%29.pdf (July 8, 2022) (last visited April 13, 2023).

124.     NSC and NSRC's decision to adopt PSR likewise contributed to both companies cutting the use of signalmen to install, repair, and maintain signal systems, which railroads use to direct trains from one location to the next safely and on time.

125.     These same signalmen are responsible for inspecting, maintaining, and repairing wayside detectors like "hot-box" detectors, which alert operators to equipment failures while the train is in operation.

126.     Under their PSR program, NSC and NSRC have no such signalmen employed in or around the area of East Palestine, Ohio.

127.     Furthermore, the wayside detectors are not monitored locally, but by NSC and NSRC's train dispatcher located in Atlanta, Georgia.

*Responsibilities of the Railcar Defendants*

128.     In addition to railroads like Norfolk Southern, the responsibility for safe transport of cargo, including hazardous materials, via rail belongs to the owners and lessees of the railcars and the manufacturers and shippers of the materials being transported.

129.     For example, tank car manufacturers, owners and lessees are obligated to ensure tank cars are compliant with federal laws and regulations and capable of safely moving hazardous materials pursuant to 49 C.F.R. part 180.

130.     Under 49 C.F.R. part 173, shippers, in turn, are responsible for the safe loading, packaging and inspection of hazardous goods, including certifying that hazardous materials are properly classified, appropriately loaded into tank cars and shipped with proper labeling and safety materials to enable first responders to address any accidental release.

131.     Shippers are likewise charged with ensuring that the railcars and equipment they use to transport their materials, including hazardous materials, are compatible with both the certificate of approval issued for the railcar and the nature of the lading.

21

132.    While railroads like Norfolk Southern are ultimately responsible for ensuring the safe transport of all rail cars, including any hazardous materials in the railcars they accept for transport along their systems, owners, lessees and shippers are also responsible for any defects they cause, or fail to remedy, or otherwise fail to comply with the freight car safety regulations. *See* 49 CFR 215.7.

133.    With respect to the derailment of Train 32N, General American Marks Company, was at all relevant times the owner of railcar GPLX75465 ("Car 23").

134.    Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed.

135.    With respect to the derailment of Train 32N, Oxy Vinyls LP was at all relevant times the owner of railcars OCPX80235 ("Car 27"), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53").

136.    With respect to the derailment of Train 32N, GATX Corporation was at all relevant times the owner of railcar GATX95098 ("Car 29").

137.    With respect to the derailment of Train 32N, Trinity Industries Leasing Company, was at all relevant times the owner of railcar TILX402025 ("Car 26").

138.    Shipping from its La Porte, Texas, facility, Oxy Vinyls at all relevant times was also the shipper of Cars 26, 27, 28, 29 and 53 in the consist of Train 32N.

139.    These Cars (26, 27, 28, 29 & 53) were each DOT-105J300W specification tank cars and each contained vinyl chloride monomer, which was released during the February 3, 2023 derailment, including the subsequent controlled release on February 6, 2023.

*Car 23*

140.    Car 23 is a hopper car owned by General American Marks Company that was carrying polyethylene pellets when it was accepted for shipment by Norfolk Southern at the Terminal Railroad Association ("TRAA") of St. Louis yard on or about February 1, 2023.

141.    The manual for the failed wheel bearing in use on Car 23 states "cars, coaches and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces."

142.    For these reasons, responsible railcar owners prevent railcars from sitting stationary for long periods because grease separation can occur leading to a reduction in the amount of lubrication around the bearings that negatively impacts functionality.

143.    Additionally, when a railcar sits for extended periods of time in the elements, water and other environmental factors begin to degrade the structure and lubrication of the bearing leading to defects.

144.    Upon information and belief, Car 23 was twice stationary for longer than six months in the lead up to the derailment of Train 32N; first a period of 565 days ending in August 2018 and second a period of 206 days ending in May 2019.

145.    Upon information and belief, despite sitting stationary for over two of the roughly five years leading up to the derailment of Train 32N, General American Marks Company nor GATX ever conducted a full inspection of the railcar's wheelset, including the wheel bearing, which would have revealed the critical defect that led to the events sets forth in this Amended Complaint.

146.    General American Marks Company and/or GATX's conduct in allowing Car 23 to remain stationary caused the wheel bearings to deteriorate and become ineffective, which in combination with the acts and omissions of the Railroad Defendants as set forth herein,

23

proximately caused or contributed to the derailment and subsequent release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

*Vinyl Chloride Cars 26, 27, 28, 29 and 53*

147.    As referenced above, railcar owners and shippers are responsible for a variety of compliance and maintenance measures for tank cars that carry hazardous materials.

148.    Among these responsibilities are those set out in 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517, which obligate railcar owners to have appropriate certifications and qualifications for their tank cars, as well as impose certain maintenance requirements on the railcars and their component parts.

149.    However, upon information and belief, following the derailment of Train 32N, the FRA discovered that there were multiple discrepancies between the approval, certification and qualification of Cars 26, 27, 28, 29 and 53 and the Cars' actual, physical characteristics, including:

    a.    Car 26 had actual, physical characteristics that made it incompatible with its AAR 4-2 Certificate of Approval;

    b.    Car 29 had an incompatible pressure relief device ("PRD") replaced and never received the special regulatory approval needed to ship vinyl chloride; and

    c.    Cars 27, 28 and 53 each had required information missing from their Certificates of Approval, and Car 27 had modifications that were neither documented nor approved.

150.    In short, none of the Cars carrying vinyl chloride in the consist of Train 32N were properly constructed, approved and/or certified for transport at the time of the derailment on February 3, 2023.

151.    Additionally, several of the Cars carrying vinyl chloride in the consist of Train 32N were constructed with, or had features containing, aluminum.  The use of aluminum in railcars transporting vinyl chloride can be problematic because aluminum components can melt or otherwise be damaged in the event of a fire, as appears to have happened here.  In addition, there

is a potential for an adverse chemical reaction if the vinyl chloride is exposed to aluminum in the course of transit.

152.    More specifically, the following Cars were constructed with, or had features containing, aluminum in the consist of Train 32N:

a.    Car 26 had aluminum-coated springs in its PRD device;

b.    Cars 27, 28 and 29 had aluminum protective housing, as well as aluminum handwheels; and

c.    Car 53 included angle valve handwheels constructed from aluminum.

153.    In short, Cars 26, 27, 28, 29, and 53, each carrying vinyl chloride in the consist of Train 32N, were constructed of materials that were inappropriate for, or inconsistent with, the shipment of vinyl chloride at the time of the derailment on February 3, 2023.

154.    Oxy Vinyls, GATX, and TILC's conduct in shipping vinyl chloride, or allowing vinyl chloride to be shipped, using unapproved, uncertified and/or incompatible railcars as required by federal regulations and industry standards, which in combination with the acts and omissions of the Railroad Defendants as set forth herein, proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

*The February 3, 2023 Derailment*

155.    On Friday February 3, 2023, NSC and NSRC Train 32N, consisting of 149 cars, was carrying abnormally dangerous and ultrahazardous chemicals including, but not limited to, vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate and isobutylene while traveling a downhill route eastbound from Illinois to Pennsylvania on main track 1 of the NSC/NSRC Fort Wayne line of the Keystone Division.

156.    According to a VICE article entitled *'32 Nasty': Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, "two workers … said 32N in particular was a known safety risk."[7]

157.    These two workers told *VICE* that "multiple red flags, including two mechanical problems, about 32N went undetected or were ignored in the hours leading up to the crash."[8]

158.    According to the article, 32N has a nickname among some rail workers "for a reason."[9] They call this one "**32 Nasty**."[10]

159.    At approximately 9:00 p.m., in the area of East Palestine, Ohio, approximately 38 of the train cars derailed and an additional twenty railcars were damaged, several of which were carrying dangerous and hazardous industrial materials.  The derailment occurred in the State of Ohio, approximately one mile from the Ohio-Pennsylvania border.

160.    The train was already ablaze when at 8:13 p.m., it passed through Salem, Ohio, which is located 20 miles west of the eventual site of the fiery derailment in East Palestine.

161.    Indeed, surveillance video from cameras located along the rails in Salem, Ohio, showed what appears to be a wheel bearing in the final stage of overheating approximately 45 minutes before the derailment.

---

[7] Vice, *'32 Nasty:' Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, available at https://www.vice.com/en/article/88qze4/32-nasty-rail-workers-say-they-knew-the-train-that-derailed-in-east- palestine-was-dangerous (Feb. 15, 2023) (last visited April 13, 2023).

[8] *Id.*

[9] *Id.*

[10] *Id.*



Still frame from surveillance video taken in Salem, Ohio - 20 miles away from the train derailment site.

162.    On the Fort Wayne Line, NSC and NSRC had equipped their rail network with hotbox detectors to assess the temperature conditions of railcar wheel bearings while en route.

163.    The hotbox detectors are used to detect overheated axels and/or wheel bearings on railcars and provide real-time warnings to train crew members.

164.    NSC and NSRC sets its own standards, policies, and procedures for the placement of hotbox detectors, as well as the alarm thresholds for above ambient temperature readings.

165.    NSC/NSRC Train 32N passed three hotbox detectors before the derailment.

166.    At milepost 79.9, Train 32N passed over a NSC/NSRC hotbox detector and the suspect wheel bearing from railcar no. 23 had a recorded temperature of 38° F above ambient.

167.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 69.01, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 103° F above ambient and was visibly already on fire.

168.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 49.81, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 253°F above ambient.

169.    This hotbox reading of 253° F above ambient resulted in an alarm message instructing the crew to slow and stop the train to inspect the hot axle.  The engineer applied the train's dynamic brake, but it was already too late.  This malfunctioning railcar axle is consistent with an overheated wheel bearing, which ultimately caused the train to derail and trigger the application of the emergency brakes as the train passed through East Palestine.

170.    Eleven of the derailed cars carried hazardous materials, and five of them contained vinyl chloride:

| Rail Car # | Hazardous Materials | Amount |
|---|---|---|
| TILX 402025 | Vinyl Chloride | 178,300 pounds |
| OCPX 80235 | Vinyl Chloride | 177,250 pounds |
| OCPX 80179 | Vinyl Chloride | 177,600 pounds |
| GATX 95098 | Vinyl Chloride | 178,150 pounds |
| OCPX 80370 | Vinyl Chloride | 176,100 pounds |
| SHPX 211226 | Ethylene Glycol Monobutyl Ether | 185,750 pounds |
| DOWX 73168 | Ethylhexyl Acrylate | 205,900 pounds |
| UTLX 205907 | Butyl Acrylate | 180,000 pounds |
| NATX 35844 | Isobutylene | 155,642 pounds |
| DPRX 259013 | Benzene | Residue |
| DPRX 258671 | Benzene | Residue |

28

171.   All told, the derailed cars of Train 32N were carrying over 1,600,000 pounds of toxic and hazardous chemicals.

172.   During and after the derailment, the hazardous chemicals, including, but not limited to vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate, and isobutylene ignited, and the resulting fire continued to burn with increasing intensity from February 3-6, 2023.



173.   On Friday, February 3, 2023, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled south of Beaver Falls, Pennsylvania.

174.   The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow, and is consistent with the smoke plume being blown to the south and east, traveling at least as far as Bridgewater, Pennsylvania at that time.

29





175.    Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from their exterior labels.



176.    As part of the initial response and subsequent investigation, NSC and NSRC produced the below photograph showing the derailed rail cars and describing their contents:



177.    Given the ongoing release of toxic and hazardous chemicals from the derailment, at approximately 11:00 p.m. on February 3, 2023, officials issued a shelter-in-place order for the entire town of East Palestine.

178.    On February 4, "[r]esponding crews discovered contaminated runoff on two surface water streams: Sulphur Run and Leslie Run."[11]  It was also noted that the runoff "impacted aquatic life" and officials with the Ohio Department of Natural Resources has since reported that wildlife officials located approximately 3,500 dead fish in Leslie Run, Bull Creek, and the North Fork of Little Beaver Creek.

179.    As first responders battled the blaze from February 3 to 5, 2023, one railcar carrying vinyl chloride became a focus of concern when its emergency safety valves malfunctioned, and pressure started building to unsafe levels within the railcar's steel shell.

_____

[11] https://response.epa.gov/site/site_profile.aspx?site_id=15933.

32

180.    On Sunday, February 5, first responders and others learned of "a drastic temperature change in a rail car, and there [was] the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile."  Local officials and Ohio Governor Mike DeWine issued an evacuation order on the evening of February 5 for anyone living within a mile of the derailment site:



181.    These concerns were amplified when, on Monday, February 6, 2023, a drastic temperature change took place within the railcar with the malfunctioning safety valves, increasing the potential of a catastrophic tanker failure and explosion, and causing local officials to expand the evacuation area based on "new modeling information."

182.    Upon information and belief, NSC and NSRC reported to federal, state, and local officials that the only way to avoid a catastrophic tanker failure and explosion was to conduct a "controlled release" of the vinyl chloride in the compromised tanker.

183.    This "controlled release" called for NSC, NSRC and/or its contractors to detonate explosive charges on the compromised vinyl chloride tanker, so as to dump the vinyl chloride out of the tanker and into a trench where it would be lit on fire.

184.    Although the concern related to only one of the vinyl chloride cars, at 4:30 p.m. on Monday, February 6, 2023, NSC, NSRC and/or its contractors intentionally blew holes in, not just the one tanker car of concern, but all five derailed rail cars containing vinyl chloride.

185.    This "controlled release" was anything but controlled.  Once the charges were detonated on the five vinyl chloride cars, there was a large, fiery explosion that released a large plume of thick black smoke forming a mushroom cloud over the entire area.



186.    This toxic mushroom cloud was caused by a temperature and weather inversion over the Derailment Site, which allowed the explosion to disperse dozens of toxic chemicals and combustion by-products, including hydrogen chloride and phosgene gas, for miles.

187.    More specifically, the smoke and particulate plume from the "controlled release" was trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet. In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud cover.





188.    Upon information and belief, the smoke and particulate plume from the "controlled release" eventually traveled a total of 30 miles in each direction from the Derailment Site, contaminating the air, surfaces, soil, and water of upwards of 500,000 Class Members.

189.    On March 22, 2023, the Chair of the National Transportation Safety Board ("NTSB") characterized the derailment as "100% preventable" in her testimony before the U.S. Senate Environment and Public Works Committee.

*Hazardous Chemicals Released*

190.    The following are the hazardous chemicals and combustion products detected in air, water, soil, and sediment samples taken within a 30-mile radius of the Derailment Site following the "controlled release," along with the health and environmental effects associated with each.  These chemicals are harmful to humans, as well as livestock, plants and crops.  These chemicals may cause a direct effect on livestock, plants and crops, as well as an indirect effect on the food supply.

**Vinyl Chloride**

191.    Vinyl chloride monomer ("vinyl chloride") is classified by the Environmental Protection Agency ("EPA") as a Group A human carcinogen—the most dangerous to human health.

192.    Vinyl chloride exposure can affect the cardiovascular, respiratory, and central nervous systems, and can cause death, difficulty breathing, lung irritation, chest pains, coughing, dizziness, headaches, eye irritation, and loss of consciousness.

193.    Vinyl chloride is a toxic chemical that is unstable and prone to explode if not maintained and handled with proper methods and conditions.

194.    Vinyl chloride is specified under the Hazardous Materials Transportation Act ("HMTA") as a hazard class 2.1, flammable gas.

195.    Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects such as

dizziness, drowsiness, disorientation, tingling, numbness or burning sensation of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, or even death.

196.    Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression.

197.    Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

198.    According to the NTSB:

Vinyl chloride [CAS # 75-01-4] is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride (PVC). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration (OSHA) regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph (c) of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. **Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl chloride's presence**. **The odor threshold is too high to provide adequate warning for hazardous concentrations**.

199.    Just one pound of vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm.

200.    Upon information and belief, the train derailment and resulting toxic chemical explosion released approximately **1,000,000 pounds** of vinyl chloride throughout the area surrounding the Derailment Site.

38

**Dioxins**

201.    Dioxin is a term used to identify several chemical compounds.

202.    These compounds can be placed into three closely related families: polychlorinated dibenzo-*p*-dioxins ("CDD"), polychlorinated debenzofurans ("CDF") and polychlorinated biphenyls ("PCB"). Compounds within all three of these families are highly toxic and have varying toxicity levels.

203.    Each different form of Dioxin is called a "congener."

204.    There are many dioxins and "dioxin-like" congeners: 75 different CDDs, 135 different CDFs and 209 different PCBs.

205.    Dioxins are called persistent organic pollutants ("POP"), meaning they take a long time to break down once they are in the environment.

206.     Dioxins are dangerous and deadly. The EPA and other entities, such as the World Health Organization, began assessing the potential human health risks associated with dioxins as early as the 1970s after animal studies showed one dioxin, TCDD, to be the most potent cancer-causing chemical studied to date.

207.    Exposure to dioxins are known in the scientific and medical communities to cause cancer, liver damage, hormone changes, reproductive damage, miscarriages, birth defects, and decrease the ability to fight infection. Birth defects from dioxins have included skeleton and kidney defects, lowered immune responses, and effects on the development of the brain and the nervous system.

208.    Dioxins are one of the strongest carcinogens known, causing many kinds of cancers.

209. Dioxin exposure, even in single doses and at very low concentrations, seriously disrupts normal reproduction in humans and other animals. It lowers fertility, increases prenatal mortality, causes birth defects, and increases the risk of endometriosis.

210. Dioxins interfere with the production and function of many different hormones, growth factors, and enzymes. Their effects can be long term, and their toxicity is much more severe and consistent in children than it is in adults.

211. Dioxins are particularly toxic to children. Dioxins adversely affect the developing immune, reproductive, nervous, and lymph systems. They cause cleft palate, hemorrhage and edema, impair hearing, and retard growth.

212. The adverse effects of Dioxin exposure to human health are varied and include:

a. **Cancer:** lung, stomach, soft tissue, and liver;

b. **Male Reproductive Toxicity:** reduced sperm count, testicular atrophy, abnormal testis structure, reduced testis size, lower male hormone levels, and feminization of hormonal and behavioral responses;

c. **Female Reproductive Toxicity:** hormonal changes, decreased fertility, inability to maintain pregnancy, ovarian dysfunction, and endometriosis;

d. **Developmental Toxicity:** birth defects, alterations in reproductive system, decreased sperm count, altered mating behavior, structural abnormalities in female genitalia, reduced fertility, delayed puberty, and neurological problems;

e. **Immune Suppression:** increased susceptibility to infectious disease;

f. **Hormonal Changes:** altered sex hormones, altered thyroid hormones, and altered digestive hormones;

g. **Metabolic Changes:** altered glucose response, decreased insulin levels, altered fat metabolism, weight loss, wasting syndrome, fetal death, and diabetes;

h. **Damage to the central and peripheral nervous systems:** impaired neurological development and subsequent cognitive deficits;

i. **Organ Damage:** liver, thymus, spleen, bone marrow, lungs, and heart - leading to arrhythmias; and

j. **Skin Disorders:** chloracne, hyperpigmentation, and hirsutism.

**Ethylene Glycol Monobutyl Ether**

213.    Harmful exposure to ethylene glycol monobutyl ether occurs through ingestion or dermal contact.

214.    Inhaling ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain.

215.    Exposure can cause headaches, dizziness, lightheadedness, and passing out, and it may damage the liver and kidneys.

**Isobutylene**

216.    Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat, frostbite (from dermal contact), headaches, dizziness, lightheadedness, and fatigue.

217.    Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer, reproductive harm, and other long term health effects.

**Benzene**

218.    Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research on Cancer (IARC), and the EPA.

219.    Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness.

220.    Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death.

221.    The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects to bone marrow and can cause a decrease in red blood cells leading to anemia. Benzene exposure can also cause leukemia and lymphoma in humans.

222.     Benzene can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. Benzene may affect menstruation and decrease the size of ovaries in women following many months of exposure to high levels.

### Butyl Acrylate

223.     Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy.

224.     Exposure to butyl acrylate can cause headaches, dizziness, nausea, and vomiting. Repeated exposure can lead to permanent lung damage.

### Ethylhexyl acrylate

225.     Ethylhexyl acrylate is a flammable, clear, colorless liquid used in the production of paints and plastics.

226.     Exposure can cause drowsiness, convulsions, and irritation of the eyes and skin.

### Diethylene glycol

227.     Diethylene glycol is a clear, colorless, and near odorless liquid used to make various industrial products.

228.     Exposure can cause gastrointestinal symptoms, renal failure, and neurological issues.

### Hydrogen sulfide

229.     Hydrogen sulfide is a colorless gas with a strong odor of rotten eggs used in industrial settings including textile factories.

230.     Exposure can cause irritation to the eyes and respiratory system, apnea, coma, convulsions, dizziness, headache, weakness, irritability, insomnia, and upset stomach.

**Hydrogen cyanide**

231.    Hydrogen cyanide is a colorless or pale-blue liquid or gas with a bitter, almond-like odor used in fumigation, electroplating, mining, and chemical synthesis.

232.    Hydrogen cyanide interferes with the human body's use of oxygen and can negatively impact the brain, heart, blood vessels, and lungs.

**Phosgene**

233.    Phosgene was used as a chemical warfare agent during World War I and is banned by the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare.

234.    Exposure to phosgene in the air can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or (less likely) ingestion.

235.    Higher levels of phosgene can cause lungs to swell, making it difficult to breathe. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

**Hydrogen Chloride**

236.    Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation.

237.    Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation.

43

238.    Following exposure, people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances.

239.    Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin.

240.    Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach.

## CLASS ALLEGATIONS

241.    Plaintiffs bring this consolidated action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and, as warranted, 23(c)(4) on behalf of themselves and the following class of persons and organizations similarly situated for all direct, proximate, and foreseeable losses caused by the February 3, 2023, train derailment, fire and resulting toxic chemical explosion and contamination.  The proposed Classes, inclusive of subclasses, are hereby defined as follows:

1.    **The Residents Class:**

**All individuals who resided within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:**

a.    **The Ohio Resident Subclass:**

**All individuals residing in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;**

b. **The Pennsylvania Resident Subclass**:

**All individuals residing in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and**

c. **The West Virginia Resident Subclass**:

**All individuals residing in West Virginia within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present.**

2. **The Property Owners Class**:

**All individuals or legal entities who owned or otherwise had a legal interest in real property located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:**

a. **The Ohio Property Owner Subclass**:

**All individuals or legal entities who owned or otherwise had a legal interest in real property in Ohio located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;**

b. **The Pennsylvania Property Owner Subclass**:

**All individuals or legal entities who owned or otherwise had a legal interest in real property in Pennsylvania located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and**

c. **The West Virginia Property Owner Subclass**:

**All individuals or legal entities who owned or otherwise had a legal interest in real property in West Virginia located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N;**

Longitude 80.5222838°W from February 3, 2023, to the present.

3.   **The Employees Class:**

All individuals who worked within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:

a.   **The Ohio Employee Class Subclass**:

All individuals who worked in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;

b.   **The Pennsylvania Employee Class Subclass**:

All individuals who worked in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and

c.   **The West Virginia Employee Class Subclass**:

All individuals who worked in West Virginia within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present.

4.   **The Businesses Class:**

All individuals or legal entities who owned or operated a business within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:

a.   **The Ohio Business Class Subclass**:

All individuals or legal entities who owned or operated a business in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;

    b.  **The Ohio Agricultural Business Subclass**:

    **All individuals or legal entities who owned or operated an agricultural[12] business in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;**

    c.  **The Pennsylvania Business Class Subclass**:

    **All individuals or legal entities who owned or operated a business in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;**

    d.  **The Pennsylvania Agricultural Business Subclass**:

    **All individuals or legal entities who owned or operated an agricultural business in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and**

---

[12] "Agricultural" as used in these Class definitions is intended to encompass any business engaged in farming in all its branches, including but not limited to the cultivation and tillage of the soil, cultivation, growing and harvesting of any agricultural or horticultural commodities, including but not limited to field crops, tobacco, fruits, vegetables, nursery stock, ornamental plants or shrubs, ornamental trees, flowers, sod, or mushrooms; forestry (timber) or silvicultural; pasturage; any combination of the foregoing; the processing, drying, storage, and marketing of agricultural or horticultural commodities; breeding (husbandry), raising, maintaining or utilization of animals, including but not limited to livestock, equine, fur-bearing animals, or poultry; the production of poultry and poultry products, dairy production, or other production or products associated with any of the foregoing animals; activities conducted in conjunction with, but secondary to, such husbandry or production; any practices (including any forestry or lumbering operations) performed with any farming operations, including storage, preparation for market, delivery to storage or to market or to carriers for transportation to market; ranching; aquaculture; algaculture meaning the farming of algae; apiculture or apiaries and related activities, including the maintenance of bees and hives, crop pollination services, sale of bees, production of honey, beeswax, honeycomb, and other related products; viticulture and/or winemaking, enology and brewing along with any related activities; sugarhouse; or agritourism.

e. **The West Virginia Business Class Subclass**:

**All individuals or legal entities who owned or operated a business in West Virginia within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present.**



*Fig. 1: The Class Zone is represented by a radius of 30 miles emanating from the train derailment, (fire and explosion) site.*

242.    Excluded from the Class(es) are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class(es); and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the February 3, 2023 train derailment and resulting toxic chemical explosion, arise out of a right of subrogation, whether equitable, contractual or otherwise.

243.    Also excluded from the Class(es) are any claims of physical manifestation of personal or bodily injury.

244.    Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct additional investigation and discovery.

245.    The multiple Classes and subclasses all involve identical factual issues and common, if not identical, legal issues.

246.    The proposed Class(es) meet(s) the criteria for certification under 23(a), 23(b)(2), and/or 23(b)(3).

*Numerosity and Ascertainability*

247.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.

248.    While the exact number of Class Members is unknown to Plaintiffs at this time, it is ascertainable; the proposed Class includes thousands of residents and businesses who were unlawfully exposed to vinyl chloride and other toxic chemicals or who had property contaminated by unlawful exposure to vinyl chloride and other toxic chemicals and suffered damages. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

*Predominance of Common Issues*

249.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law or fact that predominate over questions affecting only individual Class Members.

250.    The common questions include, without limitation, the following:

a.    Whether Defendants' acts or omissions as set forth herein caused or contributed to the derailment, fire, subsequent release of toxic chemicals, resulting explosion, contamination and evacuation and/or "shelter in place" orders;

b.    Whether Defendants breached their duty of reasonable care in the transportation of hazardous materials through East Palestine, Ohio;

c.    Whether Defendants are strictly liable for injuries and damages suffered by Plaintiffs and the Classes because Defendants engaged in abnormally dangerous and/or ultrahazardous activity by transporting hazardous substances;

d.    Whether Defendants are strictly liable for injuries and damages suffered by Plaintiffs and the Classes because Defendants engaged in abnormally dangerous and/or ultrahazardous activity when they dumped the vinyl chloride they were transporting and lit it on fire in a residential community;

e.    Whether Defendants' violated Ohio statutory nuisance law by emitting air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable injury or damage to property;

f.    Whether Defendants violated Pennsylvania statutory nuisance law by emitting air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act, thereby creating a public nuisance making them liable for the cost of abatement;

g.    Whether Defendants created a private nuisance through their acts and omissions, including by the release of toxic contaminants;

h.    Whether Defendants created a public nuisance through their acts and omissions, including by the release of toxic contaminants;

i.    Whether Defendants committed trespass on the property of Plaintiffs and the Classes by their acts and omissions, including by causing hazardous materials to enter and contaminate said property;

j.    Whether Defendants committed trespass to the chattels of Plaintiffs and the Classes through their acts and omissions, including by impairing the property as to its

condition, quality, or value; depriving Plaintiffs and the Classes of the possession or use of their chattels for a substantial time; or causing harm to the property;

k.    Whether Defendants destroyed the vines, bushes, trees, and/or crops of Plaintiffs and the Classes by the entry or intrusion of hazardous materials without privilege or permission in violation of Ohio law;

l.    Whether Defendants destroyed agricultural crops through their acts and omissions, including by exposing the agricultural crops to hazardous substances in violation of Pennsylvania law;

m.    Whether Defendants destroyed the timber, trees, logs, posts, fruits, nuts, growing plants, or products of said plants through their acts and omissions in violation of West Virginia law;

n.    Whether Defendants maliciously or willfully without the consent of the owners killed or injured animals in violation of Ohio law;

o.    Whether Defendants affirmatively destroyed physical evidence, documents, or other materials and/or failed to act timely or reasonably to suspend any automatic processes that would result in such destruction;

p.    Whether Defendants' acts and omissions after the derailment caused or contributed to losses and damages sustained by Plaintiffs and the Classes;

q.    Whether the Plaintiffs and the Classes have suffered a loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or other economic damages as a result of the Defendants' acts or omissions as set forth above;

r.    Whether Plaintiffs' and the Classes' businesses have suffered a loss of income and/or diminution in value due to either (i) the release of vinyl chloride and other toxic and hazardous substances or (ii) the stigma associated with being within the evacuation and/or "shelter in place" zones;

s.    Whether Plaintiffs and the Classes have suffered damages to their businesses due to the derailment and subsequent events, including forced closings and/or the evacuation;

t.    Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct, including related to the derailment and subsequent release of vinyl chloride and other toxic and hazardous substances;

u.    Whether medical monitoring is an appropriate remedy that should be imposed to provide early detection of future injuries and other benefits to Plaintiffs and the Classes;

51

v.      Whether monitoring of the diminution in value of Plaintiffs, including the stigma, on the value of the property of Plaintiffs and the Classes is an appropriate remedy; and

w.      Whether Plaintiffs and the Classes are entitled to relief for the damages caused by Defendants.

*Typicality*

251.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

252.    Plaintiffs own property, reside in, work and/or operate a business within the Class Zone surrounding the train derailment and toxic chemical explosion, and owned property, resided in, worked and/or operated a business in the Class Zone for at all relevant times.

253.    Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

254.     Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

255.    Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

*Adequacy*

256.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort litigation, including successful class actions involving mass displacements caused by the release of dangerous substances that are similar to that at issue here.

257.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

258.    Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

*Superiority and Predominance*

259.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct predominate over any questions affecting only individual Class Members.

260.    Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions.  Moreover, the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

261.    The prosecution of this case as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially

outweighed by the benefits to the legitimate interests of the parties, the Court, and the public, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

262.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority, discretion, and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## MEDICAL MONITORING CLASS INJUNCTIVE RELIEF PURSUANT TO RULE 23(b)(2)

263.    In addition, Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Classes and that require court imposition of uniform relief, thereby making appropriate equitable relief to the Classes as a whole within the meaning of Rules 23(b)(2).

264.    As set forth above, Plaintiffs are not asserting damages claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

265.    Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

266.    As a direct and proximate result of Defendants' wrongful conduct as set forth above, Plaintiffs and the Class Members have actually been exposed, and will continue to be exposed, to toxic substances, toxic fumes and carcinogens and thereby suffer, and will continue to suffer a significantly increased risk of serious injury and diseases as alleged herein, including liver disease such as liver cancer and angiosarcoma of the liver, cancers such as brain cancer and leukemia, lung damage, Raynaud's disease, acro-osteolysis, and reproductive damage. This increased risk is such that a reasonable physician would order medical monitoring, including but not limited to periodic diagnostic medical testing and necessary examinations.

267.    As the Department of Justice and the Environmental Protection Agency recognized in connection with their own lawsuit, the health risk to Plaintiffs and the Classes is significant and ongoing: "When a Norfolk Southern train derailed last month in East Palestine, Ohio, it released toxins into the air, soil, and water, endangering the health and safety of people in surrounding communities," said Attorney General Merrick B. Garland. "With this complaint, the Justice Department and the EPA are acting to pursue justice for the residents of East Palestine and ensure that Norfolk Southern carries the financial burden for the harm it has caused and continues to inflict on the community."

268.    Moreover, Norfolk Southern Chief Executive Office Alan Shaw acknowledged on multiple occasions both the existence of long-term health risks and the need to monitor them on-going, including testifying to Congress on March 21, 2023, "We are committed to a solution that addresses long-term health risks through the creation of a long-term medical compensation fund."

269.    Early detection and treatment of cancer and many other diseases is associated with more favorable outcomes. Timely-instituted medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to vinyl

55

chloride and other toxic substances released by the derailment, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and well-being of Plaintiffs and the Classes they seek to represent. Medical monitoring and testing procedures, including clinical examinations, exist that make the early detection of exposure to those toxic substances, toxic fumes and carcinogens that were released into the class area as a result of the derailment, as well as early detection of disease, both feasible and beneficial.

270.    The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and the Class Members resulting from their exposure to vinyl chloride and other toxic substances can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendants, that: (a) notifies individuals who have been exposed to vinyl chloride and other toxic substances of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of disease and injuries caused by exposure to vinyl chloride and other toxic substances; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to vinyl chloride and other toxic substances.

271.    Establishment of a Court-supervised medical monitoring program can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for the above-referenced examination and testing procedures and related activities, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

272.     The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, modeling, and other experts. Class adjudication of the right to this relief is both appropriate and necessary.

273.     The medical monitoring program should (a) be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees; (b) involve the monitoring of all Class Members by designated physicians under a Court-approved medical treatment and research regiment; and (c) involve the collection of medical data utilized for group studies, as well as monitoring and treatment of individuals. During program administration, Defendants should address issues implicated by program administration as they develop.

**COUNT I(A)**
**NEGLIGENCE AND NEGLIGENCE PER SE**
**(On Behalf of All Classes Against the Railroad Defendants)**

274.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

275.     The derailment, fire, uncontrolled release of toxic chemicals, and explosion of toxic chemicals was caused by the negligence, carelessness and/or recklessness of the Defendants.

276.     Upon information and belief, Plaintiffs aver that the derailment, fire, release, and explosion of toxic chemicals was caused by the joint negligence, carelessness and/or recklessness of the Defendants, and is the fault of the Defendants as set forth above.

277.     In addition, and in the alternative, the derailment, fire, release, and explosion of toxic chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants.  Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

57

278.     Defendants owed Plaintiffs and the Class a duty to use reasonable care in the transportation of hazardous materials through East Palestine, Ohio. Consistent with federal regulations and industry practices and procedures, these duties include, but are not limited to, the duty to:

a.      Properly inspect their trains and railcars;

b.      Not place in service or continue in service a car with an overheated roller bearing;

c.      Not accept or transport any shipment of hazardous material that has pressure relief devices made of materials that are incompatible with the lading;

d.      To maintain vigilant lookout during the operation of its trains and railcars;

e.      To remedy defects in equipment and remove all cars that are unsafe to run;

f.      To immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires have spread beyond the roller bearing;

g.      To properly calibrate, maintain, test, and operate train braking systems;

h.      To properly develop and implement risk reduction programs;

i.      To properly develop and implement risk-based hazard management programs;

j.      To properly develop and implement safety performance evaluation processes;

k.      Operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l.      Utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; appropriately place such detectors to ensure timely alerting of any potential problems; implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and ensuring that such detectors are timely and properly inspected and maintained;

m.      Ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.      Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

58

o.      Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.      Prevent over-loading the train with too many railcars or materials;

q.      Load the railcars consistent with accepted practice;

r.      Load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.      Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.      Hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.      Train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.      Properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

w.      Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.      Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.      Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.      Adequately warn those in danger of imminent exposure to hazardous chemicals;

aa.      Institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.      Institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.      Institute proper procedures to avoid exposing hazardous materials to the environment;

dd.    Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.    Timely implement such an emergency response plan;

ff.    Transport and handle hazardous materials in a manner which would not cause Plaintiffs and Class Members harm, as Plaintiffs and Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct;

gg.    Properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including avoiding the use of techniques that would further expose Plaintiffs, Class Members, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.    Evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

ii.    Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.    Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.    Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

ll.    Contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons.

279.    However, inconsistent with federal regulations and industry practice and procedures, Defendants negligently, carelessly and/or recklessly breached their duties to Plaintiffs and the Class by, among other things:

a.    Failing to properly inspect their trains and railcars;

b.    Placing in service or continuing in service a car with an overheated roller bearing;

c.    Accepting and transporting shipments of hazardous material that had pressure relief devices made of materials that were incompatible with the lading;

60

d.      Failing to maintain vigilant lookout during the operation of its trains and railcars;

e.      Failing to remedy defects in equipment and remove all cars that were unsafe to run;

f.      Failing to immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires had spread beyond the roller bearing;

g.      Failing to properly calibrate, maintain, test, and operate train brake systems;

h.      Failing to properly develop and implement risk reduction programs;

i.      Failing to properly develop and implement risk-based hazard management programs;

j.      Failing to properly develop and implement safety performance evaluation processes;

k.      Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l.      Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

m.      Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.      Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.      Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.      Failing to prevent over-loading the train with too many railcars or materials;

q.      Failing to load the railcars consistent with accepted practice;

r.      Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.     Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.     Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.     Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.     Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

w.     Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.     Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.     Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.     Failing to adequately warn those in danger of exposure to hazardous chemicals;

aa.    Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.    Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.    Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

dd.    Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.    Failing to timely implement such an emergency response plan;

ff.    Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs and the Class Members injury or harm, as Plaintiffs and the Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct.

62

gg. Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiffs, the Class Members, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh. Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

ii. Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj. Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk. Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

ll. Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property;

mm. Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and other combustible liquids; and

nn. Otherwise unreasonably causing injury to Plaintiffs and the Class Members in ways further investigation and discovery will reveal.

280. Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, including vinyl chloride, butyl acetate, benzene residue, and combustible or hazardous liquids by railcar.

281. Defendants owed and breached a duty of reasonable care commensurate with the release and burning of those hazardous materials, including the resultant release of phosgene and hydrogen chloride.

282. Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which the controlled release and burn

63

of hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, were contaminating property at levels that would materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

283.    The damages to Plaintiffs and Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions following the derailment to mitigate the danger and harm associated with their operations.

284.    Additionally, the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq., and its accompanying regulations are implemented to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents. 49 U.S.C. § 20101.  The derailment that forms the basis of this lawsuit is currently under investigation by the National Transportation Safety Board ("NTSB").  Plaintiffs are currently unadvised of the full extent of the federal or state safety laws and regulations that Defendants or their agents may have violated but reserve the right to rely on such safety laws and regulations shown during discovery.  However, upon information and belief, Defendants' conduct violated one or more regulations, including but not limited to the following:

    a.    49 CFR Part 215, including but not limited to 49 CFR § 215.9, 49 CFR § 215.13, 49 CFR § 215.15, 49 CFR § 215.115, Appendix B of CFR Part 215, and Appendix D of 49 CFR Part 215.

    b.    49 CFR Part 229, including but not limited to 49 CFR § 229.7, and 49 CFR § 229.29.

    c.    49 CFR Part 232, including but not limited to 49 CFR § 232.103 and 49 CFR § 232.109.

    d.    49 CFR Part 271, including but not limited to 49 CFR § 271.101, 49 CFR § 271.103, 49 CFR § 271.211, and 49 CFR § 271.213.

    e.    49 CFR Part 174, including but not limited to 49 CFR § 174.3.

f.      49 CFR Part 179, including but not limited to 49 CFR § 179.15.

285.    Defendants' violation of such safety laws and regulations constitutes negligence *per se*.

286.    Additionally, the FRSA authorizes railroads such as Defendants to adopt and enforce "additional or more stringent requirements not inconsistent with" the regulations.  Upon information and belief, Defendants did in fact adopt a comprehensive set of operating rules which apply to their operations, and Defendants violated their own Operating Rule 140 regarding train inspections.

287.    As a direct and proximate result of Defendants' negligent use, emission, discharge, disposal, distribution and release of hazardous materials throughout a 30-mile radius surrounding the derailment site, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

288.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

289.    Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate,

65

benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

290.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

**COUNT I(B)**
**NEGLIGENCE**
**(All Plaintiffs Against General American Marks Company and GATX)**

291.    As railcar owners, General American Marks Company and GATX are responsible for inspecting, maintaining, and delivering a railcar for service in a safe condition.

292.    As railcar owners responsible for the maintenance of Car 23, General American Marks Company and GATX Corporation, were responsible for ensuring that Car 23 moved at least one car length every six months.

293.    However, upon information and belief, GATX and General American Marks Company breached their duty to exercise reasonable care, and were thereby negligent, in one or more of the following respects:

a.    By allowing Car 23 to be used in rail service with a defective wheel bearing;

b.    By allowing Car 23 to be used in rail service without properly inspecting the wheel bearing;

c.    By allowing Car 23 to be used in rail service without properly maintaining the wheel bearing; and

d.    By allowing Car 23 to be stationary for long periods of time, in excess of six months, without inspecting, maintaining or replacing the wheel bearing.

294.    As a direct and proximate result of one or more of the aforesaid negligent acts of General American Marks Company and GATX, in combination with the acts and omissions of the Railroad Defendants as set forth herein, the wheel bearing on Car 23 overheated and failed, causing multiple other railcars to derail, which proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

295.    As a direct and proximate result of Defendants General American Marks Company and GATX's negligence, in combination with the acts and omissions of the Railroad Defendants as set forth herein, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

296.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

297.    Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to

volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants'
activities alleged herein.

298.     General American Marks Company and GATX's conduct as alleged herein shows
that they acted with gross neglect, willfully and wantonly, maliciously, with aggravated or
egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as
to warrant the imposition of punitive damages.

**COUNT I(C)**
**NEGLIGENCE**
**(All Plaintiffs Against Oxy Vinyls, GATX, and TILC)**

299.     As railcar owners and the shippers of materials, including hazardous materials,
using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars
that are approved for use under applicable federal regulations and industry standards including,
but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

300.     As railcar owners and the shippers of materials, including hazardous materials,
using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars
that are certified for use under applicable federal regulations and industry standards including, but
not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

301.     As railcar owners and the shippers of materials, including hazardous materials,
using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars
that are constructed, repaired, replaced or maintained consistent with their approvals and
certifications for use under applicable federal regulations and industry standards including, but not
limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

302.     As railcar owners and the shippers of materials, including hazardous materials,
using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars

that are compatible with the lading or goods to be transported within them under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

303.    Despite these requirements under federal regulations and applicable industry standards, Cars 26, 27, 28, 29 and 53 – all of which were owned, leased and/or used by Oxy Vinyls, GATX, and TILC – were either unapproved, uncertified or incompatible for use with vinyl chloride in at least the following respects, in violation of federal regulations:

a.     Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction;

b.     Car 27 was fitted with modifications that were not part of its approved certificate of construction;

c.     Cars 27, 28 and 53 were each accompanied by defective and/or incomplete certificates of construction;

d.     Cars 26, 27, 28 and 53 were each constructed with aluminum in their pressure relief devices ("PRD"), PRD protective housings, handwheels and angle handwheels; and

e.     Car 29 was fitted with an unapproved pressure relief device ("PRD") and was not specially approved for use with vinyl chloride.

304.    Oxy Vinyls, GATX and TILC's collective and individual failures to ensure these Cars were approved, certified and/or compatible with the use of vinyl chloride constitutes negligence and/or a breach of duties established in the federal regulations cited herein, as well as the obligation imposed by the American Association of Railroads rules and standards authorized by federal regulations, which, in combination with the acts and omissions of the Railroad Defendants as set forth herein, directly and proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

305.    As a direct and proximate result of Defendants Oxy Vinyls, GATX, and TILC's negligence, in combination with the acts and omissions of the Railroad Defendants as set forth

herein, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

306.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

307.    Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

308.    Oxy Vinyls, GATX and TILC's conduct as alleged herein shows that they acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT II
## STRICT LIABILITY
### (On Behalf of All Classes Against the Railroad Defendants)

309.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

310.     Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

311.     The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

312.     The Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by transporting hazardous substances, including but not limited to vinyl chloride, through a residential community, making them strictly liable for any resulting damages.

313.     The Defendants also engaged in an abnormally dangerous and/or ultrahazardous activity when they dumped the vinyl chloride they were transporting and lit it on fire in a residential community, making them strictly liable for any resulting damages.

314.     As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

315.     Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for

watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

316.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

317.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class Members, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs and the Class as described above.

318.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT III
## STATUTORY NUISANCE (OHIO)
### (On Behalf of the Ohio Residents, Property Owners, Employees,
### Businesses and Agricultural Businesses Subclasses Against the Railroad Defendants)

319.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

320.    Ohio R.C. § 3704.05 states "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

321.    Ohio Admin. Code 3745-15-07(A) states "[t]he emission or escape into the open air for any source or sources whatsoever of … fumes, gases, vapors, or any other substance or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance."

322.    As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

323.    Ohio R.C. § 3746.06 requires that, when contaminated property is voluntarily cleaned up, the remedial activities undertaken must ensure the groundwater complies with standards for residential use.

324.    As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and Class Members have been exposed to hazardous air pollutants in violation of Ohio law.

325.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs and Class Members, thereby exposing their properties and bodies to unsafe levels of vinyl chloride, butyl

73

acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

326.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs and Class Members presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and have the present need for medical monitoring to ensure early detection of any such disease or illness.

327.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

328.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

329.     Plaintiffs and the Classes suffered injuries that are distinct from the injuries suffered by the public at large.

330.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

**COUNT IV**
**STATUTORY NUISANCE (PENNSYLVANIA)**
**(On Behalf of The Pennsylvania Residents, Property Owners, Employees,**
**Businesses and Agricultural Businesses Subclasses Against the Railroad Defendants)**

331.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

332.     Under the Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is impermissible to emit air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act.

333.     Section 112 of the Clean Air Act includes vinyl chloride in the list of hazardous air pollutants and sets a national emission standard. 41 Fed. Reg. 46560 (1976).

334.     35 P.S. § 4013 declares that any violation of the Air Pollution Control Act "shall constitute a public nuisance," and "[a]ny person who causes the public nuisance shall be liable for the cost of abatement."

335.     As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

336.     As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Class Members have been exposed to hazardous air pollutants in violation of Pennsylvania law.

337.     As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs and Class Members, thereby exposing their properties and body to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

338.     As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs and Class Members presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

339.     Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for

watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

340.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

341.    Plaintiffs and the Classes suffered injuries that are distinct from the injuries suffered by the public at large.

342.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT V
## PRIVATE NUISANCE
### (On Behalf of All Classes Against the Railroad Defendants)

343.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

344.    At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposal of these materials would cause injury to Plaintiffs and the Class Members and their property.

77

345.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the East Palestine derailment site.

346.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have released vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene onto Plaintiffs' and the Class Members' land and have contaminated Plaintiffs' and the Class Members' real property, water and persons.

347.    The Defendants' contamination of Plaintiffs' and the Class Members' property with vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene has unreasonably interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or water pets and livestock.  This has, in turn, caused significant loss of income, out of pocket expenses, loss of use and enjoyment and inconvenience.

348.    Defendants' conduct has also substantially interfered with Plaintiffs' and the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

349.     Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs and the Class Members.

350.     Plaintiffs and the Class Members, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious, illegal, and wrongful conduct, including the pollution of their land and water.

351.     Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene and the contamination of Plaintiffs' and the Class Members' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs and the Class Members to presently suffer, and continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

352.     Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

353.     Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate,

benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

354.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT VI
## PUBLIC NUISANCE
### (On Behalf of All Classes Against the Railroad Defendants)

355.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

356.    At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposing of these materials was hazardous and harmful to people living in nearby areas.

357.    Plaintiffs and the Class Members have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running and groundwater without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

358.    Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids substantially and unreasonably infringed upon and transgressed these public rights.

359.    As a proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs,' the Class Members,' and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

360.    As a proximate result of Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and contaminated the areas surrounding Plaintiffs' and Class Members' residences, thereby exposing them to toxic chemicals and carcinogens.

361.    Each of the Plaintiffs and Class Members suffered injuries that are distinct from the public at large because their individual real and personal property rights have been unreasonably interfered with.

362.    As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

363.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for

watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

364.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

365.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

**COUNT VII**
**TRESPASS**
**(On Behalf of The Residents, Property Owners, Businesses**
**and Agricultural Businesses Classes Against the Railroad Defendants)**

366.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

367.    At all times relevant hereto, Defendants knew or should have known vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiffs and Class Members and their property.

368.    Defendants, through their activities alleged herein, caused hazardous materials to enter and contaminate Plaintiffs' and the Class Members' property. They intentionally, knowingly,

and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs and the Class Members.

369.    Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride and/or other combustible liquids to enter and contaminate Plaintiffs' and the Class Members' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' and the Class Members' land and water.

370.    At all relevant times Defendants were aware that their conduct in disposing of vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride, and other combustible liquids was contrary to Plaintiffs' and the Class Members' rights in their property.

371.    At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' and the Class Members' rights to their property.

372.    Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful person or business.

373.    The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' real and personal property with hazardous materials has interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' and the Class Members' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

374.    Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

375.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

376.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

377.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

### COUNT VIII
### TRESPASS TO CHATTELS
#### (On Behalf of The Residents, Property Owners, Businesses
#### and Agricultural Businesses Classes Against the Railroad Defendants)

378.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

379. At all relevant times, Plaintiffs and the Class Members had a possessory interest in all their personal property, including but not limited to personal vehicles, commercial vehicles, household goods, food, professional equipment, recreational equipment, livestock, and pets.

380. Defendants, through their activities alleged herein, caused the impairment of Plaintiffs' and the Class Members' property as to its condition, quality, or value and harmed Plaintiffs' materially valuable interest in the same.

381. Defendants, through their activities alleged herein, deprived Plaintiffs and the Class Members of the possession or use of their chattel for a substantial time.

382. Defendants, through their activities alleged herein, caused harm to property in which Plaintiffs and the Class Members had or have a legally protected interest.

383. At all relevant times Defendants were aware that their conduct in transporting, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene was contrary to Plaintiffs' and the Class Members' legally protected interest in their personal property.

384. The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' personal property substantially impaired Plaintiffs' and the Class Members' legally protected interest in their property as well as economic and property damages as alleged herein.

385. Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' and the Class Members' ability to enjoy their personal property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs and the Class Members so choose.

386.    Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members personal property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience. These damages include, but are not limited to, the contamination and/or death of livestock and pets, and the contamination of personal vehicles, commercial vehicles, household goods, food, professional equipment, and recreational equipment.

387.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

388.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

389.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

86

**COUNT IX**
**DESTRUCTION OF VINES, BUSHES, TREES, AND CROPS**
**OHIO R.C. § 901.51**
**(On Behalf of the Ohio Residents, Property Owners, Businesses**
**and Agricultural Businesses Classes Against the Railroad Defendants)**

390.    Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

391.    At all relevant times, Plaintiffs and the Class Members engaged in growing or standing vines, bushes, shrubs, saplings, trees, or crops on real property, owned, leased or otherwise occupied by Plaintiffs and the Class Members.

392.    Defendants, through their activities alleged herein, damaged Plaintiffs' and the Class Members' vines, bushes, and/or trees by the entry and intrusion of hazardous materials to Plaintiffs' and the Class Members' property and were without any applicable privilege or permission for such entry.

393.    At all relevant times, Defendants' conduct displayed indifference to and disregard for the Plaintiffs' and the Class Members' rights to their land.

394.    At all relevant times, Defendants' conduct as alleged herein was done with a conscious disregard or indifference to the substantial and unjustifiable risk of harm to Plaintiffs' and the Class Members' property by the entry and/or exposure to the hazardous materials.

395.    As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs and the Class Members presently suffer, and will continue to suffer in the future, damage to vines, bushes, shrubs, saplings, trees, and/or crops standing or growing on the land, owned, leased or otherwise occupied by Plaintiffs and the Class Members.

396.    Plaintiffs' and the Class Members' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution

in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

397.    In addition, Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

398.    Pursuant to O.R.C. § 901.51, Plaintiffs and the Class Members are entitled to treble damages for the injuries caused and alleged herein, as well as any other damages, including punitive damages.

399.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

**COUNT X**
**AGRICULTURAL CROP DESTRUCTION**
**42 Pa.C.S.A. § 8313**
**(On Behalf of the Pennsylvania Residents, Property Owners, Businesses
and Agricultural Businesses Classes Against the Railroad Defendants)**

400.    Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

401.    At all relevant times, Plaintiffs and the Class Members engaged in raising field crops, vegetables or fruit plants, or trees for scientific or commercial purposes, or for testing or research purposes in connection to a public or private research facility or university or governmental agency.

402.    Defendants, through their activities alleged herein, damaged Plaintiffs' and the Class Members' field crops, vegetables or fruit plants, and/or trees and such damage was not the result of research or normal commercial activities.

403.    Plaintiffs' and the Class Members' field crops, vegetables or fruit plants and/or trees were damaged when exposed to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' negligent, reckless, ultrahazardous, and willful and wanton conduct as alleged herein.

404.    Plaintiffs' and the Class Members' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

405.    Pursuant to 42 Pa. C.S.A. §8313, Plaintiffs and the Class Members are entitled to all appropriate relief, including compensatory and punitive damages, reasonable investigative expenses, reasonable attorney fees, and other costs associated with the litigation.

406.    Plaintiffs and the Class Members shall be entitled to damages treble the market value of the field crops, vegetable or fruit plants or trees prior to damage, in addition to actual damages related to the production, research, testing, replacement and crop development costs directly related to the crop that has been damaged as part of the value of the crop, as well as damage to any records, data and data-gathering equipment or devices.

407.    In addition, Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and

to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

408.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

**COUNT XI**
**DESTRUCTION OF TIMBER, TREES, LOGS, POSTS, FRUITS,**
**NUTS, GROWING PLANTS OR PRODUCTS OF SAID PLANTS**
**W.Va. Code § 61-3-48a**
**(On Behalf of the West Virginia Residents, Property Owners, and Businesses**
**Classes Against the Railroad Defendants)**

409.    Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

410.    At all relevant times, Plaintiffs and the Class Members engaged in growing timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

411.    Defendants, through their activities alleged herein, damaged or caused damage to occur to Plaintiffs' and the Class Members' timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

412.    At all relevant times, the Defendants did not have written permission for the forced entry onto land owned, leased, or otherwise occupied, by Plaintiffs and the Class Members where the damage occurred.

413.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all the damages to Plaintiffs and the Class Members, which were a direct and proximate result of the train derailment and release of hazardous substances and ensuing clean-up activities, resulting in the harm to Plaintiffs and the Class Members.

90

414.     Plaintiffs' and the Class Members' injuries include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

415.     In addition, Plaintiffs' and the Class Members' damages also include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

416.     Pursuant to W.Va. Code §61-3-48a, Plaintiffs and the Class Members are entitled to treble damages; an amount three times the value of the timber, trees, growing plants or products thereof, in addition to and distinct from any other penalties provide by law, including punitive damages.

417.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

### COUNT XII
### INJURING ANIMALS
### Ohio R.C. § 959.02
### (On Behalf of the Ohio Residents, Property Owners, Businesses
### and Agricultural Businesses Classes Against the Railroad Defendants)

418.     Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

419.     Ohio Rev. Code § 959.02 prohibits anyone from "maliciously, or willfully, and without the consent of the owner" killing or injuring "a horse, mare, foal, filly, jack, mule, sheep,

91

goat, cow, steer, bull, heifer, ass, ox, swine, dog, cat, or other domestic animal that is the property of another."

420.    Per Ohio Rev. Code § 2307.60(A)(1), "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action and attorneys fees [if authorized] and may recover punitive or exemplary damages [if authorized]."

421.    As a direct and proximate result of Defendants' conduct and activities as alleged herein, Plaintiffs' and the Class Members' animals have been injured and will continue to suffer injury in the future.

422.    Accordingly, Plaintiffs and the Class Members presently suffer, and will continue suffering in the future, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, and inconvenience.

423.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

424.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

425.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive or exemplary damages.

**COUNT XIII**
**MEDICAL MONITORING**
**(On Behalf of the Ohio Residents and**
**Employees Subclasses Against All Defendants)[13]**

426.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

427.    Plaintiffs and the Class Members have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

428.    The hazardous materials carried by the train and released by Defendants are highly toxic substances.

429.    Plaintiffs and the Classes were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result

---

[13] Plaintiffs acknowledge that under Ohio law, medical monitoring might not be recognized as a stand-alone cause of action. Accordingly, Plaintiffs allege it here as both a cause of action and an element of damages available under other applicable causes of action. Moreover, Plaintiffs plead herein a request for injunctive relief including medical monitoring on a class basis under Fed. R. Civ. P. 23(b)(2).

of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

430.    As a proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Classes have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

431.    This increased risk would warrant a reasonable physician to order monitoring.

432.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

433.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposures to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

434.    As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection

and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

435.     As a result, Plaintiffs and the Classes should be awarded the quantifiable costs of such a monitoring regime.

**COUNT XIV**
**MEDICAL MONITORING**
**(On Behalf of the Pennsylvania Residents and**
**Employees Subclasses Against All Defendants)**

436.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

437.     Plaintiffs and the Class Members have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

438.     The hazardous materials carried by the train and released by Defendants are highly toxic substances.

439.     Plaintiffs and the Class Members were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

440.     As a direct and proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including

but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Class Members have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

441.    This increased risk would warrant a reasonable physician to order monitoring.

442.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

443.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposures to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

444.    As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

445.    As a result, Plaintiffs and the Classes should be awarded the quantifiable costs of such a monitoring regime.

96

## COUNT XV
## MEDICAL MONITORING
### (On Behalf of the West Virginia Residents and
### Employees Subclasses Against All Defendants)

446.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

447.    Plaintiffs and the Class Members have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

448.    The hazardous materials carried by the train and released by Defendants are highly toxic substances.

449.    Plaintiffs and the Class Members were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

450.    As a direct and proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Class Members have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-

osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

451.    This increased risk would warrant a reasonable physician to order monitoring.

452.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

453.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

454.    As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

455.    As a result, Plaintiffs and the Classes should be awarded the quantifiable costs of such a monitoring regime.

**COUNT XVI**
**SPOLIATION**
**(On Behalf of All Classes Against the Railroad Defendants)**

456.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

457.     Under the common law of Ohio as well as the Federal Rules of Civil Procedure, the Defendants were required to preserve any and all evidence relating to the train derailment and subsequent toxic explosion once they reasonably anticipated that litigation would ensue.

458.     Under the common law of Ohio, as well as the Federal Rules of Civil Procedure, this duty to preserve evidence not only required the Defendants to refrain from affirmatively destroying physical evidence, documents, and other materials, but also required the Defendants to suspend any automatic processes that would result in the same.

459.     The Defendants reasonably anticipated, or should have reasonably anticipated, litigation concerning the train derailment and subsequent toxic explosion as of February 3, 2023, immediately after Train 32N derailed.

460.     However, despite reasonably anticipating litigation, the Defendants did not act timely or reasonably to suspend automatic processes that would result in the destruction of case-critical evidence.

461.     Specifically, according to the NTSB, the Defendants failed to suspend the processes whereby the full surveillance video from the cab of Train 32N would be preserved, instead placing Train 32N back into service such that automatic processes in the video recording system deleted and recorded over this case-critical evidence.[14]

462.     According to the NTSB, the full surveillance video from the cab of Train 32N is "just as important" as those limited portions the Defendants selected to preserve before allowing the rest of the surveillance footage to be automatically deleted and overwritten.[15]

---

[14] Rowland, Darrel, "Most of Norfolk Southern video leading up to East Palestine derailment is gone" March 26, 2023 (last accessed March 27, 2023).
[15] *Id*.

463.     Indeed, the NTSB explained that because the Defendants allowed the full surveillance video from the cab of Train 32N to be deleted, "we don't even have what was occurring around the first and second wayside (defect) detectors, much less before that, **all of which is key to investigations**."[16]

464.     As a result of the destruction of this video surveillance footage from the cab of Train 32N – and other acts or omissions which may be revealed throughout the course of investigation and discovery – Defendants have willfully destroyed or interfered with evidence that disrupts Plaintiffs' and the Class Members' ability to prosecute their claims.

465.     Accordingly, Plaintiffs and the Class Members should be awarded damages commensurate with Defendants' spoliation of evidence in an amount to be determined at trial, together with any other appropriate remedies.

**COUNT XVII**
**GROSS NEGLIGENCE/WILLFUL AND WANTON CONDUCT**
**(On Behalf of All Classes Against All Defendants)**

466.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

467.     At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members.

468.     Upon information and belief, Defendants were, at all times relevant, aware that vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride are highly carcinogenic, mutagenic and/or otherwise harmful to humans.

---

[16] *Id*. (emphasis added).

469.     Upon information and belief, Defendants were, at all times relevant, aware of the considerable health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various diseases and cancers in the surrounding population.

470.     Upon information and belief, Defendants were, at all times relevant, aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

471.     Upon information and belief, Defendants were, at all times relevant, aware that at least one railcar was malfunctioning for at least 20 miles before the derailment occurred.

472.     Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties by, among other things:

    a.    Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

    b.    Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

    c.    Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

    d.    Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

    e.    Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

f.      Failing to prevent over-loading the train with too many railcars or materials;

g.      Failing to load the railcars consistent with accepted practice;

h.      Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

i.      Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

j.      Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

k.      Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

l.      Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

m.      Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

n.      Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

o.      Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

p.      Failing to adequately warn those in danger of exposure to hazardous chemicals;

q.      Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

r.      Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

s.      Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

t.      Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

102

u.     Failing to timely implement such an emergency response plan;

v.     Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs and Class Members injury or harm, as Plaintiffs and Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct;

w.    Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

x.     Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.     Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

z.     Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

aa.    Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

bb.    Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons in order to avoid injury to;

cc.    Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene; and

dd.    Otherwise unreasonably causing injury to Plaintiffs and Class Members in ways further investigation and discovery will reveal.

ee.    With respect to Defendants General American Marks Company and GATX, by allowing Car 23 to be used in rail service with a defective wheel bearing; by allowing Car 23 to be used in rail service without properly inspecting the wheel bearing; by allowing Car 23 to be used in rail service without properly maintaining the wheel bearing, and by allowing Car 23 to be stationary for long periods of time, in excess of six months, without inspecting, maintaining, or replacing the wheel bearings.

103

ff.  With respect to Defendants Oxy Vinyls, GATX, and TILC, by using or allowing to be used Cars 26, 27, 28, 29, and 53 for the transportation of vinyl chloride in violation of federal regulations as follows:  (1) Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction; (2) Car 27 was fitted with modifications that were not part of its approved certificate of construction; (3) Cars 27, 28 and 53 were each accompanied by defective and/or incomplete certificates of construction;  (4) Cars 26, 27, 28 and 53 were each constructed with aluminum in their pressure relief devices ("PRD"), PRD protective housings, handwheels and angle handwheels; and (5) Car 29 was fitted with an unapproved pressure relief device ("PRD") and was not specially approved for use with vinyl chloride.

473.  Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute gross negligence, willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members so as to warrant the imposition of punitive or exemplary damages.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class Members proposed in this Master Consolidated Class Action Complaint, respectfully request that the Court enter judgment in their favor and against Defendants, including jointly and severally as warranted, as follows:

a.  For an Order certifying the Classes, as defined herein, and appointing Plaintiffs and their Counsel to represent the Classes;

b.  For damages, including compensatory, punitive, and exemplary damages, in an amount determined just and reasonable;

c.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d.  For prejudgment and post-judgment interest on all amounts awarded;

e.  For injunctive and declaratory relief, as allowed by law, including medical monitoring; and

f.  Such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a jury trial on all issues so triable.


Dated: August 14, 2023


Respectfully submitted,

/s/ *Michelle L. Kranz*
Michelle L. Kranz (Oh 62749)
ZOLL & KRANZ, LLC
6620 West Central Ave., Suite 100
Toledo, Ohio 43617
419-841-9623
419-841-9719 (fax)
michelle@toledolaw.com

*Plaintiffs' Liaison Counsel*


 /s/ *Seth A. Katz*
Seth A. Katz (pro hac vice)
BURG SIMPSON ELDREDGE HERSH
& JARDINE, P.C.
40 Inverness Drive East
Englewood, CO 80112
303-792-5595
303-708-0527 (fax)
skatz@burgsimpson.com

M. Elizabeth Graham (pro hac vice)
GRANT & EISENHOFER, P.A.
123 S. Justison Street, 6th Floor
Wilmington, DE 19801
303-622-7000
303-622-7100 (fax)
egraham@gelaw.com

Jayne Conroy (pro hac vice)
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
212-784-6400

212-213-5949 (fax)
jconroy@simmonsfirm.com

Michael Morgan (pro hac vice)
MORGAN & MORGAN
20 North Orange Ave., Suite 1600
Orlando, FL 32801
407-420-1414
407-245-3389 (fax)
mmorgan@forthepeople.com


*Plaintiffs' Interim Class Counsel and Co-Lead Counsel*


## Certificate of Service


I hereby certify that on August 14, 2023, a copy of foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.


/s/ *Michelle L. Kranz*
Michelle L. Kranz

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMBRIDGE AREA SCHOOL DISTRICT, | ) | |
| WESTERN BEAVER COUNTY SCHOOL | ) | Civil Case No. 2:23-cv-01530-CB |
| DISTRICT, BLACKHAWK SCHOOL | ) | |
| DISTRICT, UNION AREA SCHOOL | ) | Class Action |
| DISTRICT, SOUTH SIDE AREA SCHOOL | ) | |
| DISTRICT, BEAVER AREA SCHOOL | ) | Hon. Cathy Bissoon |
| DISTRICT, local government entities, and on | ) | |
| behalf of similarly situated school districts; | ) | |
| A.W., M.W., L.W., and H.F., minors | ) | |
| by and through their parent/legal guardian | ) | |
| VERA FINNEY; and J.D., a minor by and | ) | |
| through his parent/legal guardian | ) | |
| ROBERT D. DOUGHTY, individually and | ) | |
| on behalf of similarly situated individuals, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORFOLK SOUTHERN CORPORATION, | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, OXY VINYLS LP, GATX | ) | |
| CORPORATION, GENERAL AMERICAN | ) | |
| MARKS COMPANY, TRINITY | ) | |
| INDUSTRIES LEASING COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **FIRST AMENDED COMPLAINT**

NOW COME Plaintiffs, Ambridge Area School District, Wester Beaver County School
District, Blackhawk School District, Union Area School District, South Side Area School District,
and Beaver Area School District, (collectively "Representative School District Plaintiffs")
individually and on behalf of similarly situated school districts ("School District Class Members"),
and minor Plaintiffs A.W., M.W., L.W., and H.F., by and through their parent/legal guardian Vera
Finney, and J.D. by and through his parent/legal guardian Robert D. Doughty, (collectively

Representative Student Plaintiffs") individually and on behalf of similarly situated individuals

("Student Class Members"), who hereby file this First Amended Complaint in the above captioned

case as a matter of course pursuant to Fed. R. Civ. P. Rule 15(a)(1). Plaintiffs allege as follows:

### INTRODUCTION

1.      At approximately 9:00pm on February 3, 2023, eastbound Norfolk Southern Railway

Train 32N, owned and/or operated by Defendant Norfolk Southern Corporation ("NSC") and/or

Defendant Norfolk Southern Railway Company ("NSRC") (collectively the "Norfolk

Defendants") derailed in East Palestine, Ohio.

2.      Train 32N was just under 2 miles long, weighed a massive (approximate) 18,000 tons,

and was traveling at least 47-50 mph just before it derailed. It was manned by three people at the

time: an engineer, conductor, and conductor trainee; and was comprised of 2 head-end locomotives

and 149 railcars. This included 20 railcars that were carrying toxic, hazardous, and dangerous

chemicals, of which 11 derailed. These 11 derailed tank cars that were carrying toxic, hazardous,

and dangerous chemicals, including known human carcinogens, ignited when the derailment

occurred and fueled a large fire that damaged an additional 12 non-derailed railcars. First

responders fought the initial fire from the train derailment from February 3rd through February 6th.

3.      On February 5th one of the railcars carrying a known human carcinogen, vinyl

chloride, became even more dangerous when a safety valve failed and the fire caused the

temperature and pressure to build in the railcar. On February 6th, the temperature and pressure

within the railcar with the failed safety relief valve continued to increase, and the Norfolk

Defendants implemented, and/or caused or contributed to the implementation of, and/or approved

the implementation of, a plan whereby explosives would be used to blow holes in all five vinyl-

chloride-carrying railcars in order to empty/vent the entire contents of all five railcars –

approximately 1,000,000 pounds of toxic vinyl chloride – onto/into the ground, and then the 1,000,000 pounds of toxic vinyl chloride would be permitted to burn on the spot until it (seemingly) disappeared.

4.    At approximately 4:30pm on February 6th, the Norfolk Defendants, either directly or indirectly, caused or contributed to this plan occurring. This so called "controlled release" or "controlled burn" or "vent and burn" was anything but controlled. The explosion and subsequent inferno released a large plume of thick black toxic smoke and toxic fallout, including toxic soot and other toxic particulate matter.

5.    Both the derailment and initial chemical release and initial fire, and then the intentional use of explosives to empty/vent the five vinyl chloride carrying railcars and the ensuing fire, caused the release of, contamination with, and exposure to, Vinyl Chloride, Dioxins, Phosgene, Hydrogen Chloride, Dipropylene Glycol, Diethylene Glycol, Ethylene Glycol Monbutyl Ether, Polyvinyl, Polypropyl Glycol, Isobutylene, Butyl Acrylates, Petro Oil, Benzene, and volatile and semi-volatile byproduct compounds and other combustible materials.

6.    These chemicals were transported over and onto the school properties through plumes of toxic smoke and toxic fallout, including toxic soot and other toxic particulate matter containing these chemicals, and were deposited on the school properties (both real property and personal property) through the toxic fallout.

**PARTIES**

7.    Representative Plaintiff, Ambridge Area School District, is a school district that, as of at least February 3, 2023, and continuing thereafter, owns and possesses buildings and facilities within a 30-mile radius of East Palestine, Ohio, including the following school buildings and facilities, located at the following addresses: Ambridge Area High School, 901 Duss Avenue,

Ambridge, Pennsylvania 15003, Ambridge Area Middle School, 401 First Street, Freedom, Pennsylvania 15042, Economy Elementary School, 1000 First Street, Freedom, Pennsylvania15042, Highland Elementary School, 1101 Highland Avenue, Ambridge, Pennsylvania 15003, and State Street Elementary School, 600 Harmony Road, Baden, Pennsylvania 15005.

8.   Ambridge Area School District encompasses a 27 square mile area, and includes students from Beaver County in Pennsylvania.

9.   Representative Plaintiff, Western Beaver County School District, is a school district that, as of at least February 3, 2023, and continuing thereafter, owns and possesses buildings and facilities within a 30-mile radius of East Palestine, Ohio, including Fairview Elementary School, 343 Ridgemont Drive, Midland, Pennsylvania 15059; and Western Beaver Junior Senior High School, 216 Engle Road, Industry, Pennsylvania 15052.

10.   Western Beaver County School District encompasses a 34.5 square mile area, and includes students from Beaver County in Pennsylvania.

11.   Representative Plaintiff, Blackhawk School District, is a Pennsylvania local governmental entity that, as of at least February 3, 2023 and continuing thereafter, owns and possesses (without limitation) the following school buildings and facilities, located at the following addresses: 500 Blackhawk Road, Beaver Falls, Pennsylvania 15010; 402 Shenango Road, Beaver Falls, Pennsylvania 15010; 635 Shenango Road, Beaver Falls, Pennsylvania 15010; and 701 Darlington Road, Beaver Falls, Pennsylvania 15010. These buildings and facilities are all within a 30-mile radius of East Palestine, Ohio.

12.   Blackhawk School District encompasses a 69 square mile area, and includes students from both Beaver and Lawrence Counties in Pennsylvania.

13.     Representative Plaintiff, Union Area School District, is a Pennsylvania local governmental entity that, as of at least February 3, 2023 and continuing thereafter, owns and possesses buildings and facilities within a 30-mile radius of East Palestine, Ohio, including 2106 Camden Ave, New Castle, Pennsylvania 16101 and 500 South Scotland Lane New Castle, Pennsylvania 16101.

14.     The Union Area School District encompasses approximately 10 square miles, and includes students from Lawrence County, Pennsylvania.

15.     Representative Plaintiff, South Side Area School District, is a Pennsylvania local governmental entity that, as of at least February 3, 2023 and continuing thereafter, owns and possesses buildings and facilities within a 30-mile radius of East Palestine, Ohio, including 4949 State Route 151, Hookstown, Pennsylvania, 15050. These buildings and facilities are all within a 30-mile radius of East Palestine, Ohio.

16.     The South Side Area School District encompasses approximately 76 square miles, and includes students from Beaver County, Pennsylvania.

17.     Representative Plaintiff, Beaver Area School District, is a Pennsylvania local governmental entity that, as of at least February 3, 2023 and continuing thereafter, owns and possesses buildings and facilities within a 30-mile radius of East Palestine, Ohio, including 375 College Avenue Beaver, PA 15009; 1300 Fifth Street Beaver, PA 15009; Dutch Ridge Road Beaver, PA 15009; Gypsy Glen Road Beaver, PA 15009; Gypsy Glen Road Beaver, PA 15009.

18.     Minor Plaintiffs A.W., M.W., L.W., and H.F., were students at Representative Plaintiff, Ambridge Area School District, at the time of the subject derailment. Vera Finney is their parent/legal guardian.

19.   Minor Plaintiff, J.D., was a student at Representative Plaintiff, Beaver Area School District, at the time of the subject derailment. Robert D. Doughty is his parent/legal guardian.

20.   Defendant Norfolk Southern Corporation ("NSC") is a public corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia, with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

21.   Defendant Norfolk Southern Railway Company ("NSRC") is a wholly owned subsidiary of NSC. NSRC is a Class I railroad corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia, with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

22.   Defendant Oxy Vinyls LP ("Oxy Vinyls"), is a North American manufacturer and shipper of vinyl chloride, resins, chlorine, and caustic soda. Oxy Vinyls also owns and maintains a fleet of railcars for use in transportation of their products. Oxy Vinyls is a Delaware limited partnership, with its principal place of business in Dallas, Texas. Occidental PVC, LLC, and Occidental Chemical Corporation are the only Partners of Oxy Vinyls. The sole member of Occidental PVC, LLC is Occidental Chemical Corporation. Occidental Chemical Corporation is a New York corporation with its principal place of business in Dallas, Texas.

23.   Defendant GATX Corporation ("GATX") is a public corporation that owns and maintains a fleet of railcars for use in transportation of goods and products and leases their railcars to shippers such as Oxy Vinyls in this case. GATX Corporation is a New York corporation, with its principal place of business in Chicago, Illinois.

24.   Defendant General American Marks Company ("GAMC") owns and maintains a fleet of railcars for use in transportation of goods and products and leases their railcars to shippers such

6

as Oxy Vinyls in this case. GAMC is a Delaware corporation with its principal place of business in Chicago, Illinois. GAMC is a wholly owned subsidiary of Defendant GATX.

25.   Defendant Trinity Industries Leasing Company ("TILC") owns and maintains a fleet of railcars for use in transportation of goods and products and leases their railcars to shippers such as Oxy Vinyls in this case. TILC is a Delaware corporation with its principal place of business located in Dallas, Texas and is a wholly owned subsidiary of Trinity Industries, Inc.

26.   At all relevant times, Defendants acted on their own, as well as by and through their officers, directors, executives, employees, contractors, subcontractors, and/or agents.

## JURISDICTION AND VENUE

27.   Jurisdiction exists under the Class Action Fairness Act ("CAFA"), 28 USC §1332(d), because at least one class member is a citizen of a different state than Defendants, and the matter in controversy exceeds the sum or value of $5,000,000.

28.   This Court has personal jurisdiction over Defendants because they regularly engage in business within Pennsylvania, including operating and/or using the Fort Wayne rail line, which runs from Illinois to Pittsburg, Pennsylvania. Additionally, the tortious conduct and otherwise improper conduct of the Defendants caused damages to Plaintiffs and class members in Pennsylvania.

29.   Venue is proper in this judicial district pursuant to 28 USC §1391(b)(2), as Defendants tortious and otherwise improper conduct caused damages to occur within the Western District of Pennsylvania.

## FACTS

### *The Norfolk Defendants*

30.  NSC's 2021 Annual Report states that NSC's subsidiaries were under the common control of NSC, and that rail operations are coordinated at the holding company level by NSC's Chief Operating Officer. Thus, NSC controls NSRC and has established management, financial, operational safety standards, and parameters for NSC's operations which directly involve the subject train, railway, and safety devices. Thus, NSC and NSRC are jointly and severally liable for each other's conduct as alleged herein because they acted in concert and under alter ego and piercing the corporate veil theories.

31.  The Norfolk Defendants operate approximately 19,300 route miles in 22 states and the District of Columbia, including more than 2,000 route miles in Pennsylvania and serves every major container port in the eastern United States.

32.  According to the Federal Railroad Administration ("FRA"), the Norfolk Defendants had the most derailments of all railroad companies in Pennsylvania, with 76 accidents total from 2019 to 2022 – 23 in 2019, 14 in 2020, 23 in 2021, and 16 in 2022.

33.  According to the FRA, the Norfolk Defendants also had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 69 accidents total – 22 in 2019, 18 in 2020, 15 in 2021 and 14 in 2022.

34.  According to the FRA, the Norfolk Defendants also had the most derailments of all railroad companies in West Virginia 2019 through 2022, with 13 accidents total – 4 in 2019, 6 in 2020, 2 in 2021, and 1 in 2022.

35.   The Norfolk Defendants' recent history of train derailments and accidents has been caused, in part, by their adoption and implementation of a program known as "Precision Scheduled Railroading" ("PSR").

36.   In 2019, the Norfolk Defendants implemented PSR to cut costs, increase profits, and decrease NSC's operating ratio to entice investment in NSC. Operating ratio is a metric that investors use to gauge the financial health of a company.

37.   Upon information and belief, approximately eighty percent (80%) of the compensation for NSC's executives are based on performance metrics such as operating ratio and operating income for NSC subsidiaries, including NSRC. Operating ratio looks at operating expenses as a percentage of revenue – the lower the operating ratio the more attractive the company is to investors and may be thought of as a measure of "efficiency" as compared to peer companies. Operating income looks at operating revenue less operating expenses.

38.   Since many, if not most, Class I railroad companies were implementing (or had already implemented) PSR programs, the Norfolk Defendants were essentially in a race to the bottom with their competitor railroad companies.

39.   To win this race, cut costs, increase profits, and decrease NSC's operating ratio, the Norfolk Defendants, under their PSR program, ran heavier, longer trains than ever before, and at higher speeds than ever before, while simultaneously reducing their staff of employees – including those employees involved in safety, inspection, maintenance, training, operation, and lookout roles, which caused or contributed to the injuries complained of.

40.   The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants running their trains on fixed schedules, which reduced and limited the amount of time

for inspection, maintenance, and repair of trains and railcars, which caused or contributed to the injuries complained of.

41.   The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants reducing the number of inspection points, which caused or contributed to the injuries complained of.

42.   The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants permitting train crews who are less qualified (and thus less costly) than carmen to inspect trains and railcars, which caused or contributed to the injuries complained of.

43.   The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants inadequately inspecting, maintaining, repairing, and operating their hot bearing detector ("HBD") system (sometimes referred to as "hot-box detectors" or "wayside detectors")[1], which caused or contributed to the injuries complained of.

44.   The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants inadequately calibrating their HBD system, calibrating their HBD system so as to reduce warnings, and/or otherwise failing to set adequate standards, thresholds, and algorithms for providing a warning of an overheating bearing or axle, which caused or contributed to the injuries complained of.

45.   The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants permitting warning systems, algorithms, alerts, and/or alarms to be ignored or overridden relating to their HBD system, which caused or contributed to the injuries complained of.

---

[1] HBDs (or hotbox detectors, or wayside detectors) are devices positioned along the tracks that measure the temperature of bearings and provide a warning to the train's crew and a twenty-four-hour alert desk in Atlanta when bearing temperatures indicate potential overheating.

46.  The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants electing to use or continue to use substandard and outdated airbrakes rather than updating to a safer braking system such as Electronically Controlled Pneumatic (ECP) brakes, which can significantly reduce train stopping distances, and which caused or contributed to the injuries complained of.

47.  The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants cutting spending on safety, inspection, maintenance, and repair measures for trains and railcars, which caused or contributed to the injuries complained of.

48.  The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants cutting spending on training relating to inspection, maintenance, repair, and operation of trains and railcars, which caused or contributed to the injuries complained of.

49.  The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants cutting spending on training relating to emergency response measures, including hazardous waste emergency response measures, after a train has ceased operating or after a derailment has occurred, which caused or contributed to the injuries complained of.

50.  The Norfolk Defendant's decision to implement PSR also led, in part, to the Norfolk Defendants failing to employ individuals and/or adequately staff trains to allow an individual to keep a proper lookout while the train is in operation for issues including sparks and/or fire coming from railcars, which caused or contributed to the injuries complained of.

51.  The Norfolk Defendant's decision to implement PSR also led, in part, to a July 2022 audit report by the FRA finding that between January 2022 and May 2022, the Norfolk Defendants suffered from significant safety violations. **<u>Exhibit 1</u>**.  The FRA audit report noted that the Norfolk Defendants "did not take immediate actions to remediate defective conditions" and that "these

conditions have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service." Additionally, the FRA warned Norfolk Southern that "when critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential." The FRA Report also found that a "failure to properly administer and implement the program of operational testing", which "can diminish the capacity to correct accident/incident and injury trends."    The FRA Report found "inadequate communication between the NS transportation and mechanical departments", which led to defective conditions not reported for repair and/or not removed from service, which "may raise the overall risk of train derailment". The Norfolk Defendants failure to address these issues and abide by these warnings caused or contributed to the injuries complained of.

52.   The Norfolk Defendants implementation of PSR included, in part, the Norfolk Defendants utilizing significantly fewer signalmen.  Signalmen install, repair, and maintain, signal and other systems, which railroads use to direct trains from one location to the next safely, including the Norfolk Defendants' HBD system. Under their PSR program, the Norfolk Defendants have no such signalmen employed in or around the area of East Palestine, which was negligent and/or reckless and caused or contributed to the injuries complained of.

53.   At all relevant times, the Norfolk Defendants, independently, or jointly, owned Train 32N, which derailed in East Palestine, on February 3, 2023.

54.   At all relevant times, the Norfolk Defendants, independently or jointly, by and through its/their agents and employees, operated and/or controlled Train 32N.

55.   At all relevant times, the Norfolk Defendants, independently or jointly, by and through its/their agents and employees, were responsible for the safe inspection, operation, maintenance, and repair of Train 32N's railcars.

56.   At all relevant times, the Norfolk Defendants, independently or jointly, owned or leased the railway that Train 32N derailed from in East Palestine, Ohio, on February 3, 2023.

57.   At all relevant times, the Norfolk Defendants, independently or jointly, by and through its/their agents and employees, were responsible for the safe operation and maintenance of the railway that Train 32N derailed from in East Palestine, Ohio, on February 3, 2023.

58.   At all relevant times, the Norfolk Defendants, independently or jointly, by and through its/their agents and employees, were responsible to ensure that safe hazardous material response measures were undertaken, including but not limited to the safe containment and mitigation of hazardous material spills from trains owned and/or operated by the Norfolk Defendants or by trains and railcars owned and operated by others on the railway owned and operated by them.

### The Derailment of Train 32N and the Emergency Response

59.   On February 3, 2023, Train 32N, owned and/or operated by the Norfolk Defendants, was traveling eastbound on the Fort Wayne Line of the Keystone Division through northeast Ohio. Train 32N was assembled in Madison, Illinois, and was destined for Conway, Pennsylvania.

60.   According to media reports, the Norfolk Defendants' agents and employees were aware that Train 32N presented a safety risk on February 3, 2023, and some agents and employees had even nicknamed Train 32N "Train 32Nasty."

61.   The Norfolk Defendants had equipped the Fort Wayne line with HBD's to detect overheated axles and/or wheel bearings on railcars and provide real-time warnings while a train was traveling down the tracks.

62.   The Norfolk Defendants set their own standards, policies, and procedures for the placement of the HBD's and the alarm thresholds for above ambient temperature readings.

63.   Norfolk Southern's thresholds in effect on February 3, 2023 were set such that if a bearing temperature reading exceeded 200°F above ambient temperature, a "critical alarm" would be triggered that required the train to be stopped, a reading of 170°F above ambient temperature triggered a "non-critical alarm," and a "953 alert" was triggered based on a trending algorithm of data to alert the (remote) Wayside Help Desk in Atlanta that a bearing may be overheating.

64.   Near Sebring, Ohio, at milepost 79.8, Train 32N passed an HBD, but no alert or alarm was triggered.

65.   Approximately 10 miles later, near Salem, Ohio at milepost 69.01, Train 32N passed another HBD. At around this same time, as Train 32N was traveling through Salem, Ohio at approximately 8:15pm, railcar GPLX75465 ("Car 23") was captured by surveillance cameras positioned along the railway (in Salem, Ohio) visibly on fire and emitting a shower of sparks.[2]

66.   The HBD reading near Salem Ohio, at milepost 69.01, triggered a 953 alert, yet the Norfolk Defendants did nothing to stop Train 32N and inspect for an axle or bearing problem or overheating. Had they done so, they would have discovered Car 23's axle and/or bearing overheating and/or on fire.

67.   The HBD near Salem Ohio, at milepost 69.01, and the area where the surveillance cameras captured Car 23 visibly on fire and emitting a shower of sparks, is approximately 20 miles before the derailment site in East Palestine. The reading at this HBD, which triggered a 953 alert, occurred approximately 45 minutes before Train 32N derailed.

---

[2] Reference to Car #'s within this Complaint refer to the order in which the railcars were situated, in order from front to back, but not counting the two front-end locomotives that powered and started the train. Thus, Car 23 (railcar GPLX75465, which had the critical bearing failure) would have been the 25th railway vehicle on Train 32N if the front two locomotives are counted, and the first vinyl chloride car would have been Car 28 (instead of Car 26) if the front two locomotives are counted.

68. Approximately 20 miles past the Salem HBD, near East Palestine, Ohio at milepost 49.81, Train 32N passed another HBD. That HBD recorded a temperature of 253°F above ambient temperature, triggering a "critical alarm."

69. At this point, the engineer attempted to stop Train 32N using ~~to~~ its outdated airbrakes, but due to the Norfolk Defendants' failures and delays, the engineer was unable to sufficiently slow Train 32N down sufficiently or bring it to a stop quickly enough before the bearing/axle on Car 23 finally failed and caused Car 23 to derail.

70. At approximately 8:54 pm., the overheated bearing/axle on Car 23 finally had a catastrophic failure that caused Car 23 to derail near railway milepost 49.5 in East Palestine, Ohio.

71. East Palestine, is a village in northeastern Columbiana County, located along the Ohio-Pennsylvania state line. The derailment occurred at or about 40.8360°N 80.5227°W.

72. Thirty-seven other railcars derailed after Car 23 derailed (38 railcars derailed in total), including eleven carrying toxic, hazardous, and dangerous chemicals. These consisted of: five railcars carrying vinyl chloride;[3] one railcar carrying ethylene glycol monobutyl ether;[4] one railcar carrying 2-ethyl hexyl acrylate;[5] one railcar carrying butyl acrylates;[6] one railcar carrying isobutylene;[7] and two railcars carrying benzene residue.[8]

73. These 11 derailed tank cars that were carrying toxic, hazardous, and dangerous chemicals ignited upon derailment and fueled a large fire that damaged an additional 12 non-derailed railcars.

---

[3] Railcars TILX402025 ("Car 26"), OCPX80235 ("Car 27"), OCPX80179 ("Car 28"), GATX95098 ("Car 29"), and OCPX80370 ("Car 53").
[4] Railcar SHPX211226 ("Car 34").
[5] Railcar DOWX73168 ("Car 36").
[6] Railcar UTLX205907 ("Car 48").
[7] Railcar NATX35844 ("Car 47").
[8] Railcars DPRX259013 ("Car 57") and DPRX258671 ("Car 58").

74. At around 11:00pm on February 3rd, a shelter in place order was issued for all of East Palestine due to the release of chemicals and fire.

75. The plume of toxic smoke and its toxic fallout (toxic soot and other toxic particulate matter) from this initial fire traveled south-east before shifting and traveling to the east, north-east. The initial fire raged over night February 3rd and over the course of February 4th and February 5th, with the toxic plume even appearing on local weather stations radar as moderate rain/snow.  See Image 1, below.



Image 1[9]

76. The evening of February 5th, Ohio Governor Mike DeWine issued an evacuation order for anyone living within a mile of the derailment site.

---

[9]  https://www.wkbn.com/news/local-news/east-palestine-train-derailment/east-palestine-train-derailment-fire-was-visible-on-pittsburgh-radar/

77.   On February 6th, the evacuation was expanded to cover a one-mile by two-mile area surrounding East Palestine, including parts of both Ohio and Pennsylvania.

78.   As discussed above, rather than addressing the single vinyl-chloride-carrying railcar with the failed safety relief valve and the danger this single railcar posed, the Norfolk Defendants caused, contributed to, and/or approved the implementation of a plan whereby explosives would be used to blow holes in all five vinyl-chloride-carrying railcars in order to empty/vent the entire contents of all five railcars onto/into the ground, and then let the 1,000,000 pounds of toxic vinyl chloride and other toxic chemicals (Vinyl Chloride, Dioxins, Phosgene, Hydrogen Chloride, Dipropylene Glycol, Diethylene Glycol, Ethylene Glycol Monbutyl Ether, Polyvinyl, Polypropyl Glycol, Isobutylene, Butyl Acrylates, Petro Oil, Benzene, and volatile and semi-volatile byproduct compounds and other combustible materials) burn on the spot until it all disappeared ***from that particular site*** and was released into the atmosphere.[10]

79.   At approximately 4:30pm on February 6th, the Norfolk Defendants, either directly or indirectly, caused or contributed to the use of explosives to blow holes in all five of the vinyl chloride carrying derailed railcars. This so-called "controlled release" or "controlled burn" or "vent and burn" was anything but controlled.

80.   The explosion and subsequent inferno released a large plume of thick black toxic smoke and toxic fallout, including toxic soot and other toxic particulate matter.

81.   The toxic plume from this second explosion and fire also appeared on local weather stations, but it did not initially travel towards the east/north-east where the initial fire's toxic plume had left off earlier. Instead, the toxic plume went mainly upwards until it reached approximately 3,000 feet and then became trapped by a weather inversion. It then spread out like a mushroom

---

[10] One pound of vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm.

cloud in a roughly circular pattern around East Palestine with an approximate 30-mile radius and deposited toxic fallout. The toxic plume and its toxic fallout lingered for days before eventually travelling east, north-east. See Image 2; Image 3, below.



Image 2[11]

---

[11] https://pugetsoundkeeper.org/2023/02/27/east-palestine-train-derailment/



Image 3[12]

82.   As discussed above, the toxic chemicals were transported over and onto the school properties, contaminating personal and real property thereon.

83.   This toxic contamination has caused significant loss of the use and enjoyment of the school ~~property~~properties, past, present, and future, by the school students, including the Representative Student Plaintiffs and Student Class Members, and school employees (teachers and staff), and will require significant testing, monitoring, and remediation of the school properties, past, present, and future.

---

[12]https://www.weatherandradar.com/weather-news/east-palestine-ohio-train-derailment-causes-big-problems--ce7dc4c8-28d0-4925-aee5-30ebe6c36c57

84.   Additionally, because of this toxic contamination of the school properties, school students, including the Representative Student Plaintiffs and Student Class Members, and school employees (teachers and staff) have been and continue to be exposed to greater-than-normal background levels of toxic chemicals and materials, including known human carcinogens. This school exposure will require significant expenditures by the schools for future medical and other monitoring of students and staff to take place at the schools relating to school exposure, and significant additional expenditures by the schools for additional employees to care for and treat students and staff at the schools relating to school exposure.

### The Investigation of the Derailment

85.   On February 14, 2023, the National Transportation Safety Board ("NTSB") issued a preliminary Investigative Update regarding the February 3, 2023 train derailment (**Exhibit 2**), stating that: "On Feb. 3, at approximately 8:54 p.m., local time, eastbound Norfolk Southern Railway, general merchandise freight train 32N, derailed on main track 1 in East Palestine, Ohio. As a result of the derailment, 38 railcars derailed and a fire ensued which damaged an additional 12 railcars. There were 20 total hazardous material railcars in the train consist – 11 of which derailed."

86.   The NTSB's February 14, 2023, preliminary Investigative Update also stated that "NTSB investigators have identified and examined the rail car that initiated the derailment. Surveillance video from a residence showed what appears to be a wheel bearing in the final stage of overheat failure moments before the derailment. The wheelset for the suspected railcar has been collected as evidence for metallurgical examination. The suspected overheated wheel bearing has been collected and will be examined by engineers from the NTSB Materials Laboratory in Washington D.C." The amounts released as a result of the derailment included 688,000 pounds of

Polyvinyl, 273,394 pounds of Ethylhexyl acrylate, 273,394 pounds of Ethylene Glycol Monobutyl

Ether, 206,000 pounds of Butyl Acrylates, and 1,109,400 pounds of Vinyl Chloride. (citation?)

87.   The United States Environmental Protection Agency ("EPA") sent a letter to the

Norfolk Defendants dated February 10, 2023 (**Exhibit 3**) regarding the derailment, stating in part

that:

> (a) The EPA has documented the release or threat of release of hazardous substances, pollutants or contaminants into the environment from the East Palestine Train Derailment Site;
>
> (b) Regarding the subject train, [a]pproximately 20 rail cars were listed as carrying hazardous materials;
>
> (c) Cars containing Vinyl Chloride, Butyl Acrylate, Ethylhexyl Acrylate, and Ethylene Glycol Monobutyl ether are known to have been and continue to be released to the air, surface soils, and surface waters;
>
> (d) Based on information presently available to EPA, EPA has determined that Norfolk Southern Railway Company … may be responsible under CERCLA for cleanup of the Site or costs EPA has incurred in cleaning up the Site;
>
> (e) Based on the information collected during and following the incident that occurred on February 3, 2023, at approximately 8:55 PM EST in East Palestine, Ohio, EPA believes that Norfolk Southern may be liable under Section 107(a) of CERCLA with respect to the East Palestine Train Derailment Site, as a current or previous owner and/or operator of the Site;
>
> (f) The EPA made the following observations:
>
>> i.   Materials released during the incident were observed and detected in samples from Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.
>>
>> ii.   Materials related to the incident were observed entering storm drains.
>>
>> iii.   Multiple rail cars and tankers were observed derailed, breached, and/or on fire, that included but not limited to the following materials:

21

1. Vinyl chloride;
2. Ethylene Glycol Monobutyl Ether;
3. Ethylhexyl Acrylate
4. Isobutylene;
5. Butyl Acrylate;

iv. Five rail car tankers of vinyl chloride were intentionally breached; the vinyl chloride was diverted to an excavated trench and then burned off;

v. Areas of contaminated soil and free liquids were observed and potentially covered and/or filled during reconstruction of the rail line including portions of the trench that was used for the open burn off of Vinyl Chloride.

88. Pennsylvania Governor Josh Shapiro sent Alan Shaw, President and CEO of Norfolk Southern Corporation, a letter dated February 14, 2023 (**Exhibit 4**), stating in part that:

(a) Norfolk Southern failed to implement Unified Command, creating confusion and resulting in a general lack of awareness for first responders and emergency management of the tactics Norfolk Southern planned in response;

(b) Norfolk Southern gave inaccurate information and conflicting modeling about the impact of the controlled release that made protective action decision making more difficult in the immediate aftermath of the derailment; and,

(c) Norfolk Southern's unwillingness to explore or articulate alternate courses of action to their proposed vent and burn limited state and local leaders' ability to respond effectively.

89. On February 21, 2023, the EPA issued its Unilateral Administrative Order for Removal Actions (**Exhibit 5,** without appendices), containing the following findings of fact, in pertinent part:

(a) The East Palestine Train Derailment Site is located within a mixed-use residential, commercial, and industrial area, with residential properties northwest, southeast, and south of the derailment area. Residential properties are also located along contaminated waterways which became contaminated after the derailment and are within the affected area. The Ohio-Pennsylvania border is located less than a mile from the derailment location. The nearest public well supply is located approximately one (1)

mile from the derailment location. A ditch, located on the south side of the tracks flows west for approximately 1,000 feet before it empties into Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek before emptying into the Ohio River. Wetlands and State Line Lake are located immediately adjacent to the Northeast of the Site…

(b) A train derailment occurred at approximately 2055 eastern standard time (EST) on February 3, 2023, in East Palestine, Columbiana County, Ohio, less than a mile from the Ohio-Pennsylvania border. Norfolk Southern Railway Company reported the incident at 2253 EST to the National Response Center (NRC). Federal, state, and local officials arrived on scene after the derailment. EPA mobilized to the Site with EPA Superfund Technical Assessment and Response Team (START) at approximately 2330 EST on February 3, 2023…

(c) At the time of the initial report, the number of derailed rail cars (of the 149) was unknown but 20 of the rail cars were listed by Norfolk Southern Railway Company as carrying hazardous materials, described as: Vinyl Chloride, Stabilized (5); Sulfuric Acid (5); Ethylene Glycol Monobutyl Ether (1); Butyl Acrylate, Stabilized (2); Combustible Liquids nos (1); Isobutylene (1) Ethyl-Hexyl Acrylate(1); Empty Residue – last contained liquified petroleum gas (LPG) (1); Residue – last contained Benzene (2).

(d) The derailment resulted in a large fire affecting numerous rail cars, including rail cars carrying hazardous materials, although the status (e.g. breached, burning, etc.) was initially unknown due to safety concerns associated with the fire as well as the position of the derailed cars, which affected the ability of responders to identify which rail cars were actively breached and/or burning. Initially, a shelter-in-place order was recommended, and firefighting efforts were stood down due to safety concerns; however, an evacuation order was enacted by the Village of East Palestine on February 4, 2023. The fire continued to burn throughout the following days. Local citizens reported smoke from the fire observed over the State of Ohio and the Commonwealth of Pennsylvania.

(e) Southern Railway Company provided response officials at the Site, including EPA, with a list of the contents of the rail cars which derailed at the Site…On February 3, 2023, at 2201 EST, Norfolk Southern Railway Company provided response officials at the Site with a consist (manifest) which details the volume of materials in each rail car. … Rail cars 23 through 74 were the rail cars which derailed, eleven of which contained hazardous materials…

(f) Releases of hazardous substances occurred after the derailment and subsequent fires Releases to the air occurred when hazardous substances

spilled from the rail cars, when smoke from burning rail cars was produced, and hazardous substances including vinyl chloride, phosgene and hydrogen chloride were released. Releases to surface water occurred when liquid product exited rail cars and also when runoff from firefighting efforts at the derailment location moved through a ditch to Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek, and then the Ohio River. Releases to soil occurred (1) when liquid product exited rail cars after the derailment (2) when run-off from firefighting efforts at the derailment location flowed from the right-of-way to adjoining property, and (3) when ash from the burns landed on soil. Local citizens reported smoke from the burns observed over the State of Ohio and the Commonwealth of Pennsylvania.

(g) The following are health/environmental effects associated with the hazardous materials involved in the derailment, or were detected in air, water, soil, and sediment samples, or were combustion by-products of some of those chemicals at the Site:

i. Vinyl Chloride: Breathing high levels of vinyl chloride can cause dizziness or sleepiness. Breathing very high levels can cause fainting and breathing even higher levels can cause death. Studies have shown chronic inhalation of vinyl chloride for several years causes changes in the structure of the liver, and individuals who breath high levels are more likely to experience these changes. Highly exposed workers have also developed liver cancer (angiosarcoma of the liver). The effects of ingesting high levels of vinyl chloride are unknown. Dermal exposure may cause numbness, redness, and blisters. Animal studies have shown that exposure to vinyl chloride during pregnancy can affect the growth and development of the fetus. Vinyl chloride is a known human carcinogen according to the Department of Health and Human Services (DHHS), the International Agency for Research or Cancer (IARC), and the EPA.

ii. Ethylene Glycol Monobutyl Ether: Routes of exposure include ingestion and dermal contact. Inhaling Ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain. Exposure can cause headache, dizziness, lightheadedness, and passing out. It may damage the liver and kidneys.

iii. Isobutylene: Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat; dermal contact can cause frostbite; headache, dizziness, lightheadedness, and fatigue. Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer hazard, reproductive hazard, and other long-term health effects.

iv. <u>Benzene</u>: Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death. The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects on the bone marrow and can cause a decrease in red blood cells leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. benzene may affect menstruation and decrease the size of ovaries in women following many months of exposure to high levels. Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research or Cancer (IARC), and the EPA.

v. <u>Butyl Acrylate</u>: Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy. Exposure to butyl acrylate can cause headache, dizziness, nausea, and vomiting. Repeated exposure can lead to permanent lung damage.

vi. <u>Phosgene</u>: Exposure to phosgene in the air can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or (less likely) ingestion. Higher levels of phosgene can cause lungs to swell, making it difficult to breathe. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

vii. <u>Hydrogen Chloride</u>: Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation. Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation. Some people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances. Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin. Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach.

(h) Acrylate odors were noted by responders during indoor air monitoring.

(i) Acrylate odors along Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, and Little Beaver Creek were noted by responders during sampling and containment activities.

(j) ODNR reported an estimated number of aquatic animals killed at approximately 3,500. Those aquatic animals were found in Sulphur Run, Leslie Run, Bull Creek, and a portion of the North Fork of Beaver Creek. Most of the fish appear to be small suckers, minnows, darters, and sculpin. Most of these deaths are believed to have been caused by the immediate release of contaminants into the water.

90. On March 22, 2023, the Chair of the NTSB characterized the derailment as "***100% preventable***" in her testimony before the U.S. Senate Environment and Public Works Committee.

### *Defendants Oxy Vinyls, GATX, GAMC, and TILC*

91. At all relevant times, Oxy Vinyls was the owner of railcars OCPX80235 ("Car 27"), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53"), and was the shipper of the vinyl chloride in these railcars when Train 32N derailed on February 3, 2023.

92. Oxy Vinyls was also the shipper of two other railcars carrying vinyl chloride when Train 32N derailed on February 3, 2023 – TILX402025 ("Car 26"), owned by Defendant Trinity Industries Leasing Company, and GATX95098 ("Car 29"), owned by Defendant GATX Corporation, which these Defendants leased to Oxy Vinyls.

93. At all relevant times, Oxy Vinyls, as owner of Car 27, Car 28, and Car 53 and as shipper of the vinyl chloride in all five of the railcars that contained same and derailed, was responsible to ensure that tank cars transporting hazardous materials are certified with proper and reliable safety information in case of an emergency and for complying with a variety of compliance and maintenance measures for tank cars that carry hazardous materials.

94. In the aftermath of the derailment and vent and burn, the FRA found discrepancies between the approved documents for the Oxy Vinyls-owned tank cars and the actual physical characteristics of the cars, including: (i) missing or incorrect information; (ii) unapproved and

undocumented modifications; and (iii) unapproved and undocumented modification of component parts.

95.   Shippers such as Oxy Vinyls are responsible for the proper loading and labeling of tank cars, which includes federal certification of the proper packaging of the commodity and placement of tank car placards. *See* 49 C.F.R. §§ 173.31, 172.508. Shippers must also provide a safety data sheet ("SDS") for each hazardous chemical they produce or import that identifies, among other items, accidental release measures, stability and reactivity, and fire-fighting measures.

96.   The vinyl chloride SDS prepared by Oxy Vinyls and provided to Norfolk Southern warned of the risks of polymerization and explosion if the vinyl chloride is exposed to "air, sunlight, excessive heat" and/or "Catalytic metals, such as copper, aluminum, and their alloys."

97.   At all relevant times, GATX was the owner of Car 29, carrying vinyl chloride when Train 32N derailed on February 3, 2023.

98.   At all relevant times, GATX, as owner of Car 29, was responsible to ensure that tank cars transporting hazardous materials are certified with proper and reliable safety information in case of an emergency and for complying with a variety of compliance and maintenance measures for tank cars that carry hazardous materials.

99.   After the derailment, the FRA identified three problems with the approval documents for Car 29 as compared to its actual physical characteristics. First, the car had never been approved for vinyl chloride transport; secondly, the original tank car valve had been replaced with a Midland 720 valve without approval; third, the car's original pressure relief device ("PRD"), which had a 225-psi start, had been replaced with a PRD with a 247.5-psi start without approval, and lastly, all three vinyl chloride carrying railcars owned by Oxy Vinyls – Cars 27, 28, and 53 – had missing or

incorrect information on their AAR (Association of American Railroads) Form 4-2. For example, Car 27 had modifications that were not properly documented or approved, including changes to component parts that modified the material from carbon to stainless steel.

100.   These discrepancies violate federal regulations. Additionally, despite the known risk of polymerization upon an interaction between vinyl chloride and catalytic metals including aluminum, Car 29 was fitted with a protective housing cover made of aluminum; aluminum was also found in the exterior debris of the protective housing and housing cover following the derailment, and the angle valves were covered in solidified melted aluminum.

101.   At all relevant times, GAMC was the owner of railcar GPLX75465 ("Car 23") when Train 32N derailed on February 3, 2023. Car 23 is the railcar that commenced the derailment of Train 32N when a wheel bearing on Car 23 failed. Alternatively, GATX was the owner of Car 23.

102.   At all relevant times, GAMC or alternatively GATX, as owner of Car 23 was responsible to ensure that the rail car was certified with proper and reliable safety information in case of an emergency and for complying with a variety of compliance and maintenance measures.

103.   The bearing on Car 23 was manufactured by Timken Company. The manual for installing the bearing provides "[c]ars, coaches, and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces." Timken's guidance is consistent with industry practice to prevent railcars from sitting stationary for long periods which negatively impacts bearing functionality.

104.   At all relevant times, GAMC or alternatively GATX, as owner of Car 23 was responsible for inspecting and maintaining the bearing that failed, including but not limited to inspecting and maintaining it, providing proper lubrication and other needed maintenance of the bearing, and ensuring that Car 23 was moved at least one car length every six months.

105.  Records for Car 23 indicates that it had been stationary for longer than six months at least twice. In August 2018 Car 23 did not move for 565 days. In May 2019 it was stationary for 206 days. GAMC's, or alternatively GATX's, failure to move Car 23 every six months, and failure to inspect, lubricate, and otherwise maintain the bearing resulted in the internal degradation and ultimate failure of Car 23's bearing and derailment of Train 32N.

106.  At all relevant times, TILC was the owner of Car 26, carrying vinyl chloride when Train 32N derailed on February 3, 2023.

107.  At all relevant times, TILC, as owner of Car 26, was responsible to ensure that tank cars transporting hazardous materials are certified with proper and reliable safety information in case of an emergency and for complying with a variety of compliance and maintenance measures for tank cars that carry hazardous materials.

108.  After the derailment, the FRA identified problems with the approved documentation for Car 26 as compared to its actual physical characteristics, revealing that Car 26 was not constructed and maintained in a manner consistent with its certification. The discrepancies included changes to the PRDs, valves, and component parts that had not been approved, rendering them unfit for the transportation of vinyl chloride. Additionally, despite the known risk of polymerization occurring from interaction between vinyl chloride and catalytic metals including aluminum, samples of the interior surface of the manway nozzle of Car 26 revealed the presence of aluminum, and aluminum was also found on the car's PRD springs.

## CLASS ALLEGATIONS

109. The Representative School District Plaintiffs bring this action on behalf of themselves and all other similarly situated school districts pursuant to Fed.R.Civ.P. 23(a) and 23(b)(1), (2), and (3).

110.  The Representative School District Plaintiffs propose to represent a School District Class defined as school districts who owned or operated school facilities in Pennsylvania within a 30-mile radius of the derailment site (40.8360684°N – 80.5215884°W) between February 3, 2023 and the date of class certification.

111.  The Representative Student Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed.R.Civ.P. 23(a) and 23(b)(1), (2), and (3).

112.  Representative Student Plaintiffs propose to represent a Student Class defined as all students who attended a school district in the School District Class between February 3, 2023 and the date of class certification.

113.  The Representative Plaintiffs reserve the right to amend these class definitions, including adding classes and subclasses, after discovery.

114.  The classes are so numerous that joinder of all members is impractical.

115.   The size of the classes, and any trial, would be readily manageable.

116.   There are questions of law or fact common to the classes that predominate. These include, though are not limited to, the following:

   (a) Whether the Defendants engaged in reckless, negligent, ultrahazardous, or intentional acts and omissions;

   (b) Whether such acts and omissions were a breach of the Defendants' duty of care to the Representative Plaintiffs and class members;

   (c) Whether such acts and omissions directly and proximately caused the subject derailment;

   (d) Whether the subject derailment caused the Representative Plaintiffs and class members to suffer damages.

117.  The Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final relief with respect to the classes.

118.  The Representative Plaintiffs and the class members have substantive claims that are similar, if not identical, in all material respects, and will require proof of the same kind and application of the same laws.

119.  The Representative Plaintiff's claims are typical of those of the classes. All are based on the same factual and/or legal theories. Plaintiffs and class members all suffered damages as a result of the subject train derailment, which Plaintiffs allege was caused by the negligent, reckless, ultrahazardous, and/or intentional acts and omissions of the Defendants.

120.  The Representative Plaintiffs will fairly and adequately represent and protect the interests of the classes.

121.  The Representative Plaintiffs are represented by counsel competent and experienced in both consumer protection and class action litigation.

122.  The Representative Plaintiffs have no conflict with class members in the maintenance of this action, and their respective claims are identical to or at least typical of claims of the class members.

123.  Because most class members either do not know that their rights have been violated, could not economically justify the effort and expense required to litigate their individual claims or have little interest in, or ability to, prosecute an individual action, due to the complexity of the issues involved in this litigation, a class action is the most practical proceeding in which they can recover.

124. A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all class members is impracticable. This class action represents the most fair and efficient method of adjudicating this controversy.

125.  There are no unusual legal or factual issues that would cause management problems not normally and routinely handled in class actions.

126.  The questions of law and fact common to the classes predominate over any questions affecting only individual members.

127.  If each of the class members were forced to bring individual suits, this would burden judicial resources and would create the risk of multiple inconsistent results for similarly situated parties. A class action will serve the goals of judicial economy and ensure uniformity of decision.

## CLAIMS

### COUNT I
### Negligence and Negligence Per Se

128.  Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

129.  The derailment, release of toxic chemicals, fire, and then the explosion and uncontrolled release of toxic chemicals was caused by the joint negligence, carelessness, and/or recklessness of the Norfolk Defendants.

130.  The derailment, release of toxic chemicals, fire, and then the explosion and uncontrolled release of toxic chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody, and control of the Norfolk Defendants, whom knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

131.  The Norfolk Defendants owed a duty to use reasonable care in the transportation of hazardous materials. Consistent with federal regulations, industry practices and procedures, and/or internal operating procedures, these duties include, but are not limited to, the duty to:

a.   Properly inspect trains and railcars;

b. Inspect and remedy defects in equipment, including but not limited to railcar bearings and/or axles, and remove all railcars that are unsafe;

c. Not place in service or continue in service a railcar, such as Car 23, that had been stationary for longer than six months at least twice (565 days in August 2018 and 206 days in May 2019), against bearing manufacturer guidelines.

d. Not accept or transport any shipment of hazardous material that has pressure relief devices made of materials that are incompatible with the lading;

e. Maintain a vigilant lookout during the operation of its trains and railcars;

f. Adequately staff positions that would maintain a vigilant lookout during the operation of its trains and railcars;

g. Not ignore or otherwise override any warning, alarm, or alert, including but not limited to 953 alerts, indicative of an overheating bearing and/or axle, and/or not have a policy allowing same;

h. Properly inspect, maintain, repair, test, calibrate, and operate its HBD system, including setting appropriate alarm thresholds, algorithms, and other criteria for determining when a potentially dangerous condition exists; and ensuring that such detectors are timely and properly inspected, maintained, repaired, tested, calibrated and operating adequately;

i. Have an adequate and up-to-date braking system;

j. Immediately notify train dispatchers about fires on roller bearings and/or axles;

k. Operate, maintain, inspect and/or repair the railway and railcars to ensure the safe and proper operation of the railway and railcars, particularly when transporting hazardous materials such as in this case;

l. Adequately staff positions that inspect, maintain, repair, and operate the transportation of hazardous materials by railcar;

m. Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

n. Ensure proper procedures or systems to timely identify any malfunctions of the railway and railcars;

o. Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars;

p.   Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment;

q.   Properly loading railcars and avoiding placement of heavier cars in the rear, considering whether the planned route is downhill and the weight and length of the train;

r.   Prevent over-loading the train with too many railcars and/or too much weight;

s.   Give accurate information and modeling regarding the (so called) controlled explosion (or vent and burn) and the impact of same;

t.   Hire, train, manage, oversee, and supervise their agents, servants, and/or employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.   Properly determine the adequacy and skill of their agents, servants, and/or employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

v.   Ensure that their agents, servants, and/or employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

w.   Maintaining an appropriate speed on the railway, considering whether the planned route is downhill and considering the weight and length of the train;

x.   Properly instruct and adequately train their agents, servants, and/or employees, concerning safety and emergency procedures in the event of a possible derailment;

y.   Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.   Adequately warn those in danger of imminent exposure to hazardous chemicals;

aa.   Institute proper procedures and training for response to derailment of railcars containing hazardous materials and to avoid exposing hazardous materials to the environment;

bb.   Have an adequate emergency response plan to contain and prevent the spread of hazardous materials into the surrounding environment and elsewhere and into the atmosphere;

cc. Adequately train its agents and employees to contain and prevent the spread of hazardous materials into the surrounding environment and elsewhere and into the atmosphere;

dd. Ensure that its agents and employees contain and prevent the spread of hazardous materials into the surrounding environment and elsewhere and into the atmosphere;

ee. Timely implement the emergency response plan;

ff. Develop and implement risk reduction programs;

gg. Develop and implement risk-based hazard management programs;

hh. Develop and implement safety performance evaluation processes;

ii. Transport and handle hazardous materials in a manner which would not cause Plaintiffs and Class Members harm;

jj. Evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

kk. Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, dioxins, phosgene, hydrogen chloride, dipropylene glycol, diethylene glycol, ethylene glycol monbutyl ether, polyvinyl, polypropyl glycol, isobutylene, butyl acrylates, petro oil, benzene, and volatile and semi-volatile byproduct compounds and other combustible materials, to persons at risk of exposure, including those outside the evacuation zone;

ll. Contain the spread of hazardous materials and by-products, including vinyl chloride, dioxins, phosgene, hydrogen chloride, dipropylene glycol, diethylene glycol, ethylene glycol monbutyl ether, polyvinyl, polypropyl glycol, isobutylene, butyl acrylates, petro oil, benzene, and volatile and semi-volatile byproduct compounds and other combustible materials;

mm. Ensure that it/they are not engaging in negligent conduct.

132. The Norfolk Defendants breached their duty of care as described herein and violated federal regulations, industry practice and procedures, and/or internal operating procedures, causing the harm alleged.

133.  The damages to Plaintiffs and Class Members were also caused, ~~by~~ or aggravated, by the fact that the Norfolk Defendants failed to act appropriately following the derailment in order to mitigate the danger and harm associated with the derailment.

134.  Additionally, the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq., and its accompanying regulations are implemented to promote safe railroad operations and reduce railroad-related accidents and incidents. 49 U.S.C. § 20101.

135.  The derailment is under investigation by the NTSB. Plaintiffs are unaware of the full extent of the federal or state safety laws and regulations that Defendants or their agents may have violated and reserve the right to rely on the violations of such safety laws and regulations as revealed in the NTSB or other investigations and as revealed in discovery.

136.  However, upon information and belief, the Norfolk Defendants' conduct violated one or more regulations, including but not limited to the following:

    a.  49 CFR Part 215, including but not limited to 49 CFR § 215.9, 49 CFR §215.13, 49 CFR §215.15, 49 CFR §215.105, 49 CFR §215.115, Appendix B of CFR Part 215, and Appendix D of 49 CFR Part 215.

    b.  49 CFR Part 229, including but not limited to 49 CFR § 229.7, and 49 CFR §229.29.

    c.  49 CFR Part 232, including but not limited to 49 CFR §232.103 and 49 CFR §232.109.

    d.  49 CFR Part 271, including but not limited to 49 CFR §271.101, 49 CFR §271.103, 49 CFR §271.211, and 49 CFR §271.213.

    e.  49 CFR Part 174, including but not limited to 49 CFR §174.3.

    f.  49 CFR Part 179, including but not limited to 49 CFR §179.15.

137.  The Norfolk Defendants' violation of such safety laws and regulations constitutes negligence and negligence *per se*.

138. Additionally, the FRSA authorizes the Norfolk Defendants to adopt and enforce "additional or more stringent requirements not inconsistent with" the regulations. Upon information and belief, the Norfolk Defendants adopted a comprehensive set of operating rules which apply to their operations, and Defendants violated their own operating rules, including, but not limited to, Operating Rule 140 regarding train inspections.

139. As the owner of Car 23, GAMC, or alternatively GATX, were responsible for inspecting, maintaining, repairing, and delivering a railcar for service in a safe condition.

140. GAMC, or alternatively GATX, are responsible for inspecting, maintaining, and delivering a railcar, such as Car 23 in this case, for service in a safe condition.

141. As owner of Car 23, GAMC, or alternatively GATX, breached their duty to exercise reasonable care, and were negligent, including but not limited to:

    a. Allowing Car 23 to be used in rail service with a defective wheel bearing;

    b. Allowing Car 23 to be used in rail service without properly inspecting the wheel bearing;

    c. Allowing Car 23 to be used in rail service without properly maintaining the wheel bearing; and

    d. Allowing Car 23 to be stationary for long periods of time, in excess of six months, without inspecting, maintaining or replacing the wheel bearing.

142. As the owner of certain railcars, and the shipper of the toxic Vinyl Chloride, using the Norfolk Defendants railway, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are approved for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

143. As the owner of certain railcars and the shipper of the toxic Vinyl Chloride, using the Norfolk Defendants railway, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are constructed, repaired, replaced, and maintained consistent with their

approvals and certifications for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

144.  As the owner of certain railcars, and the shipper of the toxic Vinyl Chloride, using the Norfolk Defendants railway, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are compatible with the lading or goods to be transported within them under applicable federal regulations, industry standards, and internal operating procedures, including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

145.   Despite the applicable federal regulations, industry standards, and internal operating procedures, Cars 26, 27, 28, 29 and 53 – all of which were owned, leased and/or used by Oxy Vinyls, GATX, and TILC – were either unapproved, uncertified or incompatible for use with vinyl chloride in at least the following respects, in violation of federal regulations:

    a.  Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction;

    b.  Car 27 was fitted with modifications that were not part of its approved certificate of construction;

    c.  Cars 27, 28 and 53 were each accompanied by defective and/or incomplete certificates of construction;

    d.  Cars 26, 27, 28 and 53 were each constructed with aluminum in their pressure relief devices ("PRD"), PRD protective housings, handwheels and angle handwheels; and

    e.  Car 29 was fitted with an unapproved pressure relief device ("PRD") and was not specially approved for use with vinyl chloride.

146.  Oxy Vinyls, GMAC, GATX and TILC's failure to ensure these Cars were approved, certified, and/or compatible with the use of vinyl chloride constitutes a breach of duties established in the federal regulations, as well as the obligation imposed by the American Association of Railroads rules and standards authorized by federal regulations, which, in combination with the

acts and omissions of the Norfolk Defendants as set forth herein, directly and proximately caused or contributed to the release of hazardous materials, including vinyl chloride.

147. Defendants Oxy Vinyls', GATX's, GAMC's, and TILC's violations of such safety laws and regulations constitute negligence and negligence *per se*.

148. The Defendants' conduct averred herein constitutes recklessness, willful and wanton conduct, and/or actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Representative Plaintiffs and class members) that has a great probability of causing substantial harm. Therefore, punitive damages are warranted against each Defendant.

## COUNT II
## Strict Liability

149. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

150. The Defendants engaged in abnormally dangerous and ultrahazardous activity, and the Defendants are strictly liable for harm resulting from such activity.

151. Restatement (Second) of Torts §519: "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm."

152. Restatement (Second) of Torts §520: "In determining whether an activity is abnormally dangerous, the following factors are to be considered:

  (a) Existence of a high degree of risk of some harm to the person, land or chattels of others;

  (b) Likelihood that the harm that results from it will be great;

  (c) Inability to eliminate the risk by the exercise of reasonable care;

  (d) Extent to which the activity is not a matter of common usage;

  (e) Inappropriateness of the activity to the place where it is carried on; and,

(f)  Extent to which its value to the community is outweighed by its dangerous attributes."

153.  The transportation of the hazardous, toxic, and dangerous chemicals and materials by train (or in the alternative the transportation of vinyl chloride by train) was an ultrahazardous and abnormally dangerous activity for reasons including but are not limited to the following:

(a)  Such transportation creates a high degree of risk of some harm to the person, land or chattels of others.  Derailments are very common, as can be seen by the numerous freight train derailments in the United States per year (1,242 in 2019, 1,013 in 2020, 1,002 in 2021, and 1,044 in 2002[13]);

(b)  The likelihood that harm will result from this activity is great.  These trains travel past private land and through many densely populated areas, thus any derailment and subsequent release of chemicals will harm surrounding properties and populations;

(c)  Even with the exercise of reasonable care, such derailments would still have happened;

(d)  The transportation of hazardous chemicals is strictly regulated by the government, and is not an activity that is commonly engaged in;

(e)  As can be seen by the accident in East Palestine, hazardous chemicals are routinely transported through populated areas, which is inappropriate, as these common derailments can result in the forced evacuations of thousands of people; and,

(f)  The value to the community of transportation of hazardous chemicals, especially through populated areas, is outweighed by its dangerous attributes.

154.  Employees or agents of the Norfolk Defendants carried out a (so called) "controlled" explosion (or vent and burn) of the five tanker cars that were at risk of explosion in order to breach the tanker railcars and vent/drain the contents onto/into the ground. The hazardous, toxic, and dangerous chemicals and materials were then set on fire. This was an ultrahazardous and abnormal activity, because:

---

[13] https://safetydata.fra.dot.gov/officeofsafety/publicsite/summary.aspx

(a) Breaching the tanker railcars and venting/draining the contents onto/into the ground and then burning the toxic of toxic, hazardous, and dangerous chemicals – which releases other toxic, hazardous, and dangerous chemicals and materials as a byproduct (including but not limited to phosgene and hydrogen chloride), creates a high degree of risk of some harm to the person, land or chattels of others;

(b) It is likely that harm will result from breaching the tanker railcars, venting/draining the contents onto/into the ground, and then burning the toxic, hazardous, and dangerous chemicals;

(c) Even with the exercise of reasonable care, harm would result from breaching the tanker railcars, venting/draining the contents onto/into the ground, and then burning the toxic, hazardous, and dangerous chemicals;

(d) This is not an activity that is commonly engaged in;

(e) Having this toxic burn pit in a populated area was inappropriate. There is no safe way to conduct such activity. It caused the mandatory evacuation of the entire town of East Palestine and some surrounding areas for five days. Others voluntarily evacuated; and,

(f) The value to the community of from breaching the tanker railcars, venting/draining the contents onto/into the ground, and then burning the toxic, hazardous, and dangerous chemicals is outweighed by its dangerous attributes.

155. Defendants are strictly liable for the harm suffered by the Representative Plaintiffs and class members resulting from the operation of the subject train, the derailment, and subsequent response.

156. As a result of the Defendants' actions and omissions as set forth herein, the Representative School District Plaintiffs and School District Class members have been harmed, including but not limited to medical and health issues for their students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air

and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, and expenses of future medical monitoring.

157.  As a result of the Defendants' actions and omissions as set forth herein, the Representative Student Plaintiffs and Student Class Members were harmed, including, but not limited to, suffering physical and emotional injuries, increased risk of disease, and expenses of future medical monitoring.

158.  Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Representative Plaintiffs and class members) that has a great probability of causing substantial harm.  Punitive damages are warranted.

## COUNT III
### Private Nuisance

159.  Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

160.  Pursuant to the Restatement (Second) of Torts, §821D, "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land."

161.  Pursuant to the Restatement (Second) of Torts, §822:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either:
>
> (a)  Intentional and unreasonable, or
>
> (b)  Unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

162.  The derailment and resulting release of toxic, hazardous, and dangerous chemicals and materials resulted in a private nuisance – an invasion of the Representative Plaintiff's and class members' interests in the private use and enjoyment of land.

42

163.  This invasion was the direct and proximate result of the Defendants' (1) negligent conduct, or (2), intentional, reckless conduct, and/or abnormally dangerous activities and/or conditions.

164.  As a result of this private nuisance, the Representative School District Plaintiffs and School District Class members have been harmed, including but not limited to medical and health issues for their students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, and expenses of future medical monitoring.

165.  As a result of the private nuisance, the Representative Student Plaintiffs and Student Class Members were harmed, including but not limited to, suffering physical and emotional injuries, increased risk of disease, and expenses of future medical monitoring.

166.  Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Representative Plaintiffs  and class members) that has a great probability of causing substantial harm.  Punitive damages are warranted.

### COUNT IV
### Public Nuisance

167.  Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

168.  Pursuant to Restatement (Second) of Torts, §821B:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience; or,

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation; or,

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

169.  Pursuant to Restatement (Second) of Torts, §821C:

(1) In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.

(2) In order to maintain a proceeding to enjoin to abate a public nuisance, one must:

(a) have the right to recover damages, as indicated in Subsection (1); or,

(b) have authority as a public official or public agency to represent the state or a political subdivision in the matter; or,

(c) have standing to sue as a representative of the general public, as a citizen in a citizen's action.

170.  The derailment and subsequent release of toxic, hazardous, and dangerous chemicals and materials resulted in a public nuisance.

171.  The release and spread of these chemicals and materials was an unreasonable and significant interference with rights common to the general public, including public health, public safety, public peace, public comfort, public convenience, and the right to clean public water and fresh air in public spaces, including in public school facilities.

172.  The release and spread of these chemicals and materials has produced a permanent and long-lasting effect.

173. This public nuisance also interfered with the Representative Plaintiffs' and class members' rights to use and enjoy the public-school property.

174. This was a significant harm, involving more than slight inconvenience.

175. This harm was of greater magnitude and of a different kind that that which the general public suffered.

176. This invasion was the direct and proximate result of the Defendants' (1) negligent conduct, or (2), intentional, reckless conduct, and/or abnormally dangerous activities and/or conditions.

177. As a result of this public nuisance, the Representative School District Plaintiffs and School District Class members have been harmed, including but not limited to medical and health issues for their students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, and expenses of future medical monitoring.

178. As a result of this public nuisance, the Representative Student Plaintiffs and Student Class Members were harmed, including but not limited to, suffering physical and emotional injuries, increased risk of disease, and expenses of future medical monitoring.

179. Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Representative Plaintiff and class members) that has a great probability of causing substantial harm.  Punitive damages are warranted.

**COUNT V**
**Future Health Monitoring**

180.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

181.    The subject derailment and "controlled" explosion and burn, which are a result of the Defendants' negligence as set forth in this Complaint, resulted in the release of proven hazardous substances into the surrounding air, surface soil, surface water, and groundwater, which  Plaintiffs believe and aver contaminated the facilities and property of the Representative School District Plaintiffs and the School District Class Members.

182.    These substances include but are not limited to Vinyl Chloride, Phosgene, Hydrogen Chloride, Dipropylene Glycol, Diethylene Glycol, Ethylene Glycol Monbutyl Ether, Polyvinyl, Polypropyl Glycol, Isobutylene, Butyl Acrylates, Petro Oil, and Benzene.

183.    As a result, Representative Student Plaintiffs and Student Class Members were exposed to greater-than-normal background levels of these chemicals and materials.

184.    As a proximate result of these exposures, the Representative School District Plaintiffs' and class members' students have a significantly increased risk of contracting one or more serious latent diseases and/or respiratory diseases.

185.    Monitoring procedures exist that make the early detection of these serious latent diseases possible.

186.    These monitoring regimes are different than those normally recommended in the absence of such exposures.

187.    These monitoring regimes are reasonably necessary to protect the Representative School District Plaintiffs' and School District Class Members' students according to contemporary scientific principles.

188.   The   Representative   Plaintiffs   request   that   the   Court   establish   a medical monitoring program, managed by court-appointed and court-supervised trustees (which Plaintiffs request be the members of the School District Class, each supervising the medical monitoring of the  from their respective district), whereby the Representative School District Plaintiffs' and School District Class Members' students will be monitored by physicians, and the medical data produced utilized for epidemiological or other scientific studies.

189.   Establishing a Court-supervised, School District managed, medical monitoring program will ensure that funds are reserved, available, and used for medical monitoring, scientific studies, and related activities, the details of which are to be determined by the Court after being advised by experts the Court deems appropriate.

190.   Alternatively, the Representative Plaintiffs and Class Members should be awarded the quantifiable costs of such a monitoring program for the Representative Plaintiffs and class members to undertake.

191.   Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Representative Plaintiffs and class members) that has a great probability of causing substantial harm.  Punitive damages are warranted

## COUNT VI
## Trespass

192.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

193.   As a result of the train derailment and of the Norfolk Defendants' explosion and burn, chemicals, materials, and byproducts have invaded and continue to invade the Representative School District Plaintiffs' and School District Class Members' property, and have interfered with their possession, use, and enjoyment of their property.

194.   These actions constitute a trespass, including a continuing trespass, on their property.

195.   As a direct and proximate result of this trespass, the Representative Plaintiffs and class members have been harmed, past, present and future, including but not limited to the contamination of school properties (personal property and real property) and water sources; medical and health issues for students and staff relating to contamination of school properties and exposure to same; testing and monitoring the impact on school properties and water sources; remediation of school properties and water sources; remedial measures to ensure safe and clean air and water at school properties; loss of use and enjoyment of school properties; increased risk of disease, and expenses of future medical monitoring relating to contamination of school properties and exposure to same.

196.   Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Representative Plaintiffs and class members) that has a great probability of causing substantial harm.  Punitive damages are warranted.

WHEREFORE, Plaintiffs request that this Honorable Court:

A.  Award compensatory damages for the injuries suffered, as permitted by law;

B.  Award punitive damages, as permitted by law;

C.  Award attorneys' fees, costs, and expenses, as permitted by law;

D.  Interest on all amounts awarded, as permitted by law;

E.  Equitable, injunctive and declaratory relief, including future medical monitoring of students and staff, as permitted by law;

F.  Any other relief that this Honorable Court deems just and proper, as permitted by law or equity.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs respectfully demand a trial by jury on all jury triable issues.

Respectfully Submitted,

**SHENKAN INJURY LAWYERS, LLC.**
By: */s/ Richard Shenkan*
Richard Shenkan
Pa. I.D. No. 79800
P.O. Box 7125
New Castle, PA 16107
rshenkan@shenkanlaw.com
T: (412) 716-5800

**DILLON, McCANDLESS, KING
COULTER & GRAHAM, L.L.P.**
By: */s/ Thomas W. King, III*
PA I.D. No. 21580
128 West Cunningham St.
Butler, PA 16001
tking@dmkcg.com
T: (724) 283-2200

**FRANTZ LAW GROUP, APLC**
By: */s/ James Frantz*
James Frantz (Pro Hac Vice)
JPF@frantzlawgroup.com
William Shinoff (Pro Hac Vice)
wshinoff@frantzlawgroup.com
Regina Bagdasarian (Pro Hac Vice)
regina@frantzlawgroup.com
402 West Broadway, Suite 860
San Diego, CA 92101
T: (619) 233-5945

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been sent, as filed, to all counsel of record through the Court's ECF system, which all counsel of record subscribes to.

SHENKAN INJURY LAWYERS, LLC.
*/s/ Richard Shenkan*
Richard Shenkan

# Exhibit 1



U.S. Department of Transportation

**Federal Railroad Administration**

# FRA AUDIT REPORT

**Norfolk Southern Railway Company**

**(NS) Class I**

**FRA Audit Number: 2022-NS Special Audit- 01-1**

**Report Date: July 8, 2022**

FRA Audit Leadership:

| | |
|---|---|
| Karl Alexy | Associate Administrator for Railroad Safety/Chief Safety Officer |
| Carolyn Hayward-Williams | Director, Office of Railroad Systems and Technology |
| Charles King | Director, Office of Railroad Infrastructure and Mechanical |
| Mike Long | Director, Office of Regional Operations and Outreach |
| Mark Patterson | Director, Office of Data Analysis and Program Support |

## Preface

*The Federal Railroad Administration (FRA) is statutorily authorized to conduct inspections and investigations and issue reports concerning railroad operations but is not solely an auditing organization.   Therefore, this performance audit does not strictly adhere to generally accepted government auditing standards.   However, this performance audit was planned and performed to meet the stated audit objectives, obtain sufficient and appropriate evidence, and to provide a reasonable basis for the stated findings and conclusions.*

## Executive Summary

FRA is conducting systemwide special audits of railroads as part of its oversight obligations.  In the second half of 2021, Norfolk Southern Railway Company (NS) had three unfortunate amputation accidents, and a year over year increase of 4.7% in total train accidents per million train miles.

Although employee injuries have decreased by 23% at NS and mainline accidents have decreased by 16%, several serious accidents and incidents did occur in 2021, including five involving conductor/brakemen who suffered amputations and other serious injuries between March and October 2021, alone.   In contrast, NS experienced 3 such accidents in the entirety of 2020, and none in 2019.   Two of the 2021 accidents involved conductors who had less than one year of service and occurred within one week of each other in October 2021.   Then-Acting Administrator Bose sent NS a letter on October 28, 2021, highlighting the above accidents and incidents and noting FRA's concerns regarding deficiencies in the NS conductor certification training program submission.  NS replied to that letter on November 8, 2021.

FRA conducted a system-wide, special audit of NS from January through early May 2022.  During this special audit, FRA focused on seven discipline areas: Critical Incident Stress Plans, Hazardous Materials, Safety Partnerships, Motive Power & Equipment, Operating Practices, Signal & Train Control, and Track.   Inspectors from each discipline conducted field work at times and locations determined by relevant characteristics of NS operations and were not present on NS property

3

FRA Audit Number: 2022-NS Special Audit -01-1

constantly throughout the audit period.   FRA's audit showed that in many aspects, NS programs are largely effective and compliant with relevant safety regulations.   Still, NS has many opportunities to improve employee and manager awareness of and compliance with both FRA safety regulations and NS safety programs.

FRA provided NS an opportunity to review and comment on this audit report; NS provided comments on July 22, 2022.   Where NS identified factual errors or additional information, FRA revised the text.  Other comments are summarized and responded to where appropriate throughout the report.

## Significant Findings

Of the seven discipline areas reviewed, FRA observed the most significant issues with the *Operating Practices* discipline.   FRA observed inconsistencies in NS's operational testing and inspection program, ranging from access to and accuracy of records, to the methods and processes used to prioritize the testing of rules that prevent accidents.  The failure to properly administer and implement the program of operational testing can diminish the capacity to correct accident/incident and injury trends.  Furthermore, the recordkeeping system should not allow testing officers to record numbers of tests that cannot be verified.  Without a properly administered program, NS could be hindered in monitoring conditions on the railroad or targeting resources successfully. FRA has met with NS management to discuss the findings that were brought to light during this audit and will follow up with NS through an audit of their program.

For *Critical Incident Stress Plans* (CISP), FRA found that most NS employees and managers are generally not aware of either the regulation or the NS CISP.  As a result of managers' ignorance of NS' CISP provisions, they are unable to consistently provide the support to directly involved employees after a critical incident required under 49 CFR § 272.101.  Delay in the provision of required relief and services could exacerbate symptoms of distress following a critical incident.

FRA's *Safety Partnerships Division* identified four findings, with the most significant being that NS did not provide a digital or hardcopy document of the tasks and related steps associated with

4

FRA Audit Number: 2022-NS Special Audit -01-1

on-the-job training (OJT) exercises for its new-hire conductor employees.   The failure to do so leaves conductor new hires without a reference for the steps necessary to adequately perform their OJT exercises.

FRA's *Motive Power and Equipment Division* found inadequate communication between the NS transportation and mechanical departments.   The NS transportation department performed the required equipment inspections, but in certain cases either the defective conditions identified were not reported to the mechanical department for repair or the equipment was not removed from service until repairs could be made.   This inadequate communication could expose crews to increased personal injury hazards and may raise the overall risk of train derailment.

FRA's *Hazardous Materials Division* noted that at several locations and dates during the audit, NS trains were observed with missing placards departing where a rail car containing a load or residue of a hazardous material was accepted or where that rail car was placed into a train.

Specifically, FRA observed nine defects and recommended four violations of 49 CFR § 174.9, and 41 defects of which one was recommended for violation of 49 CFR § 174.59.   In these cases, NS employees failed to inspect rail cars containing a load/residue of a hazardous material at ground level for missing placards or failed to place or replace missing placards.   In the event of an emergency, responders rely on the information on a placard to determine the proper response to a release of the hazardous material in question.   Failure to provide this information by marking cars with appropriate placards could exacerbate the risks associated with the release to emergency responders, train crews, and members of the public.

FRA's *Signal, Train Control, and Crossings (S&TC) Division* found instances where NS had not updated numerous circuit plans in a timely fashion.   In several locations near St. Louis, significant changes were made at one or more highway rail grade crossings (HRGCs), but the circuit plans had not been updated to show these changes.   As a result of the failure to timely update the circuit plans, employees did not have current, accurate information, increasing the likelihood that they might put in place changes that could degrade the safe operation of the crossing warning system.

FRA's *Track Division* determined that there are deficiencies in the current NS Continuous Welded Rail (CWR) plan.  Therefore, FRA is formally requesting a full review of the current CWR Plan.

5

FRA Audit Number: 2022-NS Special Audit -01-1

This is based upon the  appearance of inconsistent application of CWR procedures among NS workforces, and NS CWR records that do not all match the rail marking information in the field.

## Audit Findings/Results by Discipline

## Operating Practices

*The objective of FRA's Operating Practices (OP) Division audit was to review NS's compliance with 49 CFR § 217.9, Program of Operational Tests and Inspections; Recordkeeping.   That regulation requires that each applicable railroad must periodically conduct operational tests and inspections to determine the extent of compliance with its code of operating rules, timetables, and timetable special instructions, specifically including tests and inspections sufficient to verify compliance with the requirements of 49 CFR part 218, subpart F, in accordance with a written program.   In particular, FRA's OP audit focused on the qualifications of the railroad testing officers, administration of the program, and recordkeeping.*

During the week of April 18-22, 2022, FRA conducted an audit of four-yard locations: Enola/Harrisburg, PA, Atlanta and Macon, GA, and Bellevue, OH.   These four locations were chosen because, in calendar year (CY) 2021, these operations were responsible for 15% of NS reportable human factor caused accidents and incidents.

Overall, FRA observed some inconsistencies in NS's operational testing and inspection program, ranging from access to and accuracy of records, to the methods and processes used to prioritize the testing of rules that prevent accidents.  The failure to properly administer and implement the program of operational testing can diminish the capacity to correct accident/incident and injury trends.  Furthermore, the recordkeeping system should not allow testing officers to record numbers of tests that cannot be verified.

Without a properly administered program, NS could be hindered in monitoring conditions on the railroad or targeting resources successfully.   FRA has met with NS management to discuss the findings that were brought to light during this audit.

6

FRA Audit Number: 2022-NS Special Audit -01-1

FRA notes that some encouraging and progressive measures already discussed are moving in a positive direction, and FRA is looking forward to the implementation of all the changes described. Additionally, FRA will initiate a proactive approach with a systemwide audit and, as part of the audit, verify the identified issues are addressed.

**Finding 1: Qualifications of the Railroad Testing Officers Is Difficult to Validate.**

FRA requires that each railroad officer who conducts operational tests and inspections (railroad testing officer) must meet certain qualifications and that the railroad retain records documenting those qualifications.   For example, FRA requires that each railroad testing officer be qualified on the railroad's operating rules, be qualified on the operational testing and inspection program requirements and procedures relevant to the testing and inspections the officer will conduct, and receive appropriate field training, as necessary to achieve proficiency, on each operational test or inspection that the officer is authorized to conduct.  49 CFR § 217.9(b)(1)(i)-(iii).  FRA requested a select number of records to review.  The number of records provided were limited, and FRA observed that although NS stated that the records did exist, the records are not "centralized", impeding NS's ability to extract records.  NS acknowledged this was problematic and are currently consolidating records to one location for sustainable access and management standards.

**Finding 2:  Program Administration: NS Cannot Verify the Types of Tests Administered, NS Failed to Identify/Test for a Significant Safety Issue, and FRA Observed Officers' Inaccurate Recording of Test Failures.**

FRA requires that each railroad have a written program of operational tests and inspections under the various operating conditions on the railroad, and that the program address, with particular emphasis, those operating rules that cause or are likely to cause the most accidents or incidents  as identified in mandated periodic reviews of the program.  49 CFR § 217.9(c).   Further, FRA regulations requires the railroad testing officers to conduct operational tests and inspections per the railroad's operational tests and inspections program.  49 CFR § 217.9(b)(1)(iv).

FRA reviewed the NS program titled "RP-1 Supervisors Guidelines for Conducting Efficiency Checks" and the railroad's records to determine whether railroad testing officers were placing particular emphasis on those operating rules that cause or are likely to cause the most accidents or

7

incidents as identified in mandated periodic reviews of the program.   FRA found that the NS program relies on a "scenario" based system from which a wide range of operating rules and tests can be chosen. RP-1 at 14-39.   However, observing or testing for every rule listed in a scenario is not feasible. NS does not have procedures to know which rules were observed or which test or tests were performed.   For example, the "EQUIPMENT OPERATION, HANDLING & INSPECTION" test includes 49 potential rules an officer can test for.   NS could not explain or establish whether its railroad testing officers were placing particular emphasis on those operating rules that cause or are likely to cause the most accidents or incidents.

FRA also noted that the NS RP-1 program is unclear how each type of test or inspection is to be conducted.  NS could not submit other documents or training materials that illustrate that each testing officer understands how to achieve proficiency in administering tests and inspections.

### Finding 3: Failure to Identify and Test for Rules that Prevent Accidents Related to By-Passed Couplers.

Further to Finding 2 and related to compliance to 49 CFR § 217.9(c), FRA observed that NS did not conduct operational test at either Bellevue, OH, or Macon, GA to address human factor caused train accident prevention, specifically accidents related to by-passed couplers.   Those two locations, however, account for 22% of NS system by-passed coupler accidents.   No operational testing was recorded in either location related to the specific actions that resulted in by-passed coupler accidents.   At Bellevue, OH, FRA was informed that testing for by-passed couplers was not required and therefore, not performed.   Further the railroad's quarterly reviews of safety issues failed to acknowledge the growing trend for by-passed couplers at any location until the 1st Quarter 2022 review.

In its comments to the FRA, NS contended that "the increase in by-passed coupler incidents is not entirely attributable to rule compliance," and indicated that they will continue to engage with FRA in discussing the issue.  FRA notes in response that NS revised the operating conditions at Bellevue, OH, and Macon, GA, in July and August of 2022, and looks forward to working with NS to ensure that human factor accidents attributable to by-passed couplers are appropriately addressed.

8

FRA Audit Number: 2022-NS Special Audit -01-1

**Finding 4: Undercounting and inadequately observing rules failures.**

FRA's audit of railroad testing officers suggests they were undercounting and inadequately observing rules failures.  The following are some examples of FRA's on-site audit observations:

a. At the audit locations, NS recorded the aggregate failure rate prior to the audit at 3.26%, and during the audit, the failure rate rose to 10.1%, a 210% difference.   At the audit locations, the overall failure rate for testing observations made by NS supervisors unaccompanied by FRA inspectors differed significantly from when accompanied by FRA inspectors.   The observations made by FRA conducting 217T (Observation of Railroad Testing Officers) inspection activity with railroad officers found 23 exceptions, which suggests that the failures due to rules non-compliance are underreported by the railroad. The failure rate when FRA accompanied railroad testing officers was 3.6%.  In contrast, NS failure rate for railroad testing officers unaccompanied by FRA inspectors during the 4th Quarter of CY 2021 was 0.13%.

b. FRA observed 13 of 29 testing officers, i.e., 45%, to have either recorded observed rule failures improperly or failed to record them

c. NS supervisors failed to correctly report seven testing exceptions into the NS recordkeeping program for crewmembers who were observed not following the operating or safety rules.   The failure to record test failures calls into question the accuracy of NS recordkeeping when not under FRA observation.   FRA found NS only recorded 39 test failures at the four locations where FRA made its observations over the 4th quarter of CY 2021.

NS commented that this issue might have been related to the fact that their process at the time of the audit included supervisors providing informal corrections to employees regarding rule violations without recording those interactions; they are accordingly effecting a change to what is documented in order to capture the informal interactions.  FRA believes that the lack of documentation for non-formal handling of violations presents a missed opportunity to document non-compliance and identify safety trends and looks forward to NS collecting more complete data and using it effectively.

9

FRA Audit Number: 2022-NS Special Audit -01-1

A further example was observed in Atlanta and Macon, GA, where FRA found two violations. One was for having bottled air on a cut of cars and having an instruction stating it was allowed - § 232.103(n)(2).   The other violation was for leaving a locomotive in the foul - § 218.101(b).   The fact that the instruction bulletin, which had the effect of directing both regulatory and NS rules noncompliance was issued and left uncontested by railroad testing officers.

### Finding 5: Number of Tests and Times of Tests Cannot Be Verified.

FRA requires that each railroad keep a record of the date, time, place, and result of each operational test and inspection that was performed in accordance with its program.   Each record shall specify the officer administering the test and inspection and each employee tested.  49 CFR§ 217.9(d).

FRA's audit of NS operational testing and inspection procedures and recordkeeping system identified inconsistencies and potential for errors.   The number of tests recorded at the subject locations appeared elevated.   For example, during the 4th Quarter of CY 2021, NS reported nearly 36,000 observation tests at the four-yard locations audited.   The testing volume was so great that some officers recorded more than 1,000 tests in the quarter.   For instance, one officer recorded just shy of 2,000 tests in the quarter—a concerning number considering there are 92 days in a quarter, and that would mean that the officer was averaging approximately 22 tests every day if the officer worked every day of the quarter.

NS does not record the exact time a test is performed, although NS does record an observation period.  It was observed that this observation period can last several minutes to 18 hours. Therefore, NS cannot verify that it performed rules testing at times that address the most common incident trends.

NS noted there is no right or wrong number of tests, and that they plan to engage in further discussions with FRA on this matter.  FRA is working with NS to ensure that testing is conducted in a way to achieve and maintain a safe work environment.

10

**Recommendations:**

1. **Ensure railroad testing officers understand all requirements of the Operational Testing and Inspections program and maintain accurate records of qualifications.**

2. **Ensure and amend, where necessary, the Operational Testing and Inspections program to ensure compliance with all requirements of 49 CFR Part 217, including both the administration of the program, recordkeeping requirements and the requirement that operational testing and inspections prioritize rules that prevent accidents.**

3. **Ensure that testing officers understand procedures for administering and recording tests.**

FRA Audit Number: 2022-NS Special Audit -01-1

**Critical Incident Stress Plans (CISP)**

*The objectives of the Critical Incident Stress Plan (CISP), 49 CFR Part 272 audit were to determine if NS management and labor understand: (1) the requirements of the NS Part 272 CISP; (2) what is considered a critical incident under the regulation; (3) how to offer (management) and where to obtain (labor) post-incident resources and assistance; and (4) where to obtain a copy of the NS CISP.  This portion of the audit is focused on the effectiveness of the NS CISP as currently implemented.*

**Finding 1: NS management and employees generally lack awareness of the NS CISP.**

FRA interviewed 10 NS managers and about 60 employees.  Interviews with NS managers, covered employees, and union representatives revealed a general lack of knowledge regarding: (1) the plan requirements under Part 272; (2) the definition of which employees are covered under Part 272; (3) what relief options are available to a covered employee after a critical incident; and (4) what support services are available to covered employees after a critical incident.   Interviews revealed that some managers are following the spirit of the Part 272 regulation because it is "the right thing to do" and they are committed to ensuring employees are "taken care of" after a critical incident.   However, they are apparently doing so without knowledge of regulatory requirements or the NS CISP plan; none of the interviewees were aware of or had attended any associated training.  As a result, whether an employee is offered relief and access to appropriate support services after a critical incident may depend on what individual managers feel is appropriate.

In addition, employees expressed concerns that not only were they unaware of the provisions in Part 272 or that they would be considered covered employees under the NS CISP, but also that they were not provided access to timely relief after a critical incident, additional relief as necessary, or access to support services – even when requested.   By delaying or failing to provide early access to support services for employees involved in critical incidents, there is an increased likelihood that those employees could experience worsening symptoms of distress following a critical incident, including potentially developing acute stress disorder or even post- traumatic

12

FRA Audit Number: 2022-NS Special Audit -01-1

stress disorder (PTSD).[1]

**Recommendations:**

- **Ensure covered employees understand NS CISP program requirements, what to expect from the program following a critical incident, and what relief options are available after a critical incident.**

- **Develop and implement a program to increase awareness across the NS system regarding Part 272 requirements and the NS CISP plan.**

- **Ensure that managers comply with the requirements of the NS CISP.**

- **Create a training program for managers:**

    - **Include specific sections on Part 272 plan requirements, definitions of key terms including critical incident, directly involved employee, and covered employee, and penalties for non-compliance.**

    - **Include information on how to determine if an incident is a critical incident and what to do if unsure.**

    - **Provide information and examples of the steps that need to happen, according to the NS CISP plan, after a critical incident.**

    - **Provide information on the roles and responsibilities of those involved in a critical incident including not only the managers, dispatchers, and directly involved employees, but also any Peer Support and Employee Assistance Program (EAP) resources.**

    - **Include information on relief options available to covered employees.**

---

[1] For prevention of PTSD, the U.S. Department of Veterans Affairs recommends assessment and treatment beginning within 30 days of exposure.  *See* U.S. Department of Veterans Affairs, VA/DOD Clinical Practice Guideline for the Management of Posttraumatic Stress Disorder and Acute Stress Disorder Version 3.0, 2017. Pp 5-11.

13

FRA Audit Number: 2022-NS Special Audit -01-1

**Finding 2: There is currently no system in place to track employee involvement in critical incidents.**

Although a tracking system is not a regulatory requirement under Part 272, railroads that have implemented such systems as a best practice have found it provides better outcomes for covered employees and more consistent application of regulatory requirements by managers across their systems.   A tracking system would allow managers the ability to review information on the number of previous incidents, how recently the last critical incident in which the  employee was involved took place, and basic information (e.g., trespasser fatality, vehicle strike) about previous incidents.   Managers and EAP providers could then use that information to help determine if additional time off, after initial relief from duty, might be necessary, and to determine how best to present available after-care options to the employee.   In the absence of such a system, unless an individual manager is aware of previous incidents in which a covered employee was involved, managers may approach each incident as an isolated event.   This ignores how involvement in previous critical incidents can exacerbate the severity of distress and trauma experienced after subsequent critical incidents and could result in a covered employee not being offered access to the necessary, appropriate after-care options required to assist in recovery after critical incident involvement.

**Recommendations:**

- **Document the basic information (name, date of incident, type of incident, etc.) for each employee involved in a critical incident regardless of whether that employee sought relief from the remainder of the duty tour or additional assistance.**

- **Document relief options and additional assistance provided for those employees in need of these resources as indicated in Part 272.**

- **Provide EAP personnel with access to information on accidents/incidents reportable under 49 CFR Part 225 so personnel can ensure both NS internal policies and Part 272 requirements are being correctly implemented.**

14

FRA Audit Number: 2022-NS Special Audit -01-1

NS noted that the objectives of the CISP portion of the audit are not requirements under 49 CFR Part 272 and recommended that FRA delete the entire section.  FRA's audit, however, was not focused on determining whether NS' plan was compliant with the regulation, but rather to identify whether it is effective.  FRA identified specific actions NS could take to improve its program and is therefore leaving the section in place.

15

**Hazardous Materials**

*The objectives of the Hazardous Materials portion of the audit were to determine NS compliance with 49 CFR Part 172, Subparts H & I; Part 174, Subparts A & B; Special Permits; and OT 55-R.*

FRA's Hazardous Materials (HM) Division conducted its audit between April 4 and April 16, 2022, concluding at NS Headquarters in Atlanta, GA.   The field inspections encompassed 50 locations throughout 17 States where NS operates.   The HM Division reviewed NS compliance history over the past three years and examined the following in its field inspections:

<u>Criteria</u>

- Part 172, Subparts H-Training and I-Safety and Security

- Part 174, Subparts A-General Requirements and B-General Operating Requirements

- Special Permits (SP) e.g., SP 20996 (Distributed Power Unit Buffer Car Relief) SP-20954 (Electronic Train Consist), etc.

- OT-55-R Recommended Railroad Operating Practices for Transportation of Hazardous Materials

<u>Inspection Locations</u>

NS Major Yards – inbound and outbound trains including local trains

NS Interchange Yards – inbound and outbound trains

NS Off Hours – inspectors inspect yards in their local territory outside of normal duty hours

NS Headquarters Security Audit and Closeout – Atlanta, GA

The carrier's compliance history reveals that compliance with 49 CFR § 174.26, which requires train crews to maintain a paper document that accurately reflects the position of hazardous materials shipments within a train and has been the leading non-compliant item on FRA's hazmat

16

FRA Audit Number: 2022-NS Special Audit -01-1

inspection reports for the NS.  Adherence to the § 174.26 requirements for maintaining an accurate consist should become less of an issue with the advent of the DOT-SP 21110, allowing the use of electronic train consist information.   NS has only implemented the authorized use of the DOT-SP 21110 on its Gulf and Coastal operations divisions.   Other divisions are utilizing the tool "only as a means to become familiar with the new system." Therefore, FRA examined whether NS maintained paper documentation of consists as required on other NS divisions.

NS also has been granted authorization to utilize DOT-SP 20996, which authorizes the placement of most placarded railcars next to an unoccupied (DPU) locomotive for the entire system.   As part of the compliance conditions of this SP, securement of these locomotives must be established to prevent occupancy while in use, and this condition was evaluated as part of the HM Division's activities.  FRA observed compliance with these conditions during the audit.

FRA observed compliance with 49 CFR Part 174-Carriage by Rail Subpart A-General requirements section: § 174.14 Movements to be expedited.   If railcars containing a hazardous material are not forwarded in a timely manner, delays could cause an undue hardship on the consignee due to material shortages; and in a worst-case scenario, delays could cause injury or death to employees or the general public, or environmental harm due to an unintentional release of hazardous materials that are time sensitive shipments.   At locations where FRA made observations regarding this regulation, inspectors found no conditions where rail cars containing a hazardous material had exceeded the regulatory requirements for the dwell time.   The carrier in these locations has a procedure in place to identify the dwell time of rail cars containing a hazardous material and implemented that procedure.

Title 49 CFR § 174.63 prohibits transporting portable tanks, Intermodal (IM) portable tanks, Intermediate Bulk Containers (IBCs), Large Packaging, cargo tanks, or multi-unit tank car tanks containing hazardous materials in Container-on-Flat-Car (COFC) or Trailer-on-Flat-Car (TOFC) service without specific permissions.   FRA found no instances of noncompliance at observed locations.   The carrier in these locations has a procedure in place to identify acceptable packages to be placed on a flat car for rail transportation.

During the carrier audit FRA inspectors only had the opportunity to observe the implementation of

17

Section III of the Association of American Railroads Circular No. OT-55-R "Recommended Railroad Operating Practices for Transportation of Hazardous Materials."  Section III covers coupling speeds in rail yards.   The carrier appeared to implement these recommended practices.

**Finding 1:  Inconsistent application of the requirement to inspect for and replace missing placards.**

Pursuant to the requirements of 49 CFR Part 174-Carriage by Rail Subpart A-General requirements section:

§ 174.9 Safety and security inspection and acceptance

>   At each location where a hazardous material is accepted for transportation or placed in a train, the carrier must inspect each rail car containing the hazardous material, at ground level, for required markings, labels, placards, securement of closures, and leakage. These inspections may be performed in conjunction with inspections required under parts 215 and 232 of this title.

Pursuant to the requirements of 49 CFR Part 174-Carriage by Rail Subpart C-General handling and loading requirements section:

§ 174.59 Marking and placarding of rail cars

>   No person may transport a rail car carrying hazardous materials unless it is marked and placarded as required by this subchapter. Placards and car certificates lost in transit must be replaced at the next inspection point, and those not required must be removed at the next terminal where the train is classified. For Canadian shipments, required placards lost in transit, must be replaced either by those required by part 172 of this subchapter https://www.ecfr.gov/current/title-49/part-172 or by those authorized under § 171.12.

At several locations and dates during the audit, NS trains were observed with missing placards departing either where a rail car containing a load or residue of a hazardous material was accepted or where that rail car was placed into a train.   Specifically, FRA observed 9 instances of non-compliance with § 174.9, and has recommended 4 violations for the non-compliance.   FRA also

18

observed 42 instances of non-compliance with § 174.59 and has recommended one violation for the non-compliance.   Based on FRA's findings, NS failed to inspect the rail cars containing a load/residue of a hazardous material at ground level for missing placards and take corrective action for the placard defects prior to accepting or allowing the shipments to continue in transportation. In the event of an emergency, responders rely on the information on a placard as one of the sources of information to determine the proper response to a release of the hazardous material in question. An improper response could exacerbate the hazards associated with the release, possibly putting emergency responders, employees, and potentially the public in additional harm's way.

**Recommendation: Ensure that rail cars carrying either a load or residue of hazardous material are inspected and are properly placarded prior to departure from the location where they are accepted or placed into trains.**

## Finding 2: Locations of hazardous materials shipments are sometimes not accurately documented in train consists.

Pursuant to the requirements of 49 CFR Part 174-Carriage by Rail Subpart B-General operating requirements section:

§ 174.26 Notice to train crews

> The train crew must have a document that reflects the current position in the train of each rail car containing a hazardous material.  The train crew must update the document to indicate changes in the placement of a rail car within the train.  For example, the train crew may update the document by handwriting on it or by appending or attaching another document to it.

> A member of the crew of a train transporting a hazardous material must have a copy of a document for the hazardous material being transported showing the information required by part 172 of this subchapter, including the requirements in § 172.604(b) applicable to emergency response information.

19

FRA Audit Number: 2022-NS Special Audit -01-1

At multiple locations and dates during this audit, FRA found instances where crews did not have or maintain the accurate position of rail cars containing a hazardous material on their train consist or document identifying the placement of these cars in their train.  FRA found 39 instances of non-compliance with the requirements of § 174.26 and have recommended 22 violations for the non-compliance.   Based on FRA's findings, the inaccurate documentation of the placement in train of the rail cars containing a hazardous material on a train crews consist or document identifying the placement of these cars in their train is the result of two contributing factors:

- Incorrect information in the carrier's train line-up program, or

- The train crew's failure to update their document after either setting-off or picking-up rail cars during their tour of duty.

In the case of a train derailment, it is vital that either the carrier's personnel or emergency responders have an accurate location of railcars containing hazardous materials in the train. Without accurate information, there is an increased likelihood for person(s) walking the train to come in contact with a breached rail car containing a hazardous material.

**Recommendation:  Ensure that train crews have and maintain documentation to reflect the location of hazardous materials shipments within the train.**

### Finding 3: Proper segregation of placarded cars, transport vehicles, freight containers, and bulk packages are sometimes not accurately applied within a train.

Pursuant to the requirements of 49 CFR Part 174-Carriage by Rail Subpart D-Handling of placarded rail cars, transport vehicles and freight containers section:

§ 174.85 Position in train of placarded cars, transport vehicles, freight containers, and bulk packagings

(a) Except as provided in paragraphs (b) and (c) of this section, the position in a train of each loaded placarded car, transport vehicle, freight container, and bulk packaging must conform to the provisions of this section.

20

FRA Audit Number: 2022-NS Special Audit -01-1

(b) A car placarded "RADIOACTIVE" must comply with train positioning requirements of paragraph (d) of this section and must be separated from a locomotive, occupied caboose, or carload of undeveloped film by at least one non-placarded car.

(c) A tank car containing the residue of a hazardous material must be separated from a locomotive or occupied caboose by at least one rail car other than a placarded tank car.

FRA identified two instances of non-compliance with § 174.85 and has recommended one violation for the non-compliance.   During the audit, FRA found a train with an unauthorized placarded rail car closer than the sixth car to the occupied locomotive during transportation.   The carrier or the train crew failed to place the correct number of authorized rail cars between the placement- restricted rail car containing a hazardous material and the locomotive.    In the case of a derailment, if the closest rail car containing a placement-restricted hazardous material is nearer than the sixth car from a locomotive, a release of hazardous material could be more likely to subject the train crew members to harm.

**Recommendation: Ensure that hazardous materials shipments are properly segregated within a train in accordance with § 174.85, and that crews ensure segregation compliance is maintained within a train when making changes to the consist.**

## Finding 4: Compliance with required Operating Controls established in DOT-SP-20996.

Pursuant to the requirements of the Pipeline and Hazardous Materials Safety Administration's (PHMSA) Special Permit DOT-SP 20996 all train types and railcar types used with "Unoccupied Distributed Power" section:

7. Safety Control Measures

FRA Audit Number: 2022-NS Special Audit -01-1

a. <u>Packaging</u>: All train types and railcar types used with unoccupied distributed power units (UDPs) and dead-in-tow locomotives.

b. <u>Operational Controls</u>:

(1) All locomotives located at the head of the train, or closer than 10 freight cars to an occupied locomotive or occupied rail car, must continue to be subject to the position in train requirements of 49 CFR 174.85.

(2) Dead-in-tow locomotives must continue to be subject to the requirements of 49 CFR 229.9.

(3) The operating rail carrier must keep a copy of the special permit at its operating headquarters.

(4) The operating rail carrier must not deadhead employees on DPUs or dead-in-tow locomotives operating under this special permit.

(5) UDPs and dead-in-tow locomotives must be locked to prevent unintended occupancy during operation.

(6) UDPs and dead-in-tow locomotives are prohibited from placement next to the following rail cars and must be separated by at least one (1) buffer car:

(i)       Divisions 1.1 and 1.2.

(ii)      Division 2.3 (TIH/PIH) tank cars.

(iii)     Division 6.1, Packing Group I, Zone A tank cars

(iv)     Class 7 (SNF & HLRW Shipments Only

(7) The operating rail carrier must provide operating employees any necessary changes to their hazmat instructions to ensure compliance with the special permit.

During this audit, FRA also inspected for NS's compliance with the requirements of the operating

22

controls established in DOT-SP-20996.  While no defects were observed during the HM Division's conduct of its field audits, FRA does want to bring to NS's attention a compliance issue that occurred during the period of the FRA's NS audit.

Specifically, a HM train placement issue occurred with Train 19MU126 departing westbound from NS Shaffer's Crossing Yard located in Roanoke, VA, to NS Bluefield Yard in Bluefield, WV. Upon arriving at Shaffer's Crossing Yard, the train crew set out the head thirty-seven rail cars between the lead locomotives and the unoccupied DPU locomotive.   When completing this switch, the train crew then went back to the remainder of the train, coupling into the DPU locomotive.   Locomotive NS 4107 (the designated DPU) was coupled into residue HM tank car CBTX 785064, a residue shipment of UN 1075//Liquefied Petroleum Gas//Class 2.1, located at position #1 in the outbound train.   This is in violation of § 174.85, as section 7(b)(1) states that the Special Permit does not alter requirements for locomotives at the head of the train or closer than 10 freight cars to an occupied locomotive.

In the case of a derailment, if the closest rail car containing a placement-restricted hazardous material is nearer than the sixth car from a locomotive, the risk of injury or fatality to train crew members from a breach of the package containing the hazardous material could potentially be increased.

**Recommendation: Ensure trains utilizing SP 20996 adhere to all specified operational conditions established in the SP.**


## Finding 5: Compliance with required Operating Controls established in DOT-SP-21110.

Pursuant to the requirements of PHMSA's Special Permit DOT-SP 21110 that authorizes the use of electronic means to maintain and communicate on-board train consist information in lieu of paper documentation when hazardous materials are transported by rail section:

7.    Safety Control Measures

23

a.  Packaging: As required in the HMR, special permit, or approval.

b.  Operational Controls:

(1)    This permit is limited to specific routes associated with designated routes as described in this application.

(2)    The information describing how to conduct operations under this special permit must be included in the grantee's HM-rules.

(3)    The following information must be readily available by electronic means to the train crew during operations; and to Federal, State, or local government representatives (e.g., emergency responders) in the event of an accident/incident or inspection/investigation:

   (i)  Shipping paper information required pursuant to 49 CFR Part 172, Subparts C and G.

   (ii)  The current position and identification numbers for all rail cars containing hazardous materials.

(4)    Any changes to position of railcars in the train consist must be updated electronically, in real-time, as railcars are added or removed from the train.

(5)    As soon as practicable, the grantee must transmit updated car position information to Railinc for use in the AskRail application.

(6)    The train crew must be provided mobile device(s) containing the following:

   (i)  Instructions to the train crew on how to provide the information required by paragraph 7.b.(3) above in electronic format to Federal, State, or local government representatives;

   (ii)  A copy of this special permit; and

24

FRA Audit Number: 2022-NS Special Audit -01-1

    (iii)   An electronic document reflecting the current position in the train of each rail car containing a hazardous material.

(7)    More than one method of electronic information exchange must be made available to train crews to ensure redundancy and account for potential mobile device limitations of the requesting authority.  Upon initial notification of an incident to the agency having jurisdiction ("AHJ") a copy of the train consist must be offered to the AHJ.

(8)    One of the selected methods of electronic information exchange must allow for immediate exchange of information to the onsite responders (e.g., transmission between mobile devices).

(9)    In the event electronic communication is unavailable, one of the following communication options must be utilized to communicate to first responders.

    (i)   Conventional land line or facsimile.

    (ii)   An alternative communication method (e.g., land mobile radio communication, satellite phones) to provide up-to-date electronic shipping paper and train placement information.

    (iii)   Providing the mobile device directly to first responders for review and inspection on the mobile device.

(1)    Training must be provided by the grantee for first responders along areas of the route without cellular service on the methods to be taken in an emergency to access the information on the electronic device when communication with an employee from the railroad is not possible.

(2)    Each employee subject to functions covered by this special permit shall be provided training on how to perform these functions by the grantee.

(3)     The grantee must provide notification and instruction on the use of this special permit to the emergency response officials along the right-of-way where the permit is being used.

FRA identified one instance of non-conformance with the requirements of SP 21110.   An NS train crew was observed using both a paper consist and an electronic device; neither the paper consist nor the electronic device provided an accurate accounting for the location of rail cars transporting hazardous materials.   The electronic device did not have an accurate accounting of the placement of the cars containing hazardous material and the train crew did not update their paper consist to reflect the placement of rail cars containing a hazardous material.   In the case of a train derailment, it is vital that either the carrier's personnel or emergency responders have an accurate location of railcars containing hazardous materials in the train.   There is increased probability that a person(s) walking the train might  encounter a breached rail car containing hazardous material.

**Recommendation:  Ensure that train crews adhere to the requirements to maintain an accurate placement-in-train document per § 174.26 and SP 21110.   If a train crew is utilizing both an electronic document and a paper document, both documents must be maintained to reflect accurate position-in-train information of hazardous materials shipments.**

26

FRA Audit Number: 2022-NS Special Audit -01-1

**Safety Partnerships**

*FRA's Safety Partnerships Division conducted a limited scope program review to determine compliance with 49 CFR Part 243 - Training, Qualification, and Oversight for Safety-Related Railroad Employees.  Part 243 went into effect on January 1, 2020.*

Safety Partnerships commenced its program review activities the week of February 7, 2022, at the NS Training Center in McDonough, GA.   Observations of additional classes for signal and mechanical personnel are scheduled for the summer and fall of 2022, as a follow-up to the program review; findings of these follow-up reviews will be discussed onsite with NS training staff.   Safety Partnerships observed delivery of a new hire conductor class which consisted of lectures, in class practical exercises, and on-the-job-training (OJT) field exercises.  Additional training program content analysis continued up until May 27, 2022.   These analyses were conducted at FRA mobile offices, as the data requests of NS were received.   FRA focused on several areas, including:

- § 243.101(d)(3), requiring the tasks and related steps associated with OJT exercises for a particular category or subcategory of employee to be maintained together in one manual, checklist, or similar document;

- § 243.109(b), requiring NS to review previously approved programs and modify them accordingly when new safety-related Federal railroad laws, regulations, or orders are issued, or new safety-related technologies, procedures, or equipment are introduced into the workplace and result in new knowledge requirements, safety-related tasks, or modification of existing safety-related duties;

- § 243.201(a)(1), requiring NS to designate its existing safety-related railroad employees by occupational category or subcategory, and to limit performance of each category or subcategory to designated employees, by September 1, 2020;

- § 243.203, establishing requirements for content and accessibility of qualification status records;

FRA Audit Number: 2022-NS Special Audit -01-1

- § 243.207, requiring NS to complete its first annual review to determine if knowledge or performance gaps exist in the application of Federal railroad safety laws, regulations, and orders by September 1, 2021; and

- § 243.209, requiring NS to maintain a current list of contractors utilized to perform safety related tasks, excluding those contractors whose employees NS may have trained and qualified.

**Finding 1: NS failed to provide a copy of the tasks and related steps associated with OJT exercises to its newly hired conductors.**

NS failed to provide new hires with a document (digital or hardcopy) containing all OJT tasks and related steps necessary for demonstrating competency and in an occupational category or subcategory, as required by § 243.101(d)(3).   NS managers indicated that they simply overlooked this requirement in the regulation.   By failing to provide this information, NS did not ensure that new learners have a clear reference of what is necessary to achieve qualification in their craft.

At the time of the audit, NS did not have OJT checklists available for FRA inspection for any occupational category.  FRA notes, however, that NS has since remediated this finding for all occupational categories.

**Recommendation: Create and provide the required OJT checklists together in one document (digital or hardcopy), for each new employee prior to beginning OJT exercises.**

**Finding 2: NS failed to conduct its first annual review by September 1, 2021, to determine if knowledge or performance gaps exist in the application of Federal railroad safety laws, regulations, and orders.**

NS failed to conduct an annual review of its various safety data and performance metrics to identify knowledge or performance gaps in occupational categories, to determine whether adjustments to a training component of the program are the appropriate intervention to close those gaps, or to otherwise improve the effectiveness of the program, as required by § 243.207.  NS managers indicated that they simply overlooked this requirement in the regulation.   Failure to

28

conduct an annual review of the various data performance metrics reduces the number of continuous improvement opportunities with respect to refresher training development and/or modifying existing training curriculum.

**Recommendation:  Conduct an annual review of safety data and performance metrics within 30 days of this report.**

## Finding 3: NS incorrectly reported it did not find the need to modify any of its previously approved training programs.

NS did not modify any of its previously approved training programs, as required by § 243.109(b). NS may have overlooked this requirement in the regulation.   Failure to conduct an initial annual review as noted in the previous finding was a contributing factor, due to the absence of qualitive and quantitative data analysis necessary to determine if adjustments in training program curricula were appropriate.

**Recommendation:  Review all active NS courses relating to Federal laws, regulations, or orders and consider revisions based on data gathered from the annual review.**

## Finding 4: NS partially failed to record the qualification designation(s) of existing and new employees.

NS did not fully describe the qualification designation(s) for existing and new hire employees as required by §§ 243.201 and 243.203.   Designating existing employees under § 243.201 is related to § 243.203, in that the latter relates to keeping records by which a railroad indicates the qualification designation(s) of all its employees.   At the time of the audit, the NS Learning Management System (LMS) was utilized to maintain the qualification records required by § 243.203 but was not configured to allow officials to record qualification designation.   Failure to fully describe all the qualification designation(s) of NS employees impedes FRA's and the employees' ability to understand which safety-related tasks they are qualified to perform.

29

FRA Audit Number: 2022-NS Special Audit -01-1

**Recommendation: Complete all ongoing revisions to the LMS to clearly document the qualification designation(s) of all occupational category and subcategory of NS employees.**

FRA Audit Number: 2022-NS Special Audit -01-1

**Motive Power & Equipment (MP&E)**

FRA's *Motive Power & Equipment (MP&E) portion of the audit contained several objectives concerning the level of compliance by NS with MP&E Regulations, 49 CFR Parts 215, Freight Car Safety Standards, 218, Railroad Operating Practices (Blue Flag Protection), 229, Railroad Locomotive Safety Standards, 231, Railroad Safety Appliance Standards, and 232, Brake System Safety Standards.   The primary objective of the audit was to capture the largest part of the locomotive fleet in service and being operated.   The second objective was to observe brake tests, daily inspections, mechanical inspections, blue flag protection of mechanical employees and crews designated to perform inspections on freight cars and locomotives.   The last objective was to observe and sample the completeness and record retention of Single Car Airbrake Tests (SCABT) in key locations.*

The MP&E Division conducted an audit of the NS system that consisted of 16 States and 37 individual locations over a span of 10 days, 24 hours a day.

Of the 37 locations inspected, the top 5 locations by defects were:

- Conway, PA  211 defects of which 17 were recommended for violations.

- Enola, PA 204 defects of which 11 were recommended for violations.

- Macon, GA 198 defects of which 3 were recommended for violations.

- Irondale, AL 176 defects of which 7 were recommended for violations.

- Chattanooga, TN 140 defects of which 2 were recommended for violations.

In total FRA inspected 5,035 freight cars, with 810 of those cars defective for a ratio of 16.1%.  FRA inspected 420 locomotives, with 291 locomotives defective for a ratio of 69.3%.   Of these cars and locomotives, there were a total of 60 recommendations for violation.

FRA commends NS on the locations where significant compliance was demonstrated.  For instance, in Kansas City, MO, 1,029 units were inspected with only 36 defects found, and no violations recommended.  Also, in Roanoke, VA, 421 units were inspected with only 16 defects

31

FRA Audit Number: 2022-NS Special Audit -01-1

and no violations recommended.

SCABT were sampled and no exceptions were taken.

### Finding 1: FRA found instances where NS did not take immediate actions to remediate defective conditions.

Transportation crews on locomotives typically performed the required inspections of their equipment; however, FRA found instances where defective conditions were not reported to the mechanical department for repair, or the equipment was not removed from service until repairs could be made.   These conditions could have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service.   Brake tests and mechanical inspection of freight cars resulted in a defect ratio of 16%.  In contrast, locomotive inspections resulted in a 69.3% defect ratio.

Consistent reporting of defective conditions to the mechanical department by the transportation department is a concern

**Recommendation:  Ensure effective and timely communication between the transportation department and the mechanical department of defective conditions identified by members of the transportation department.**

FRA Audit Number: 2022-NS Special Audit -01-1

**Signal & Train Control**

*The first objective of the Signal & Train Control (S&TC) portion of the audit was to determine the level of NS compliance with 49 CFR Parts 228, 234, and 236.  The second objective was to follow up on NS remedial actions in response to the FRA S&TC Division's NS Dispatch review in 2021.  A final objective was to review records and reports to validate:*

a.  *Positive Train Control (PTC) System Performance to include Reporting (Enforcements, Initialization Failures, Cut-Outs and Malfunctions).*

b.  *Configuration Management (New or Updated control plans, Critical Features Verification and Validation (V&V) Process).*

c.  *Validation of current Positive Train Control Implementation Plan (PTCIP) and Positive Train Control Safety Plan (PTCSP) documentation.*

d.  *PTC Training by disciplines.*

The FRA S&TC Division conducted an audit of the NS system between April 12 and April 22, 2022.  This audit consisted of inspections in 12 States and 21 different Districts (the NS term for Subdivision) over a span of 10 days.

FRA found no instances of noncompliance for PTC system performance.   The carrier has an effective procedure in place to ensure system performance, reporting, and identify and address potential failures.

During these two weeks, the S&TC Division inspected 640 units and 4,661 sub-units, finding 286 defects of which 42 were recommended as violations.   FRA identified several additional defects and violations during this audit not related to the above objectives.   The majority of defects and violations discovered during this audit related to issues addressed during the 2021 Signal Dispatch Review.   These issues include Hours of Service (HOS) recordkeeping and interference of Maintenance of Way (MoW)/train crews (OP) at HRGCs.

NS is working to correct the HOS recordkeeping program to identify missing information, which comprise many of the FRA defects.   This is a continuation of the action plan NS

33

FRA Audit Number: 2022-NS Special Audit -01-1

provided to FRA last year.   FRA will continue to monitor this for progress.  NS is reaching out to other Class I railroads to see how they have improved their MoW and OP interference issues. This is also a continuation of the remedial action plan NS provided to FRA last year.  This issue has improved but remains a concern.   FRA will continue to monitor this for progress.

Because those findings were addressed in an earlier report, FRA is not making any related recommendations in this report.   The S&TC Division has continued discussions with NS senior management regarding the NS action plan to correct the systemic issues noted above.

**Finding 1: FRA found instances where NS did not update certain circuit plans in a timely fashion.**

At 30 percent of the locations whose records were inspected by FRA, significant changes were made at one or more Highway Rail Grade Crossings (HRGCs), but the circuit plans had not been updated to show these changes.   As a result of the failure to timely update these circuit plans pursuant to 49 CFR § 234.201, employees do not have accurate information, which could increase the likelihood that they could put in place changes that degrade the safe operation of the crossing warning system.

**Recommendation:  Develop and implement a process for ensuring that changes to warning systems at HRGCs are recorded in applicable circuit plans in a timely fashion.**

34

FRA Audit Number: 2022-NS Special Audit -01-1

**Track**

*The objectives of the Track portion of the audit were to determine NS compliance with 49 CFR Parts 213 and 214.*

During the two weeks of inspections conducted, FRA's Track Division inspected 13,923 units, documented 4,145 defects, and recommended 30 violations.   The majority of FRA's findings are centered on three primary issues, including the NS Continuous Welded Rail (CWR) plan, track special work defects, and increased defect ratios when walking inspections are conducted.

**Finding 1: NS CWR activities were not compliant with regulatory requirements.**

As part of the Track Division's NS audit, the Rail Integrity Team evaluated the effectiveness of NS rail defect and CWR plan monitoring.  This included a review of CWR records in 19 randomly selected NS districts, with randomly selected locations for field follow-up to verify if the records matched the activities in the field.

There are two parts to the CWR findings identified by FRA during this audit.   The first part is associated with field identification inspections by the Track Inspectors and Rail Integrity Specialists looking for compliance with the written CWR plan and procedures.   In this part, FRA inspected 228 assets and found 134 non-compliant conditions with 125 defects of which 9 of those were recommended for violation.   Most non-compliance centered on:

- Rail anchoring or fastening requirements that were not in accordance with the NS CWR plan under defect code 213.119.B;

- Non-compliant rail joint installation and maintenance procedures under defect codes 213.119.C2 and C3; and

- Identified failures to follow procedures to maintain the desired rail installation temperature range during rail plug cut-ins under defect code 213.119.D.

The second component of FRA's CWR findings focuses on compliance with record-keeping and documentation that were field verified through follow-up verification inspections for rail plug cut-

FRA Audit Number: 2022-NS Special Audit -01-1

ins.   Overall review of CWR activities revealed 532 rail record defects that were identified out of 1,947 rail records sampled by FRA.     A review of CWR reporting activities looked at 19 districts/subdivisions and identified 1,805 defects over multiple affiliated documents.   The Rail Integrity Team's field verifications uncovered unreliable reporting data, which could demonstrate a lack of CWR follow-up monitoring and potentially inaccurate documentation of work performed. The Team reviewed 13,680 rail/added or removed records (line-items), finding that 2,361 of those records contained an entry stating that zero inches of track were added or removed at a temperature that is outside the 20-degree safe temperature range specified in the NS CWR plan.     These records did not show the adjusted rail neutral temperature (RNT) after that work was performed, as required by 49 CFR § 213.119(j)(1).   These records indicate that NS is tracking rail that is added and removed without sufficient procedures to control for adjusted rail neutral temperature, which is not in compliance with the requirements of 213.119.D.

There are two additional issues found involving NS CWR plan monitoring.   The Rail Integrity Team found a flaw in how NS is recording remedial action taken for FRA classified rail defects. FRA reviewed 2,310 total records (line items) of rail defects identified for repair.  Of these, FRA noted that 1,606 were FRA classified rail defects.   FRA remedial action codes have a multi-level remediation process with FRA requiring the initial remedial action to be recorded.   In 676 of those records, or 42% of the time, the initial reported remedial action code was incorrectly applied.

The second is that NS has provided field personnel with a "Reference Mark Field Guide."  This guide is not included in their submitted CWR plan, and FRA has not approved this field guide under § 213.118.   In the field guide procedures, the workforce is required to make their reference marks and then write the distance "after the work" has been completed.   This is not an approved process for CWR match marks as it is not included in the approved NS CWR Plan.   FRA discovered the workforce was not correctly applying the reference marks.

The NS CWR plan does not have sufficient written procedures for calculating the RNT.   Instead, the NS CWR plan simply attempts to track the amount of rail that is added or removed from the track.   This is not consistent with § 213.119(d) & (f).   FRA findings of inconsistent CWR plan application along with omitted procedural documentation, and inaccurate reporting of initial remedial actions, are serious concerns that further compounds the issue of tracking rail

FRA Audit Number: 2022-NS Special Audit -01-1

added/removed.    A CWR plan is intended to be a complete, stand-alone document that consists of an FRA-approved set of procedures to be used by the engineering work groups (that can be verified by FRA Inspectors) for the proper management of thermal forces induced by the RNT. Making changes to the CWR plan without re-submission to FRA for review is not in compliance with § 213.118 and can lead to improper application of track buckling/pull apart countermeasures, inconsistent rail cut-ins, and improper reporting of corrective actions taken to repair or protect both buckle prone and pull-apart prone conditions.

## *Summary*

There appears to be an inconsistent application of CWR procedures among the NS engineering workforce.  For example, in multiple instances NS CWR records did not match the rail marking information in the field.

1. NS is only tracking rail added or removed, and the CWR plan does not provide directions for calculating the RNT after work is performed to assure the RNT has been adjusted to the proper safe range.

2. Initial remedial actions for rail defects are in general not being clearly reported in NS rail records.   NS use of letters for codes corresponding to the letters in the 213.113 Remedial Action Table can be unclear and could have multiple meanings for the work performed leading to a number of different actions taken under that one code.  Some NS workers reported letter codes which represent actions that are more restrictive than those required in the table but are not the required action for defects of that nature. Because of this imprecise coding system, the workforce did not select the correct code 42% of the time.

According to NS, the CWR policy submitted in January 2021 is consistent with the regulation as written and addresses issues cited during the FRA System Audit.  They assert that acceptance of NS's plan as submitted would resolve the exceptions cited in this report.  FRA disagrees and will discuss the matter further with NS during the upcoming plan review process.

37

**Recommendations:**

**Resubmit a revised CWR plan for FRA approval that:**

- **Includes proper reporting requirements for rail plug cut-ins that establishes control and proper monitoring by NS management for the proper adjustment of RNT in accordance with §§ 213.118 & 119.**

- **Includes written procedures which address: the installation, adjustment, maintenance, and inspection of CWR; inspection of CWR joints; and an updated training program for the application of those procedures.**

- **Retrain § 213.7(c) personnel who are qualified to inspect CWR or supervise the installation, adjustment, and maintenance of CWR track in the proper FRA reporting requirements for initial remedial action for rail record retention.**

- **Clearly define initial remedial actions associated with field activities taken to replace, repair, or protect defective rails listed in accordance with the table of § 213.113(c).**

## Finding 2: The NS program for maintaining Main Track and Yard Track Switches (turnouts) could be improved.

For the most part, main line track on the NS system is well maintained.   However, FRA took exceptions for loose, worn, and missing fastening components in turnouts.   FRA inspection of turnouts looks at the overall component effectiveness, including general fasteners, switch and rail components, and the crossing or turnout frogs as a system for the safe transition from one track to another track.   All components of the turnout play a vital role in this critical area of the track structure for safe train movement.   Of the 2,821 turnouts on main track, 1,204 defects were identified with 9 of those defects being recommended for violation, resulting in a defect ratio of 43%.   Of the 2,665 turnouts in yard track, 1,582 defects were identified with none of those defects recommended for violation at this time, but did result in a defect ratio of 59%.

38

For main track and yard track turnouts the table below shows the most common identified turnout defects.

| Part | Code | Description | Defect count | Rec. Violation |
|------|------|-------------|--------------|----------------|
| 213 | 119.B | Failure to comply with written CWR procedures | 95 | 9 |
| 213 | 133.A12 | Loose, worn or missing frog bolts | 401 | |
| 213 | 133.A13 | Loose, worn or missing guard rail bolts | 163 | |
| 213 | 133.A14 | Loose, worn or missing guard rail clamps/wedges or other components | 102 | |
| 213 | 133.A15 | Other turnout or crossing fastenings not intact or maintained | 152 | |
| 213 | 135.D | Heel of switch insecure | 350 | |
| 213 | 137.A | Insufficient flangeway depth | 32 | |
| 213 | 137.C | Tread portion of frog worn in excess of allowable | 46 | |
| 213 | 137.F | Severe frog condition not otherwise provided | 133 | |
| 213 | 141.A | Raised guard worn excessively | 11 | |
| 213 | 143.A1 | Guard check gage less than allowable | 83 | 5 |

FRA conducted a random sample of FRA inspection reports of NS trackage to provide additional insight into which component defects were identified with the greatest frequency.

39

FRA Audit Number: 2022-NS Special Audit -01-1

**Highest Frequency Component Defects**

| Main Defects | Counts | Yard Defect | Counts |
|---|---|---|---|
| 119.B | 17 | 133.A12 | 41 |
| 133.A9 | 11 | 135.D | 35 |
| 133.A12 | 9 | | |
| 133.A15 | 30 | | |
| 135.D | 5 | | |
| 137.F | 4 | | |

The above tables highlight that 213.119.B (*Failure to comply with written CWR procedures – anchoring or fastening*) defects should be addressed along with critical turnout components that were found loose and not maintained.   This is particularly true of loose, worn, and missing frog bolts and insecure heel blocks.   Turnout component defects identified on the main track during the audit yielded a defect ratio above the national average of 24%.

Turnouts play a critical function that turnouts in the safety of the track structure.   When critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential.   Data obtained from FRA's Safety Data Site shows derailments that, between January 2017 and March of 2022, NS had 83 derailments associated with turnouts.  This totaled $8,136,313 in report damages.  Of these, 16 derailments occurred on the mainline, totaling $5,118,395 in damages.

*Summary*

- Main track turnout components accounted for 29% of all defects.

40

FRA Audit Number: 2022-NS Special Audit -01-1

- Yard track turnout components accounted for 38% of all defects.

- Improved identification and maintenance of Frog bolts, insecure heel blocks, loose fasteners, overall frog conditions, and adjacent guard rails is necessary.

**Recommendations:**

**Develop and implement an approach to address defects in turnout areas that:**

- **Improves oversight of track inspection reporting in critical component areas of turnouts.**

- **Improves support for follow-up maintenance activities once component issues are identified with a focus on quality repairs.**

- **Addresses severely deficient frog conditions**.

## Finding 3: The NS track inspection program could be improved with increased walking inspections.

In both the main tracks and yard tracks there is an increase in identified track conditions related to special work defects when walking inspections were conducted.   This is especially true for joint bars, where 85 defects were identified under defect code 213.121.E (*Less than 2 bolts per rail at any joint in continuous welded rail*) and 95 defects were identified under defect code 213.121.F (*Loose joint bars (joint rail)*).   These accounted for 180 defective joint bar conditions, and there was a total of 307 defects (7%) in the category of joint bar defects identified during the audit.   If joint bars are not maintained, they can fail suddenly; derailments associated with failed joint bars are usually associated with high reported damage costs.

This is supported by data obtained from FRA's Safety Data Site that shows derailments between January 2017 and March of 2022.   For all types of derailments associated with joint bars, NS had a total 8 derailments that totaled $2,305,726 in damages.  Of these, 4 were main line derailments totaling $2,115,123 in damages.

41

FRA Audit Number: 2022-NS Special Audit -01-1

*Summary*

- Walking inspections are more effective at finding certain types of defects.

In its comments, NS noted that they comply with the regulatory walking inspection requirements. In this instance, FRA is noting that NS has an opportunity to increase the effectiveness of their track inspection program.

**Recommendations:**

- **Increase periodic walking inspection in main tracks at joints at ends of curves and CWR rail cut-ins.**

- **Increase periodic walking inspection in yards for improved joint bar defect identification.**

## Conclusion

FRA provided NS with a draft copy of this report in July 2022.   NS reviewed the report and provided comments.  Where NS provided factual corrections or requested clarifying edits to the text, FRA has revised its report.  Other comments are summarized in the relevant sections, and FRA has included brief responses.

FRA's audit illustrated that in many aspects, NS programs are largely effective and compliant with relevant safety regulations.   Still, NS has many opportunities to improve employee and manager awareness of and compliance with both FRA safety regulations and NS safety programs.   With more effective use of training, improved management oversight, or even innovative applications of technology, NS can better prevent property damage, loss of life, or catastrophic damage to communities by ensuring its personnel have all of the knowledge and tools they need to maximize railroad safety.

FRA Audit Number: 2022-NS Special Audit -01-1

# Exhibit 2



## Related Investigations

- Norfolk Southern Railway Train Derailment with Subsequent Hazardous Material Release and Fires



# NTSB Issues Investigative Update on Ohio Train Derailment

**2/14/2023**

WASHINGTON (Feb. 14, 2023) — The NTSB investigation of the Feb. 3 Norfolk Southern freight train derailment in East Palestine, Ohio is ongoing.

On Feb. 3, at approximately 8:54 p.m., local time, eastbound Norfolk Southern Railway, general merchandise freight train 32N, derailed on main track 1 in East Palestine, Ohio. As a result of the derailment, 38 rail cars derailed and a fire ensued which damaged an additional 12 cars. There were 20 total hazardous material cars in the train consist—11 of which derailed. A list of what the derailed rail cars were carrying is available online. There were no reported fatalities or injuries.

NTSB is conducting a safety investigation to determine the probable cause of the derailment and issue any safety recommendations, if necessary, to prevent future derailments. The NTSB can also issue urgent recommendations at any point during the investigation. All questions regarding the safety investigation should go to NTSB. While emergency response will be a factor in the investigation, NTSB is not involved in air monitoring, testing of water quality, environmental remediation or the evacuation orders. Questions on environmental issues should be referred to the Environmental Protection Agency. Learn more: East Palestine Train Derailment - EPA OSC Response.

Parties to the NTSB investigation provide technical assistance. They include: U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration and Federal Railroad Administration, Ohio State Highway Patrol, the Village of East Palestine, Norfolk Southern Railway, Trinity Industries Leasing Company, GATX Corporation, Brotherhood of Railway Carmen, International Association of Sheet Metal, Air, Rail and Transportation Workers and Brotherhood of Locomotive Engineers and Trainmen.

NTSB continues to work with the investigative parties to determine what exactly caused the derailment and to evaluate the emergency response efforts.

NTSB investigators have identified and examined the rail car that initiated the derailment. Surveillance video from a residence showed what appears to be a wheel bearing in the final stage of overheat failure moments before the derailment. The wheelset from the suspected railcar has been collected as evidence for metallurgical examination. The suspected overheated wheel bearing has been collected and will be examined by engineers from the NTSB Materials Laboratory in Washington, D.C.

The tank cars are currently being decontaminated. Once the process is complete, NTSB investigators will return to Ohio to complete a thorough examination of the tank cars.

The vinyl chloride tank car top fittings, including the relief valves, were removed and secured in a locked intermodal container pending an NTSB examination. Once the fittings are examined by NTSB investigators, they will be shipped to Texas for testing, which will be conducted under the direction of the NTSB.

NTSB has obtained locomotive event recorder data, forward- and inward-facing image recording data and wayside defect detector data. NTSB investigators continue to review documentation, event recorder data and perform interviews. A preliminary report is expected to publish in two weeks.

While on scene, NTSB Member Michael Graham hosted two press briefing on Feb. 4 and Feb. 5, which are available on NTSB's YouTube channel. B-Roll is also available on YouTube.

Editor's note: An earlier version of this release indicated 10 hazardous material railcars were part of the derailment. The actual number is 11.
To report an incident/accident or if you are a public safety agency, please call 1-844-373-9922 or 202-314-6290 to speak to a Watch Officer at the NTSB Response Operations Center (ROC) in Washington, DC (24/7).

# Exhibit 3



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

February 10, 2023

REPLY TO THE ATTENTION OF:

SE-5J

<u>**VIA EMAIL AND FED EX OVERNIGHT DELIVERY**</u>
<u>**SIGNATURE REQUIRED**</u>

Norfolk Southern Railway Company
c/o Matt Gernand, Deputy General Counsel
650 West Peachtree Steet NW
Atlanta, Georgia 30308

Re:     East Palestine Train Derailment Site
        Norfolk Southern Rail Line, East Palestine, Columbiana County, Ohio
        Site/Spill Identifier (SSID): C5XR
        General Notice of Potential Liability

Dear Mr. Gernand:

The U.S. Environmental Protection Agency has documented the release or threat of release of
hazardous substances, pollutants or contaminants into the environment from the East Palestine
Train Derailment Site (the Site) located in East Palestine, Ohio (Latitude: 40.8360864°N,
Longitude: -80.5215884°W). On February 3, 2023, at approximately 8:55 PM EST, a Norfolk
Southern train comprised of roughly 150 rail cars derailed. Approximately 20 rail cars were
listed as carrying hazardous materials. Cars containing vinyl chloride, butyl acrylate, ethylhexyl
acrylate, and ethylene glycol monobutyl ether are known to have been and continue to be
released to the air, surface soils, and surface waters.

Under the Comprehensive Environmental Response, Compensation, and Liability Act
(CERCLA), commonly known as the federal "Superfund" law, EPA is responsible for
responding to the release or threat of release of hazardous substances, pollutants or contaminants
into the environment – that is, for stopping further contamination from occurring and for
cleaning up or otherwise addressing any contamination that has already occurred. EPA has spent,
or is considering spending, public funds to investigate and control releases of hazardous
substances or potential releases of hazardous substances at the Site. Based on information
presently available to EPA, EPA has determined that Norfolk Southern Railway Company
(Norfolk Southern or "you") may be responsible under CERCLA for cleanup of the Site or costs
EPA has incurred in cleaning up the Site.



## Property Access Agreement and Release

| Date: | 2/11/23 |
|---|---|
| Full Address: ("Property") | ███████████████ |
| Phone Number: | ████████ |

I,      Katlyn ████████████      , the legal and rightful owner or occupant of the Property ("Landowner"), hereby authorize Norfolk Southern, its affiliates, subsidiaries, parents, contractors, associated environmental professionals, and assisting local, state, and federal agencies, including but not limited to CTEH LLC and any of their personnel (collectively, "Monitoring Team") to access the Property for air monitoring or environmental sampling:

☐ outside the home or structure at the Property

☐ inside the home or structure at the Property

Landowner agrees to indemnify, release, and hold harmless Unified Command from and against any and all legal claims, including for personal injury or property damage, arising from Monitoring Team's performance of air monitoring or environmental sampling at the Property on the date of signature below.

Landowner states he or she has the authority to grant access to the Property and to sign this document.

| Signature of Landowner: | |
|---|---|
| Printed Name: | Katlyn ████████████ |
| Signed On (Date): | |



# Operation Home Safely FAQ Sheet

Taggart Road Incident – East Palestine, OH

## General Information Regarding the Incident

Just before 9:00 PM on February 3, 2023, a train derailed in East Palestine, Ohio on Taggart Road. Approximately 50 railcars were involved in the derailment, ten of which contained hazardous materials including vinyl chloride, combustible liquids (ethylene glycol monobutyl ether acetate, 2-ethylhexyl acrylate), isobutylene, n-butyl acrylate, and benzene residue (meaning the cars had previously carried benzene). A number of local, state, and federal agencies responded to the incident along with the railroad and their emergency response contractors. A precautionary evacuation and shelter-in-place was ordered to ensure the safety of the public.

The air has been, and is continued to be, tested 24 hours per day throughout the evacuation zone and in the community outside the evacuation zone. The results of air monitoring indicate no detections of vinyl chloride in the community and support that the air in the community is safe for residents to return home.

If you live within the evacuation zone, when you re-enter your home following the lift of evacuation orders, you will have the voluntary option of being accompanied by environmental professionals and a representative of the United States Environmental Protection Agency (US EPA), who will conduct air monitoring in and around your home to ensure that unsafe levels of substances are not present in your home.

## Frequently Asked Questions

### Is the air safe?

Yes – Air monitoring is being performed 24 hours a day in the community for the substances associated with the derailment and fire. Air monitoring results indicate that the air in the community is safe. Similarly, if you live within the evacuation zone, we will monitor the air in and around your home at your request to confirm that your home is safe to re-enter.

### Is my drinking water safe?

Yes – the East Palestine water supply comes from a series of groundwater wells. Due to the location of the derailment, it is improbable that substances from the derailment have impacted or will impact the groundwater or drinking water wells in the area. We are performing sampling of surface waters downstream of the derailment site, but any surface water detections from the derailment will not affect your drinking water.

### I smell a strange odor. Should I be worried?

Some of the substances associated with the derailment can be smelled even when instrument air monitoring findings are non-detect or below a level of concern. Similarly, non-hazardous materials can produce odors when on fire. While these odors may be irritating, they do not indicate that you are being exposed. Air monitoring in the community is ongoing and will continue until clean-up is complete.

**4.2     Unified Incident Command System**



# Exhibit 4



# GOVERNOR
# JOSH SHAPIRO

February 14, 2023

Alan Shaw, President and CEO
Norfolk Southern Corporation
1200 Peachtree Street, NE
Atlanta, GA 30309

Dear Mr. Shaw:

I am writing to express my serious concerns regarding Norfolk Southern Corporation's management of the Norfolk Southern train derailment that occurred near East Palestine, Ohio on February 3. The derailment occurred approximately a quarter mile from the Pennsylvania state line and has had a significant impact on the residents, businesses, and environment in Beaver County.

Earlier today, I met with elected leaders and emergency management officials in Beaver County, including State Senator Camera Bartolotta, State Rep. Josh Kail, State Rep. Jim Marshall, State Rep. Robert Matzie, Beaver County Commissioners Dan Camp, Jack Manning, and Tony Amadio, and Beaver County Emergency Services Deputy Director Kevin Whipple, who share my concerns about Norfolk Southern's poor handling of this incident.

The Pennsylvania Department of Environmental Protection (DEP) and Pennsylvania Emergency Management Agency (PEMA) were not immediately contacted by Norfolk Southern and learned of the incident independently in the first few hours after it occurred and immediately began monitoring for impacts to the residents, businesses, and environment in the Commonwealth. Through this process, DEP and PEMA observed at least three priority issues with Norfolk Southern's management of the response that put the safety of our first responders and residents at significant risk.

**First, Norfolk Southern failed to implement Unified Command, creating confusion and resulting in a general lack of awareness for first responders and emergency management of the tactics Norfolk Southern planned in response.** Early in the incident, Norfolk Southern personnel separated themselves from the rest of the incident management structure at the Incident Command Post to conduct separate operational and tactical planning, forcing state and local response agencies to react to tactics that were developed unilaterally and without the combined input of key state agencies.

Mr. Shaw
February 14, 2023
Page Two

**Second, Norfolk Southern gave inaccurate information and conflicting modeling about the impact of the controlled release that made protective action decision making more difficult in the immediate aftermath of the derailment.** Norfolk Southern failed to notify state and local response agencies initially of their intention to vent and burn all five cars containing vinyl chloride, rather than just the single car Norfolk Southern personnel identified originally. Furthermore, Norfolk Southern failed to immediately inform authorities as to the number of rail cars that contained dangerous chemicals. Norfolk Southern's failure to participate in the Unified Command and share accurate information led to confusion and wide variability in potentially affected population estimates in the downwind plume impacting the Commonwealth.

**Third, Norfolk Southern's unwillingness to explore or articulate alternate courses of action to their proposed vent and burn limited state and local leaders' ability to respond effectively.** As discussed, Norfolk Southern response personnel improperly planned tactical response operations without adequate input from elected officials, local response organizations, or state agencies, resulting in a single plan of action to vent and burn all five cars without allowing for input from Pennsylvania emergency management leaders. Norfolk Southern failed to explore all potential courses of action, including some that may have kept the rail line closed longer but could have resulted in a safer overall approach for first responders, residents, and the environment.

While I appreciate that responding to train derailments presents an array of complex challenges, failure to adhere to well-accepted standards of practice related to incident management and prioritizing an accelerated and arbitrary timeline to reopen the rail line injected unnecessary risk and created confusion in the process. You can be assured that Pennsylvania will hold Norfolk Southern accountable for any and all impacts to our Commonwealth.

Norfolk Southern has repeatedly assured us of the safety of their rail cars — in fact, leading Norfolk Southern personnel described them to me as "the Cadillac of rail cars" — yet despite these assertions, these were the same cars that Norfolk Southern personnel rushed to vent and burn without gathering input from state and local leaders. Norfolk Southern's well known opposition to modernized regulations require further scrutiny and investigation to limit the devastating effects of future accidents on peoples' lives, property, businesses, and the environment.

While regulation of the railroad industry is largely the purview of our federal partners, we plan to take direct action here in the Commonwealth of Pennsylvania. I have called on the Pennsylvania Public Utility Commission, which is charged with oversight of the Commonwealth's railroads, to review Norfolk Southern's conduct and report back their findings. Like me, members of our state legislative delegation are troubled by the conduct of Norfolk Southern during this incident. As they proceed with their review and

Mr. Shaw
February 14, 2023
Page Three

oversight responsibilities, I have pledged offered the full cooperation of my
Administration in order to help them facilitate holding your company accountable to
Pennsylvanians.

I have also spoken directly with the President of the United States and the
U.S. Secretary of Transportation, who have both pledged their full support to the people
of Pennsylvania and have been constructive partners during this process. I urge the
federal Pipeline and Hazardous Materials Safety Administration (PHMSA) to reexamine
what constitutes a high-hazard flammable train and revisit the need for regulation
requiring high-hazard flammable trains to carry more advanced safety and braking
equipment.

As you conduct your after-action report, I expect you to address these
concerns and report back on what steps you are taking to rectify the situation and ensure
this does not happen again.

I await your response.

Governor Josh Shapiro


CC:
Secretary Pete Buttigieg, United States Department of Transportation
Senator Bob Casey
Senator John Fetterman
Congressman Chris Deluzio
Acting Attorney General Michelle Henry
State Senator Elder Vogel Jr.
State Senator Camera Bartolotta
State Representative Jim Marshall
State Representative Josh Kail
State Representative Robert Matzie
Beaver County Commissioner Dan Camp
Beaver County Commissioner Jack Manning
Beaver County Commissioner Tony Amadio
Beaver County Emergency Services Deputy Director Kevin Whipple
Chairman Gladys Brown Dutrieuille, Pennsylvania Public Utilities Commission

# Exhibit 5

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGIONS 3 AND 5

IN THE MATTER OF: )
)
) CERCLA Docket No. V-W-23-C-004
East Palestine Train Derailment Site )
East Palestine, Columbiana County, Ohio )
)
Norfolk Southern Railway Company, )
)
Respondent )
)
Proceeding under Section 106(a) )  **UNILATERAL ADMINISTRATIVE**
of the Comprehensive Environmental )  **ORDER FOR REMOVAL ACTIONS**
Response, Compensation, and Liability )
Act, as amended, 42 U.S.C. § 9606(a). )
)
)

# TABLE OF CONTENTS

I.      JURISDICTION AND GENERAL PROVISIONS..........................................1
II.     PARTIES BOUND ...........................................................................1
III.    DEFINITIONS.................................................................................1
IV.     FINDINGS OF FACT.........................................................................4
V.      CONCLUSIONS OF LAW AND DETERMINATIONS....................................8
VI.     ORDER .......................................................................................11
VII.    OPPORTUNITY TO CONFER..............................................................11
VIII.   EFFECTIVE DATE ..........................................................................12
IX.     NOTICE OF INTENT TO COMPLY .......................................................12
X.      DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-
        SCENE COORDINATOR....................................................................12
XI.     WORK TO BE PERFORMED ...............................................................13
XII.    QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS ......................19
XIII.   PROPERTY REQUIREMENTS..............................................................21
XIV.    ACCESS TO INFORMATION ...............................................................23
XV.     RETENTION OF RECORDS.................................................................24
XVI.    COMPLIANCE WITH OTHER LAWS......................................................24
XVII.   EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES......................25
XVIII.  PAYMENT OF RESPONSE COSTS.........................................................25
XIX.    ENFORCEMENT/WORK TAKEOVER ......................................................26
XX.     RESERVATIONS OF RIGHTS BY EPA .....................................................27
XXI.    OTHER CLAIMS .............................................................................27
XXII.   INSURANCE...................................................................................27
XXIII.  FINANCIAL ASSURANCE ..................................................................28
XXIV.   MODIFICATION ..............................................................................32
XXV.    DELAY IN PERFORMANCE.................................................................32
XXVI.   ADDITIONAL REMOVAL ACTIONS.......................................................33
XXVII.  NOTICE OF COMPLETION OF WORK....................................................33
XXVIII. ADMINISTRATIVE RECORD ...............................................................33
XXIX.   SEVERABILITY ..............................................................................33

## I.      JURISDICTION AND GENERAL PROVISIONS

1.      This Administrative Order ("Order") is issued under the authority vested in the President of the United States by Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, (CERCLA), as amended, 42 U.S.C. § 9606(a). This authority was delegated to the Administrator of the United States Environmental Protection Agency (EPA) by Executive Order No. 12580, 52 Fed. Reg. 2923 (Jan. 23, 1987), and further delegated to the Regional Administrators by EPA Delegation Nos. 14-14A and 14-14B. This authority was further redelegated by the Regional Administrator of EPA Region 5 to the Director of the EPA Region 5 Superfund & Emergency Management Division by EPA Region 5 Delegation Nos. 14-14-A (Aug. 24, 2015) and 14-14-B (May 11, 1996) and by the Regional Administrator of EPA Region 3 to the Director of the EPA Region 3 Superfund & Emergency Management Division by EPA Region 3 Delegation Nos. 14-14-A (April 15, 2019) and 14-14-B (April 15, 2019).

2.      This Order pertains to property located at the Rail Line east northeast of the intersection of East Taggart Street and North Pleasant Drive (Latitude: 40.8360395; Longitude: 80.5222838) in East Palestine, Ohio (the "East Palestine Train Derailment Site"), which is more specifically defined in the definition of "Site" in Paragraph 6, below. In addition to the response actions that are currently occurring, this Order requires Respondent to conduct removal actions described herein to abate an imminent and substantial endangerment to the public health or welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Site.

3.      EPA has notified the State of Ohio and the Commonwealth of Pennsylvania (collectively, the "States") of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

## II.      PARTIES BOUND

4.      This Order applies to and is binding upon Respondent and its successors and assigns. Any change in ownership or control of the Site or change in the corporate or partnership status of Respondent, including, but not limited to, any transfer of assets or real or personal property, shall not alter Respondent's responsibilities under this Order.

5.      Respondent shall provide a copy of this Order to each contractor hired to perform the Work required by this Order and to each person representing the Respondent with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Order. Respondent or its contractors shall provide written notice of the Order to all subcontractors hired to perform any portion of the Work required by this Order. Respondent shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this Order.

## III.      DEFINITIONS

6.      Unless otherwise expressly provided in this Order, terms used in this Order that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this

Order or in appendices to or documents incorporated by reference into this Order, the following definitions shall apply:

"Affected Property" shall mean all real property at the Site and any other real property where EPA determines, at any time, that access or land, water, or other resource, use restrictions are needed to implement the removal action.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-9675.

"Day" or "day" shall mean a calendar day. In computing any period of time under this Order, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"Effective Date" shall mean the effective date of this Order as provided in Section VIII.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"OEPA" shall mean the Ohio Environmental Protection Agency and any successor departments or agencies of the State of Ohio.

"PADEP" shall mean the Pennsylvania Department of Environmental Protection and any successor departments or agencies of the Commonwealth of Pennsylvania.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Respondent Owner" shall mean any person, other than Respondent, that owns or controls any Affected Property. The phrase "Non-Respondent Owner's Affected Property" means Affected Property owned or controlled by Non-Respondent Owner.

"Order" shall mean this Unilateral Administrative Order and all appendices attached hereto. In the event of conflict between this Order and any appendix, this Order shall control.

"Paragraph" shall mean a portion of this Order identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean EPA and Respondent.

"Post-Removal Site Control" shall mean actions necessary to ensure the effectiveness and integrity of the removal action to be performed pursuant to this Order consistent with Sections 300.415(l) and 300.5 of the NCP and "Policy on Management of Post-Removal Site Control" (OSWER Directive No. 9360.2-02, Dec. 3, 1990).

"RCRA" shall mean the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992.

"Respondent" shall mean Norfolk Southern Railway Company.

"Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in monitoring and supervising Respondent's performance of the Work to determine whether such performance is consistent with the requirements of this Order, including costs incurred in reviewing deliverables submitted pursuant to this Order, as well as costs incurred in overseeing implementation of this Order, including, but not limited to, payroll costs, contractor costs, travel costs, and laboratory costs.

"Section" shall mean a portion of this Order identified by a Roman numeral.

"Site" shall mean the areal extent of where hazardous substances have come to be located, in Ohio and Pennsylvania, as a result of the Norfolk Southern Railway Company train derailment that occurred on February 3, 2023, at the rail line northeast of East Taggart Street and North Pleasant Drive intersection in East Palestine, Columbiana County, Ohio (Latitude: 40.8360395 Longitude: 80.5222838) and the subsequent emergency response activities including, but not limited to, breached rail cars and the controlled "vent and burn" that occurred on February 6, 2023.

"States" shall mean the State of Ohio and the Commonwealth of Pennsylvania.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (a) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (b) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (c) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); (d) any "hazardous waste" under 37 Ohio Rev. Code § 3734.01(J); (e) any "hazardous substance" under 27 P.S. § 6020.103 and (f) any "hazardous waste" under 25 Pa. Code 261a.3.

"Work" shall mean all activities Respondent is required to perform under this Order, except those required by Section XV (Retention of Records).

## IV.    FINDINGS OF FACT

7.      The East Palestine Train Derailment Site is located in East Palestine, Columbiana County, Ohio, at approximately Latitude: 40.8360395; Longitude: -80.5222838. which is more specifically defined in the definition of "Site" in Paragraph 6 above.

8.      The area immediately south of the Site is a mixed-use commercial, industrial, and residential area. The area north of the Site is a commercial and industrial area, with additional residences to the northeast. The nearest residences are less than 1,000 feet from the derailment Site.

9.      The East Palestine Train Derailment Site is located within a mixed-use residential, commercial, and industrial area, with residential properties northwest, southeast, and south of the derailment area. Residential properties are also located along contaminated waterways which became contaminated after the derailment and are within the affected area. The Ohio-Pennsylvania border is located less than a mile from the derailment location. The nearest public well supply is located approximately one (1) mile from the derailment location. A ditch, located on the south side of the tracks flows west for approximately 1,000 feet before it empties into Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek before emptying into the Ohio River.  Wetlands and State Line Lake are located immediately adjacent to the Northeast of the Site.  Segments of the affected waterways are considered to be habitat for the Eastern Hellbender, an endangered species of salamander.

10.     Norfolk Southern Railway Company owns and operates a Class I freight railroad that passes through the town of East Palestine, Ohio.

11.     A train derailment occurred at approximately 2055 eastern standard time (EST) on February 3, 2023, in East Palestine, Columbiana County, Ohio, less than a mile from the Ohio-Pennsylvania border.  Norfolk Southern Railway Company reported the incident at 2253 EST to the National Response Center (NRC). Federal, state, and local officials arrived on scene after the derailment. EPA mobilized to the Site with EPA Superfund Technical Assessment and Response Team (START) at approximately 2330 EST on February 3, 2023.  Norfolk Southern Railway Company, Ohio Environmental Protection Agency (OEPA), Columbiana County, Village of East Palestine, Pennsylvania Department of Environmental Protection (PADEP), Ohio Department of Natural Resources (ODNR), Butler County Incident Management Team (IMT), Federal Railroad Administration (FRA), National Transportation Safety Board (NTSB), and other agencies also mobilized to the Site. EPA coordinated with the Interagency Modeling and Atmospheric Assessment Center (IMAAC) to provide plume modeling throughout the duration of the derailment fire.

12.     At the time of the initial report, the number of derailed rail cars (of the 149) was unknown but 20 of the rail cars were listed by Norfolk Southern Railway Company as carrying hazardous materials, described as:  Vinyl Chloride, Stabilized (5); Sulfuric Acid (5); Ethylene Glycol Monobutyl Ether (1); Butyl Acrylate, Stabilized (2); Combustible Liquids nos (1);

Isobutylene (1) Ethyl-Hexyl Acrylate(1); Empty Residue – last contained liquified petroleum gas (LPG) (1); Residue – last contained Benzene (2).

13.     The derailment resulted in a large fire affecting numerous rail cars, including rail cars carrying hazardous materials, although the status (e.g. breached, burning, etc.) was initially unknown due to safety concerns associated with the fire as well as the position of the derailed cars, which affected the ability of responders to identify which rail cars were actively breached and/or burning. Initially, a shelter-in-place order was recommended, and firefighting efforts were stood down due to safety concerns; however, an evacuation order was enacted by the Village of East Palestine on February 4, 2023. The fire continued to burn throughout the following days. Local citizens reported smoke from the fire observed over the State of Ohio and the Commonwealth of Pennsylvania.

14.     Ohio officials, working with the Fire Chief as Incident Commander, evacuated residents within a one-mile radius and took other emergency actions to protect human health and the environment in the aftermath of the derailment. EPA supported these efforts with air monitoring and sampling, including EPA's Airborne Spectral Photometric Environmental Collection Technology (ASPECT) aircraft, and sampling and indoor air monitoring on a voluntary basis. In addition, a mobile laboratory was mobilized to analyze air samples.

15.     After monitoring on February 5, 2023, indicated rising temperatures in a tank car containing vinyl choride, Respondent, in consultation with Ohio response officials, vented and burned product into a flare trench on February 6, 2023, in order to prevent a catastrophic explosion of the rail car.

16.     The February 6, 2023, controlled "vent and burn" involved five (5) rail cars containing vinyl chloride in a flare trench to prevent a catastrophic explosion of the rail cars. In advance of the controlled "vent and burn" and based on plume modeling conducted by IMAAC and the Ohio National Guard 52nd Civil Support Team, the evacuation radius described in Paragraph 13 was increased to a roughly one-mile by two-mile area pursuant to evacuation orders issued by the State of Ohio and the Commonwealth of Pennsylvania.

17.     Norfolk Southern Railway Company provided response officials at the Site, including EPA, with a list of the contents of the rail cars which derailed at the Site. See Appendix A. On February 3, 2023, at 2201 EST, Norfolk Southern Railway Company provided response officials at the Site with a consist (manifest) which details the volume of materials in each rail car. See Appendix B. Rail cars 23 through 74 were the rail cars which derailed, eleven of which contained hazardous materials. See Appendix C for a labeled aerial photo of a subset of those cars. The hazardous materials contained in these eleven rail cars are as follows:

| Rail Car # | Hazardous Materials | Amount |
|---|---|---|
| TILX 402025 | Vinyl Chloride | 178,300 pounds |
| OCPX 80235 | Vinyl Chloride | 177,250 pounds |

| OCPX 80179 | Vinyl Chloride | 177,600 pounds |
|---|---|---|
| GATX 95098 | Vinyl Chloride | 178,150 pounds |
| OCPX 80370 | Vinyl Chloride | 176,100 pounds |
| SHPX 211226 | Ethylene Glycol Monobutyl Ether | 185,750 pounds |
| DOWX 73168 | Ethylhexyl Acrylate | 205,900 pounds |
| UTLX 205907 | Butyl Acrylate | 180,000 pounds |
| NATX 35844 | Isobutylene | 155,642 pounds |
| DPRX 259013 | Benzene | Residue |
| DPRX 258671 | Benzene | Residue |

18.     Releases of hazardous substances occurred after the derailment and subsequent fires Releases to the air occurred when hazardous substances spilled from the rail cars, when smoke from burning rail cars was produced, and hazardous substances including vinyl chloride, phosgene and hydrogen chloride were released. Releases to surface water occurred when liquid product exited rail cars and also when run-off from firefighting efforts at the derailment location moved through a ditch to Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek, and then the Ohio River. Releases to soil occurred (1) when liquid product exited rail cars after the derailment (2) when run-off from firefighting efforts at the derailment location flowed from the right-of-way to adjoining property, and (3) when ash from the burns landed on soil. Local citizens reported smoke from the burns observed over the State of Ohio and the Commonwealth of Pennsylvania.

19.     Populations at risk include:

a.     Human residents;

b.     Human workers;

c.     Wildlife including but not limited to:

(1)     Several fish species as well as the eastern hellbender, an endangered species with habitat within portions of the affected waterways;

(2)     Domesticated pets;

        d.     Agricultural areas which supply the human food supply and the animal food chain.

20.    The following are health/environmental effects associated with the hazardous materials involved in the derailment, or were detected in air, water, soil, and sediment samples, or were combustion by-products of some of those chemicals at the Site:

        a.     **Vinyl Chloride**: Breathing high levels of vinyl chloride can cause dizziness or sleepiness. Breathing very high levels can cause fainting and breathing even higher levels can cause death. Studies have shown chronic inhalation of vinyl chloride for several years causes changes in the structure of the liver, and individuals who breath high levels are more likely to experience these changes. Highly exposed workers have also developed liver cancer (angiosarcoma of the liver). The effects of ingesting high levels of vinyl chloride are unknown. Dermal exposure may cause numbness, redness, and blisters. Animal studies have shown that exposure to vinyl chloride during pregnancy can affect the growth and development of the fetus. Vinyl chloride is a known human carcinogen according to the Department of Health and Human Services (DHHS), the International Agency for Research or Cancer (IARC), and the EPA.

        b.     **Ethylene Glycol Monobutyl Ether**: Routes of exposure include ingestion and dermal contact. Inhaling Ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain. Exposure can cause headache, dizziness, lightheadedness, and passing out. It may damage the liver and kidneys.

        c.     **Isobutylene**: Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat; dermal contact can cause frostbite; headache, dizziness, lightheadedness, and fatigue. Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer hazard, reproductive hazard, and other long-term health effects.

        d.     **Benzene**: Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death. The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects on the bone marrow and can cause a decrease in red blood cells leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. Benzene may affect menstruation and decrease the size of ovaries in women following many months of exposure to high levels. Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research or Cancer (IARC), and the EPA.

        e.     **Butyl Acrylate**: Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy. Exposure to butyl acrylate can cause headache, dizziness, nausea, and vomiting. Repeated exposure can lead to permanent lung damage.

        f.     **Phosgene**: Exposure to phosgene in the air can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through

inhalation, dermal contact, or (less likely) ingestion. Higher levels of phosgene can cause lungs to swell, making it difficult to breathe. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

g.     **Hydrogen Chloride:** Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation. Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation. Some people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances. Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin. Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach.

21.     Acrylate odors were noted by responders during indoor air monitoring.

22.     Acrylate odors along Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, and Little Beaver Creek were noted by responders during sampling and containment activities.

23.     ODNR reported an estimated number of aquatic animals killed at approximately 3,500. Those aquatic animals were found in Sulphur Run, Leslie Run, Bull Creek, and a portion of the North Fork of Beaver Creek. Most of the fish appear to be small suckers, minnows, darters, and sculpin. Most of these deaths are believed to have been caused by the immediate release of contaminants into the water.

24.     Respondent is a corporation organized under the laws of the state of Virginia. Respondent is liable under CERCLA § 107(a)(1) as the owner and/or operator of the train that derailed at the Site, and as the owner and/or operator of the rail line from which the train derailed.

## V.     CONCLUSIONS OF LAW AND DETERMINATIONS

25.     Based on the Findings of Fact set forth above, and the administrative record, EPA has determined that:

a.     The East Palestine Train Derailment Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b.     Norfolk Southern Train 32N and the individual rail cars comprising the train are "rolling stock" and therefore are a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

c.     Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

    d.      Respondent is a liable party under one or more provisions of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

        (1)      Respondent Norfolk Southern Railway Company is the "owner" and/or "operator" of the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

        (2)      Respondent Norfolk Southern Railway Company is the "owner" and/or "operator" of the facility at the time of disposal of hazardous substances at the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

    e.      The contaminants vinyl chloride, benzene, and butyl acrylate found at the Site, as identified in the Findings of Fact above, are each a "hazardous substance" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) that may present an imminent and substantial danger to public health or welfare under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1).

    f.      The conditions described in Paragraphs 7-24 of the Findings of Fact above constitute an actual and/or threatened "release" of a hazardous substance from the facility as defined by Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

    g.      The conditions at the Site may constitute a threat to public health or welfare or the environment, based on the factors set forth in Section 300.415(b)(2) of the NCP. These factors include, but are not limited to, the following:

        (1)      **actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances and pollutants or contaminants**. This factor is present at the Site due to the existence of the discharge of vinyl chloride and butyl acrylate to one or more of the following: surface soils, surface waters, and air. ODNR reports the total estimated number of aquatic animals killed at approximately 3,500. Those animals were found in Sulphur Run, Leslie Run, Bull Creek, and a portion of the North Fork of Beaver Creek. Most of the fish appear to be small suckers, minnows, darters, and sculpin. Most of these deaths are believed to have been caused by the immediate release of contaminants into the water. Additionally, waste piles containing mixtures of vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether remain on site and pose a threat of exposure should containment be compromised. Acrylate odors continue to be noted along portions of Sulphur and Leslie Run.

        (2)      **actual or potential contamination of drinking water supplies or sensitive ecosystems**. This factor is present at the Site due to the release of vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether to surface soils and surface waters. The releases have impacted drinking water

resulting in the closures of water intakes on the Ohio River and have the potential
to affect groundwater used for drinking water and irrigation;

(3)     **hazardous substances and pollutants or contaminants in
drums, barrels, tanks, or other bulk storage containers, that may pose a
threat of release**. This factor is present at the Site due to the presence of damaged
rail cars containing isobutylene and residual benzene. As of February 18, 2023,
approximately 1,557,000 gallons of liquid wastes have been collected from the
Site. OEPA has reported to EPA that as of February 17, 2023, 247,000 gallons
have already been transported off site for disposal;

(4)     **high levels of hazardous substances and pollutants or
contaminants in soils largely at or near the surface, that may migrate**. This
factor is present at the Site due to the breaching of rail cars releasing, but not
limited to, vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol
monobutyl ether. As of February 18, 2023, approximately 13,600 cubic yards of
grossly contaminated soils have been excavated and staged on Site;

(5)     **weather conditions that may cause hazardous substances and
pollutants or contaminants to migrate or be released**. This factor is present at
the Site due to the continuing presence of hazardous substances, including but not
limited to, vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol
monobutyl ether that were released from the derailment location to adjacent
properties and downstream surface waters. Rainfall events have the potential to
cause further releases to surface waters. Dry weather and remediation activities
have the potential to result in the release of contaminated soils by tracking or dust
emissions;

(6)     **threat of fire or explosion**. This factor is present at the Site due to
the continued presence of rail cars containing isobutylene (DOT Class 2.1
Flammable Gas) and residual benzene (DOT Class 3 Flammable Liquid);

(7)     **other situations or factors that may pose threats to public
health or welfare or the environment**. This factor is present at the Site due to
the fact that a full assessment of the extent of contamination has not been
completed.

h.     The conditions described in Paragraphs 7-24 of the Findings of Fact above
may constitute an imminent and substantial endangerment to the public health or welfare or the
environment because of an actual or threatened release of a hazardous substance from the facility
within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

i.     The removal actions required by this Order are necessary to protect the
public health, welfare, or the environment.

## VI.    ORDER

26.    Based upon the Findings of Fact, Conclusions of Law and Determinations set forth above, and the administrative record, Respondents are hereby ordered to comply with all provisions of this Order and any modifications to this Order, including all appendices to this Order and all documents incorporated by reference into this Order.

## VII.    OPPORTUNITY TO CONFER

27.    No later than 24 hours after this Order is signed by the Regional Administrators or their delegatees, Respondent may, in writing, a) request a conference with EPA to discuss this Order, including its applicability, the factual findings and the determinations upon which it is based, the appropriateness of any actions Respondent is ordered to take, or any other relevant and material issues or contentions that Respondent may have regarding this Order, or b) notify EPA that it intends to submit written comments or a statement of position in lieu of requesting a conference.

28.    If a conference is requested, Respondent may appear in person or by an attorney or other representative. Any such conference shall be held in person or by video conference at the discretion of EPA no later than 1 day after the conference is requested. Any written comments or statements of position on any matter pertinent to this Order must be submitted no later than 1 day after the conference or 2 days after this Order is signed if Respondent does not request a conference. This conference is not an evidentiary hearing, does not constitute a proceeding to challenge this Order, and does not give Respondent a right to seek review of this Order. Any request for a conference or written comments or statements should be submitted to:

Catherine Garypie, Office of Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 West Jackson Blvd. (Mail Code C-14J)
Chicago, Illinois 60604
312-886-5825
garypie.catherine@epa.gov

and

Naeha Dixit, Office of Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 West Jackson Blvd. (Mail Code C-14J)
Chicago, Illinois  60604
312-353-5542
dixit.naeha@epa.gov

## VIII.   EFFECTIVE DATE

29.     This Order shall be effective 2 days after the Order is signed by the Regional Administrators or their delegatees unless a conference is requested or notice is given that written materials will be submitted in lieu of a conference in accordance with Section VII (Opportunity to Confer). If a conference is requested or such notice is submitted, this Order shall be effective on the 2nd day after the day of the conference, or if no conference is requested, on the 1st day after written materials, if any, are submitted, unless EPA determines that the Order should be modified based on the conference or written materials. In such event, EPA shall notify Respondent, within the applicable 5 day period, that EPA intends to modify the Order. The modified Order shall be effective 5 days after it is signed by the Regional Administrators or their delegatees.

## IX.     NOTICE OF INTENT TO COMPLY

30.     On or before the Effective Date, Respondent shall notify EPA in writing of Respondent's irrevocable intent to comply with this Order. Such written notice shall be sent to EPA as provided in Paragraph 28. Respondent's written notice shall describe, using facts that exist on or prior to the Effective Date, any "sufficient cause" defense asserted by such Respondent under Sections 106(b) and 107(c)(3) of CERCLA, 42 U.S.C. §§ 9606(b) and 9607(c)(3). The absence of a response by EPA to the notice required by this Paragraph shall not be deemed to be acceptance of Respondent's assertions. Failure of Respondent to provide such notice of intent to comply within this time period shall, as of the Effective Date, be treated as a violation of this Order by Respondent.

## X.     DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR

31.     **Selection of Contractors, Personnel.** All Work performed under this Order shall be under the direction and supervision of qualified personnel. Within 3 days after the Effective Date, and before the Work outlined below begins, Respondent shall notify EPA in writing of the names, titles, addresses, telephone numbers, email addresses, and qualifications of the personnel, including contractors, subcontractors, consultants, and laboratories to be used in carrying out such Work. If, after the commencement of the Work, Respondent retains additional contractors or subcontractors, Respondent shall notify EPA of the names, titles, contact information, and qualifications of such contractors or subcontractors retained to perform the Work at least 5 days prior to commencement of Work by such additional contractors or subcontractors. EPA retains the right, at any time, to disapprove of any or all of the contractors and/or subcontractors retained by Respondent. If EPA disapproves of a selected contractor or subcontractor, Respondent shall retain a different contractor or subcontractor and shall notify EPA of that contractor's or subcontractor's name, title, contact information, and qualifications within 2 days after EPA's disapproval. With respect to any proposed contractor, Respondent shall demonstrate that the proposed contractor demonstrates compliance with ASQ/ANSI E4:2014 "Quality management systems for environmental information and technology programs – Requirements with guidance for use" (American Society for Quality, February 2014), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, Reissued May 2006) or equivalent documentation as determined by EPA. The qualifications of the persons

undertaking the Work for Respondent shall be subject to EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and that they do not have a conflict of interest with respect to the project.

32.     Within 3 days after the Effective Date, Respondent shall designate a Project Coordinator who shall be responsible for administration of the Work required by this Order and shall submit to EPA the designated Project Coordinator's name, title, address, telephone number, email address, and qualifications. To the greatest extent possible, the Project Coordinator shall be present on Site or readily available during the Work. EPA retains the right to disapprove of the designated Project Coordinator who does not meet the requirements of Paragraph 31 (Selection of Contractors, Personnel). If EPA disapproves of the designated Project Coordinator, Respondent shall retain a different Project Coordinator and shall notify EPA of that person's name, title, contact information, and qualifications within 1 day following EPA's disapproval. Respondent shall have the right to change its Project Coordinator, subject to EPA's right to disapprove. Respondent shall notify EPA 5 days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notification. Communications between Respondent and EPA, and all documents concerning the activities performed pursuant to this Order, shall be directed to the Project Coordinator. Receipt by Respondent's Project Coordinator of any notice or communication from EPA relating to this Order shall constitute receipt by Respondent.

33.     EPA has designated Ralph Dollhopf of the EPA Region 5, Superfund & Emergency Response Division, Emergency Response Branch, as the On-Scene Coordinator (OSC) for the Site and for Work performed in Ohio. EPA has designated Jack Kelly of the EPA Region 3, Superfund & Emergency Response Division, Emergency Response Branch, as its OSC for Work performed in Pennsylvania.

34.     EPA will notify Respondent of a change of one of its designated OSCs. Communications between Respondent and EPA, and all documents concerning the activities performed pursuant to this Order, shall be directed to the OSCs in accordance with Paragraph 39.a(1).

35.     The OSCs shall be responsible for overseeing Respondent's implementation of this Order. The OSCs shall have the authority vested in a Remedial Project Manager (RPM) and an OSC by the NCP, including the authority to halt, conduct, or direct any Work required by this Order, or to direct any other response action when s/he determines that conditions at the Site constitute an emergency situation or may present a threat to public health or welfare or the environment. Absence of one or both OSCs from the Site shall not be cause for stoppage or delay of Work.

## XI.     WORK TO BE PERFORMED

36.     In addition to the actions that it is currently performing, Respondent shall perform, at a minimum, all actions necessary to implement the following items. The actions to be implemented generally include, but are not limited to, the following:

a.      In conjunction with other federal, state and local agencies, Respondent shall participate in all required elements of the Site's response organization structure (Incident Command System) as established and coordinated by the OSCs;

b.      Develop and implement a Security Plan;

c.      Develop and implement an air monitoring and sampling plan for:

(1)      Indoor air of occupied structures;

(2)      Perimeter community air monitoring at any remediation areas;

d.      Develop and implement a plan for the identification and delineation of the extent of contamination for:

(1)      Surface and subsurface soils;

(2)      Surface waters and sediments;

(3)      Groundwater;

(4)      Drinking water sources;

e.      Develop and implement a plan for the containment and remediation of contaminated surface and sub-surface soils, surface waters and sediments, groundwater (including private, municipal, agricultural wells);

f.      As of the date of issuance of this Order, EPA expects to clean up dust and debris in the interior and exterior of buildings resulting from the February 3, 2023, train derailment and subsequent fires upon request. If at a later date EPA determines that it is appropriate for Respondent to take over this task, Respondent will be required to develop and implement a plan for these cleanup activities;

g.      Expected boundaries for work identified above are described below:

(1)      For air, surface soil, interior and exterior home cleaning (1-mile x 2-mile evacuation area);

(2)      For surface water and sediments (length of the contaminated surface waters from unnamed ditch to the Ohio River);

(3)      For subsurface soils and groundwater (perimeter of and within the areal extent of derailment location); and

(4)      Drinking water sources (1 mile radius from the derailment and a 250-foot buffer from the center line of the contaminated surface waters from unnamed ditch to the Ohio River).

h.      Remove, secure, stage, consolidate, package, transport, and dispose of identified hazardous substances, pollutants, and contaminants at EPA-approved disposal facilities in accordance with the EPA's Off-Site Rule 40 C.F.R. § 300.440; and

i.      Taking any response action to address all releases or threatened releases which EPA determines may pose an imminent and substantial endangerment to the public health or the environment.

37.     For any regulation or guidance referenced in the Order, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after Respondent receives notification from EPA of the modification, amendment, or replacement.

38.     **Work Plan and Implementation**

a.      Within 7 days after the Effective Date, in accordance with Paragraph 39 (Submission of Deliverables), Respondent shall submit to EPA for review and approval draft work plans for performing the removal actions (collectively, the "Removal Work Plan") generally described in Paragraph 36 above. The draft Removal Work Plan shall provide a description of, and an expeditious schedule for, the Work required by this Order. The Removal Work Plan must describe all community impact mitigation activities to be performed to: (a) reduce impacts (e.g., air emissions, dust, odor, traffic, noise, temporary relocation, negative economic effects) to residential areas, schools, playgrounds, healthcare facilities, or recreational public areas frequented by community members ("Community Areas") during implementation of the Removal Action; (b) conduct monitoring in Community Areas of impacts from the implementation of the Removal Action; (c) communicate validated sampling data; and (d) make adjustments during the implementation of the Removal Action in order to further reduce negative impacts to affected Community Areas. The Removal Work Plan shall contain information about impacts to Community Areas that is sufficient to assist EPA's OSCs and Community Involvement Coordinator(s) in performing the evaluations described in the Superfund Community Involvement Handbook, OLEM 9230.0-51 (Mar. 2020). The Handbook is located at https://www.epa.gov/superfund/superfund-community-involvementtools-and-resources#handbook.

b.      EPA may approve, disapprove, require revisions to, or modify the draft Removal Work Plan in whole or in part. If EPA requires revisions, Respondent shall submit a revised draft Removal Work Plan within 3 days after receipt of EPA's notification of the required revisions. Respondent shall implement the Removal Work Plan as approved in writing by EPA in accordance with the schedule approved by EPA. Once approved, or approved with modifications, the Removal Work Plan, the schedule, and any subsequent modifications shall be incorporated into and become fully enforceable under this Order.

c.      Upon approval or approval with modifications of the Removal Work Plan Respondent shall commence implementation of the Work in accordance with the schedule included therein. Respondent shall not commence or perform any Work except in conformance with the terms of this Order. Respondent shall notify EPA at least 48 hours prior to performing any Work on-Site pursuant to the EPA-approved Removal Work Plan.

     d.     Unless otherwise provided in this Order, any additional deliverables that require EPA approval under the Removal Work Plan shall be reviewed and approved by EPA in accordance with this Paragraph.

     e.     Any non-compliance with any EPA-approved plans, reports, specifications, schedules, or other deliverables shall be considered a violation of the requirements of this Order. Determinations of non-compliance shall be made by EPA. Approval of the Removal Work Plan shall not limit EPA's authority under the terms of this Order to require Respondents to conduct activities consistent with this Order to accomplish the Work outlined in this Section.

39.     **Submission of Deliverables**

     a.     **General Requirements for Deliverables**

     (1)     Except as otherwise provided in this Order, Respondent shall direct all submissions required by this Order to the OSCs at Ralph Dollhopf, On-Scene Coordinator, U.S. EPA Region 5, 2565 Plymouth Road – Mail Code SEAA, Ann Arbor, Michigan, 48105 (231/301-0559), dollhopf.ralph@epa.gov and Jack Kelly, On-Scene Coordinator, U.S. EPA Region 3, 1600 John F. Kennedy Boulevard, Philadelphia, Pennsylvania, 19103-2852 (215/814-3112), kelly.jack@epa.gov. Respondent shall submit all deliverables required by this Order or any approved work plan to EPA in accordance with the schedule set forth in such plan.

     (2)     Respondent shall direct all submissions required to be submitted to the State of Ohio by this Order to:

> Anne Vogel, Director
> Ohio EPA - Director's Office
> P.O. Box 1049
> Columbus, Ohio 43216-1049
> 614-644-2782
> Anne.Vogel@epa.ohio.gov

     (3)     Respondent shall submit all deliverables in electronic form. Technical specifications for sampling and monitoring data and spatial data are addressed in Paragraph 39.b. All other deliverables shall be submitted to EPA in the form specified by an OSC. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5 x 11 inches, Respondent shall also provide EPA with paper copies of such exhibits.

     b.     **Technical Specifications for Deliverables**

     (1)     Sampling and monitoring data should be submitted in standard Regional EDD format as specified by EPA Regions 5 and 3. Other delivery methods may be allowed if electronic direct submission presents a significant burden or as technology changes.

16

(2)     Spatial data, including spatially-referenced data and geospatial data, should be submitted: (a) in the ESRI File Geodatabase format ; and (b) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://www.epa.gov/geospatial/epa-metadata-editor.

(3)     Each file must include an attribute name for each site unit or sub-unit submitted. Consult https://www.epa.gov/geospatial/geospatial-policies-and-standards for any further available guidance on attribute identification and naming.

(4)     Spatial data submitted by Respondent does not, and is not intended to, define the boundaries of the Site.

40.     **Sampling and Analysis Plan**. Within 7 days after the Effective Date, Respondent shall submit a Sampling and Analysis Plan to EPA for review and approval. This plan shall consist of a Field Sampling Plan (FSP) and a Quality Assurance Project Plan (QAPP) that is consistent with the plans cited in the Work to Be Performed and the NCP, including, but not limited to, "Guidance for Quality Assurance Project Plans (QA/G-5)" EPA/240/R-02/009 (December 2002), "EPA Requirements for Quality Assurance Project Plans (QA/R-5)" EPA 240/B-01/003 (March 2001, reissued May 2006), and "Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3 EPA/505/B-04/900A-900C (March 2005). Upon its approval by EPA, the Sampling and Analysis Plan shall be incorporated into and become enforceable under this Order.

41.     **Health and Safety Plan**. Within 7 days after the Effective Date, Respondent shall submit for EPA review and comment a Health and Safety Plan that ensures the protection of on-site workers and the public during performance of on-site Work under this Order. This plan shall be prepared in accordance with "OSWER Integrated Health and Safety Program Operating Practices for OSWER Field Activities," Pub. 9285.0-OIC (Nov. 2002), available on the NSCEP database at https://www.epa.gov/nscep, and "EPA's Emergency Responder Health and Safety Manual," OSWER Directive 9285.3-12 (July 2005 and updates), available at https://www.epaosc.org/_HealthSafetyManual/manual-index.htm. In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration (OSHA) regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning. Respondent shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal actions.

42.     **Community Involvement Plan**. EPA has the lead responsibility for implementing community involvement activities at the Site, including the preparation of a community involvement plan, in accordance with the NCP and EPA guidance. As requested by EPA, Respondents shall participate in community involvement activities, including participation in (a) the preparation of information regarding the Work for dissemination to the public (including compliance schedules and progress reports), with consideration given to the specific needs of the community, including translated materials and mass media and/or Internet notification and (b) public meetings that may be held or sponsored by EPA to explain activities at or relating to the Site.

43.     **Post-Removal Site Control**. In accordance with the Removal Work Plan schedule, or as otherwise directed by EPA, Respondent shall submit a proposal for Post-Removal Site Control. Upon EPA approval, Respondent shall either conduct Post-Removal Site Control activities, or obtain a written commitment from another party for conduct of such activities, until such time as EPA determines that no further Post-Removal Site Control is necessary. Respondent shall provide EPA with documentation of all Post-Removal Site Control commitments. Respondent shall implement post-removal site control consistent with the provisions of 40 C.F.R. § 300.415(l).

44.     **Progress Reports**. Respondent shall submit a written progress report to EPA concerning actions undertaken pursuant to this Order on a weekly basis, or as otherwise requested by EPA, from the date of receipt of EPA's approval of the Removal Work Plan until issuance of Notice of Completion of Work pursuant to Section XXVII, unless otherwise directed in writing by an OSC. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

45.     **Final Report**. Within 30 days after completion of all Work required by this Order, with the exception of any continuing obligations required by this Order, including, but not limited to, post-removal site controls, reimbursement of Response Costs, or record retention, Respondent shall submit for EPA review and approval a final report summarizing the actions taken to comply with this Order. EPA will review and approve the final report in accordance with Section XXVII (Notice of Completion of Work). The final report shall conform, at a minimum, with the requirements set forth in Section 300.165 of the NCP, "OSC Reports." The final report shall include a good faith estimate of total costs or a statement of actual costs incurred in complying with the Order, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal actions (e.g., manifests, invoices, bills, contracts, and permits). The final report shall also include the following certification signed by a responsible corporate official of a Respondent or Respondent's Project Coordinator: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or

those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

46.   **Off-Site Shipments**

   a.   Respondent may ship hazardous substances, pollutants, and contaminants from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondent will be deemed to be in compliance with CERCLA § 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Respondent obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

   b.   Respondent may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, they provide written notice to the appropriate state environmental official in the receiving facility's state and to the OSCs. This notice requirement will not apply to any off-Site shipments when the total quantity of all such shipments will not exceed ten cubic yards. The written notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Respondent shall also notify the state environmental official referenced above and the OSCs of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. Respondent shall provide the notice after the award of the contract for the removal action and before the Waste Material is shipped.

   c.   Respondent may ship Investigation Derived Waste (IDW) from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, EPA's "Guide to Management of Investigation Derived Waste," OSWER 9345.3-03FS (Jan. 1992). Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 C.F.R. § 261.4(e) shipped off-Site for treatability studies, are not subject to 40 C.F.R. § 300.440.

## XII.   QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

47.   Respondent shall use quality assurance, quality control, and other technical activities and chain of custody procedures for all samples consistent with "EPA Requirements for Quality Assurance Project Plans (QA/R5)," EPA/240/B-01/003 (March 2001, reissued May 2006), "Guidance for Quality Assurance Project Plans (QA/G-5)," EPA/240/R-02/009 (December 2002), and "Uniform Federal Policy for Quality Assurance Project Plans," Parts 1-3, EPA/505/B-04/900A-900C (March 2005).

48.   **Access to Laboratories**

   a.   Respondent shall ensure that EPA and State personnel and their authorized representatives are allowed access at reasonable times to all laboratories utilized by Respondent

pursuant to this Order. In addition, Respondent shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance, quality control, and technical activities that will satisfy the stated performance criteria as specified in the QAPP and that sampling and field activities are conducted in accordance with the Agency's "EPA QA Field Activities Procedure," CIO 2105-P-02.1 (9/23/2014) available at https://www.epa.gov/irmpoli8/epa-qa-field-activities-procedures. Respondent shall ensure that the laboratories they utilize for the analysis of samples taken pursuant to this Order meet the competency requirements set forth in EPA's "Policy to Assure Competency of Laboratories, Field Sampling, and Other Organizations Generating Environmental Measurement Data under Agency-Funded Acquisitions" available at https://www.epa.gov/measurements/documents-about-measurement-competency-under-acquisition-agreements and that the laboratories perform all analyses using EPA-accepted methods. Accepted EPA methods consist of, but are not limited to, methods that are documented in the EPA's Contract Laboratory Program (https://www.epa.gov/clp), SW 846 "Test Methods for Evaluating Solid Waste, Physical/Chemical Methods" (https://www.epa.gov/hw-sw846), "Standard Methods for the Examination of Water and Wastewater" (https://www.standardmethods.org/), 40 C.F.R. Part 136, "Air Toxics - Monitoring Methods" (https://www.epa.gov/amtic/air-toxics-ambient-monitoring#methods)." However, upon approval by EPA, Respondent may use other appropriate analytical method(s), as long as (i) quality assurance/quality control (QA/QC) criteria are contained in the method(s) and the method(s) are included in the QAPP, (ii) the analytical method(s) are at least as stringent as the methods listed above, and (iii) the method(s) have been approved for use by a nationally recognized organization responsible for verification and publication of analytical methods, e.g., EPA, ASTM, NIOSH, OSHA, etc. Respondent shall ensure that all laboratories they use for analysis of samples taken pursuant to this Order have a documented Quality System that complies with ASQ/ANSI E4:2014 "Quality management systems for environmental information and technology programs – Requirements with guidance for use" (American Society for Quality, February 2014), and "EPA Requirements for Quality Management Plans (QA/R-2)" EPA/240/B-01/002 (March 2001, reissued May 2006), or equivalent documentation as determined by EPA. EPA may consider Environmental Response Laboratory Network (ERLN) laboratories, laboratories accredited under the National Environmental Laboratory Accreditation Program (NELAP), or laboratories that meet International Standardization Organization (ISO 17025) standards or other nationally recognized programs as meeting the Quality System requirements. Respondent shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Order are conducted in accordance with the procedures set forth in the QAPP approved by EPA.

b.      Upon request, Respondent shall provide split or duplicate samples to EPA and the States or their authorized representatives. Respondent shall notify EPA and the States not less than 5 days in advance of any sample collection activity. In addition, EPA and the States shall have the right to take any additional samples that EPA or the States deem necessary. Upon request, EPA shall provide to Respondent split or duplicate samples of any samples it takes as part of EPA's oversight of Respondent's implementation of the Work.

c.      Respondent shall submit to EPA and the States, in the next monthly progress report as described in Paragraph 44 (Progress Reports) copies of the results of all sampling and/or tests or other data obtained or generated by or on behalf of Respondent with respect to the Site and/or the implementation of this Order.

## XIII.  PROPERTY REQUIREMENTS

49.    **Agreements Regarding Access and Non-Interference**. Respondent shall, with respect to any Non-Respondent Owner's Affected Property, use best efforts to secure from such Non-Respondent Owner an agreement, enforceable by Respondent and EPA, providing that such Non-Respondent Owner, and Respondent shall, with respect to Respondent's Affected Property: (i) provide EPA, the applicable State, Respondent, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the Order, including those activities listed in Paragraph 49.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the removal action. Respondent shall provide a copy of such access agreements to EPA and the applicable State.

a.    **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)    Monitoring the Work;

(2)    Verifying any data or information submitted to EPA or the State;

(3)    Conducting investigations regarding contamination at or near the Site;

(4)    Obtaining samples;

(5)    Assessing the need for, planning, implementing, or monitoring response actions;

(6)    Assessing implementation of quality assurance and quality control practices as defined in the approved quality assurance quality control plan;

(7)    Implementing the Work pursuant to the conditions set forth in Section XIX (Enforcement/Work Takeover);

(8)    Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Respondent or its agents, consistent with Section XIV (Access to Information);

(9)    Assessing Respondent's compliance with the Order;

(10)    Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Order; and

(11)    Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions regarding the Affected Property.

50.    **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Respondent would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements, as required by this Section. If, within 15 days after it is known access is required at a particular property, Respondent is unable to accomplish what is required through "best efforts" it shall notify EPA, and include a description of the steps taken to comply with the requirements. If EPA deems it appropriate, it may assist Respondent or take independent action in obtaining such access and/or use restrictions. EPA reserves the right to seek payment from Respondent for all costs, including cost of attorneys' time, incurred by the United States in obtaining such access or agreements to restrict land, water, or other resource use.

51.    **Notice to Successors-in-Title**

a.    Respondent shall, within 15 days after the Effective Date, submit for EPA approval a notice to be filed regarding Affected Property owned by Respondent in the appropriate land records. The notice must: (1) include a proper legal description of the Affected Property; (2) provide notice to all successors-in-title that: (i) the Affected Property is part of, or related to, the Site; (ii) EPA has selected a removal action for the Site; and (iii) EPA has ordered potentially responsible parties to implement that removal action; and (3) identify the EPA docket number and Effective Date of this Order. Respondent shall record the notice within 10 days after EPA's approval of the notice and submit to EPA, within 10 days thereafter, a certified copy of the recorded notice.

b.    Respondent shall, prior to entering into a contract to Transfer its Affected Property, or 60 days prior to Transferring its Affected Property, whichever is earlier:

(1)    Notify the proposed transferee that EPA has selected a removal action regarding the Site, that EPA has ordered potentially responsible parties to implement such removal action, (identifying the EPA docket number and the Effective Date of this Order); and

(2)    Notify EPA and the applicable State of the name and address of the proposed transferee and provide EPA and the applicable State with a copy of the above notice that it provided to the proposed transferee.

52.    In the event of any Transfer of the Affected Property, unless EPA otherwise consents in writing, Respondent shall continue to comply with its obligations under this Order, including its obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property.

53.    Notwithstanding any provision of this Order, EPA and the States retain all of their access authorities and rights, as well as all of their rights to require land, water, or other resource

22

use restrictions, including enforcement authorities related thereto under CERCLA, RCRA, and any other applicable statute or regulations.

## XIV.   ACCESS TO INFORMATION

54.    Respondent shall provide to EPA and the States, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within Respondent's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Order, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. Respondent shall also make available to EPA and the States, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

55.    **Privileged and Protected Claims**

a.    Respondent may assert that all or part of a Record requested by EPA or the States is privileged or protected as provided under federal law, in lieu of providing the Record, provided Respondent complies with Paragraph 55.b, and except as provided in Paragraph 55.c.

b.    If Respondent asserts a claim of privilege or protection, it shall provide EPA and the States with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, Respondent shall provide the Record to EPA and the States in redacted form to mask the privileged or protected portion only. Respondent shall retain all Records that it claims to be privileged or protected until EPA and the States or a court determines that such Record is privileged or protected.

c.    Respondent may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological, or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that Respondent is required to create or generate pursuant to this Order.

56.    **Business Confidential Claims**. Respondent may assert that all or part of a Record provided to EPA and the States under this Section or Section XV (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Respondent shall segregate and clearly identify all Records or parts thereof submitted under this UAO for which Respondent asserts business confidentiality claims. Records that Respondent claims to be confidential business information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the States, or if EPA has notified Respondent that the Records are not confidential under the standards of

Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Respondent.

57.     Notwithstanding any provision of this Order, EPA and the States retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XV.   RETENTION OF RECORDS

58.     During the pendency of this Order and for a minimum of 10 years after Respondent's receipt of EPA's notification pursuant to Section XXVII (Notice of Completion of Work), Respondent shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control, or that come into its possession or control, that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that Respondent, as potentially liable as an owner or operator of the Site or part of the Site, must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site.  Respondent must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above, all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that Respondent (and its contractors and agents) must retain, in addition, copies of all data generated during performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

59.     At the conclusion of this document retention period, Respondent shall notify EPA and the States at least 90 days prior to the destruction of any such Records, and, upon request by EPA or the States, and except as provided in Paragraph 55, Respondent shall deliver any such Records to EPA or the States.

60.     Within 5 days after the Effective Date, Respondent shall submit a written certification to the OSCs that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of its potential liability by the United States or the States, and that it has fully complied with any and all EPA or State requests for information regarding the Site pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927, or state law. If Respondent is unable to so certify, Respondent shall submit a modified certification that explains in detail why it is unable to certify in full with regard to all Records.

## XVI.   COMPLIANCE WITH OTHER LAWS

61.     Nothing in this Order limits Respondent's obligations to comply with the requirements of all applicable state and federal laws and regulations, except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-site actions required pursuant to this Order shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain

applicable or relevant and appropriate requirements (ARARs) under federal environmental or state environmental or facility siting laws.

62.     No local, state, or federal permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work), including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621. Where any portion of the Work that is not on-site requires a federal or state permit or approval, Respondent shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals. This Order is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XVII.  EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

63.     **Emergency Response**. If any event occurs during performance of the Work that causes or threatens to cause a release of any Waste Material on, at, or from the Site that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Respondent shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release. Respondent shall take these actions in accordance with all applicable provisions of this Order, including, but not limited to, the Health and Safety Plan. Respondent shall also immediately notify the OSCs or, in the event of his/her unavailability, the Regional Duty Officer for Region 5 (at 312/353-2318) and Region 3 (at 215/814-3255) of the incident or Site conditions. In the event that Respondent fails to take appropriate response action as required by this Paragraph, and EPA takes such action instead, EPA reserves the right to pursue cost recovery.

64.     **Release Reporting**. Upon the occurrence of any event during performance of the Work that Respondent is required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-To-Know Act (EPCRA), 42 U.S.C. § 11004, Respondent shall immediately orally notify an OSC, or, in the event of his/her unavailability, the Regional Duty Officer at Region 5 (at 312/353-2318) and Region 3 (at 215/814-3255) and the National Response Center at (800) 424-8802. This reporting requirement is in addition to, and not in lieu of, the reporting required by CERCLA §§ 103 and 111(g), or EPCRA § 304.

65.     For any event covered under this Section, Respondent shall submit a written report to EPA within 7 days after the onset of such event, setting forth the action or event that occurred and the measures taken, and to be taken, to mitigate any release or threat of release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release or threat of release.

## XVIII. PAYMENT OF RESPONSE COSTS

66.     Upon EPA's written demand, Respondent shall pay EPA all Response Costs incurred or to be incurred in connection with this Order. On a periodic basis, EPA Regions 3 and 5 will send Respondent bills requiring payment of all Response Costs incurred by the United

States with respect to this Order that includes an Itemized Cost Summary, which includes direct and indirect costs incurred by EPA, its contractors, and the Department of Justice.

**Respondent shall make all payments within 30 days after receipt of each written demand requiring payment.**

Fedwire EFT:          Federal Reserve Bank of New York
                      ABA: 021030004
                      Account: 68010727
                      SWIFT address: FRNYUS33
                      Field Tag 4200: D 68010727 Environmental Protection Agency

67.     At the time of payment, Respondent shall send notice that payment has been made to dollhopf.ralph@epa.gov, kelly.jack@epa.gov, garypie.catherine@epa.gov, and dixit.naeha@epa.gov, and to the EPA Cincinnati Finance Office by email at cinwd_acctsreceivable@epa.gov, or by mail to:

      EPA Cincinnati Finance Office
      26 W. Martin Luther King Drive
      Cincinnati, Ohio 45268

Such notice shall reference Site/Spill ID Number C5XR and EPA docket number for this action.

68.     In the event that the payments for Response Costs are not made within 30 days after Respondent's receipt of a written demand requiring payment, Respondent shall pay Interest on the unpaid balance. The Interest on Response Costs shall begin to accrue on the date of the written demand and shall continue to accrue until the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondent's failure to make timely payments under this Section. Respondent shall make all payments required by this Paragraph in the manner described in Paragraphs 66 and 67.

## XIX.   ENFORCEMENT/WORK TAKEOVER

69.     Any willful violation, or failure or refusal to comply with any provision of this Order may subject Respondent to civil penalties up to the maximum amount authorized by law. CERCLA § 106(b)(1), 42 U.S.C. § 9606(b)(1). As of the date of issuance of this Order, the statutory maximum amount is $67,544 per violation per day. This maximum amount may increase in the future, as EPA amends its civil penalty amounts through rulemaking pursuant to the 1990 Federal Civil Penalties Inflation Adjustment Act (Public Law 101-410, codified at 28 U.S.C. § 2461), as amended by the 2015 Federal Civil Penalties Inflation Adjustment Act Improvement Act (Section 701 of Public Law 114-74). The maximum amount to be applied to this violation will be set as the most recent maximum amount set forth in 40 C.F.R. section 19.4 as of the date that the U.S. District Court assesses any such penalty. In the event of such willful violation, or failure or refusal to comply, EPA may unilaterally carry out the actions required by this Order, pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604, and/or may seek judicial enforcement of this Order pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606. In addition, nothing in this

Order shall limit EPA's authority under Section XXIII (Financial Assurance). Respondent may also be subject to punitive damages in an amount up to three times the amount of any cost incurred by the United States as a result of such failure to comply, as provided in Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).

## XX.   RESERVATIONS OF RIGHTS BY EPA

70.    Nothing in this Order shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants, or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing in this Order shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Order, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law. EPA reserves the right to bring an action against Respondent under Section 107 of CERCLA, 42 U.S.C. § 9607, for recovery of any response costs incurred by the United States related to this Order or the Site and not paid by Respondent.

## XXI.   OTHER CLAIMS

71.    By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. The United States or EPA shall not be deemed a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Order.

72.    Nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

73.    Nothing in this Order shall be deemed to constitute preauthorization of a claim within the meaning of Section 111(a)(2) of CERCLA, 42 U.S.C. § 9611(a)(2), or 40 C.F.R. § 300.700(d).

74.    No action or decision by EPA pursuant to this Order shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXII.   INSURANCE

75.    No later than 5 days before commencing any on-site Work, Respondent shall secure, and shall maintain for the duration of this Order, commercial general liability with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming EPA as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Respondent pursuant to this Order. Within the same time period, Respondent shall

provide EPA with certificates of such insurance and a copy of each insurance policy. Respondent shall submit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of the Order, Respondent shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing Work on behalf of Respondent in furtherance of this Order. If Respondent demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Respondent need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor. Respondent shall ensure that all submittals to EPA under this Paragraph identify the East Palestine Train Derailment Site, East Palestine, Ohio and the EPA docket number for this action.

## XXIII. FINANCIAL ASSURANCE

76.      In order to ensure completion of the Work, Respondent shall secure financial assurance, within 30 days of receiving an initial estimated cost of work ("Estimated Cost of the Work") from EPA, in an amount equal to the Estimated Cost of the Work. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA or under the "Financial Assurance - Orders" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. Respondent may use multiple mechanisms if they are limited to trust funds, surety bonds guaranteeing payment, and/or letters of credit.

a.      A trust fund: (1) established to ensure that funds will be available as and when needed for performance of the Work; (2) administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency; and (3) governed by an agreement that requires the trustee to make payments from the fund only when the EPA Region 5 Superfund & Emergency Response Division Director advises the trustee in writing that: (i) payments are necessary to fulfill the Respondent's obligations under the Order; or (ii) funds held in trust are in excess of the funds that are necessary to complete the performance of Work in accordance with this Order;

b.      A surety bond, issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury, guaranteeing payment or performance in accordance with Paragraph 82 (Access to Financial Assurance);

c.      An irrevocable letter of credit, issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency, guaranteeing payment in accordance with Paragraph 82 (Access to Financial Assurance);

d.      A demonstration by a Respondent that it meets the relevant financial test criteria of Paragraph 79; or

e.      A guarantee to fund or perform the Work executed by a company (1) that is a direct or indirect parent company of a Respondent or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a Respondent; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of Paragraph 79.

77.      **Standby Trust**. If Respondent seeks to establish financial assurance by using a surety bond, a letter of credit, or a corporate guarantee, Respondent shall at the same time establish and thereafter maintain a standby trust fund, which must meet the requirements specified in Paragraph 76.a, and into which payments from the other financial assurance mechanism can be deposited if the financial assurance provider is directed to do so by EPA pursuant to Paragraph 82 (Access to Financial Assurance). An originally signed duplicate of the standby trust agreement must be submitted, with the other financial mechanism, to EPA in accordance with Paragraph 78. Until the standby trust fund is funded pursuant to Paragraph 82 (Access to Financial Assurance), neither payments into the standby trust fund nor annual valuations are required.

78.      Within 30 days after receiving the Estimated Cost of the Work from EPA, Respondent shall submit to EPA proposed financial assurance mechanisms in draft form in accordance with Paragraph 76 for EPA's review. Within 30 days after EPA's approval of the form and substance of Respondent's financial assurance, Respondent shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the EPA regional attorneys: garypie.catherine@epa.gov and dixit.naeha@epa.gov.

79.      If Respondent seeks to provide financial assurance by means of a demonstration or guarantee under Paragraph 76.d or 76.e, then Respondent must within 30 days:

a.      Demonstrate that:

(1)      the Respondent or guarantor has:

i.      Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

ii.      Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii.      Tangible net worth of at least $10 million; and

iv.      Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations

29

financially assured through the use of a financial test or guarantee; or

(2)    The Respondent or guarantor has:

    i.    A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

    ii.    Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

    iii.    Tangible net worth of at least $10 million; and

    iv.    Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

b.    Submit to EPA for the Respondent or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance – Orders" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

80.    If Respondent provides financial assurance by means of a demonstration or guarantee under Paragraph 76.d or 76.e, Respondent must also:

a.    Annually resubmit the documents described in Paragraph 79.b within 90 days after the close of the Respondent's or guarantor's fiscal year;

b.    Notify EPA within 30 days after the Respondent or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

c.    Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the Respondent or guarantor in addition to those specified in Paragraph 79.b; EPA may make such a request at any time based on a belief that the Respondent or guarantor may no longer meet the financial test requirements of this Section.

81.    Respondent shall diligently monitor the adequacy of the financial assurance. If Respondent becomes aware of any information indicating that the financial assurance provided

under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, Respondent shall notify EPA of such information within 30 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the Respondent of such determination. Respondent shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. Respondent shall follow the procedures of Paragraph 83 in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Respondent's inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this Order.

82. **Access to Financial Assurance**

a.      If EPA determines that Respondent (1) has ceased implementation of any portion of the Work, (2) is seriously or repeatedly deficient or late in its performance of the Work, or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Performance Failure Notice") to both Respondent and the financial assurance provider regarding the Respondent's failure to perform. Any Performance Failure Notice issued by EPA will specify the grounds upon which such notice was issued and will provide Respondent a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice. If, after expiration of the 10-day period specified in this Paragraph, Respondent has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Performance Failure Notice, then, in accordance with any applicable financial assurance mechanism, EPA may at any time thereafter direct the financial assurance provider to immediately: (i) deposit any funds assured pursuant to this Section into the standby trust fund; or (ii) arrange for performance of the Work in accordance with this Order.

b.      If EPA is notified by the provider of a financial assurance mechanism that it intends to cancel the mechanism, and the Respondent fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, EPA may, prior to cancellation, direct the financial assurance provider to deposit any funds guaranteed under such mechanism into the standby trust fund for use consistent with this Section.

83. **Modification of Amount, Form, or Terms of Financial Assurance**. Respondent may submit, on any anniversary of the Effective Date or following Respondent's request for, and EPA's approval of, another date, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to the EPA individual(s) referenced in Paragraph 78, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, a description of the proposed changes, if any, to the form or terms of the financial assurance, and any newly proposed financial assurance documentation in accordance with the requirements of Paragraphs 76 and 77 (Standby Trust). EPA will notify Respondent of its decision to approve or disapprove a requested reduction or change. Respondent may reduce the amount or change the form or terms of the financial assurance mechanism only in accordance with EPA's approval. Within 30 days after receipt of

EPA's approval of the requested modifications pursuant to this Paragraph, Respondent shall submit to the EPA individual(s) referenced in Paragraph 78 all executed and/or otherwise finalized documentation relating to the amended, reduced, or alternative financial assurance mechanism. Upon EPA's approval, the Estimated Cost of the Work shall be deemed to be the estimate of the cost of the remaining Work in the approved proposal.

84. **Release, Cancellation, or Discontinuation of Financial Assurance**. Respondent may release, cancel, or discontinue any financial assurance provided under this Section only: (a) after receipt of documentation issued by EPA certifying completion of the Work; or (b) in accordance with EPA's written approval of such release, cancellation, or discontinuation.

## XXIV. MODIFICATION

85. An OSC may make modifications to any plan or schedule in writing or by oral direction. Any oral modification will be memorialized in writing by EPA within 5 days, but shall have as its effective date the date of the OSC's oral direction. Any other requirements of this Order may be modified in writing by signature of the Division Directors (or their designees) of EPA Regions 3 and 5.

86. If Respondent seeks permission to deviate from any approved Work Plan or schedule, Respondent's Project Coordinator shall submit a written request to EPA for approval outlining the proposed modification and its basis. Respondent may not proceed with the requested deviation until receiving approval from the OSC pursuant to Paragraph 85.

87. No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondent shall relieve Respondent of its obligation to obtain any formal approval required by this Order, or to comply with all requirements of this Order, unless it is formally modified.

## XXV.  DELAY IN PERFORMANCE

88. Respondent shall notify EPA of any delay or anticipated delay in performing any requirement of this Order. Such notification shall be made by telephone and email to the OSC within 48 hours after Respondent first knew or should have known that a delay might occur. Respondent shall adopt all reasonable measures to avoid or minimize any such delay. Within 7 days after notifying EPA by telephone and email, Respondent shall provide to EPA written notification fully describing the nature of the delay, the anticipated duration of the delay, any justification for the delay, all actions taken or to be taken to prevent or minimize the delay or the effect of the delay, a schedule for implementation of any measures to be taken to mitigate the effect of the delay, and any reason why Respondent should not be held strictly accountable for failing to comply with any relevant requirements of this Order. Increased costs or expenses associated with implementation of the activities called for in this Order is not a justification for any delay in performance.

89. Any delay in performance of this Order that, in EPA's judgment, is not properly justified by Respondent under the terms of Paragraph 88 shall be considered a violation of this Order. Any delay in performance of this Order shall not affect Respondent's obligations to fully perform all obligations under the terms and conditions of this Order.

## XXVI. ADDITIONAL REMOVAL ACTIONS

90.      Unless otherwise stated by EPA, within 30 days of receipt of notice from EPA that additional removal actions are necessary to protect public health, welfare, or the environment, Respondent shall submit for approval by EPA a Work Plan for the additional removal actions. The Work Plan shall conform to the applicable requirements of Section XI (Work to Be Performed) of this Order. Upon EPA's approval of the Work Plan pursuant to Section XI, Respondent shall implement the Work Plan for additional removal actions in accordance with the provisions and schedule contained therein. This Section does not alter or diminish the OSC's authority to make oral modifications to any plan or schedule pursuant to Section XXIV (Modification).

## XXVII.          NOTICE OF COMPLETION OF WORK

91.      When EPA determines, after EPA's review of the final report, that all Work has been fully performed in accordance with this Order, with the exception of any continuing obligations required by this Order, including, but not limited to, post-removal site controls, land, water, or other resource use restrictions, reimbursement of Response Costs, and Record Retention, EPA will provide written notice to Respondent. If EPA determines that any Work has not been completed in accordance with this Order, EPA will notify Respondent, provide a list of the deficiencies, and require that Respondent modify the Work Plan, if appropriate, in order to correct such deficiencies within 30 days after receipt of the EPA notice. The modified Work Plan shall include a schedule for correcting such deficiencies. Within 10 days after receipt of written approval of the modified Work Plan, Respondent shall implement the modified and approved Work Plan and shall submit a modified Final Report in accordance with the EPA notice. Failure by Respondent to implement the approved modified Work Plan shall be a violation of this Order.

## XXVIII.          ADMINISTRATIVE RECORD

92.      EPA will establish an administrative record which contains the documents that form the basis for the issuance of this Order. No later than 60 days of the Effective Date of this Order, and it shall be made available for review on EPA's website (www.epa.gov) and by appointment on weekdays between the hours of 9 am and 5 pm at the EPA offices located at 77 West Jackson Blvd., Chicago, Illinois. To review the administrative record, please contact Todd Quesada, U.S. EPA Region 5 Superfund and Emergency Management Division Records Officer at 312-886-4465 to make an appointment.

## XXIX. SEVERABILITY

93.      If a court issues an order that invalidates any provision of this Order or finds that Respondent has sufficient cause not to comply with one or more provisions of this Order, Respondent shall remain bound to comply with all provisions of this Order not invalidated or determined to be subject to a sufficient cause defense by the court's order.

It is so ORDERED.


BY: DOUGLAS BALLOTTI
_____
Digitally signed by
DOUGLAS BALLOTTI
Date: 2023.02.21
09:11:01 -06'00'

*[digitally signed and dated]*
Douglas Ballotti
Superfund & Emergency Response Division, Region 5
U.S. Environmental Protection Agency




BY: PAUL LEONARD
_____
Digitally signed by PAUL
LEONARD
Date: 2023.02.21
11:11:15 -05'00'

*[digitally signed and dated]*
Paul Leonard
Superfund & Emergency Response Division, Region 3
U.S. Environmental Protection Agency

# Exhibit
# E

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

## EASTERN DIVISION, YOUNGSTOWN

| | | |
|---|---|---|
| **Patricia Almasy, Nina Aquino, Raeann Bankston, Holly Carroll, Alice M. Craft, Todd Craft, Kristine Croston, Robert Delposen, Glenn Dixon, John Dryfuse, Brad Edwards, Olivia Foster, Oscar Gaunt, Karen Gilmore, Sarah Ann Graham, Debra Lee Gray, Dylan Hall, Randy Hogue, Elijah D. Holloway, Tammie Howarth, Laryssa Jackson, Nicole Jamison, James Jones, Patricia L. Kasserman, Timothy Lambright, Matt Liberty, Christopher Lucas, Linda McLaughlin, Nathan Minerd, Albert L. Nahar II, Diana Nizer, Sheena Nolan, Patrick Palmer, Rocco Anthony Pietz, Ronald Prokop, Mark Richard, Ronald Roach, Donald Simmons, Penny Singleton, and Charles W. Will** | : | **CASE NO.** |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | |
| **Norfolk Southern Corporation, Norfolk Southern Railway Company, Oxy Vinyls, LP, GATX Corporation, General American Marks Company, Trinity Industries Leasing Company** | : | |
| | : | |
| | : | |
| **Defendants** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Patricia Almasy, Nina Aquino, Raeann Bankston, Holly Carroll, Alice M. Craft, Todd Craft, Kristine Croston, Robert Delposen, Glenn Dixon, John Dryfuse, Brad Edwards, Olivia Foster, Oscar Gaunt, Karen Gilmore, Sarah Ann Graham, Debra Lee Gray, Dylan Hall, Randy Hogue, Elijah D. Holloway, Tammie Howarth, Laryssa Jackson, Nicole Jamison, James Jones, Patricia L. Kasserman, Timothy Lambright, Matt Liberty, Christopher Lucas, Linda McLaughlin, Nathan Minerd, Albert L. Nahar II, Diana Nizer, Sheena Nolan, Patrick Palmer, Rocco Anthony Pietz, Ronald Prokop, Mark Richard, Ronald Roach, Donald Simmons, Penny Singleton, and Charles W. Will (collectively "Plaintiffs"), sue Defendants Norfolk Southern Corporation ("NSC"), Norfolk Southern Railway Company ("NSRC"), (collectively "Railroad Defendants"); Oxy Vinyls LP, GATX Corporation, General American Marks Company, and Trinity Industries Leasing Company (collectively, "Railcar Defendants"), and based on personal knowledge, investigation of counsel and review of public documents and information, allege as follows:

## INTRODUCTION

This Complaint seeks redress for residents, property owners, and employees, working and/or located in and around the February 3, 2023 Norfolk Southern Freight Train 32N derailment and subsequent "controlled" release in East Palestine, Ohio (the "Derailment Site")[1], that resulted in contamination of, and exposure to, massive amounts of vinyl chloride, dioxins, and other toxic chemicals—including butyl acrylate, benzene, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, volatile and semi-volatile byproduct compounds and other combustible materials. As a result of this derailment and NSC and NSRC's actions afterwards to conduct a "controlled" release and burn, Plaintiffs have all suffered, among other things, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, and economic damages as alleged more specifically below.[2]

---

[1]The Derailment Site is in East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W.

[2]These events are herein referred to as the train derailment and resulting toxic chemical explosion.

## THE PARTIES

### *Plaintiffs*

1.      At all relevant times, Plaintiff Patricia Almasy was an adult citizen of Ohio and the resident-owner of the real property located at 1719 McColusky Road, Columbiana, Ohio 44408.

2.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Almasy has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

3.      At all relevant times, Plaintiff Nina Aquino was an adult citizen of Pennsylvania residing at 839 Mercer Road, Beaver Falls, Pennsylvania 15010.

4.      Further, at all relevant times, Ms. Aquino's principal place of employment was located at 6800 Big Beaver Boulevard, Suite H, Beaver Falls, Pennsylvania 15010, which is located within ten (10) miles of the Derailment Site.

5.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Aquino has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

6.      At all relevant times, Plaintiff Raeann Bankston was an adult citizen of Ohio residing at 100 Covington Drive, East Palestine, Ohio, 44413.

7.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Bankston has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her

property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

8.      At all relevant times, Plaintiff Holly Carroll was an adult citizen of Ohio residing at 51615 Darlington Road, #1, Negley, Ohio 44441.

9.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Carroll has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

10.     At all relevant times, Plaintiff Alice M. Craft was an adult citizen of Ohio and the owner-occupier of the real property located at 3191 North Pleasant Drive, East Palestine, Ohio 44413.

11.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Craft has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

12.     At all relevant times, Plaintiff Todd Craft was an adult citizen of Ohio residing at 1487 Lake Road, Conneaut, Ohio 44030.

13.     Further, at all relevant times, Mr. Craft's principal place of employment was located at 2535 Middletown Road East, Poland, Ohio 44514, which is located within ten (10) miles of the Derailment Site.

14.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Craft has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and

4

place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

15.    At all relevant times, Plaintiff Kristine Croston was an adult citizen of Pennsylvania and the resident-owner of the real property located at 3612 Orchard Street, Beaver Falls, Pennsylvania 15010.

16.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Croston has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

17.    At all relevant times, Plaintiff Robert Delposen was an adult citizen of  Pennsylvania residing at 2715 Darlington Road, Beaver Falls, Pennsylvania 15010.

18.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Delposen has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

19.    At all relevant times, Plaintiff Glenn Dixon was an adult citizen of Ohio residing at 524 East Clark Street, East Palestine, Ohio 44413.

20.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Dixon has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

21.    At all relevant times, Plaintiff John Dryfuse was an adult citizen of Ohio residing at 674

½ East Main Street, East Palestine, Ohio 44413.

22.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Dryfuse has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

23.     At all relevant times, Plaintiff Brad Edwards was an adult citizen of Pennsylvania residing at 239 Kay Street, Wampum, Pennsylvania 16157.

24.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Edwards has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

25.     At all relevant times, Plaintiff Olivia Foster was an adult citizen of Ohio residing at 46390 Mills Street, Rogers, Ohio 44455.

26.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Foster has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

27.     At all relevant times, Plaintiff Oscar Gaunt was an adult citizen of Pennsylvania residing at 267 Oakville Road, Beaver Falls, Pennsylvania 15010.

28.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Gaunt

6

has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

29.     At all relevant times, Plaintiff Karen Gilmore was an adult citizen of West Virginia residing at 3769 Blairs Ridge Road, Moundsville, West Virginia 26041.

30.     Since the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Gilmore's principal place of employment has been in East Palestine, Ohio where she works traffic control every weekend.

31.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Gilmore has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

32.     At all relevant times, Plaintiff Sarah Ann Graham was an adult citizen of Ohio residing at 3383 Pinewood Drive, 106, New Waterford, Ohio 44445.

33.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Graham has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

34.     At all relevant times, Plaintiff Debra Lee Gray was an adult citizen of Ohio residing at 9227 Ottawa Trail, Negley, Ohio 44441.

35.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Gray

has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

36.     At all relevant times, Plaintiff Dylan Hall was an adult citizen of Ohio residing at 11140 Youngstown Pittsburg Road, #24, New Middletown, Ohio 44442.

37.     Further, at all relevant times, Mr. Hall's principal place of employment was located at 2875 East State Street, Salem, Ohio 44460, which is located within fifteen (15) miles of the Derailment Site.

38.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Hall has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

39.     At all relevant times, Plaintiff Randy Hogue was an adult citizen of Pennsylvania residing at 1024 Old State Road, Newcastle, Pennsylvania 16101.

40.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Hogue has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

41.     At all relevant times, Plaintiff Elijah D. Holloway was an adult citizen of Pennsylvania residing at 114 St. Tropez Circle, Beaver Falls, Pennsylvania 15010.

42.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr.

Holloway has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

43.     At all relevant times, Plaintiff Tammie Howarth was an adult citizen of Pennsylvania and the resident-owner of the real property located at 319 State Route 168, New Galilee, Pennsylvania 16141.

44.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Howarth has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

45.     At all relevant times, Plaintiff Laryssa Jackson was an adult citizen of Ohio residing at 1203 Bacon Avenue, East Palestine, Ohio 44413

46.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Jackson has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

47.     At all relevant times, Plaintiff Nicole Jamison was an adult citizen of Pennsylvania residing at 116 Colonial Oaks, Beaver Falls, Pennsylvania 15010.

48.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Jamison has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts

dispersed by Defendants into the air, soil and water.

49.    At all relevant times, Plaintiff James Jones was an adult citizen of Pennsylvania residing at 102 Locus Stret, New Galilee, Pennsylvania 16141.

50.    Further, at all relevant times, Mr. Jones' principal place of employment was located at 900 Washington Avenue, New Galilee, Pennsylvania 16141, which is located within ten (10) miles of the Derailment Site.

51.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Jones has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

52.    At all relevant times, Plaintiff Patricia L. Kasserman was an adult citizen of Ohio residing at 368 East North Avenue, East Palestine, Ohio 44413.

53.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Kasserman has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

54.    At all relevant times, Plaintiff Timothy Lambright was an adult citizen of Ohio and the resident-owner of the real property located at 222 South Market Street, East Palestine, Ohio 44413.

55.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Lambright has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts

dispersed by Defendants into the air, soil and water.

56. At all relevant times, Plaintiff Matt Liberty was an adult citizen of Pennsylvania and the resident-owner of the real property located at 220 Little Beaver Road, Enon Valley, Pennsylvania 16120, where he owns/operates a garlic farm approximately 5-6 acres.

57. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Liberty has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

58. At all relevant times, Plaintiff Christopher Lucas was an adult citizen of Ohio residing at 10710 Main Street, New Middleton, Ohio 44442.

59. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Lucas has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

60. At all relevant times, Plaintiff Linda McLaughlin was an adult citizen of Ohio and the resident-owner of the real property located at 368 East Taggart Street, East Palestine, Ohio 44413.

61. Further, Ms. McLaughlin owns a rental property located at 13 Carla Drive, Darlington, Ohio 16115, which is located within 1,000 ft. of the Derailment Site.

62. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. McLaughlin has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals

11

and their byproducts dispersed by Defendants into the air, soil and water.

63. At all relevant times, Plaintiff Nathan Minerd was an adult citizen of Ohio residing at 515 Parkcliffe, Youngstown, Ohio 44511.

64. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Minerd has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

65. At all relevant times, Plaintiff Albert L. Nahar II was an adult citizen of Pennsylvania residing at 560 Cannelton Road, Darlington, Pennsylvania 16115.

66. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Nahar has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

67. At all relevant times, Plaintiff Diana Nizer was an adult citizen of Ohio and the resident-owner of the real property located at 49687 Calcutta Smithferry Road, East Liverpool, Ohio 43920.

68. Further, at all relevant times, Ms. Nizer's principal place of employment was located at 100-298 10th Street, Midland, Pennsylvania 15059, which is located within fifteen (15) miles of the Derailment Site.

69. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Nizer has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their

byproducts dispersed by Defendants into the air, soil and water.

70.     At all relevant times, Plaintiff Sheena Nolan was an adult citizen of Pennsylvania residing at 133 Chestnut Ridge Drive, Beaver Falls, Pennsylvania 15010.

71.     Further, at all relevant times, Ms. Nolan's principal place of employment was located at 1612 7th Avenue, Beaver Falls, Pennsylvania 15010, which is located within fifteen (15) miles of the Derailment Site.

72.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Nolan has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

73.     At all relevant times, Plaintiff Patrick Palmer was an adult citizen of Pennsylvania and the resident-owner of the real property located at 599 Lisbon Road, Darlington, Pennsylvania 16115, where he raises cattle.

74.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Palmer has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

75.     At all relevant times, Plaintiff Rocco Anthony Pietz was an adult citizen of Pennsylvania residing at 44 North Walnut Street, Ambridge, Pennsylvania 15003.

76.     Further, at all relevant times, Mr. Pietz's principal place of employment was located at 120 Brighton Street, Beaver Falls, Pennsylvania 15010, which is located within fifteen (15) miles of the Derailment Site.

77.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in

13

connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Pietz has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

78.     At all relevant times, Plaintiff Ronald Prokop was an adult citizen of Ohio and the resident-owner of the real property located at 11257 Market Street, North Lima, Ohio 44452, where he operates an auto detailing business out of his garage.

79.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Prokop has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

80.     At all relevant times, Plaintiff Mark Richard was an adult citizen of Ohio residing at 3419 North Pleasant Drive, East Palestine, Ohio 44413.

81.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Richard has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

82.     At all relevant times, Plaintiff Ronald Roach was an adult citizen of Ohio and the resident-owner of the real property located at 16115 State Road 170, East Liverpool, Ohio 43920.

83.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Roach has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and

organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

84.     At all relevant times, Plaintiff Donald Simmons was an adult citizen of Pennsylvania residing at 41 Hemlock Drive, Beaver Falls, Pennsylvania 15010.

85.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Simmons has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

86.     At all relevant times, Plaintiff Penny Singleton was an adult citizen of Pennsylvania and the resident-owner of the real property located at 625 McKinley Road, Darlington, Pennsylvania 16115.

87.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Singleton has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

88.     At all relevant times, Plaintiff Charles W. Will was an adult citizen of Ohio and the owner-occupier of the real property located at 6084 Millrock Road, New Waterford, Ohio 44445.

89.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Will has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

### *The Railroad Defendants*

90.     Defendant NSC is a publicly traded corporation that is organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 650 West Peachtree Street, NW, Atlanta, Georgia 30308.

91.     Defendant NSC plays a controlling role in decisions regarding the operations of NSRC, which operates a freight railroad over 35,000 miles of track in 22 states, transporting all manner of materials and goods, including coal, intermodal containers, agricultural products, chemicals, metals, and automotive products.

92.     Defendant NSRC is a wholly owned subsidiary of NSC.  NSRC is a Class I railroad corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 650 West Peachtree Street, NW, Atlanta, Georgia 30308.

93.     Defendant NSRC is a common carrier that accepts hazardous substances for transport.

94.     Defendants NSC and NSRC operated Norfolk Southern Train 32N and its railcars in their Keystone Division in Pennsylvania, at all relevant times.

95.     Defendants NSC and NSRC owned the locomotive and certain of the railcars on Norfolk Southern Train 32N at all relevant times.

96.     At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

### *The Railcar Defendants*

97.     Defendant General American Marks Company is a Delaware corporation with its principal place of business in Chicago, Illinois.  General American Marks Company is a wholly owned subsidiary of Defendant GATX Corporation.

98.     Upon information and belief, Defendant General American Marks Company owns and maintains a fleet of railcars for use in transportation of goods and products.

99.     At all relevant times, Defendant General American Marks Company was the owner of one of the railcars (GPLX 75465, "Car 23") in the consist of Train 32N that derailed on February 3, 2023.

16

100.     Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed.

101.     At all relevant times, Defendant General American Marks Company acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

102.     Defendant Oxy Vinyls, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

103.     The only General Partner of Oxy Vinyls is Occidental PVC, LLC, and the only Limited Partner of Oxy Vinyls is Occidental Chemical Corporation.  Occidental Chemical Corporation is a New York corporation with its principal place of business in Dallas, Texas.  The sole member of Occidental PVC, LLC is Occidental Chemical Corporation.

104.     Defendant Oxy Vinyls is a leading North American manufacturer of vinyl resins, chlorine and caustic soda, key building blocks for a number of plastic products.

105.     Upon information and belief, Defendant Oxy Vinyls owns and maintains a fleet of railcars for use in transportation of its goods and products, including vinyl chloride.

106.     At all relevant times Defendant Oxy Vinyls was the owner and shipper of three of the five railcars (OCPX 80235 ("Car 27"), OCPX 80179 ("Car 28"), and OCPX 80370 ("Car 53")) carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

107.     At all relevant times, Defendant Oxy Vinyls was also the shipper of two of the other railcars carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023: TILX 402025, "Car 26" owned by Defendant Trinity Industries Leasing Company; and GATX 95098, "Car 29," owned by Defendant GATX Corporation.

108.     At all relevant times, Defendant Oxy Vinyls acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

109.     Defendant GATX Corporation ("GATX") is a publicly traded corporation organized and existing under the laws of the State of New York with its principal place of business in Chicago, Illinois. Defendant GATX is a leading global railcar lessor, owning fleets in North America, Europe and India.

17

110. At all relevant times, Defendant GATX was the owner of one of the five railcars (GATX 95098, "Car 29") carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

111. At all relevant times, Defendant GATX acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

112. Defendant Trinity Industries Leasing Company ("TILC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Dallas, Texas.

113. Upon information and belief, Defendant TILC, a wholly owned subsidiary of Trinity Industries, Inc., owns a fleet of railcars, as well as originates and manages railcar leases for third party shippers.

114. At all relevant times, Defendant TILC was the owner of one of the five railcars (TILX 402025, "Car 26") carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

115. At all relevant times, Defendant TILC acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

116. Upon information and belief, all Railcar Defendants were aware that transportation of the railcars from the Midwest to the East Coast would involve passing through Ohio.

## JURISDICTION AND VENUE

117. This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because this lawsuit is between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

118. This Court has personal jurisdiction over Defendants because they regularly engage in business within the state of Ohio, were engaged in business within the state of Ohio prior to and at the time of the derailment, and because the claims asserted herein arise from the business activities and tortious conduct of Defendants within the state of Ohio prior to and at the time of the derailment.

119. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of Ohio, and Plaintiffs were injured because of tortious activity in this District.

## FACTUAL ALLEGATIONS

### *The Relationship Between NSC and NSRC*

120.    Both NSC and NSRC operate out of the same corporate headquarters, and the President, Vice President, Chief Financial Officer, and Treasurer for NSRC hold the same or very similar positions in NSC.

121.    NSC and NSRC are jointly and severally liable for conduct alleged herein because they acted in concert and under alter ego and piercing the corporate veil theories, including based on the domination and /or control by NSC and the interlocking and overlapping officers and directors.

122.    The United States Surface Transportation Board requires railroad companies operating within the United States to submit an annual report ("Annual Report").

123.    NSC's 2021 Annual Report states that all of NSC's subsidiaries were under the common control of NSC, and that rail operations are coordinated at the holding company level by NSC's Chief Operating Officer.

124.    The 2021 Annual Report identifies NSRC as the principal subsidiary of NSC.

125.    Clairborne L. Moore, the Vice President and Controller for NSC, signed the 2021 Annual Report.

126.    In affidavits filed in federal ligation[3], Jason Zampi, a Vice President and Controller for NSC, stated that the annual reports submitted to the Surface Transportation Board are prepared by personnel of NSC with knowledge of and a business duty to prepare the information contained in the annual reports.

127.    In affidavits filed in that same federal litigation, Roger Petersen, NSC's General Counsel for Litigation, stated that NSC "directs, controls, oversees, and handles litigation involving it and its wholly owned subsidiaries, including [NSRC]."

128.    Approximately eighty percent (80%) of the compensation for NSC's executives are based on performance metrics.

_____

[3]*See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

129.     These metrics focus on performance measures such as operating ratio and operating income for NSC subsidiaries, including NSRC. Operating ratio looks at operating expenses as a percentage of revenue. Operating income looks at operating revenue fewer operating expenses.

130.     These financial metrics were selected to motivate and reward NSC's executives for increasing revenue, improving operating efficiency, and reducing expenses of its railroad subsidiaries.

131.     NSC's executives achieve these metrics by controlling subsidiaries' operations, which includes the operations of NSRC.

132.     Over the past four years, NSC's Annual Reports show a stark contrast between the increases in operating income and the drop in railroad operating costs.

133.     The drop in operating costs includes reductions in NSC and/or NSRC spending to repair, service, and maintain locomotives and freight cars, perform train inspections, and pay engine crews and train crews.

134.     In 2019, Mike Wheeler, then the Executive Vice President and Chief Operating Officer for NSC, issued Operating Rules governing the operations of all of NSC's railroad subsidiaries, including NSRC.

135.     Upon information and belief, these same or similar Operating Rules were in place at the time of the train derailment and subsequent explosion.

136.     These Operating Rules cover almost every aspect of NSRC's operations, including train inspections, use of defective equipment detectors, train movement, braking, and positive train control.

137.     NSC has also issued Railroad Special Hazmat Instructions that govern the transportation and handling of hazardous materials by NSRC employees.

138.     NSC requires each NSRC employee who inspects or transports hazardous materials by rail to have a copy of and comply with the Railroad Special Hazmat Instructions.

139.     Upon information and belief, NSC's Railroad Special Hazmat Instructions were in place at the time of the train derailment and subsequent explosion.

140.     Further, NSC trains each NSRC employee who transports hazardous materials.

*NSC and NSRC's Prolific History of Train Derailments*

20

141.    Between 1990 and 2022, there were a total of 55,755 train derailments throughout the United States, for an average of 1,742 train derailments a year.[4]

142.    According to the Federal Railroad Administration ("FRA"), NSC and NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 69 accidents total—22 in 2019, 18 in 2020, 15 in 2021 and 14 in 2022.

143.    According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 76 total accidents from 2019 to 2022—23 in 2019, 14 in 2020, 23 in 2021, and 16 in 2022.

144.    According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in West Virginia. This includes 13 total accidents from 2019 to 2022—4 in 2019, 6 in 2020, 2 in 2021, and 1 in 2022.

145.    According to data from the FRA, there were a total of 103 derailments in January 2023, and 11 were NSC and NRSC derailments.  Although the FRA only has publicly available data through January 2023, additional NSC and NRSC derailments have occurred this year: February 16 in Van Buren Township, Michigan; February 16 in Mingo County, West Virginia; February 25 in Lexington, North Carolina; March 4 in Springfield, Ohio; March 9 in Iron City, Alabama; Aril 8 in Pittsburgh, Pennsylvania; and April 9 in Jasper, Alabama.

146.    NSC and NSRC's record of train derailments and accidents, especially in recent years, is caused, in part, by its adoption of operating procedures referred to as "Precision Scheduled Railroading" ("PSR").

147.    More specifically, in 2019, NSC and NSRC launched an "ambitious three-year strategic plan," which relied heavily on PSR to achieve "goals that include creating longer trains, continuing productivity initiatives and finding growth opportunities."[5]

148.    In plain speak, PSR was NSC's and NSRC's plan to cut jobs, cut costs, cut safety and

---

[4]*See* Federal Railroad Safety Administration. Office of Safety Analysis, Table 3.16 data, available at 3.16 - Summary of Train Accidents With Reportable Damage, Casualties, and Major Causes (dot.gov).
[5]*See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

increase risks – all so they could increase their profits.

149.    PSR eliminates necessary inspections, maintenance, repairs and safety devices so that trains stay in depots for shorter amounts of time.  The elimination of these tasks also allowed NSC and NSRC to eliminate a number of jobs for inspectors, maintenance workers and repair workers.

150.    PSR is a widely criticized practice in the railroad industry because it eliminates jobs while increasing the overall size and weight of trains leading to increased safety risks.

151.    Increasing the overall size and weight of trains makes trains more difficult to control, renders safety devices less effective, and increases the risks of train wrecks.

152.    PSR also deprioritizes rail and railcar inspections, maintenance, repairs, and safety devices in favor of increasing the speed and efficiency with which loads are transported.

153.    For example, NSC and NSRC were aware that there are different, safer braking mechanisms available for their trains, including Electronically Controlled Pneumatic (ECP) brakes, which have the potential to reduce train stopping distances by up to sixty percent. However, under its PSR program, NSC and NSRC prioritized profits over safety by utilizing outdated airbrakes instead of ECP brakes in its trains.

154.    NSC and NSRC's decision to adopt PSR also led to the FRA determining that between January 2022 and May 2022, both companies suffered from significant safety violations including undercounting, inadequately observing rules failures, and failing to verify the performance of operational tests.[6] FRA noted that "NS did not take immediate actions to remediate defective conditions" and that "these conditions have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service". Additionally, FRA identified a number of rail component defects, and warned Norfolk Southern that "when critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential."

155.    NSC and NSRC's decision to adopt PSR likewise contributed to both companies cutting

---

[6]U.S. Dept. of Transportation, FRA Audit Report of Norfolk Southern Railway Company, FRA Audit Number:   2022-NS   Special   Audit-01-1,   at   7,   9-10,   available   at https://railroads.dot.gov/sites/fra.dot.gov/files/202211/Final%20Norfolk%20Southern%20Audit%20Report%202022%20%28003%29.pdf  (July  8, 2022) (last visited April 13, 2023).

the use of signalmen to install, repair, and maintain signal systems, which railroads use to direct trains from one location to the next safely and on time.

156.    These same signalmen are responsible for inspecting, maintaining, and repairing wayside detectors like "hot box" detectors, which alert operators to equipment failures while the train is in operation.

157.    Under their PSR program, NSC and NSRC have no such signalmen employed in or around the area of East Palestine, Ohio.

158.    Furthermore, the wayside detectors are not monitored locally, but by NSC and NSRC's train dispatcher located in Atlanta, Georgia.

### Responsibilities of the Railcar Defendants

159.    In addition to railroads like Norfolk Southern, the responsibility for safe transport of cargo, including hazardous materials, via rail belongs to the owners and lessees of the railcars and the manufacturers and shippers of the materials being transported.

160.    For example, tank car manufacturers, owners and lessees are obligated to ensure tank cars are compliant with federal laws and regulations and capable of safely moving hazardous materials pursuant to 49 C.F.R. part 180.

161.    Under 49 C.F.R. part 173, shippers, in turn, are responsible for the safe loading, packaging and inspection of hazardous goods, including certifying that hazardous materials are properly classified, appropriately loaded into tank cars and shipped with proper labeling and safety materials to enable first responders to address any accidental release.

162.    Shippers are likewise charged with ensuring that the railcars and equipment they use to transport their materials, including hazardous materials, are compatible with both the certificate of approval issued for the railcar and the nature of the lading.

163.    While railroads like Norfolk Southern are ultimately responsible for ensuring the safe transport of all rail cars, including any hazardous materials in the railcars they accept for transport along their systems, owners, lessees and shippers are also responsible for any defects they cause, or fail to remedy, or otherwise fail to comply with the freight car safety regulations. *See* 49 CFR 215.7.

164.    With respect to the derailment of Train 32N, General American Marks Company, was at all relevant times the owner of railcar GPLX75465 ("Car 23").

165.    Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed.

166.    With respect to the derailment of Train 32N, Oxy Vinyls LP was at all relevant times the owner of railcars OCPX80235 ("Car 27"), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53").

167.    With respect to the derailment of Train 32N, GATX Corporation was at all relevant times the owner of railcar GATX95098 ("Car 29").

168.    With respect to the derailment of Train 32N, Trinity Industries Leasing Company, was at all relevant times the owner of railcar TILX402025 ("Car 26").

169.    Shipping from its La Porte, Texas, facility, Oxy Vinyls at all relevant times was also the shipper of Cars 26, 27, 28, 29 and 53 in the consist of Train 32N.

170.    These Cars (26, 27, 28, 29 & 53) were each DOT-105J300W specification tank cars and each contained vinyl chloride monomer, which was released during the February 3, 2023 derailment, including the subsequent controlled release on February 6, 2023.

### *Car 23*

171.    Car 23 is a hopper car owned by General American Marks Company that was carrying polyethylene pellets when it was accepted for shipment by Norfolk Southern at the Terminal Railroad Association ("TRAA") of St. Louis yard on or about February 1, 2023.

172.    The manual for the failed wheel bearing in use on Car 23 states "cars, coaches and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces."

173.    For these reasons, responsible railcar owners prevent railcars from sitting stationary for long periods because grease separation can occur leading to a reduction in the amount of lubrication around the bearings that negatively impacts functionality.

174.    Additionally, when a railcar sits for extended periods of time in the elements, water and other environmental factors begin to degrade the structure and lubrication of the bearing leading to

24

defects.

175.    Upon information and belief, Car 23 was twice stationary for longer than six months in the lead up to the derailment of Train 32N; first a period of 565 days ending in August 2018 and second a period of 206 days ending in May 2019.

176.    Upon information and belief, despite sitting stationary for over two of the roughly five years leading up to the derailment of Train 32N, General American Marks Company nor GATX ever conducted a full inspection of the railcar's wheelset, including the wheel bearing, which would have revealed the critical defect that led to the events sets forth in this Amended Complaint.

177.    General American Marks Company and/or GATX's conduct in allowing Car 23 to remain stationary caused the wheel bearings to deteriorate and become ineffective, which in combination with the acts and omissions of the Railroad Defendants as set forth herein, proximately caused or contributed to the derailment and subsequent release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

### *Vinyl Chloride Cars 26, 27, 28, 29 and 53*

178.    As referenced above, railcar owners and shippers are responsible for a variety of compliance and maintenance measures for tank cars that carry hazardous materials.

179.    Among these responsibilities are those set out in 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517, which obligate railcar owners to have appropriate certifications and qualifications for their tank cars, as well as impose certain maintenance requirements on the railcars and their component parts.

180.    However, upon information and belief, following the derailment of Train 32N, the FRA discovered that there were multiple discrepancies between the approval, certification and qualification of Cars 26, 27, 28, 29 and 53 and the Cars' actual, physical characteristics, including:

      a.    Car 26 had actual, physical characteristics that made it incompatible with its AAR 4-2 Certificate of Approval;

      b.    Car 29 had an incompatible pressure relief device ("PRD") replaced and never received the special regulatory approval needed to ship vinyl chloride; and

      c.    Cars 27, 28 and 53 each had required information missing from their Certificates of

Approval, and Car 27 had modifications that were neither documented nor approved.

181.    In short, none of the Cars carrying vinyl chloride in the consist of Train 32N were properly constructed, approved and/or certified for transport at the time of the derailment on February 3, 2023.

182.    Additionally, several of the Cars carrying vinyl chloride in the consist of Train 32N were constructed with, or had features containing, aluminum.  The use of aluminum in railcars transporting vinyl chloride can be problematic because aluminum components can melt or otherwise be damaged in the event of a fire, as appears to have happened here.  In addition, there is a potential for an adverse chemical reaction if the vinyl chloride is exposed to aluminum in the course of transit.

183.    More specifically, the following Cars were constructed with, or had features containing, aluminum in the consist of Train 32N:

    a.    Car 26 had aluminum-coated springs in its PRD device;

    b.    Cars 27, 28 and 29 had aluminum protective housing, as well as aluminum handwheels; and

    c.    Car 53 included angle valve handwheels constructed from aluminum.

184.    In short, Cars 26, 27, 28, 29, and 53, each carrying vinyl chloride in the consist of Train 32N, were constructed of materials that were inappropriate for, or inconsistent with, the shipment of vinyl chloride at the time of the derailment on February 3, 2023.

185.    Oxy Vinyls, GATX, and TILC's conduct in shipping vinyl chloride, or allowing vinyl chloride to be shipped, using unapproved, uncertified and/or incompatible railcars as required by federal regulations and industry standards, which in combination with the acts and omissions of the Railroad Defendants as set forth herein, proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

### *The February 3, 2023 Derailment*

186.    On Friday February 3, 2023, NSC and NSRC Train 32N, consisting of 149 cars, was carrying abnormally dangerous and ultrahazardous chemicals including, but not limited to, vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate and isobutylene while traveling a downhill route eastbound from Illinois to Pennsylvania on main track 1 of the

NSC/NSRC Fort Wayne line of the Keystone Division.

187.    According to a VICE article entitled *'32 Nasty': Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, "two workers … said 32N in particular was a known safety risk."[7]

188.    These two workers told *VICE* that "multiple red flags, including two mechanical problems, about 32N went undetected or were ignored in the hours leading up to the crash."[8]

189.    According to the article, 32N has a nickname among some rail workers "for a reason."[9] They call this one "**32 Nasty**."[10]

190.    At approximately 9:00 p.m., in the area of East Palestine, Ohio, approximately 38 of the train cars derailed and an additional twenty railcars were damaged, several of which were carrying dangerous and hazardous industrial materials.  The derailment occurred in the State of Ohio, approximately one mile from the Ohio-Pennsylvania border.

191.    The train was already ablaze when at 8:13 p.m., it passed through Salem, Ohio, which is located 20 miles west of the eventual site of the fiery derailment in East Palestine.

192.    Indeed, surveillance video from cameras located along the rails in Salem, Ohio, showed what appears to be a wheel bearing in the final stage of overheating approximately 45 minutes before the derailment.



---

[7]Vice, *'32 Nasty:' Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, available at https://www.vice.com/en/article/88qze4/32-nasty-rail-workers-say-they- knew-the-train-that-derailed-in-east- palestine-was-dangerous (Feb. 15, 2023) (last visited April 13, 2023).
[8]*Id*.
[9]*Id*.
[10]*Id*.

Still frame from surveillance video taken in Salem, Ohio - 20 miles away from the train derailment site.

193.    On the Fort Wayne Line, NSC and NSRC had equipped their rail network with  hotbox detectors to assess the temperature conditions of railcar wheel bearings while en route.

194.    The hotbox detectors are used to detect overheated axels and/or wheel bearings on railcars and provide real-time warnings to train crew members.

195.    NSC and NSRC sets its own standards, policies, and procedures for the placement of hotbox detectors, as well as the alarm thresholds for above ambient temperature readings.

196.    NSC/NSRC Train 32N passed three hotbox detectors before the derailment.

197.    At milepost 79.9, Train 32N passed over a NSC/NSRC hotbox detector and the suspect wheel bearing from railcar no. 23 had a recorded temperature of 38° F above ambient.

198.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 69.01, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 103° F above ambient and was visibly already on fire.

199.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 49.81, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 253°F above ambient.

200.    This hotbox reading of 253° F above ambient resulted in an alarm message instructing the crew to slow and stop the train to inspect the hot axle.  The engineer applied the train's dynamic brake, but it was already too late.  This malfunctioning railcar axle is consistent with an overheated wheel bearing, which ultimately caused the train to derail and trigger the application of the emergency brakes as the train passed through East Palestine.

201.    Eleven of the derailed cars carried hazardous materials, and five of them contained vinyl chloride:

| Rail Car # | Hazardous Materials | Amount |
|---|---|---|
| TILX 402025 | Vinyl Chloride | 178,300 pounds |

28

| | | |
|---|---|---|
| OCPX 80235 | Vinyl Chloride | 177,250 pounds |
| OCPX 80179 | Vinyl Chloride | 177,600 pounds |
| GATX 95098 | Vinyl Chloride | 178,150 pounds |
| OCPX 80370 | Vinyl Chloride | 176,100 pounds |
| SHPX 211226 | Ethylene Glycol Monobutyl Ether | 185,750 pounds |
| DOWX 73168 | Ethylhexyl Acrylate | 205,900 pounds |
| UTLX 205907 | Butyl Acrylate | 180,000 pounds |
| NATX 35844 | Isobutylene | 155,642 pounds |
| DPRX 259013 | Benzene | Residue |
| DPRX 258671 | Benzene | Residue |

202.    All told, the derailed cars of Train 32N were carrying over 1,600,000 pounds of toxic and hazardous chemicals.

203.    During and after the derailment, the hazardous chemicals, including, but not limited to vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate, and isobutylene ignited, and the resulting fire continued to burn with increasing intensity from February 3-6, 2023.



204.    On Friday, February 3, 2023, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled south of Beaver Falls, Pennsylvania.

205.    The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow, and is consistent with the smoke plume being blown to the south and east, traveling at least as far as Bridgewater, Pennsylvania at that time.





206.    Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from their exterior labels.



207.    As part of the initial response and subsequent investigation, NSC and NSRC produced the below photograph showing the derailed rail cars and describing their contents:



208.    Given the ongoing release of toxic and hazardous chemicals from the derailment, at approximately 11:00 p.m. on February 3, 2023, officials issued a shelter-in-place order for the entire town of East Palestine.

209.    On February 4, "[r]esponding crews discovered contaminated runoff on two surface water streams:  Sulphur Run and Leslie Run."[11]  It was also noted that the runoff "impacted aquatic life" and officials with the Ohio Department of Natural Resources has since reported that wildlife officials located approximately 3,500 dead fish in Leslie Run, Bull Creek, and the North Fork of Little Beaver Creek.

210.    As first responders battled the blaze fromFebrua1y 3 to 5, 2023, one railcar carrying vinyl chloride became a focus of concern when its emergency safety valves malfunctioned, and pressure started building to unsafe levels within the railcar's steel shell.

211.    On Sunday, February 5, first responders and others learned of "a drastic temperature

[11]https://response.epa,.gov/site/site_profile.aspx?site_id=l 5933.

change in a rail car, and there [was] the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile." Local officials and Ohio Governor Mike DeWine issued an evacuation order on the evening of February 5 for anyone living within a mile of the derailment site:



212.    These concerns were amplified when, on Monday, February 6, 2023, a drastic temperature change took place within the railcar with the malfunctioning safety valves, increasing the potential of a catastrophic tanker failure and explosion, and causing local officials to expand the evacuation area based on "new modeling information."

213.    Upon information and belief, NSC and NSRC reported to federal, state, and local officials that the only way to avoid a catastrophic tanker failure and explosion was to conduct a "controlled release" of the vinyl chloride in the compromised tanker.

214.    This "controlled release" called for NSC, NSRC and/or its contractors to detonate explosive charges on the compromised vinyl chloride tanker, so as to dump the vinyl chloride out of the tanker and into a trench where it would be lit on fire.

215.    Although the concern related to only one of the vinyl chloride cars, at 4:30 p.m. on Monday, February 6, 2023, NSC, NSRC and/or its contractors intentionally blew holes in, not just the one

33

tanker car of concern, but all five derailed rail cars containing vinyl chloride.

216.    This "controlled release" was anything but controlled.  Once the charges were detonated

on the five vinyl chloride cars, there was a large, fiery explosion that released a large plume of thick black

smoke forming a mushroom cloud over the entire area.



217.    This toxic mushroom cloud was caused by a temperature and weather inversion over the

Derailment Site, which allowed the explosion to disperse dozens of toxic chemicals and combustion by-

products, including hydrogen chloride and phosgene gas, for miles.

218.    More specifically, the smoke and particulate plume from the "controlled release" was

trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet. In other

words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable

to continue to rise vertically, so it began to spread out horizontally in a thick cloud cover.





219.    Upon information and belief, the smoke and particulate plume from the "controlled release" eventually traveled a total of 30 miles in each direction from the Derailment Site, contaminating the air, surfaces, soil, and water of Plaintiffs.

220.    On March 22, 2023, the Chair of the National Transportation Safety Board ("NTSB") characterized the derailment as "100% preventable" in her testimony before the U.S. Senate Environment and Public Works Committee.

### *Hazardous Chemicals Released*

221.    The following are the hazardous chemicals and combustion products detected in air, water, soil, and sediment samples taken within a 30-mile radius of the Derailment Site following the

"controlled release," along with the health and environmental effects associated with each. These chemicals are harmful to humans, as well as livestock, plants and crops. These chemicals may cause a direct effect on livestock, plants and crops, as well as an indirect effect on the food supply.

## 1.    Vinyl Chloride

222.    Vinyl chloride monomer ("vinyl chloride") is classified by the Environmental Protection Agency ("EPA") as a Group A human carcinogen—the most dangerous to human health.

223.    Vinyl chloride exposure can affect the cardiovascular, respiratory, and central nervous systems, and can cause death, difficulty breathing, lung irritation, chest pains, coughing, dizziness, headaches, eye irritation, and loss of consciousness.

224.    Vinyl chloride is a toxic chemical that is unstable and prone to explode if not maintained and handled with proper methods and conditions.

225.    Vinyl chloride is specified under the Hazardous Materials Transportation Act ("HMTA") as a hazard class 2.1, flammable gas.

226.    Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects such as dizziness, drowsiness, disorientation, tingling, numbness or burning sensation of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, or even death.

227.    Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression.

228.    Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

229.    According to the NTSB:

> Vinyl chloride [CAS # 75-01-4] is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride (PVC). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration (OSHA) regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph (c) of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater

than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. **Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl chloride's presence. The odor threshold is too high to provide adequate warning for hazardous concentrations**.

230.    Just one pound of vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm.

231.    Upon information and belief, the train derailment and resulting toxic chemical explosion released approximately **1,000,000 pounds** of vinyl chloride throughout the area surrounding the Derailment Site.

## 2.    Dioxins

232.    Dioxin is a term used to identify several chemical compounds.

233.    These compounds can be placed into three closely related families: polychlorinated dibenzo-*p*-dioxins ("CDD"), polychlorinated debenzofurans ("CDF") and polychlorinated biphenyls ("PCB"). Compounds within all three of these families are highly toxic and have varying toxicity levels.

234.    Each different form of Dioxin is called a "congener."

235.    There are many dioxins and "dioxin-like" congeners: 75 different CDDs, 135 different CDFs and 209 different PCBs.

236.    Dioxins are called persistent organic pollutants ("POP"), meaning they take a long time to break down once they are in the environment.

237.    Dioxins are dangerous and deadly. The EPA and other entities, such as the World Health Organization, began assessing the potential human health risks associated with dioxins as early as the 1970s after animal studies showed one dioxin, TCDD, to be the most potent cancer- causing chemical studied to date.

238.    Exposure to dioxins are known in the scientific and medical communities to cause cancer, liver damage, hormone changes, reproductive damage, miscarriages, birth defects, and decrease the ability to fight infection. Birth defects from dioxins have included skeleton and kidney defects, lowered immune responses, and effects on the development of the brain and the nervous system.

37

239.    Dioxins are one of the strongest carcinogens known, causing many kinds of cancers.

240.    Dioxin exposure, even in single doses and at very low concentrations, seriously disrupts normal reproduction in humans and other animals. It lowers fertility, increases prenatal mortality, causes birth defects, and increases the risk of endometriosis.

241.    Dioxins interfere with the production and function of many different hormones, growth factors, and enzymes. Their effects can be long term, and their toxicity is much more severe and consistent in children than it is in adults.

242.    Dioxins are particularly toxic to children. Dioxins adversely affect the developing immune, reproductive, nervous, and lymph systems. They cause cleft palate, hemorrhage and edema, impair hearing, and retard growth.

243.    The adverse effects of Dioxin exposure to human health are varied and include:

a.      **Cancer:** lung, stomach, soft tissue, and liver;

b.      **Male Reproductive Toxicity:** reduced sperm count, testicular atrophy, abnormal testis structure, reduced testis size, lower male hormone levels, and feminization of hormonal and behavioral responses;

c.      **Female Reproductive Toxicity:** hormonal changes, decreased fertility, inability to maintain pregnancy, ovarian dysfunction, and endometriosis;

d.      **Developmental Toxicity:** birth defects, alterations in reproductive system, decreased sperm count, altered mating behavior, structural abnormalities in female genitalia, reduced fertility, delayed puberty, and neurological problems;

e.      **Immune Suppression:** increased susceptibility to infectious disease;

f.      **Hormonal Changes:** altered sex hormones, altered thyroid hormones, and altered digestive hormones;

g.      **Metabolic Changes:** altered glucose response, decreased insulin levels, altered fat metabolism, weight loss, wasting syndrome, fetal death, and diabetes;

h.      **Damage to the central and peripheral nervous systems:** impaired neurological development and subsequent cognitive deficits;

38

    i.    **Organ Damage:** liver, thymus, spleen, bone marrow, lungs, and heart - leading to arrhythmias; and

    j.    **Skin Disorders:** chloracne, hyperpigmentation, and hirsutism.

### 3.    Ethylene Glycol Monobutyl Ether

244.    Harmful exposure to ethylene glycol monobutyl ether occurs through ingestion or dermal contact.

245.    Inhaling ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain.

246.    Exposure can cause headaches, dizziness, lightheadedness, and passing out, and it may damage the liver and kidneys.

### 4.    Isobutylene

247.    Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat, frostbite (from dermal contact), headaches, dizziness, lightheadedness, and fatigue.

248.    Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer, reproductive harm, and other long term health effects.

### 5.    Benzene

249.    Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research on Cancer (IARC), and the EPA.

250.    Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness.

251.    Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death.

252.    The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects to bone marrow and can cause a decrease in red blood cells leading to anemia. Benzene exposure can also cause leukemia and lymphoma in humans.

253.    Benzene can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. Benzene may affect menstruation and decrease the size of ovaries in women

following many months of exposure to high levels.

### 6.      Butyl Acrylate

254.    Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy.

255.    Exposure to butyl acrylate can cause headaches, dizziness, nausea, and vomiting.

256.    Repeated exposure can lead to permanent lung damage.

### 7.      Ethylhexyl acrylate

257.    Ethylhexyl acrylate is a flammable, clear, colorless liquid used in the production of paints and plastics.

258.    Exposure can cause drowsiness, convulsions, and irritation of the eyes and skin.

### 8.      Diethylene glycol

259.    Diethylene glycol is a clear, colorless, and near odorless liquid used to make various industrial products.

260.    Exposure can cause gastrointestinal symptoms, renal failure, and neurological issues.

### 9.      Hydrogen sulfide

261.    Hydrogen sulfide is a colorless gas with a strong odor of rotten eggs used in industrial settings including textile factories.

262.    Exposure can cause irritation to the eyes and respiratory system, apnea, coma, convulsions, dizziness, headache, weakness, irritability, insomnia, and upset stomach.

### 10.     Hydrogen cyanide

263.    Hydrogen cyanide is a colorless or pale-blue liquid or gas with a bitter, almond-like odor used in fumigation, electroplating, mining, and chemical synthesis.

264.    Hydrogen cyanide interferes with the human body's use of oxygen and can negatively impact the brain, heart, blood vessels, and lungs.

### 11.     Phosgene

265.    Phosgene was used as a chemical warfare agent during World War I and is banned by the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases,

and of Bacteriological Methods of Warfare.

266.    Exposure to phosgene in the air can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or (less likely) ingestion.

267.    Higher levels of phosgene can cause lungs to swell, making it difficult to breathe.

268.    Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

### 12.    Hydrogen Chloride

269.    Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation.

270.    Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation.

271.    Following exposure, people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances.

272.    Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin.

273.    Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach.

## COUNT I(A)

## NEGLIGENCE AND NEGLIGENCE PER SE

### (On Behalf of All Plaintiffs Against the Railroad Defendants)

274.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

275.    The derailment, fire, uncontrolled release of toxic chemicals, and explosion of toxic

41

chemicals was caused by the negligence, carelessness and/or recklessness of the Defendants.

276.    Upon information and belief, Plaintiffs aver that the derailment, fire, release, and explosion of toxic chemicals was caused by the joint negligence, carelessness and/or recklessness of the Defendants, and is the fault of the Defendants as set forth above.

277.    In addition, and in the alternative, the derailment, fire, release, and explosion of toxic chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants.  Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

278.    Defendants owed Plaintiffs a duty to use reasonable care in the transportation of hazardous materials through East Palestine, Ohio. Consistent with federal regulations and industry practices and procedures, these duties include, but are not limited to, the duty to:

a.    Properly inspect their trains and railcars;

b.    Not place in service or continue in service a car with an overheated roller bearing;

c.    Not accept or transport any shipment of hazardous material that has pressure relief devices made of materials that are incompatible with the lading;

d.    To maintain vigilant lookout during the operation of its trains and railcars;

e.    To remedy defects in equipment and remove all cars that are unsafe to run;

f.    To immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires have spread beyond the roller bearing;

g.    To properly calibrate, maintain, test, and operate train braking systems;

h.    To properly develop and implement risk reduction programs;

i.    To properly develop and implement risk-based hazard management programs;

j.    To properly develop and implement safety performance evaluation processes;

k.    Operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l.      Utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; appropriately place such detectors to ensure timely alerting of any potential problems; implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and ensuring that such detectors are timely and properly inspected and maintained;

m.     Ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.      Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.      Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.      Prevent over-loading the train with too many railcars or materials;

q.      Load the railcars consistent with accepted practice;

r.      Load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.      Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.      Hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.      Train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.      Properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning

43

the operation of Train 32N on February 3, 2023;

w.     Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.     Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.     Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.     Adequately warn those in danger of imminent exposure to hazardous chemicals;

aa.     Institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.     Institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.     Institute proper procedures to avoid exposing hazardous materials to the environment;

dd.     Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.     Timely implement such an emergency response plan;

ff.     Transport and handle hazardous materials in a manner which would not cause Plaintiffs harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

gg.     Properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including avoiding the use of techniques that would further expose Plaintiffs, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.     Evacuate an appropriate geographical area to avoid exposing persons nearby to

hazardous materials and causing injury;

ii.     Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.     Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.     Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

ll.     Contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons.

279.    However, inconsistent with federal regulations and industry practice and procedures, Defendants negligently, carelessly and/or recklessly breached their duties to Plaintiffs by, among other things:

a.      Failing to properly inspect their trains and railcars;

b.      Placing in service or continuing in service a car with an overheated roller bearing;

c.      Accepting and transporting shipments of hazardous material that had pressure relief devices made of materials that were incompatible with the lading;

d.      Failing to maintain vigilant lookout during the operation of its trains and railcars;

e.      Failing to remedy defects in equipment and remove all cars that were unsafe to run;

f.      Failing to immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires had spread beyond the roller bearing;

g.      Failing to properly calibrate, maintain, test, and operate train brake systems;

h.      Failing to properly develop and implement risk reduction programs;

i.      Failing to properly develop and implement risk-based hazard management programs;

j.      Failing to properly develop and implement safety performance evaluation processes;

k.      Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l.      Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

m.      Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.      Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.      Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.      Failing to prevent over-loading the train with too many railcars or materials;

q.      Failing to load the railcars consistent with accepted practice;

r.      Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.      Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.      Failing to adequately hire, train, manage, oversee, and supervise their agents,

46

servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.    Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.    Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

w.    Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.    Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.    Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.    Failing to adequately warn those in danger of exposure to hazardous chemicals;

aa.   Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.   Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.   Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

dd.   Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.    Failing to timely implement such an emergency response plan;

ff.    Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct.

gg.    Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiffs, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.    Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

ii.    Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.    Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.    Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

ll.    Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property;

mm.    Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and other combustible liquids; and

48

nn.     Otherwise unreasonably causing injury to Plaintiffs in ways further investigation and
discovery will reveal.

280.    Defendants owed and breached a duty of reasonable care commensurate with the risk of
transporting hazardous materials, including vinyl chloride, butyl acetate, benzene residue, and
combustible or hazardous liquids by railcar.

281.    Defendants owed and breached a duty of reasonable care commensurate with the release
and burning of those hazardous materials, including the resultant release of phosgene and hydrogen
chloride.

282.    Given the likelihood of contamination of neighboring areas and exposure to their
residents, Defendants had a duty to investigate the extent to which the controlled release and burn of
hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as
alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, were
contaminating property at levels that would materially increase nearby residents' likelihood and risk of
developing cancer and other diseases.

283.    The damages to Plaintiffs were also caused by or aggravated by the fact that Defendants
failed to take necessary actions following the derailment to mitigate the danger and harm associated with
their operations.

284.    Additionally, the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq., and its
accompanying regulations are implemented to promote safety in every area of railroad operations and
reduce railroad-related accidents and incidents. 49 U.S.C. § 20101.  The derailment that forms the basis of
this lawsuit is currently under investigation by the National Transportation Safety Board ("NTSB").
Plaintiffs are currently unadvised of the full extent of the federal or state safety laws and regulations that
Defendants or their agents may have violated but reserve the right to rely on such safety laws and
regulations shown during discovery.  However, upon information and belief, Defendants' conduct
violated one or more regulations, including but not limited to the following:

a.      49 CFR Part 215, including but not limited to 49 CFR § 215.9, 49 CFR § 215.13,
49 CFR § 215.15, 49 CFR § 215.115, Appendix B of CFR Part 215, and Appendix D

of 49 CFR Part 215.

b.   49 CFR Part 229, including but not limited to 49 CFR § 229.7, and 49 CFR § 229.29.

c.   49 CFR Part 232, including but not limited to 49 CFR § 232.103 and 49 CFR § 232.109.

d.   49 CFR Part 271, including but not limited to 49 CFR § 271.101, 49 CFR § 271.103, 49 CFR § 271.211, and 49 CFR § 271.213.

e.   49 CFR Part 174, including but not limited to 49 CFR § 174.3.

f.   49 CFR Part 179, including but not limited to 49 CFR § 179.15.

285.   Defendants' violation of such safety laws and regulations constitutes negligence *per se*.

286.   Additionally, the FRSA authorizes railroads such as Defendants to adopt and enforce "additional or more stringent requirements not inconsistent with" the regulations. Upon information and belief, Defendants did in fact adopt a comprehensive set of operating rules which apply to their operations, and Defendants violated their own Operating Rule 140 regarding train inspections.

287.   As a direct and proximate result of Defendants' negligent use, emission, discharge, disposal, distribution and release of hazardous materials throughout a 30-mile radius surrounding the derailment site, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

288.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

289.   Plaintiffs' damages include the need for remediation and continued, periodic testing of

50

their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

290.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT I(B)**

**NEGLIGENCE**

**(On Behalf of All Plaintiffs Against General American Marks Company and GATX)**

291.    As railcar owners, General American Marks Company and GATX are responsible for inspecting, maintaining, and delivering a railcar for service in a safe condition.

292.    As railcar owners responsible for the maintenance of Car 23, General American Marks Company and GATX Corporation, were responsible for ensuring that Car 23 moved at least one car length every six months.

293.    However, upon information and belief, GATX and General American Marks Company breached their duty to exercise reasonable care, and were thereby negligent, in one or more of the following respects:

    a.      By allowing Car 23 to be used in rail service with a defective wheel bearing;

    b.      By allowing Car 23 to be used in rail service without properly inspecting the wheel bearing;

    c.      By allowing Car 23 to be used in rail service without properly maintaining the wheel bearing; and

    d.      By allowing Car 23 to be stationary for long periods of time, in excess of six months, without inspecting, maintaining or replacing the wheel bearing.

294.    As a direct and proximate result of one or more of the aforesaid negligent acts of General American Marks Company and GATX, in combination with the acts and omissions of the Railroad

51

Defendants as set forth herein, the wheel bearing on Car 23 overheated and failed, causing multiple other railcars to derail, which proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

295.    As a direct and proximate result of Defendants General American Marks Company and GATX's negligence, in combination with the acts and omissions of the Railroad Defendants as set forth herein, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

296.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

297.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to

volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

General American Marks Company and GATX's conduct as alleged herein shows that they acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT I(C)**

**NEGLIGENCE**

**(On Behalf of All Plaintiffs Against Oxy Vinyls, GATX, and TILC)**

298.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are approved for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

299.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are certified for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

300.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are constructed, repaired, replaced or maintained consistent with their approvals and certifications for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

301.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are compatible with the lading or goods to be transported within them under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

302.    Despite these requirements under federal regulations and applicable industry standards, Cars 26, 27, 28, 29 and 53 – all of which were owned, leased and/or used by Oxy Vinyls, GATX, and TILC – were either unapproved, uncertified or incompatible for use with vinyl chloride in at least the following respects, in violation of federal regulations:

    a.    Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction;

    b.    Car 27 was fitted with modifications that were not part of its approved certificate of construction;

    c.    Cars 27, 28 and 53 were each accompanied by defective and/or incomplete

certificates of construction;

d.   Cars 26, 27, 28 and 53 were each constructed with aluminum in their pressure relief devices ("PRD"), PRD protective housings, handwheels and angle handwheels; and

e.   Car 29 was fitted with an unapproved pressure relief device ("PRD") and was not specially approved for use with vinyl chloride.

303.   Oxy Vinyls, GATX and TILC's collective and individual failures to ensure these Cars were approved, certified and/or compatible with the use of vinyl chloride constitutes negligence and/or a breach of duties established in the federal regulations cited herein, as well as the obligation imposed by the American Association of Railroads rules and standards authorized by federal regulations, which, in combination with the acts and omissions of the Railroad Defendants as set forth herein, directly and proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

304.   As a direct and proximate result of Defendants Oxy Vinyls, GATX, and TILC's negligence, in combination with the acts and omissions of the Railroad Defendants as set forth herein, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

305.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

306.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as

54

alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

307.    Oxy Vinyls, GATX and TILC's conduct as alleged herein shows that they acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT II

## STRICT LIABILITY

### (On Behalf of All Plaintiffs Against the Railroad Defendants)

308.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

309.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

310.    The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

311.    The Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by transporting hazardous substances, including but not limited to vinyl chloride, through a residential community, making them strictly liable for any resulting damages.

312.    The Defendants also engaged in an abnormally dangerous and/or ultrahazardous activity when they dumped the vinyl chloride they were transporting and lit it on fire in a residential community, making them strictly liable for any resulting damages.

313.    As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

314.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

315.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

316.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs as described above.

317.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT III

## STATUTORY NUISANCE (OHIO)

**(On Behalf of the Ohio Residents and Property Owners Against the Railroad Defendants)**

318.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

319.    Ohio R.C. § 3704.05 states "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

320.    Ohio Admin. Code 3745-15-07(A) states "[t]he emission or escape into the open air for any source or sources whatsoever of … fumes, gases, vapors, or any other substance or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance.

It shall be unlawful for any person to cause, permit or maintain any such public nuisance."

321.    As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

322.    Ohio R.C. § 3746.06 requires that, when contaminated property is voluntarily cleaned up, the remedial activities undertaken must ensure the groundwater complies with standards for residential use.

323.    As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have been exposed to hazardous air pollutants in violation of Ohio law.

324.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their properties and bodies to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

325.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and have the present need for medical monitoring to ensure early detection of any such disease or illness.

326.    Plaintiffs' damages include the need for remediation and continued, periodic testing of

their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

327.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

328.    Plaintiffs suffered injuries that are distinct from the injuries suffered by the public at large.

329.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT IV

## STATUTORY NUISANCE (PENNSYLVANIA)

### (On Behalf of The Pennsylvania Residents, Property Owners, and Employees, Against the Railroad Defendants)

330.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

331.    Under the Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is impermissible to emit air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act.

332.    Section 112 of the Clean Air Act includes vinyl chloride in the list of hazardous air pollutants and sets a national emission standard. 41 Fed. Reg. 46560 (1976).

333.    35 P.S. § 4013 declares that any violation of the Air Pollution Control Act "shall constitute a public nuisance," and "[a]ny person who causes the public nuisance shall be liable for the cost of abatement."

334.    As a result of the derailment and subsequent fire and toxic chemical burn, Defendants

emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

335.   As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have been exposed to hazardous air pollutants in violation of Pennsylvania law.

336.   As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their properties and body to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

337.   As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

338.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

339.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the

contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

340.    Plaintiffs suffered injuries that are distinct from the injuries suffered by the public at large.

341.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT V

## PRIVATE NUISANCE

### (On Behalf of All Plaintiffs Against the Railroad Defendants)

342.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

343.    At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposal of these materials would cause injury to Plaintiffs and the and their property.

344.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the East Palestine derailment site.

345.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have released vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene onto Plaintiffs' land and have contaminated Plaintiffs' real property, water and persons.

346.    The Defendants' contamination of Plaintiffs' property with vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene has unreasonably interfered with the rights of Plaintiffs to use and

enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or water pets and livestock. This has, in turn, caused significant loss of income, out of pocket expenses, loss of use and enjoyment and inconvenience.

347.   Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

348.   Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

349.   Plaintiffs, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious, illegal, and wrongful conduct, including the pollution of their land and water.

350.   Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs to presently suffer, and continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

351.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

352.     Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

353.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT VI**

**PUBLIC NUISANCE**

**(On Behalf of All Plaintiffs Against the Railroad Defendants)**

354.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

355.     At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposing of these materials was hazardous and harmful to people living in nearby areas.

356.     Plaintiffs have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running and groundwater without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

357.     Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids substantially and unreasonably infringed upon and transgressed these public rights.

358.     As a proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs, and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

359.    As a proximate result of Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and contaminated the areas surrounding Plaintiffs' residences, thereby exposing them to toxic chemicals and carcinogens.

360.    Each of the Plaintiffs suffered injuries that are distinct from the public at large because their individual real and personal property rights have been unreasonably interfered with.

361.    As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

362.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

363.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

364.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT VII**

**TRESPASS**

63

**(On Behalf of The Residents and Property Owners Against the Railroad Defendants)**

365.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

366.    At all times relevant hereto, Defendants knew or should have known vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiffs and their property.

367.    Defendants, through their activities alleged herein, caused hazardous materials to enter and contaminate Plaintiffs' property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

368.    Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride and/or other combustible liquids to enter and contaminate Plaintiffs' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' land and water.

369.    At all relevant times Defendants were aware that their conduct in disposing of vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride, and other combustible liquids was contrary to Plaintiffs' rights in their property.

370.    At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' rights to their property.

371.    Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful person or business.

372.    The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with hazardous materials has interfered with the

64

rights of Plaintiffs to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

373.    Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

374.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

375.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

376.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VIII

## TRESPASS TO CHATTELS

### (On Behalf of The Residents and Property Owners Against the Railroad Defendants)

377.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

378.    At all relevant times, Plaintiffs had a possessory interest in all their personal property, including but not limited to personal vehicles, commercial vehicles, household goods, food, professional

equipment, recreational equipment, livestock, and pets.

379. Defendants, through their activities alleged herein, caused the impairment of Plaintiffs' property as to its condition, quality, or value and harmed Plaintiffs' materially valuable interest in the same.

380. Defendants, through their activities alleged herein, deprived Plaintiffs of the possession or use of their chattel for a substantial time.

381. Defendants, through their activities alleged herein, caused harm to property in which Plaintiffs had or have a legally protected interest.

382. At all relevant times Defendants were aware that their conduct in transporting, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene was contrary to Plaintiffs' legally protected interest in their personal property.

383. The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' personal property substantially impaired Plaintiffs' legally protected interest in their property as well as economic and property damages as alleged herein.

384. Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their personal property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs so choose.

385. Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs personal property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience. These damages include, but are not limited to, the contamination and/or death of livestock and pets, and the contamination of personal vehicles, commercial vehicles, household goods, food, professional equipment, and recreational equipment.

386. Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested

to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

387.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

388.   Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT IX

## DESTRUCTION OF VINES, BUSHES, TREES, AND CROPS OHIO R.C. § 901.51

### (On Behalf of the Ohio Residents and Property Owners Against the Railroad Defendants)

389.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

390.   At all relevant times, Plaintiffs engaged in growing or standing vines, bushes, shrubs, saplings, trees, or crops on real property, owned, leased or otherwise occupied by Plaintiffs.

391.   Defendants, through their activities alleged herein, damaged Plaintiffs' vines, bushes, and/or trees by the entry and intrusion of hazardous materials to Plaintiffs' property and were without any applicable privilege or permission for such entry.

392.   At all relevant times, Defendants' conduct displayed indifference to and disregard for the Plaintiffs' rights to their land.

393.   At all relevant times, Defendants' conduct as alleged herein was done with a conscious disregard or indifference to the substantial and unjustifiable risk of harm to Plaintiffs' property by the entry and/or exposure to the hazardous materials.

394.   As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs presently suffer, and will continue to suffer in the future, damage to

vines, bushes, shrubs, saplings, trees, and/or crops standing or growing on the land, owned, leased or otherwise occupied by Plaintiffs.

395.    Plaintiffs' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

396.    In addition, Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

397.    Pursuant to O.R.C. § 901.51, Plaintiffs are entitled to treble damages for the injuries caused and alleged herein, as well as any other damages, including punitive damages.

398.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT X
## AGRICULTURAL CROP DESTRUCTION
### 42 Pa.C.S.A. § 8313
**(On Behalf of the Pennsylvania Residents and Property Owners Against the Railroad Defendants)**

399.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

400.    At all relevant times, Plaintiffs engaged in raising field crops, vegetables or fruit plants, or trees for scientific or commercial purposes, or for testing or research purposes in connection to a public or private research facility or university or governmental agency.

401.    Defendants, through their activities alleged herein, damaged Plaintiffs' field crops, vegetables or fruit plants, and/or trees and such damage was not the result of research or normal commercial activities.

402.    Plaintiffs' field crops, vegetables or fruit plants and/or trees were damaged when exposed to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' negligent, reckless, ultrahazardous, and willful and wanton conduct as alleged herein.

403.    Plaintiffs' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

404.    Pursuant to 42 Pa. C.S.A. §8313, Plaintiffs are entitled to all appropriate relief, including compensatory and punitive damages, reasonable investigative expenses, reasonable attorney fees, and other costs associated with the litigation.

405.    Plaintiffs shall be entitled to damages treble the market value of the field crops, vegetable or fruit plants or trees prior to damage, in addition to actual damages related to the production, research, testing, replacement and crop development costs directly related to the crop that has been damaged as part of the value of the crop, as well as damage to any records, data and data-gathering equipment or devices.

406.    In addition, Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

407.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT XI

## DESTRUCTION OF TIMBER, TREES, LOGS, POSTS, FRUITS, NUTS, GROWING PLANTS OR PRODUCTS OF SAID PLANTS

### W.Va. Code § 61-3-48a

**(On Behalf of the West Virginia Residents and Property Owners Against the Railroad**

**Defendants)**

408.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

409.     At all relevant times, Plaintiffs engaged in growing timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

410.     Defendants, through their activities alleged herein, damaged or caused damage to occur to Plaintiffs' timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

411.     At all relevant times, the Defendants did not have written permission for the forced entry onto land owned, leased, or otherwise occupied, by Plaintiffs where the damage occurred.

412.     Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all the damages to Plaintiffs, which were a direct and proximate result of the train derailment and release of hazardous substances and ensuing clean-up activities, resulting in the harm to Plaintiffs.

413.     Plaintiffs' injuries include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

414.     In addition, Plaintiffs' damages also include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

415.     Pursuant to W.Va. Code §61-3-48a, Plaintiffs are entitled to treble damages; an amount three times the value of the timber, trees, growing plants or products thereof, in addition to and distinct from any other penalties provide by law, including punitive damages.

416.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT XII INJURING ANIMALS Ohio R.C. § 959.02

### (On Behalf of the Ohio Residents and Property Owners Against the Railroad Defendants)

417.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

418.    Ohio Rev. Code § 959.02 prohibits anyone from "maliciously, or willfully, and without the consent of the owner" killing or injuring "a horse, mare, foal, filly, jack, mule, sheep, goat, cow, steer, bull, heifer, ass, ox, swine, dog, cat, or other domestic animal that is the property of another."

419.    Per Ohio Rev. Code § 2307.60(A)(1), "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action and attorney's fees [if authorized] and may recover punitive or exemplary damages [if authorized]."

420.    As a direct and proximate result of Defendants' conduct and activities as alleged herein, Plaintiffs' animals have been injured and will continue to suffer injury in the future.

421.    Accordingly, Plaintiffs presently suffer, and will continue suffering in the future, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, and inconvenience.

422.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

423.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

424.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded

71

Plaintiffs' rights so as to warrant the imposition of punitive or exemplary damages.

**COUNT XIII**

**MEDICAL MONITORING**

**(On Behalf of the Ohio Residents Against All Defendants)[12]**

425.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

426.    Plaintiffs have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

427.    The hazardous materials carried by the train and released by Defendants are highly toxic substances.

428.    As a proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

429.    This increased risk would warrant a reasonable physician to order monitoring.

430.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs because such diagnoses will help them monitor and minimize the harm therefrom.

431.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs'

_____

[12]Plaintiffs acknowledge that under Ohio law, medical monitoring might not be recognized as a stand-along cause of action. Accordingly, Plaintiffs allege it here as both a cause of action and an element of damages available under other applicable causes of action.

exposures to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

432.     As a direct and proximate result of Plaintiffs' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

433.     As a result, Plaintiffs should be awarded the quantifiable costs of such a monitoring regime.

## COUNT XIV

## MEDICAL MONITORING

### (On Behalf of the Pennsylvania Residents Against All Defendants)

434.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

435.     Plaintiffs have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

436.     The hazardous materials carried by the train and released by Defendants are highly toxic substances.

437.     Plaintiffs were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

438.     As a direct and proximate result of their exposure to these toxic substances, vinyl chloride,

butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro- osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

439.    This increased risk would warrant a reasonable physician to order monitoring.

440.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs because such diagnoses will help them monitor and minimize the harm therefrom.

441.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' exposures to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

442.    As a direct and proximate result of Plaintiffs' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

443.    As a result, Plaintiffs should be awarded the quantifiable costs of such a monitoring regime.

## COUNT XV

## MEDICAL MONITORING

### (On Behalf of the West Virginia Residents Against All Defendants)

444.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

445.    Plaintiffs have been exposed to significant amounts of vinyl chloride, butyl acrylate,

benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

446.    The hazardous materials carried by the train and released by Defendants are highly toxic substances.

447.    Plaintiffs were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

448.    As a direct and proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably  necessary.

449.    This increased risk would warrant a reasonable physician to order monitoring.

450.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs because such diagnoses will help them monitor and minimize the harm therefrom.

451.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' exposure to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

452.    As a direct and proximate result of Plaintiffs' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary,

because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

453.    As a result, Plaintiffs should be awarded the quantifiable costs of such a monitoring regime.

## COUNT XVI

## SPOLIATION

### (On Behalf of All Plaintiffs Against the Railroad Defendants)

454.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

455.    Under the common law of Ohio as well as the Federal Rules of Civil Procedure, the Defendants were required to preserve any and all evidence relating to the train derailment and subsequent toxic explosion once they reasonably anticipated that litigation would ensue.

456.    Under the common law of Ohio, as well as the Federal Rules of Civil Procedure, this duty to preserve evidence not only required the Defendants to refrain from affirmatively destroying physical evidence, documents, and other materials, but also required the Defendants to suspend any automatic processes that would result in the same.

457.    The Defendants reasonably anticipated, or should have reasonably anticipated, litigation concerning the train derailment and subsequent toxic explosion as of February 3, 2023, immediately after Train 32N derailed.

458.    However, despite reasonably anticipating litigation, the Defendants did not act timely or reasonably to suspend automatic processes that would result in the destruction of case- critical evidence.

459.    Specifically, according to the NTSB, the Defendants failed to suspend the processes whereby the full surveillance video from the cab of Train 32N would be preserved, instead placing Train 32N back into service such that automatic processes in the video recording system deleted and recorded over this case-critical evidence.[13]

_____

[13]Rowland, Darrel, "Most of Norfolk Southern video leading up to East Palestine derailment is gone" March 26,

460.    According to the NTSB, the full surveillance video from the cab of Train 32N is "just as important" as those limited portions the Defendants selected to preserve before allowing the rest of the surveillance footage to be automatically deleted and overwritten.[14]

461.    Indeed, the NTSB explained that because the Defendants allowed the full surveillance video from the cab of Train 32N to be deleted, "we don't even have what was occurring around the first and second wayside (defect) detectors, much less before that, **all of which is key to investigations**."[15]

462.    As a result of the destruction of this video surveillance footage from the cab of Train 32N – and other acts or omissions which may be revealed throughout the course of investigation and discovery – Defendants have willfully destroyed or interfered with evidence that disrupts Plaintiffs' ability to prosecute their claims.

463.    Accordingly, Plaintiffs should be awarded damages commensurate with Defendants' spoliation of evidence in an amount to be determined at trial, together with any other appropriate remedies.

## COUNT XVII

## GROSS NEGLIGENCE/WILLFUL AND WANTON CONDUCT

### (On Behalf of All Plaintiffs Against All Defendants)

464.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

465.    At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs.

466.    Upon information and belief, Defendants were, at all times relevant, aware that vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride are highly carcinogenic, mutagenic and/or otherwise harmful to humans.

467.    Upon information and belief, Defendants were, at all times relevant, aware of the

---

2023 (last accessed March 27, 2023).
[14]*Id.*
[15]*Id.*

considerable health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various diseases and cancers in the surrounding population.

468.    Upon information and belief, Defendants were, at all times relevant, aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

469.    Upon information and belief, Defendants were, at all times relevant, aware that at least one railcar was malfunctioning for at least 20 miles before the derailment occurred.

470.    Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties by, among other things:

a.      Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

b.      Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

c.      Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

d.      Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

e.     Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

f.     Failing to prevent over-loading the train with too many railcars or materials;

g.     Failing to load the railcars consistent with accepted practice;

h.     Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

i.     Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

j.     Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

k.     Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

l.     Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

m.     Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

n.     Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

o.     Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

p.     Failing to adequately warn those in danger of exposure to hazardous chemicals;

q.      Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

r.      Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

s.      Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

t.      Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

u.      Failing to timely implement such an emergency response plan;

v.      Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

w.      Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

x.      Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.      Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

z.      Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

aa.     Accurately make known the risk of exposure faced by those persons at risk of

exposure, including those outside the evacuation zone;

bb.  Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons in order to avoid injury to;

cc.  Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene; and

dd.  Otherwise unreasonably causing injury to Plaintiffs in ways further investigation and discovery will reveal.

ee.  With respect to Defendants General American Marks Company and GATX, by allowing Car 23 to be used in rail service with a defective wheel bearing; by allowing Car 23 to be used in rail service without properly inspecting the wheel bearing; by allowing Car 23 to be used in rail service without properly maintaining the wheel bearing, and by allowing Car 23 to be stationary for long periods of time, in excess of six months, without inspecting, maintaining, or replacing the wheel bearings.

ff.  With respect to Defendants Oxy Vinyls, GATX, and TILC, by using or allowing to be used Cars 26, 27, 28, 29, and 53 for the transportation of vinyl chloride in violation of federal regulations as follows:  (1) Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction; (2) Car 27 was fitted with modifications that were not part of its approved certificate of construction; (3) Cars 27, 28 and 53 were each accompanied by defective and/or incomplete certificates of construction;  (4) Cars 26, 27, 28 and 53 were each constructed with aluminum in their pressure relief devices ("PRD"), PRD protective housings, handwheels and angle handwheels; and (5) Car 29 was fitted with an

81

unapproved pressure relief device ("PRD") and was not specially approved for use with vinyl chloride.

471.    Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute gross negligence, willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs so as to warrant the imposition of punitive or exemplary damages.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, including jointly and severally as warranted, as follows:

a.    For damages, including compensatory, punitive, and exemplary damages, in an amount determined just and reasonable;

b.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

c.    For prejudgment and post-judgment interest on all amounts awarded;

d.    For injunctive and declaratory relief, as allowed by law, including medical monitoring; and

e.    Such other and further relief as this Court may deem just and proper.

<u>**JURY TRIAL DEMAND**</u>

Plaintiffs demand a jury trial on all issues so triable.

Dated: March 8, 2024                                    Respectfully submitted,

                                                        */s/ Christopher M. Frasor*
                                                        Christopher M. Frasor, Esq.
                                                        **FRASOR IRELAND, LLP**
                                                        306 Industrial Parkway, Suite A
                                                        Bowling Green, Ohio 43402
                                                        Telephone: (419) 806-4026
                                                        cfrasor@frasorireland.com

                                                        */s/ Jeffrey L. Haberman*
                                                        Jeffrey L. Haberman, Esq. (*pro hac vice*)

82

**SCHLESINGER LAW OFFICES, P.A.**
1212 SE Third Avenue,
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
jhaberman@schlesingerlaw.com

*Attorneys for Plaintiffs*

JS 44 (Rev. 09/20)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
Almasy, Patricia; Aquino, Nina; Bankston, Raeann; et al.,

**(b)** County of Residence of First Listed Plaintiff  Columbiana County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
(See Attachment)

### DEFENDANTS
Norfolk Southern Corporation, et al.

County of Residence of First Listed Defendant  Fulton County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State  22 - OH | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State  17 - PA; 1 - WV | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332 - Diversity Jurisdiction
Brief description of cause:
Tort due to train derailment

### VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
Exceeds $75,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE  Hon. Benita Y. Pearson

DOCKET NUMBER  4:23-cv00242

DATE  03/08/2024

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**     Civil Categories: (Please check one category only ).

1. [✓]  General Civil
2. [ ]  Administrative Review/Social Security
3. [ ]  Habeas Corpus Death Penalty

*If under Title 28, §2255, name the SENTENCING JUDGE: _____

CASE NUMBER: _____

**II.**  **RELATED OR REFILED CASES** See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled.  Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

This action: [✓] is **RELATED** to another **PENDING** civil case [ ] is a **REFILED** case [ ] was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**  In accordance with Local Civil Rule  **3.8**, actions involving counties in the Eastern Division shall be filed at any of  the divisional offices therein.  Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER.  UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

(1)  **Resident defendant** If the defendant resides in a county within this district, please set forth the name of such county
**COUNTY:**
Corporation **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

(2)  **Non-Resident defendant.** If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.
**COUNTY:** Columbiana County, Ohio

(3)  **Other Cases**. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.
**COUNTY:**

**IV.**  The Counties in the Northern District of Ohio are divided into divisions as shown below.  After the county is determined in Section  III, please check the appropriate division.

**EASTERN DIVISION**

[ ]  **AKRON**  (Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)
[ ]  **CLEVELAND**  (Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake, Lorain, Medina and Richland)
[✓]  **YOUNGSTOWN**  (Counties: Columbiana, Mahoning and Trumbull)

**WESTERN DIVISION**

[ ]  **TOLEDO**  (Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry, Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca VanWert, Williams, Wood and Wyandot)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## ATTACHMENT TO CIVIL COVER SHEET
### *Patricia Almasy, et al.,*
*v.*
### *Norfolk Southern Corporation, et al.*

<u>Plaintiffs' Counsel:</u>

Christopher M. Frasor
FRASOR IRELAND, LLP
306 Industrial Parkway, Ste. A
Bowling Green, OH 43402
(419) 806-4026

Jeffrey L. Haberman
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Fort Lauderdale, FL 33316
(954) 467-8800

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Ohio

| | |
|---|---|
| Patricia Almasy, et al. | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No. |
| Norfolk Southern Corporation, Norfolk Southern Railway Company, Oxy Vinyls, LP, GATX Corporation, General American Marks Company, Trinity Industries Leasing Company | ) ) ) ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Norfolk Southern Corporation
650 W. Peachtree Street NW
Atlanta, GA 30308

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Christopher M. Frasor
FRASOR IRELAND, LLP
306 Industrial Parkway, Ste. A
Bowling Green, OH 43402

Jeffrey L. Haberman
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Fort Lauderdale, FL 33316

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Ohio

| | |
|---|---|
| Patricia Almasy, et al. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| | ) |
| Norfolk Southern Corporation, Norfolk Southern | ) |
| Railway Company, Oxy Vinyls, LP, GATX | ) |
| Corporation, General American Marks Company, | ) |
| Trinity Industries Leasing Company | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Norfolk Southern Railway Company
c/o Statutory Agent
Corporation Service Company
3366 Riverside Drive, Suite 103
Upper Arlington, OH 43221

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
Christopher M. Frasor                     Jeffrey L. Haberman
FRASOR IRELAND, LLP                   SCHLESINGER LAW OFFICES, P.A.
306 Industrial Parkway, Ste. A        1212 SE Third Avenue
Bowling Green, OH 43402               Fort Lauderdale, FL 33316

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____         _____
                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| Patricia Almasy, et al. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) |
| Norfolk Southern Corporation, Norfolk Southern | ) |
| Railway Company, Oxy Vinyls, LP, GATX | ) |
| Corporation, General American Marks Company, | ) |
| Trinity Industries Leasing Company | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Oxy Vinyls, LP
c/o CT Corporation System
4400 Easton Commons Way
Suite 125
Columbus, OH 43219

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Christopher M. Frasor                    Jeffrey L. Haberman
FRASOR IRELAND, LLP                    SCHLESINGER LAW OFFICES, P.A.
306 Industrial Parkway, Ste. A          1212 SE Third Avenue
Bowling Green, OH 43402                  Fort Lauderdale, FL 33316

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____        _____
                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | | |
|---|---|---|
| Patricia Almasy, et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No. |
| Norfolk Southern Corporation, Norfolk Southern Railway Company, Oxy Vinyls, LP, GATX Corporation, General American Marks Company, Trinity Industries Leasing Company | ) ) ) ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_ GATX Corporation
c/o The Prentice Hall Corporation System, Inc.
3366 Riverside Drive, Suite 103
Upper Arlington, OH 43221

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Christopher M. Frasor          Jeffrey L. Haberman
FRASOR IRELAND, LLP          SCHLESINGER LAW OFFICES, P.A.
306 Industrial Parkway, Ste. A     1212 SE Third Avenue
Bowling Green, OH 43402          Fort Lauderdale, FL 33316

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_SANDY OPACICH, CLERK OF COURT_

Date: _____                    _____
                                                                _Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Ohio

| | |
|---|---|
| Patricia Almasy, et al. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Norfolk Southern Corporation, Norfolk Southern | ) |
| Railway Company, Oxy Vinyls, LP, GATX | ) |
| Corporation, General American Marks Company, | ) |
| Trinity Industries Leasing Company | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  General American Marks Company
c/o Wilmington Trust Company
Rodney Square North
1100 N. Market Street
Wilmington, DE 19890

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Christopher M. Frasor          Jeffrey L. Haberman
FRASOR IRELAND, LLP            SCHLESINGER LAW OFFICES, P.A.
306 Industrial Parkway, Ste. A 1212 SE Third Avenue
Bowling Green, OH 43402        Fort Lauderdale, FL 33316

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____          _____
                                  *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Ohio

| | | |
|---|---|---|
| Patricia Almasy, et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| Norfolk Southern Corporation, Norfolk Southern | ) | |
| Railway Company, Oxy Vinyls, LP, GATX | ) | |
| Corporation, General American Marks Company, | ) | |
| Trinity Industries Leasing Company | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Trinity Industries Leasing Company
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Christopher M. Frasor          Jeffrey L. Haberman
FRASOR IRELAND, LLP             SCHLESINGER LAW OFFICES, P.A.
306 Industrial Parkway, Ste. A  1212 SE Third Avenue
Bowling Green, OH 43402         Fort Lauderdale, FL 33316

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____          _____
                                  *Signature of Clerk or Deputy Clerk*